# EXHIBIT 1



**U.S. Department of Justice**

Civil Rights Division

*Voting Section*
*950 Pennsylvania Ave, NW – 4CON*
*Washington, DC  20530*

July 14, 2025

<u>Via Mail and Email</u>

The Honorable Jared DeMarinis
State Administrator of Elections
Maryland State Board of Elections
P.O. Box 6486
Annapolis, MD 21401-0486
jared.demarinis@maryland.gov

Dear State Administrator DeMarinis:

We write to you as the chief election official for the State of Maryland to request information regarding the state's procedures for complying with the statewide voter registration list maintenance provisions of the National Voter Registration Act ("NVRA"), 52 U.S.C. § 20501 *et seq*.

Please provide a list of the election officials who are responsible for implementing Maryland's general program of voter registration list maintenance from November 2022 through receipt of this letter, including those responsible officials not employed by your office (such as local election officials) who are also involved in that effort. Please also provide a description of the steps that you have taken, and when those steps were taken, to ensure that the state's list maintenance program has been properly carried out in full compliance with the NVRA. Please include both the actions taken by Maryland officials as well as county officials.

The NVRA requires each state and the District of Columbia to make available for inspection "all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." 52 U.S.C. § 20507(i)(1). Section 11 of the NVRA authorizes the Attorney General to bring NVRA enforcement actions. *See* 52 U.S.C. § 20510.

Pursuant to Section 20507(i) of the NVRA, the Attorney General requests that you produce for inspection the following records:

1. The current electronic copy of Maryland's computerized statewide voter registration list ("statewide voter registration list") as required by Section 303(a) of the Help America Vote Act. Please include all fields contained within the list. Please produce each list in a .xls, .csv, or delimited-text file format.  Please specify what delimiter is used, if applicable, or provide a file layout along with a database user manual, coding list, or other materials that define or explain how a voter record is coded into the statewide voter

          registration list and reported in the electronic copy of the statewide voter
          registration list.

Additionally, please provide the following information in electronic form. The time period for these requests is close of registration for the November 2022 general election through the close of registration for the November 2024 general election, the same time period as the most recent report from the Election Assistance Commission's Election Administration and Voting Survey ("EAVS"). If you are unable to provide the data, please explain why the data is not available.

1. A review of the most recent EAVS report indicates that in response to Question A1b, there are nearly as many registered voters listed as active as the citizen voting age population in Maryland, with a registration rate in 2024 of 95.9 percent of the citizen voting age population.  Furthermore, the EAVS report indicates that the ratio of registered voters to citizen voting age population has been unusually high for several years, with Maryland reporting a registration rate of 93.9 percent of citizen voting age population in 2022 and 96 percent in 2020. Please explain what actions Maryland is taking to ensure that voters who should not be on the voter roll are being removed.

2. In the EAVS data for Question A3a, Maryland had 6,491,862 registration transactions processed, which is significantly more than Maryland's 4,231,112 active registered voters.  Please explain why the number of registration transactions was significantly higher than the number of active registered voters.  In Question A3b, there are 524,189 new valid registrations, which is less than the 613,352 new registrations listed on your website in the year end activity reports for 2023 and 2024 combined: Voter Registration Statistics. Please explain why there is a difference in those registration statistics.

3. In the EAVS data for Question A10a, Maryland sent 1,559,430 confirmation notices, which is 36.9 percent of all active registered voters and well above the national average of 19.5 percent.  Based on the responses to Question A11b, it appears that most of these notices were sent because voters may have moved.  Please explain why Maryland sent confirmation notices to so many registered voters.

4. In the EAVS data for Questions A10e and A10f, Maryland combined the responses and stated that 1,520,490 confirmation notices were unreturned, which is 97.5 percent of all notices sent. According to the most recent EAVS report, only 320,634 voters are inactive. Please explain the process for determining how a voter becomes an inactive voter.  Please explain why the number of inactive voters is so low relative to the number of confirmation notices not being returned.

5. In the EAVS data for Question A12b, 44,869 voters were removed because they had moved outside of the jurisdiction.  In the EAVS data for Question A12e, 123,312 voters were removed because they failed to respond to a sent confirmation notice and had not voted in the two most recent federal elections.  Together that means a maximum of 168,181 voters might have been removed for reasons related to confirmation notices. Please explain why the number of voters removed is so low relative to the number of unreturned confirmation notices.

6. In October 2023, the Office of Legislative Audits published a report regarding the State Board of Elections (SBE). State Board of Elections - 10-31-23  The Audit found that "SBE's match of voter records to State death records were not as comprehensive as necessary to identify certain potentially deceased voters." Audit at 11.  Because SBE only followed up on exact matches and information received by SBE from the Maryland Department of Health was not complete, the Audit identified potentially thousands of deceased individuals with active voter registration. *Id*.  Please explain if the process to remove deceased voters has changed since the issuance of that Audit, and if so, please describe the process.

7. The Audit also found that Local Boards of Elections (LBE) were not removing deceased voters promptly.  "For example, as of May 2022, one LBE had not removed a voter for 332 days after receiving notification of the voter's death." Audit at 12.  The Audit's finding was that the SBE failed to ensure that LBEs were correcting voter data.  Audit at 10.  The Audit also noted a similar finding and recommended corrective action in 2019 that was not implemented. Audit at 12.  Please explain if the process that the State Board uses to ensure that LBEs are promptly updating voter rolls has changed since the issuance of the most recent Audit, and if so, please describe the updated process and when the changes were implemented.

8. The Audit also found that the duplicate voter registrations were not being removed from the voter rolls.  The Audit identified potential duplicate voter registrations. *See* Audit at 11.  In the EAVS data for Question A3d, Maryland said that there were no duplicate registrations.  In the EAVS data for Question A12h, Maryland said it removed only 430 duplicate registrations, well below the national average.  Please explain the process for removing duplicate registrations and whether the State Board or the LBEs are responsible for removing those voters.  If the records were merged, please provide that information and explain that process. Please provide the number of registrations if they were merged.

Please provide a description of the steps that Maryland has taken, and when those steps were taken, to identify registered voters who are ineligible to vote as well as the procedures Maryland used to remove those ineligible voters from the registration list. Please identify the number of registered voters identified as ineligible to vote for the time period of the close of registration for the November 2022 general election through present for each of the following reasons:

1. Non-citizen

2. Adjudicated incompetent

3. Felony conviction

For each of those voters identified in categories 1-3 above, provide their registration information on the statewide voter registration list, including their vote history.

Please provide this information within 14 days of the date of this letter. The information and materials may be sent by encrypted email to voting.section@usdoj.gov or via the Department's secure file-sharing system, Justice Enterprise File Sharing (JEFS).

Should further clarification be required, please contact Maureen Riordan at maureen.riordan2@usdoj.gov. We look forward to your assistance in advance.

Sincerely,

_____

Michael E. Gates
Deputy Assistant Attorney General
Civil Rights Division


Maureen Riordan
Acting Chief, Voting Section
Civil Rights Division

# EXHIBIT 2



**Jared DeMarinis**
State Administrator

**Katherine Berry**
Deputy Administrator

**Michael Summers**, Chairman
**Jim Shalleck**, Vice Chairman
**Yaakov "Jake" Weissmann**
**Diane Butler**
**Victoria Jackson-Stanley**

July 30, 2025

Maureen Riordan
Acting Chief, Voting Section
Michael Gates
Deputy Assistant Attorney General, Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Ave. NW - 4CON
Washington, DC 20530
Sent by email to voting.section@usdoj.gov

Dear Chief Riordan and Deputy Assistant Attorney General Gates,

I write in response to your letter dated July 14, 2025. Pursuant to applicable state law governing access to public records, please find the State Board of Elections' (SBE) response.

Preliminarily, the letter requests information regarding list maintenance carried out by state and county election officials. Under Maryland law, the State Administrator, local boards, and election directors each perform voter registration list maintenance duties. Under Maryland Code, Election Law Article § 3-501, election directors in Maryland's counties and in Baltimore City have authority to remove voters from the registration list upon their request and upon learning of their loss of eligibility. Election Law § 3-502(b)-(c) charges the appropriate election official with sending a confirmation notice upon learning that a voter may have moved, while § 3-502(d)-(e) give election directors responsibility for updating or removing records in accordance with the NVRA and State laws. Section § 3-504 describes the following roles:

- The State Administrator secures records of deaths, convictions, and name changes from State and federal agencies;
- The local boards receive jurisdiction-specific cuts of this information, as well as obituaries and reports of destruction of residences within their jurisdictions; and
- Election directors send confirmation notices and remove voters from the registration list when statutorily-required conditions are met.

Additionally, Chapters 6 and 7 of Title 33, Subtitle 5 of the Code of Maryland Regulations (COMAR) elaborate on responsibilities of the State Board and State Administrator, and local boards and election directors, in the voter registration list maintenance program. Provisions include, for example, that under COMAR § 33.05.06.06, the State Board receives reports from the jury commissioner; the State Administrator delivers county-specific information to local boards; and election directors communicate with voters and update or cancel their registration records. Under COMAR § 33.05.07.01(B), election directors mail nonforwardable specimen ballots to all registered voters in their jurisdictions as part of the State's process to identify individuals who may have become ineligible by reason of a change of address. COMAR § 33.05.07.04 requires election directors to act as soon as reasonably possible to update records

FAX (410) 974- 2019
MD Relay Service (800) 735-2258

Toll Free Phone Number (800) 222-8683
https://elections.maryland.gov

151 West Street Suite 200
Annapolis, Maryland 21401

in the statewide voter registration list.

Maryland voter registration list maintenance procedures are dictated by state law, which derive from NVRA requirements. In general, the NVRA requires that:

- State programs make a reasonable effort to remove the names of ineligible voters by reason of death or change of residence, 52 USC § 20507(a)(4);
- State programs be uniform, nondiscriminatory, and not result in removal of registered voters solely by reason of failure to vote, 52 USC § 20507(b);
- States not remove a registrant on grounds of change of address unless they confirm, or fail to respond to a confirmation notice and do not vote in two general elections for Federal office after receiving a confirmation notice, 52 USC § 20507(d)(1); and
- State programs must be completed not later than 90 days before a primary or general election for Federal office, 52 USC § 20507(c)(2)(A).

Maryland procedures for voter registration list maintenance are set forth in the Election Law Article, Title 3, Subtitle 5, and COMAR Title 33, Subtitle 5, Chapters 6 and 7. Maryland's list maintenance processes are generally explained on the State Board of Elections Website: https://elections.maryland.gov/voter_registration/list_maintenance.html.

Furthermore, Maryland is a member of the Electronic Registration Information Center (ERIC) and follows the coalition's bylaws and the procedures set forth in its Membership Agreement, both of which may be reviewed and downloaded at the following URL: https://ericstates.org/wp-content/uploads/documents/ERIC-Bylaw-MA-FINAL.pdf. As summarized on the Voter Registration List Maintenance section of our website, "Each ERIC member shares their voter registration data along with data provided by each Department of Motor Vehicles. This allows the data to be matched with member states and against the Social Security Administration's death records and the National Change of Address (NCOA) program through the U.S. Postal Service. Maryland receives 5 reports from ERIC: in-state duplicate records, death notifications, in-state address changes, cross-state address changes and a report from NCOA regarding address updates." The State Administrator sends county-specific cuts of ERIC data to local boards and election directors to take appropriate action, in accordance with standard procedures.

Without exhaustion, we highlight here key provisions that guarantee compliance with NVRA requirements for voter registration list maintenance:

- Election Law Article § 3-502(c) requires election directors who receive notice of a move outside their jurisdiction to send a confirmation notice, and § 3-502(d) prohibits removal of a voter who receives this notice unless the voter confirms their move, or fails to respond and to vote in the two general elections following issuance of the confirmation notice.
- COMAR § 33.05.07.01(C) requires that confirmation mailings and subsequent actions to remove voters or place them in inactive status must be completed at least 90 days before an election.
- Election Law Article § 3-504(a)(1) requires the State Department of Health to report deaths to the State Administrator. Under § 3-504(a)(2) the State Administrator also must seek arrangements that provide access to Social Security Administration death

notices, while local boards are empowered to make arrangements to receive change of address information from approved sources under § 3-504(b)(4). When an election director receives a report of death from one of these sources or an obituary or other reliable report, the election director requests confirmation if appropriate, and cancels registration for deceased voters in accordance with provisions in § 3-504(c).

- COMAR § 33.05.06.05(A) further specifies that election directors cancel registration immediately upon receiving a report of a voter's death from a state vital statistics agency, and § 33.05.06.05(B) requires them to send a confirmation letter when a death report comes from another credible source.

- Election Law Article § 1-201 provides that the purposes of the State's election laws include fair and equitable treatment of all voters and assurance that all qualified persons may register.

With regard to the request to inspect the current voter registration list, this process is currently prescribed by Maryland law. Pursuant to Election Law § 3-506 and COMAR Title 33, Subtitle 3, Chapter 2, copies of publicly-available data in the statewide voter registration list are available upon completion of the process described at https://elections.maryland.gov/voter_registration/data.html. Please follow these instructions to obtain a copy of the portions of the statewide voter registration list that are subject to disclosure.

Insofar as the letter sent to SBE requests information regarding EAVS data, please see the EAC's publication Instructions for Completing the 2024 Election Administration and Voting Survey, OMB Control Number 3265-0006 (Expiration April 30, 2027), at page 6 for instructions that govern Maryland's reporting of transactions. In particular the instructions provide that the response should "[i]nclude any transactions that were processed, such as changes to name, political party, or address; duplicates; or pre-registrations...divide the total number of transactions received (A3a) into the categories listed in A3b through A3f...If a registration transaction involves a registered voter moving out of your jurisdiction to another jurisdiction (either within your state or to a different state), that is considered an update to an existing valid registration that is reported in A3e. If a voter who was previously registered in another jurisdiction in your state moves into your jurisdiction, that is considered a new valid registration that is reported in A3b." As indicated in the quoted language, EAVS data measures transactions, not registered voters.

We are currently reviewing the mailing figures you highlighted and our responses to the EAVS to determine if a reporting discrepancy occurred; that review is not complete in the timeframe you requested a response to the letter.

Designation of a registered voter as inactive is controlled by Election Law § 3-503. A person who fails to respond to a notice sent under § 3-502(c) becomes an inactive voter, and an inactive voter who submits a new registration application, absentee ballot application, certificate of candidacy, or affirmation of residence, or who signs a petition, is moved from inactive to active status.

Finally, the NVRA provides that, "A State shall not remove the name of a registrant from the official list of registered voters in elections for Federal office on the ground that the registrant has changed residence unless the registrant...(B)(i) has failed to respond to a notice described in paragraph (2); and (ii) has not voted or appeared to vote...in an election during the period beginning on the date of the notice and ending

on the day after the date of the second general election for Federal office that occurs after the date of the notice." 52 USC § 20507(d)(1). Our compliance with this provision means that failure to respond to a confirmation notice does not automatically correspond with or lead to cancellation of that individual's voter registration.

The requested information regarding the Office of Legislative Audits (OLA) and corrective measures, can generally be found in SBE's response to the audit findings. Please see Appendix B to the October 2023 audit cited, in which SBE responds to OLA's findings and describes procedures it will undertake in the future, stating in pertinent part: "SBE will make the following changes to its processing of MDH death records. SBE will implement changes to the matching process to include non-exact matches on first or last name due to hyphens or apostrophes. These will be sent to the LBEs for processing as normal. In addition, SBE will create a monthly list of all deceased residents who are not forwarded to LBEs for processing, because they do not match a voter in MDVOTERS." Outside of these changes, SBE concluded, based on the detailed explanation at pages 1-3 of Appendix B, that "current procedures are sufficient to identify deceased voters and cancel them."

As described in Appendix B to the October 2023 audit cited, in which SBE responds to OLA's findings and describes procedures it has undertaken and will undertake in the future, stating in pertinent part: "Each month, the LBEs perform peer reviews of changes made to critical data in MDVOTERS. Each LBE is assigned another LBE and using procedures and requirements set out by SBE, reviews certain transactions performed by that LBE. SBE randomly selects four of the peer reviews to audit monthly in a quality assurance review. If an LBE fails to follow the proper procedure in making changes to critical data in MDVOTERS, an exception is noted by SBE. SBE notifies the LBEs of exceptions discovered during the SBE quality assurance review and requires the LBE to submit a corrective action plan, with an estimated completion date. During the audit period, the LBEs reviewed 618,977 transactions using the peer review process. SBE audited 10,748 of these transactions and identified 738 exceptions. Of the 738 exceptions, 712 were corrected by the LBE using the process described above. There were 26 errors that were not corrected, which accounts for .0042% of all transactions, 0.24% of audited transactions, and 3.52% of all exceptions identified during the review process. That said, the process will be updated to ensure that 100% of identified exceptions are corrected. The data audit summary report will continue to be forwarded to the LBE Election Director and Deputy Director when complete. SBE will make corrections during the review and note the same in the summary report."

Neither Maryland nor federal law prescribes procedures for handling suspected duplicate registrations. Maryland receives information about potential duplicate records from ERIC, and pursuant to ERIC's Membership Agreement, the State Administrator ensures that election directors initiate contact with individuals whose registration records may be inaccurate or outdated within 90 days of receiving notice. Election directors are responsible for updating or removing voter registration records in accordance with the list maintenance laws we have described above. SBE's response to the OLA audit at pages 3-4 of Appendix B to the document also describes procedures for handling suspected duplicate registrations and concludes that with reasonable adjustments, OLA's review found at most a potential 0.00645% rate of duplicates among all active Maryland voter registration records. The duplicate registrations will be identified and merged using existing list maintenance practices at regular intervals.

The right to vote is a sacred right that has been expanded through sacrifices of many before us. It is a privilege and honor to work in this field empowering individuals to make their voices heard. The State Board works diligently to ensure that every eligible Marylander can register to vote in accordance with federal and State laws. And as referenced above, election officials in Maryland continue that diligent

work to maintain up to date voter rolls.

Improper cancellation leads to disenfranchisement of an eligible voter. That is why it is a detailed process. It must be certain. Maryland's process errs on the side of removing any doubt in the cancellation before potentially disenfranchising a voter. As the Maryland Declaration of Rights states "the right of the People to participate in the Legislature is the best security of liberty and the foundation of all free Government; . . . and every citizen having the qualifications prescribed by the Constitution, ought to have the right of suffrage."

Sincerely,

Jared DeMarinis
State Administrator of Elections

# EXHIBIT 3



**MARYLAND STATE**
BOARD OF ELECTIONS
Verified. Open. Trusted. Empowering.

**Jared DeMarinis**
State Administrator

**Katherine Berry**
Deputy Administrator

**Michael Summers**, Chairman
**Jim Shalleck**, Vice Chairman
**Yaakov "Jake" Weissmann**
**Diane Butler**
**Victoria Jackson-Stanley**

August 13, 2025

Michael E. Gates
Deputy Assistant Attorney General

Maureen Riordan
Acting Chief, Voting Section
Civil Rights Division
Department of Justice
950 Pennsylvania Avenue, NW – 4CON
Washington, DC 20530

Sent via email: voting.section@doj.gov

RE: Voter Registration List Request

Thank you for your request for Maryland's voter registration list.

Maryland law requires that the voter registration list not be used for "commercial solicitation" and, more importantly, may not be used for "any other purpose not related to the electoral process." Md. Code Ann., Elec. Law § 3-506(a)(1). Based upon the current request and similar requests made to other states, it is not clear what you intend to do with Maryland's voter registration list.

From your request, we understand the Department of Justice (Department) to be creating a system of records of Maryland voters, subject to the Federal Privacy Act (5 USC § 552a). Accordingly, the Department must share the Department's purpose in creating that system of records, including the notice published in the Federal Register required by 5 USC § 552A(e)(4) and how the public voter registration list requested is necessary and relevant to that purpose.

Because the request seeks past records, could you also share how the system of records you seek to establish of Maryland's voters will be maintained with "such accuracy, relevance, timeliness, and completeness as is reasonably necessary to assure fairness to the individual in the determination." *Id*. at § 552A(e)(5). Moreover, since the voter registration list the Department requested includes party affiliation and voting history information, could you please provide your analysis for how the system of records the Department is establishing avoids maintaining a record "describing how any individual exercises rights guaranteed by the First Amendment." *Id*. at § 552A(e)(6).

Finally, I request that the Department state whether the voter registration list will be

FAX (410) 974- 2019
MD Relay Service (800) 735-2258

Toll Free Phone Number (800) 222-8683
https://elections.maryland.gov

151 West Street Suite 200
Annapolis, Maryland 21401

used in any investigative actions for potential violations of federal law. Specifically, whether the voter registration list will be used for enforcement of immigration laws against Maryland residents.

The voter registration list may not be used in a manner that intimidates a voter from going to the polls, results in or has the intent to result in the denial or abridgement of the right of a Maryland citizen to vote or causes a qualified voter to be stricken from voter registration list.

Maryland voters have the right to know what the Department intends to do with the state's voter registration list. That is why use is restricted to purposes related to the electoral process in Maryland.

Sincerely,

Jared DeMarinis
State Administrator of Elections

# EXHIBIT 4



**U.S. Department of Justice**

Civil Rights Division

_Office of the Assistant Attorney General_                    _Washington, D.C. 20530_

August 18, 2025

<u>Via Mail and Email</u>

The Honorable Jared DeMarinis
State Administrator of Elections
Maryland State Board of Elections
P.O. Box 6486
Annapolis, MD 21401-0486
Jared.DeMarinis@maryland.gov

Re:    **Complete Maryland Voter Registration List with All Fields**

Dear State Administrator DeMarinis:

  In our letter dated July 14, 2025, we made a request to you regarding the state's procedures for complying with the statewide voter registration list maintenance provisions of the National Voter Registration Act ("NVRA"), 52 U.S.C. § 20501, _et seq_.  The deadline for the requested information was July 28, 2025.  In a letter dated July 30, 2025, you directed us to a website where we could obtain "copies of publicly-available data in the statewide voter registration list[.]" You also sent a letter dated August 13, 2025, regarding our request for Maryland's voter registration list.

  This letter from the Justice Department responds to your letter of August 13, 2025.  This communication is limited to our request for the State of Maryland's voter registration list ("VRL") and associated voter registration records and does not include the Justice Department's response to your partial answers to the inquiries about Maryland's VRL maintenance processes.

  When providing the electronic copy of the statewide VRL, Maryland must ensure that it contains _all fields_, which includes the registrant's full name, date of birth, residential address, and his or her state driver's license number or the last four digits of the registrant's social security number as required under the Help America Vote Act ("HAVA")[1] to register individuals for federal elections. _See_ 52 U.S.C. § 21083(a)(5)(A)(i).

---

[1] In charging the Attorney General with enforcement of the voter registration list requirements in HAVA and in the NVRA, Congress plainly intended that DOJ be able to conduct an independent review of each state's list.  Any statewide prohibitions are clearly preempted by federal law.

Our July 14, 2025 letter requested Maryland's VRL to assess the State's compliance with the statewide VRL maintenance provisions of the NVRA, 52 U.S.C. § 20501, *et seq*. Our request is pursuant to the Attorney General's authority under Section 11 of the NVRA to bring enforcement actions. *See* 52 U.S.C. § 20510(a).

HAVA also provides authority for the Justice Department to seek the State's VRL via Section 401, which makes the Attorney General solely responsible for actions to enforce HAVA's computerized statewide voter registration list requirements. *See* 52 U.S.C. § 21111; *see also Brunner v. Ohio Republican Party*, 555 U.S. 5, 6 (2008) (*per curiam*) (finding there is no private right of action to enforce those requirements in HAVA).

In addition to those authorities, the Attorney General is also empowered by Congress to request records pursuant to Title III of the Civil Rights Act of 1960 ("CRA"), codified at 52 U.S.C. § 20701, *et seq*.  Section 301 of the CRA requires state and local officials to retain and preserve records related to voter registration and other acts requisite to voting for any federal office for a period of 22 months after any federal general, special or primary election. *See* 52 U.S.C. § 20701.

Section 303 of the CRA provides, in pertinent part, "Any record or paper required by section 20701 of this title to be retained and preserved shall, upon demand in writing by the Attorney General or his representative directed to the person having custody, possession, or control of such record or paper, be made available for inspection, reproduction, and copying at the principal office of such custodian by the Attorney General or his representative…" 52 U.S.C. § 20703.

Pursuant to the foregoing authorities, including the CRA, the Attorney General is demanding an electronic copy of Maryland's complete and current VRL. The purpose of the request is to ascertain Maryland's compliance with the list maintenance requirements of the NVRA and HAVA.

Maryland has raised privacy concerns, and the voter registration list is subject to federal privacy protections. Section 304 of the CRA provides:

> Unless otherwise ordered by a court of the United States, neither the Attorney General nor any employee of the Department of Justice, nor any other representative of the Attorney General, shall disclose any record or paper produced pursuant to this chapter, or any reproduction or copy, except to Congress and any committee thereof, governmental agencies, and in the presentation of any case or proceeding before any court or grand jury.

52 U.S.C. § 20704.

HAVA specifies that the "last 4 digits of a social security number . . . shall not be considered a social security number for purposes of section 7 of the Privacy Act of 1974" (5 U.S.C. § 552a note); 52 U.S.C. § 21083(c).  In addition, any prohibition of disclosure of a motor vehicle record contained in the Driver's License Protection Act, codified at 18 U.S.C. § 2721(b)(1), is exempted when the disclosure is for use by a government agency in carrying out the government agency's function to accomplish its enforcement authority as the Justice Department is now doing. That said, all data

received from you will be kept securely and treated consistently with the Privacy Act. The use of Maryland's statewide VRL will be limited to the enforcement of statutes regarding voting.

To that end, please provide the requested electronic Voter Registration List[2] to the Justice Department by August 25, 2025.

The information and materials may be sent by encrypted email to voting.section@usdoj.gov or via the Department's secure file-sharing system, Justice Enterprise File Sharing ("JEFS"). Should further clarification be required, please contact Maureen Riordan at maureen.riordan2@usdoj.gov.

Regards,

Harmeet K. Dhillon
Assistant Attorney General
Civil Rights Division

---

[2] Containing *all fields*, which includes the registrant's full name, date of birth, residential address, and his or her state driver's license number or the last four digits of the registrant's social security number as required by HAVA.

# EXHIBIT 5



**MARYLAND STATE**
B O A R D   O F   E L E C T I O N S
**V**erified. **O**pen. **T**rusted. **E**mpowering.

**Jared DeMarinis**
State Administrator

**Katherine Berry**
Deputy Administrator

**Michael Summers**, Chairman
**Jim Shalleck**, Vice Chairman
**Yaakov "Jake" Weissmann**
**Diane Butler**
**Victoria Jackson-Stanley**

August 25, 2025

Harmeet K. Dhillon
Assistant Attorney General
Civil Rights Division

Maureen Riordan
Acting Chief, Voting Section
Civil Rights Division
Department of Justice
950 Pennsylvania Avenue, NW – 4CON
Washington, DC 20530
Email: maureen.riordan2@usdoj.gov

Sent via email : voting.section@usdoj.gov

Re : **Complete Maryland Voting Registration List with All Fields**

Dear Assistant Attorney General Dhillon:

    I write in response to your letter dated August 18, 2025. Pursuant to applicable state law governing access to public records, please find the State Board of Elections' (SBE) response.

    Preliminarily, here is a summary of the relevant correspondence. On July 14, 2025, the Department of Justice Civil Rights Division (DOJ) sent a letter to SBE making requests for information and voter records. On July 30, 2025, SBE responded to the requests and provided information about obtaining publicly available voter registration lists. On August 5, 2025, the DOJ submitted an electronic application for a voter list. In response, on August 13, 2025, SBE requested additional information about your request for a voter list to ensure compliance with State law and regulations on its release. Specifically, SBE requested several pieces of information to determine whether (1) the list complies with the Federal Privacy Act, 5 USC § 552a, (2) the information would be used for immigration enforcement, and (3) your request related to an electoral process in Maryland.

    Your August 18, 2025 letter did not answer the questions posed in SBE's August 13, 2025 letter. Additionally, your letter expanded the information requested in the request for a voter list to information that is not publicly available. **SBE renews that request for information in this letter to ascertain the use of the voter registration relating to an electoral process in Maryland.** By evading SBE's questions and failing to provide answers, DOJ is undermining its own requests to SBE.

FAX (410) 974- 2019
MD Relay Service (800) 735-2258

Toll Free Phone Number (800) 222-8683
https://elections.maryland.gov

151 West Street Suite 200
Annapolis, Maryland 21401

August 25, 2025
Page 2 of 3

In its letter dated July 14, 2025, DOJ asserted the National Voter Registration Act (NVRA), 52 U.S.C. § 20201(i), to assess compliance with voter list maintenance provisions as the basis for its request for a voter registration list.  In its response dated July 30, 2025, SBE detailed its compliance with the NVRA and how SBE conducts its maintenance to keep the voter registration list up to date.

In the letter dated August 18, 2025, DOJ asserted the Help America Vote Act (HAVA) as a basis for the request for a voter registration list to enforce the computerized statewide voter registration list requirements. SBE has complied with requirements of 52 U.S.C. § 21083. Moreover, Maryland carefully complies with every HAVA requirement and stands ready to demonstrate this compliance through its documented policies and practices.  Notably, your letter gives no basis for suspecting any shortcoming or failure in Maryland's HAVA compliance, nor suggests that DOJ is actually investigating any alleged HAVA violation in Maryland. The actual voter list is not required to assess compliance with those provisions.

Despite this, DOJ now asserts that Sections 11 and 401 of the NVRA are the basis for the request. Again, those sections do not support such a request. Recently, DOJ added Section 303 of the Civil Rights Act of 1960, 52 U.S.C. § 20701 as a legal justification for the voter list request.  In continuation of its review of the legality of all the DOJ requests, SBE maintains that none of these provisions expressly grant to DOJ the right to access to the State's voter registration list.

Furthermore, Maryland voters have a right to know of the enforcement actions referenced in your latest letter. If you have specific cases or specific individuals suspected of involvement in electoral illegalities, please provide me with a list of names.  With that information, SBE, in coordination with Maryland's Office of State Prosecutor, would be better able to participate in any legitimate investigation. However, absent particularized and detailed concerns, a demand for the entire Maryland voter list, including sensitive personally identifying information that is not publicly available, without evidence or support, is an overreach and unreasonable under the circumstances. It cast aspersions on every Maryland voter and attempts to sow doubt on the legitimacy of Maryland's voter registration process. Improper voter registration cancellation not only leads to disenfranchisement of eligible Maryland voters, but it is unlawful. *See* Md. Code, Election Law § 16-201(a)(5).

As SBE stated in previous correspondence, the voter registration list cannot be used to threaten or intimidate a voter from going to the polls.  And the voter registration list cannot be used for a purpose that results in or has the intent to result in the denial or abridgement of the right of a Maryland citizen to vote or causes a qualified voter to be stricken from voter registration list. The Maryland Declaration of Rights states "the right of the People to participate in the Legislature is the best security of liberty and the foundation of all free Government; . . . and every citizen having the qualifications prescribed by the Constitution, ought to have the right of suffrage." SBE ensures Marylanders can exercise this constitutional right in a **v**erified, **o**pen, **t**ransparent and **e**mpowering manner that is safe and secure.

Thank you for your request. Please respond to my inquiries so that we can assess how your request for Maryland's publicly available voter registration list conforms with all relevant laws. SBE remains open to any opportunity to discuss this matter further with DOJ. I look forward to hearing from you.

Sincerely,

*Jared DeMarinis*

Jared DeMarinis
State Administrator of Elections
Maryland State Board of Elections

EXHIBIT 6

ELECTRONICALLY FILED - 2025 Oct 01 11:15 AM - RICHLAND - COMMON PLEAS - CASE#2025CP4006539

| | | |
|---|---|---|
| STATE OF SOUTH CAROLINA | ) | IN THE COURT OF COMMON PLEAS |
| COUNTY OF RICHLAND | ) | FIFTH JUDICIAL CIRCUIT |
| | ) | |
| | ) | Civil Action No. 2025-CP-40-06539 |
| | ) | |
| ANNE CROOK, | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| vs. | ) | |
| | ) | **ORDER** |
| | ) | |
| SOUTH CAROLINA ELECTION | ) | |
| COMMISSION A/K/A STATE | ) | |
| ELECTION COMMISSION, | ) | |
| *Defendant,* | ) | |
| | ) | |
| HENRY DARGAN MCMASTER, IN HIS | ) | |
| OFFICIAL CAPACITY AS GOVERNOR | ) | |
| OF THE STATE OF SOUTH | ) | |
| CAROLINA, | ) | |
| *Intervenor-Defendant.* | ) | |

This matter is before the Court on a Motion for Temporary Injunction filed by Plaintiff, Anne Crook. The motion seeks to prevent or limit the Election Commission's dissemination to DOJ of certain information from the South Carolina statewide voter registration list (VRL), containing Plaintiff's personal information. The Court heard this matter on September 26, 2025, and took the matter under advisement. For the reasons stated below, the Motion is **DENIED**.

<u>**Introduction**</u>

Plaintiff is requesting an injunction to prevent the South Carolina Election Commission (Election Commission) from releasing any protected election data to the Department of Justice (DOJ) until there is a memorandum of understanding (MOU) between the two parties. Additionally, Plaintiff requests that this Court review any MOU. In the Election Commission's memorandum in opposition, as well as at oral arguments by their counsel, they have stated point-

ELECTRONICALLY FILED - 2025 Oct 01 11:15 AM - RICHLAND - COMMON PLEAS - CASE#2025CP4006539

blank that they will not release the data to the DOJ without an MOU between the two government agencies. Additionally, counsel stated that the contents of the MOU would be discussed and voted on in open session by the commissioners. This Court denies the drastic remedy of granting injunction for several reasons.

**First**, Plaintiff has failed to prove she will suffer an irreparable harm because the Election Commission has stated it will not release the data without an MOU containing necessary security safeguards to ensure the proper and confidential use of that data and its transmission.

**Second**, Plaintiff has failed to prove there are no adequate remedies at law because she could avail herself to the state and federal tort claims acts if any data is negligently handled in the future.

**Finally**, Plaintiff is not likely to succeed on the merits for several reasons. **1.** The Election Commission is statutorily authorized to engage in the conduct she seeks to enjoin; specifically, South Carolina law vests the Election Commission with the authority to enter data sharing agreements to disclose securely certain voter registration data. **2.** The "right to privacy" constitutional provision does not encompass the sharing of data between the State and the federal government to secure federal elections. **3.** Requesting this Court to mandate an MOU and to assess its adequacy would improperly entangle the judiciary in the routine operations of the Election Commission, which would offend foundational separation of powers principles. **4.** Federal law likely requires the Election Commission to provide the requested information to DOJ.

## **Factual Background**

On August 6 and 14, 2025, the Department of Justice Civil Rights Division (DOJ) sent letters to the Election Commission, requesting, in sum, South Carolina's VRL. Specifically, in the second letter, DOJ requested "an electronic copy of the statewide voter VRL[, which] should contain *all fields*, which means, [the] state's VRL must include the registrant's full name, date of birth, residential address, [and] his or her state driver's license number or the last four digits of the registrant's social security number . . . ." *See* Compl. at 7–11 (Letter from Harmeet K. Dhillon, Assistant Attorney General Civil Rights Division to Howard Knapp, then-Executive Director, State Election Commission).

On August 27, 2025, the Election Commission met to address DOJ's requests. Wooten Aff. ¶ 4. Specifically, the Election Commission directed its staff to confer with DOJ about the prospect of entering into a data sharing agreement as authorized by section 7-5-186(C) of the South Carolina Code of Laws. *Id.* After additional communications with DOJ, on September 3, 2025, the Election Commission and DOJ held a conference call to discuss a possible data sharing agreement. *Id.*¶ 5. Based on that conference call, the Election Commission understands that DOJ is currently developing a Memorandum of Understanding (MOU) that identifies the requested information and addresses the security and privacy concerns raised by the Election Commission. *Id.* ¶ 6. The Election Commission has not yet received the MOU. *Id.* The Election Commission has stated that it will not share any data without a proper MOU in place.

Contesting dissemination of the VRL to DOJ, Plaintiff filed a complaint with a request for injunctive relief and a declaratory judgment in Calhoun County. Ultimately, the case was transferred to Richland County and assigned to the Honorable Daniel M. Coble. The Election Commission filed its Answer on September 25, 2025.

<u>**Legal Standard**</u>

An injunction is a "drastic" remedy that "ought to be applied with caution." *Strategic Res. Co. v. BCS Life Ins. Co.*, 367 S.C. 540, 544, 627 S.E.2d 687, 689 (2006). A plaintiff "must establish three elements" to obtain a preliminary injunction: (1) irreparable harm, (2) likelihood of success on the merits, and (3) no adequate remedy at law. *Compton v. S.C. Dep't of Corr.*, 392 S.C. 361, 366, 709 S.E.2d 639, 642 (2011).

**1.  Irreparable harm**

Plaintiff submits to the Court that she would suffer irreparable harm "if either 1) more of her [personal information] is shared than is permissible under the law or 2) the information is shared without adequate protection." Motion for Temporary Injunction at 11 (Sept. 23, 2025). Transmitting her personal information within the defined confines of an MOU protects against either scenario. Therefore, Plaintiff has failed to identify any sufficient harm—let alone an irreparable harm—she would suffer absent an injunction.

The Election Commission stated in court and in the filings with this Court that they will enter into an MOU with the DOJ that complies with all state law and ensure the protection of any

personal information. Additionally, the Election Commission stated that the contents of the MOU would be discussed and voted on at an open hearing. The Election Commission stated in their Memorandum in Opposition to Plaintiff's Motion for a Temporary Injunction:

> Specifically, in recognition of the significant privacy concerns involved, the Election Commission will fulfill its statutory obligations to protect private information and share voter information with DOJ only pursuant to an MOU containing necessary security safeguards to ensure the proper and confidential use of that data and its transmission. Indeed, this explains why the Election Commission has not transmitted the requested information since DOJ first inquired in early August. To appease her concerns, Plaintiff need not look any further than to the MOUs into which the Election Commission routinely perfects when exercising its statutory authority to share voter registration data to carry out its obligation "to maintain accurate voter registration records." *See* Wooten Aff. ¶ 4; S.C. Code Ann. §§ 7-3-20(D)(11), 7-5-186(A). As is standard practice, those MOUs outline the limited purpose for which the shared voter information will be used and the steps taken to protect the confidentiality of that data upon disclosure. For example, such documents ordinarily set forth data use limitations and provide secure transmission protocols and storage and destruction procedures. Any perfected MOU with DOJ should be no different.

Memorandum in Opposition to Plaintiff's Motion for a Temporary Injunction at 5 (Sept. 26, 2025).

Further, Plaintiff's alleged irreparable harm rests on the premise that the Election Commission will not act in good faith or properly carry out the law. Public officials are, absent evidence to the contrary, presumed to act in good faith and follow the laws. *S.C. Jurisprudence*, Evidence § 29 (1999*); see also Toporek v. S.C. State Election Comm'n*, 362 F. Supp. 613 (D.S.C. 1973) (stating that without an evidentiary basis, courts will not assume that state election officials will act arbitrarily in the future). The only evidence in this case is that the Election Commission has acted in good faith in enacting the MOUs with other states to fulfill its statutory duty to maintain accurate voter lists—that is, to prevent voter fraud. Plaintiff has not alleged, and the Court cannot assume, that the Election Commission will do anything other than adhere to state law in any negotiations with DOJ.

### 2. Adequate remedies

Actions for injunctive relief are equitable in nature. *Grosshuesch v. Cramer*, 367 S.C. 1, 4, 623 S.E.2d 833, 834 (2005) (citation omitted). Generally, equitable relief is available only where there is no adequate remedy at law. *Santee Cooper Resort, Inc. v. S.C. Pub. Serv. Comm'n*, 298

ELECTRONICALLY FILED - 2025 Oct 01 11:15 AM - RICHLAND - COMMON PLEAS - CASE#2025CP4006539

S.C. 179, 185, 379 S.E.2d 119, 123 (1989). Specifically, "An 'adequate' remedy at law is one which is as certain, practical, complete and efficient to attain the ends of justice and its administration as the remedy in equity." *Id*. In the unlikely event that Plaintiff's private information somehow falls in the hands of a "bad actor" as a result of the Election Commission's fulfillment of its statutory obligations under S.C. Code Ann. § 7-5-186(C) as she hypothesizes, she could avail herself to the state and federal tort claims acts. Such claims are more than adequate vehicles for relief such that an injunction is improper.

### 3. Success on the Merits

#### *Statutory Authorization*

Because the Election Commission is statutorily authorized to engage in the conduct she seeks to enjoin, Plaintiff cannot possibly establish she is likely to succeed on the merits. More specifically, South Carolina law vests the Election Commission with the authority to enter data sharing agreements to disclose securely certain voter registration data.

The South Carolina Constitution mandates the General Assembly to enact legislation providing for the regulation of elections (article II, section 1), the registration of voters (article II, section 8), and "the fulfillment and integrity of the election process" (article II, section 10). Pursuant to that authority, the General Assembly enacted Title 7 of the South Carolina Code of Laws, in turn establishing the Election Commission to oversee the administration of elections and to maintain fair and fraud-free elections. *See* S.C. Code Ann. § 7-3-10(F) (charging the Election Commission with "promulgat[ing] regulations to establish standardized processes for the administration of elections and voter registration that must be followed by the county boards of voter registration and elections").

To that end, relevant here, section 7-5-186(A) requires the Election Commission to establish and maintain a statewide voter registration database and to "conduct an annual general registration list maintenance program to maintain accurate voter registration records in the statewide voter registration system." S.C. Code Ann. § 7-5-186(A). Included in that list is the information the Election Commission collects pursuant to its statutory mandate for contents of voter registration applications. In particular, the application (and therefore the VRL) must contain a registrant's name, sex, race, social security number, date of birth, residential address and may

ELECTRONICALLY FILED - 2025 Oct 01 11:15 AM - RICHLAND - COMMON PLEAS - CASE#2025CP4006539

ELECTRONICALLY FILED - 2025 Oct 01 11:15 AM - RICHLAND - COMMON PLEAS - CASE#2025CP4006539

also include driver's license numbers, state-issued identification numbers, telephone numbers, email addresses, mailing addresses, location of prior voter registrations, voter registration agencies, and other data incident to voter registrations. S.C. Code Ann. § 7-5-170(2); *see also* S.C. Code Ann. § 7-5-185(B)(5) (requiring the same information for electronic applications for voter registration).

Furthermore, section 7-5-186(C) expressly provides,

> The State Election Commission *may enter into agreements to share information or data* with other states or groups of states, *as the commission considers necessary*, in order to maintain the statewide voter registration database established pursuant to this section. Except as otherwise provided in this subsection, the commission shall ensure that any information or data provided to the commission that is confidential in the possession of the state providing the data remains confidential while in the possession of the commission. *The commission may provide such otherwise confidential information or data to persons or organizations that are engaging in legitimate governmental purposes related to the maintenance of the statewide voter registration database.*

S.C. Code Ann. § 7-5-186(C) (Emphasis added). The plain language of the statute permits the Election Commission to share the requested information with "organizations" such as DOJ. Before perfecting the agreement, the Election Commission determines whether the DOJ MOU meets the state's statutory requirements for disclosure of voter personal information. If it does not, the Election Commission will not enter the agreement or share the VRL.

Much of the Family and Personal Identifying Information Privacy Protection Act is not relevant to this action. For instance, it requires state agencies to have privacy policies and to inform people that collected information might be disclosed, and it prohibits anyone from using personal information obtained from a government agency from using that information for commercial solicitation. *See* S.C. Code Ann. §§ 30-2-20, -40, -50(A). Specific to the section Crook cites in the heading of her motion, section 30-2-20 permits agencies to share personal information to "fulfill a legitimate public purpose." *Id.* § 30-2-20. Surely protecting the voter rolls fits that description. *See id*. § 7-3-10(G) (Commission must "comply with applicable state and federal election law").

Put simply, the statute's plain text authorizes the Election Commission to engage in the conduct Plaintiff hopes to enjoin. *See Hodges v. Rainey*, 341 S.C. 79, 85, 533 S.E.2d 578, 581 (2000) ("Under the plain meaning rule, it is not the province of the court to change the meaning of a clear and unambiguous statute.").

ELECTRONICALLY FILED - 2025 Oct 01 11:15 AM - RICHLAND - COMMON PLEAS - CASE#2025CP4006539

*Right to Privacy*

A statute gives a plaintiff the right to sue only if the General Assembly intended to create that right. *Denson v. Nat'l Cas. Co.*, 439 S.C. 142, 151, 886 S.E.2d 228, 233 (2023). "Generally, when a statute does not expressly create civil liability, a duty will not be implied unless the statute was enacted for the special benefit of a private party." *Id*. at 151–52, 886 S.E.2d at 233. Nothing in section 7-5-170 (or section 7-5-186) is for any special benefit of an individual. Instead, these statutes provide the framework how voters register and how the Election Commission handles the voter registration database. Bolstering this conclusion are other parts of Title 7, which expressly provide a person the right to challenge certain Election Commission actions. *See, e.g.*, S.C. Code Ann. §§ 7-5-230(C), 7-5-240.

Because there is no private cause of action conferred under these election statutes, the Plaintiff's standing hinges on whether or not her "right to privacy" has been implicated under South Carolina's Constitution. Article I, section 10 prohibits "unreasonable invasions of privacy." S.C. Const. art. I, § 10. That provision was intended "to take care of the invasion of privacy through modern electronic devices." Committee to Make a Study of the Constitution of South Carolina, 1895, *Minutes of Committee Meeting* 6 (Sept. 15, 1967). It sought "to protect the citizen from improper use of electronic devices, computer data banks, etc." Committee to Make a Study of the Constitution of South Carolina, 1895, *Final Report of the Committee to Make a Study of the South Carolina Constitution of 1895*, at 15 (1969). As originally understood then, this provision has nothing to do with the sharing of data between the State and the federal government to secure federal elections.

This constitutional provision's current jurisprudence is not precisely clear, and there is limited case law on the issue. Therefore, this Court must look to several recent cases to ascertain and interpret the provision in light of the facts of this case. In *Planned Parenthood I*, the South Carolina Supreme Court interpreted the right to privacy as more than merely a search or seizure related protection. However, *Planned Parenthood I* was not directly overruled, but it was clearly supplanted by *Planned Parenthood II*. The first case's two dissenting opinions viewed the right to privacy in a more limited fashion, with Justice James' opinion keeping the provision within the search and seizure framework. *Planned Parenthood II* made it clear that while the majority

opinion ruled that the right to privacy encompassed more than the search and seizure context, it did so only for the purposes of that opinion.

> Second, *Planned Parenthood I* is a highly fragmented decision with five separate opinions. …we likewise decline to revisit the fragmented decision regarding the proper scope of the privacy provision. Rather, in the interest of unity, we will assume only for purposes of our analysis and decision **today** that the privacy provision reaches beyond the search and seizure context to include bodily autonomy. Accordingly, we go no further **today** than referencing *Singleton v. State*, which held that the interests protected by the privacy clause extend to bodily autonomy and integrity.

*Planned Parenthood S. Atl. v. State*, 440 S.C. 465, 481, 892 S.E.2d 121, 130 (2023), *reh'g denied* (Aug. 29, 2023) (emphasis added). The Supreme Court made clear that in that case they were not making a definitive ruling as to the interpretation of the history and meaning of the constitutional provision in question. *Id.* at 481 n.9 ("We elect not to address those threshold differences: for purposes of our analysis and decision today, we will cast aside a review of the history and relevance of the 1971 amendments to the state constitution that included the privacy provision, including the work of the West Committee.").

Courts will attempt to avoid making legal interpretations when they are unwarranted and superfluous to the ultimate decision. The judiciary is not in the business of creating business but rather tasked with the simple job of making decisions related to past conduct and stating rules for predictability of future conduct. It is often not necessary – and usually unproductive – to create more rules, more interpretations, and more disagreements on issues that are not directly impacted by the ultimate decision. However, because the standing of this Plaintiff hinges on whether or not her right to privacy could be violated, this Court must draw an interpretation as to what the constitutional provision means.

This trial court will never say what the law is or what it ought to be – but it will say what it believes the law is as promulgated by the South Carolina Supreme Court and the South Carolina General Assembly. Following along the lines of the several opinions in *Planned Parenthood I*, in conjunction with prior precedent, this Court does not believe that this provision is implicated with the sharing of election data. In his well-reasoned and thoroughly analyzed opinion, Justice James walks through the history and times of the constitutional amendments during the 1960s and 1970s, and particularly, how the right to privacy provision came about. Without quoting verbatim the

opinion, this Court notes several passages to explain why it believes the right to privacy does not encompass the voter election data at issue in this case.

First, in a letter from the attorney general to West Committee Staff Consultant Robert H. Stoudemire, the attorney general explains the reason why the right to privacy needed to be added to the constitutional protections:

> In the first paragraph, General McLeod acknowledged that the proposed privacy provision "relate[d] to interception of communication which is generally done by electronic means." Letter from Daniel R. McLeod, S.C. Att'y Gen., to Robert H. Stoudemire, Staff Consultant, Comm. to Make a Study of the S.C. Const. (Oct. 2, 1967), 1967 WL 12658, at *1. He then noted an "additional factor [that] may be taken into consideration" is the "protection of privacy in areas such as information gotten through data processing." *Id.* The letter as a whole speaks solely in terms of "securing individual privacy in the field of data processing" and in terms of protecting against intrusions into privacy occasioned by (1) interception of communication and information by electronic means, (2) mass collection of data, (3) unguarded income tax and health information, and (4) unguarded information stored in computers. *Id.*

*Planned Parenthood S. Atl. v. State*, 438 S.C. 188, 339–40, 882 S.E.2d 770, 851–52 (2023), *reh'g denied* (Feb. 8, 2023). Second, the final report related to this constitutional provision discusses the purpose of the added language:

> **Section J. Searches and seizures.** The Committee recommends that the historic provision on searches and seizures be retained. In addition, the Committee recommends that the citizen be given constitutional protection from an unreasonable invasion of privacy by the State. <u>This additional statement is designed to protect the citizen from improper use of electronic devices, computer databanks, etc.</u> Since it is almost impossible to describe all of the <u>devices</u> which exist or which may be perfected in the future, the Committee recommends only a broad statement on policy, leaving the details to be regulated by law and court decisions.

*Planned Parenthood S. Atl. v. State*, 438 S.C. 188, 338, 882 S.E.2d 770, 850–51 (2023), *reh'g denied* (Feb. 8, 2023).

But even as expanded in *Singleton v. State*, 313 S.C. 75, 89, 437 S.E.2d 53, 61 (1993), article I, section 10 still does not reach the sharing of the voter registration list. That case holds no more than that this provision might extend to "bodily autonomy and integrity." *Planned Parenthood S. Atl. v. State*, 440 S.C. 465, 481, 892 S.E.2d 121, 130 (2023). This Court would thus break new ground by applying article I, section 10 to the voter registration list—and with no way

ELECTRONICALLY FILED - 2025 Oct 01 11:15 AM - RICHLAND - COMMON PLEAS - CASE#2025CP4006539

ELECTRONICALLY FILED - 2025 Oct 01 11:15 AM - RICHLAND - COMMON PLEAS - CASE#2025CP4006539

to reconcile that conclusion with the "intent of [article I, section 10's] framers and the people who adopted it." *State v. Long*, 406 S.C. 511, 514, 753 S.E.2d 425, 426 (2014).

And of course, article I, section 10 "draws the line at *unreasonable* invasions of privacy." *Planned Parenthood S. Atl.*, 440 S.C. at 482, 892 S.E.2d at 131 (emphasis added). So even if this provision were implicated by the sharing of voter registration lists, this provision would be violated only if the Commission would act unreasonably to provide information to the federal government. This Court does not believe there would be an unreasonable invasion of privacy for the Election Commission to turn over its data to the DOJ.

### Separation of Powers

Plaintiff seeks an injunction preventing the Election Commission from sharing any such information absent an "adequate" MOU, subject to review by this Court. This Court cannot supersede the Election Commission's discretion to enter such agreements specifically conferred by statute. In a similar vein, in the first instance, the Election Commission alone is charged with ensuring that an MOU "adequately protects" the rights of the South Carolina electorate, including Plaintiff. Requesting this Court to mandate an MOU and to assess its adequacy would improperly entangle the judiciary in the routine operations of the Election Commission. Such involvement would offend foundational separation of powers principles (article 1, section 8 of the South Carolina Constitution) and undermine the independence of the executive agency by inserting judicial oversight into the Election Commission's discharge of its statutory duties and responsibilities. *State ex rel. McLeod v. McInnis*, 278 S.C. 307, 312, 295 S.E.2d 633, 636 (1982) ("One of the prime reasons for separation of powers is the desirability of spreading out the authority for the operation of the government. It prevents the concentration of power in the hands of too few, and provides a system of checks and balances. The legislative department makes the laws; the executive department carries the laws into effect; and the judicial department interprets and declares the laws.").

### Federal law

Federal law likely requires the Election Commission to provide the requested information to DOJ, and while DOJ has also pointed to the National Voter Registration Act and the Help America Vote Act, Title III alone is sufficient to reach that conclusion. Title III requires that, for

22 months after a federal election, a state election official "retain and preserve" "all records and papers which come into his possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election." 52 U.S.C. § 20701. Title III has long been understood to "encompass[], among other things, voting registration records," *McIntyre v. Morgan*, 624 F. Supp. 658, 664 (S.D. Ind. 1985), which is not surprising given the scope of the statutory text. And since HAVA's enactment two decades ago, registration records must include either "the applicant's driver's license number" or "the last four digits of the applicant's social security number." 52 U.S.C. § 21083(a)(5)(A). The Attorney General (or his representative) may demand in writing "[a]ny record or paper" that a state election official must keep under § 20701. *Id*. § 20703. That demand must simply "contain a statement of the basis and the purpose therefor." *Id*.

DOJ's request for South Carolina's voter registration list fits comfortably within this legal framework. For starters, the voter registration list from the 2024 election is a "record" in a state election official's possession "relating to" the "registration" of voters for the 2024 election. *Id*. § 20701. And that registration now includes either a driver's license number or the last four digits of a Social Security number. *Id*. § 21083(a)(5)(A). DOJ made this request "in writing" and explained its "basis" and "purpose" of ensuring that the State was complying with HAVA and the NVRA. *Id*. § 20703; *see* Compl. Exs. 1 & 2 (DOJ letters).

## <u>Conclusion</u>

### *State Sovereignty*

This Court finds that federal law likely preempts state law in this area simply because of how this Court has to frame the issue. This case is about whether a citizen can likely succeed on the merits of challenging a State action in compliance with its own interpretation of federal law. And the State at this point has interpreted the law as requiring compliance with the federal request. It is not framed as the State *challenging* the federal request to a state agency. This Court has grave concerns about federal overreach and encroachment over this State's sovereignty. However, because this Court rules on the issue at hand, it does not discuss this issue further. As stated by Chief Justice John Roberts of the United States Supreme Court:

> Outside the strictures of the Supremacy Clause, States retain broad autonomy in structuring their governments and pursuing legislative objectives. Indeed, the

ELECTRONICALLY FILED - 2025 Oct 01 11:15 AM - RICHLAND - COMMON PLEAS - CASE#2025CP4006539

Constitution provides that all powers not specifically granted to the Federal
Government are reserved to the States or citizens. Amdt. 10. This "allocation of
powers in our federal system preserves the integrity, dignity, and residual
sovereignty of the States." *Bond v. United States,* 564 U.S. ——, ——, 131 S.Ct.
2355, 2364, 180 L.Ed.2d 269 (2011). But the federal balance "is not just an end in
itself: Rather, federalism secures to citizens the liberties that derive from the
diffusion of sovereign power." *Ibid.* (internal quotation marks omitted).  More
specifically, " 'the Framers of the Constitution intended the States to keep for
themselves, as provided in the Tenth Amendment, the power to regulate elections.'
" *Gregory v. Ashcroft,* 501 U.S. 452, 461–462, 111 S.Ct. 2395, 115 L.Ed.2d 410
(1991)

*Shelby Cnty., Ala. v. Holder*, 570 U.S. 529, 543, 133 S. Ct. 2612, 2623, 186 L. Ed. 2d 651 (2013).


    For the reasons stated above, the Motion for Temporary Injunction is **DENIED**.  The
Governor's Motion to Dismiss is continued.




**AND IT IS SO ORDERED.**


                                  _____

                                  The Honorable Daniel McLeod Coble


October 1, 2025

ELECTRONICALLY FILED - 2025 Oct 01 11:15 AM - RICHLAND - COMMON PLEAS - CASE#2025CP4006539

ELECTRONICALLY FILED - 2025 Oct 01 11:15 AM - RICHLAND - COMMON PLEAS - CASE#2025CP4006539



Richland Common Pleas

**Case Caption:**    Anne  Crook vs   South Carolina Election Commission , defendant, et al

**Case Number:**    2025CP4006539

**Type:**            Order/Other

So Ordered

s/ Daniel Coble, 2774

Electronically signed on 2025-10-01 11:10:17    page 13 of 13