# Exhibit A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>      Plaintiff,<br><br> v.<br><br>JARED DEMARINIS, in his Official Capacity as State Administrator of Elections for the State Maryland,<br><br>      Defendant. | Case No. 1:25-cv-03934<br>(Hon. Stephanie A. Gallagher) |

**MOTION TO DISMISS OF INTERVENOR-DEFENDANTS COMMON CAUSE, OUT FOR JUSTICE, INC., CARL SNOWDEN, MYRIAM PAUL, AND LUIS SIMS**

**TABLE OF CONTENTS**

TABLE OF CONTENTS.................................................................................................. i

TABLE OF AUTHORITIES ........................................................................................... ii

INTRODUCTION ........................................................................................................... 1

BACKGROUND ............................................................................................................. 2

LEGAL STANDARD...................................................................................................... 8

ARGUMENT .................................................................................................................. 9

   I.    THE UNITED STATES' DEMANDS EXCEED THE STATUTORY AUTHORITY OF THE CRA AND ARE CONTRARY TO LAW............................................................. 9

      A.   Plaintiff's Demand for Records Fails to Meet the Requisite Statutory Requirements of the CRA. ....................................................................................................................... 9

      B.   Any Records Disclosed Under the CRA Should Be Redacted to Protect the Constitutional Rights of the Voter............................................................................. 15

   II.    THE UNITED STATES IS NOT ENTITLED TO SUMMARY DISPOSITION OF ITS CRA CLAIM. ............................................................................................................. 19

CONCLUSION............................................................................................................. 23

# TABLE OF AUTHORITIES

**Cases**

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ................................................................................................ 8

*Becker v. United States*,
451 U.S. 1306 (1981) ............................................................................................ 21

*Burdick v. Takushi*,
504 U.S. 428 (1992) ................................................................................................ 1

*Coleman v. Kennedy*,
313 F.2d 867 (5th Cir. 1963) ................................................................................ 10

*Corner Post, Inc. v. Bd. of Governors of the Fed. Rsrv. Sys.*,
603 U.S. 799 (2024) .............................................................................................. 14

*Equity Inv. Assocs., LLC v. United States*,
40 F.4th 156 (4th Cir. 2022) ................................................................................ 12

*F.D.I.C. v. Wentz*,
55 F.3d 905 (3d Cir. 1995) ................................................................................... 13

*In re Coleman*,
208 F. Supp. 199 (S.D. Miss. 1962) ......................................................... 10, 18, 21

*Just Puppies, Inc. v. Brown*,
123 F.4th 652 (4th Cir. 2024) ................................................................................ 8

*Kennedy v. Lynd*,
306 F.2d 222 (5th Cir. 1962) ......................................................................... passim

*Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*,
591 F.3d 250 (4th Cir. 2009) ................................................................................. 8

*Niz-Chavez v. Garland*,
593 U.S. 155, (2021) ............................................................................................ 14

*PA Fair Elections v. Pa. Dep't of State*,
337 A.3d 598 (Pa. Commw. Ct. 2025) ................................................................... 7

*Project Vote/Voting for Am., Inc. v. Long*,
682 F.3d 331 (4th Cir. 2012) ............................................................... 16, 17, 18, 19

*Pub. Int. Legal Found. v. Benson*,
136 F.4th 613 (6th Cir. 2025) .............................................................................. 12

*Pub. Int. Legal Found. v. Boockvar*,
431 F. Supp. 3d 553 (M.D. Pa. 2019) .................................................................. 17

*Pub. Int. Legal Found., Inc. v. Bellows*,
92 F.4th 36 (1st Cir. 2024) .............................................................................. 17, 18

*Pub. Int. Legal Found., Inc. v. Dahlstrom,*
   673 F. Supp. 3d 1004 (D. Alaska 2023) ................................................................. 17

*Pub. Int. Legal Found., Inc. v. Matthews,*
   589 F. Supp. 3d 932 (C.D. Ill. 2022) ..................................................................... 17

*Pub. Int. Legal Found., Inc. v. Matthews,*
   No. 20-CV-3190, 2022 WL 1174099 (C.D. Ill. Apr. 20, 2022) ............................. 17

*Pub. Int. Legal Found., Inc. v. N.C. State Bd. of Elections,*
   996 F.3d 257 (4th Cir. 2021) ................................................................................. 17

*Republican Nat'l Comm. v. N.C. State Bd. of Elections,*
   120 F.4th 390 (4th Cir. 2024) ................................................................................... 1

*Sheetz v. Cnty. of El Dorado,*
   601 U.S. 267 (2024) ............................................................................................... 19

*State of Ala. ex rel. Gallion v. Rogers,*
   187 F. Supp. 848 (M.D. Ala. 1960) ......................................................................... 1

*United States v. Powell,*
   379 U.S. 48 (1964) ..................................................................................... 12, 21, 22

*United States v. Rosinsky,*
   547 F.2d 249 (4th Cir. 1977) ................................................................................. 13

*United States v. Simms,*
   914 F.3d 229 (4th Cir. 2019) ................................................................................. 16

*Yick Wo v. Hopkins,*
   118 U.S. 356 (1886) ................................................................................................. 1

**Statutes**

18 U.S.C. § 2721 ............................................................................................................ 23

26 U.S.C. § 7604 ............................................................................................................ 22

44 U.S.C. § 3351 ............................................................................................................ 23

5 U.S.C. § 552a .............................................................................................................. 13

52 U.S.C. § 20501 ............................................................................................................ 1

52 U.S.C. § 20507 .................................................................................................. passim

52 U.S.C. § 20507(a) ..................................................................................................... 11

52 U.S.C. § 20507(c) ..................................................................................................... 11

52 U.S.C. § 20701 ...................................................................................................... 1, 10

52 U.S.C. § 20703 .................................................................................................. passim

52 U.S.C. § 20704 ............................................................................................................ 4

52 U.S.C. § 20705 ............................................................................................ 22

52 U.S.C. § 20901 .............................................................................................. 1

52 U.S.C. § 21083 ............................................................................................ 14

52 U.S.C. § 21083(a)(2)(A) ............................................................................. 12

52 U.S.C. § 21085 ...................................................................................... 12, 15

E-Government Act of 2002,
    Pub. L. No. 107-347, 116 Stat. 2899 (2002) ............................................. 23

Privacy Act of 1974,
    Pub. L. No. 93-579, 88 Stat. 1896 (1974) ................................................. 23

**Other Authorities**

"Federal Judicial Circuits: Fifth Circuit," FEDERAL JUDICIAL CENTER,
    (last visited Dec. 9, 2025) .......................................................................... 20

Alexandra Berzon & Nick Corasaniti, *Trump Empowers Election Deniers, Still Fixated on 2020
    Grievances*, N.Y. TIMES, Oct. 22, 2025 ...................................................... 6

Andy Kroll & Nick Surgey, *Inside Ziklag, the Secret Organization of Wealthy Christians Trying
    to Sway the Election and Change the Country*, PROPUBLICA, July 13, 2024 ............................ 7

Br. for the United States as Amicus Curiae, *Project Vote/Voting for Am., Inc. v. Long*,
    No. 11-1809 (4th Cir. Oct. 18, 2011) .......................................................... 18

Br. for the United States as Amicus Curiae, *Pub. Int. Legal Found. v. Schmidt*,
    No. 23-1590 (3d Cir. Nov. 6, 2023) ............................................................ 18

Br. for the United States as Amicus Curiae, *Pub. Int. Legal Found., Inc. v. Bellows*,
    No. 23-1361 (1st Cir. July 25, 2024) ........................................................... 18

Devlin Barrett & Nick Corasaniti, *Trump Administration Quietly Seeks to Build National Voter
    Roll*, NEW YORK TIMES, Sept. 9, 2025 ................................................... 5, 21

Doug Bock Clark, *She Pushed to Overturn Trump's Loss in the 2020 Election. Now She'll Help
    Oversee U.S. Election Security*, PROPUBLICA, Aug. 26, 2025 ....................... 6

Emily Bazelon & Rachel Poser, *The Unraveling of the Justice Department*,
    NEW YORK TIMES MAGAZINE, Nov. 16, 2025 ...................................... 6, 21

H.R. Rep. No. 86-956 (1959) ............................................................................. 1

Hansi Lo Wang, *Thousands of Pennsylvania Voters Have Had Their Mail Ballot Applications
    Challenged*, NATIONAL PUBLIC RADIO, Nov. 5, 2024 ................................. 7

Jen Fifield, *Pa.'s Heather Honey, Who Questioned the 2020 Election, Is Appointed to Federal
    Election Post*, CAPITAL-STAR, Aug. 27, 2025 ............................................. 6

Jeremy Roebuck and Katie Bernard, *'I Can't Think of Anything Less American': Right-Wing Activists' Effort to Nullify Hundreds of Pa. Votes Met with Skepticism*, INQUIRER, Nov. 1, 2024 ................................................................................................................................ 7

Jude Joffe-Block & Miles Parks, *The Trump Administration Is Building a National Citizenship Data System*, June 29, 2025 ......................................................................... 6

Kaylie Martinez-Ochoa, Eileen O'Connor & Patrick Berry, Brennan Ctr. for Just., *Tracker of Justice Department Requests for Voter Information* (updated Dec. 5, 2025)........ 2, 5

Matt Cohen, *DHS Said to Brief Cleta Mitchell's Group on Citizenship Checks for Voting*, DEMOCRACY DOCKET, June 12, 2025................................................................................. 6

Press Release, U.S. Dep't of Just., *Justice Department Sues Four Additional States and One Locality for Failure to Comply with Federal Elections Laws* (Dec. 12, 2025).......................... 4

Press Release, U.S. Dep't of Justice, *Justice Department Sues Oregon and Maine for Failure to Provide Voter Registration Rolls* (Sept. 16, 2025) ..................................................... 5

Press Release, U.S. Dep't of Justice, *Justice Department Sues Six Additional States for Failure to Provide Voter Registration Rolls* (Dec. 2, 2025) ......................................................... 5

Press Release, U.S. Dep't of Justice, *Justice Department Sues Six States for Failure to Provide Voter Registration Rolls* (Sept. 25, 2025)................................................................. 5

Press Release, U.S. Dep't of Justice, *United States Announces Settlement with Kentucky Ensuring Compliance with Voter Registration List Maintenance Requirements* (July 5, 2018)................................................................................................................ 13

Sarah Lynch, *US Justice Dept Considers Handing over Voter Roll Data for Criminal Probes, Documents Show*, REUTERS, Sept. 9, 2025 .............................................................. 5

Steven F. Lawson, *Black Ballots: Voting Rights in the South, 1944-1969* (1976)....................... 20

U.S. Dep't of Just., Civ. Rts. Div., *Federal Law Constraints on Post-Election "Audits"* (Jul.

**Rules**

Fed. R. Civ. P. 12(b)(6) .......................................................................................................... 8

# INTRODUCTION

In this action, the United States seeks to compel the disclosure of sensitive personal voter data to which it is not entitled, using the civil rights laws as a pretext. Because the United States failed to disclose the basis and purpose of its request for the data, dismissal should be granted, and its attempt to summarily dispose of this case via an improper motion to compel should be rejected.

The right to vote "'is of the most fundamental significance under our constitutional structure.'" *Republican Nat'l Comm. v. N.C. State Bd. of Elections*, 120 F.4th 390, 404 (4th Cir. 2024) (quoting *Burdick v. Takushi*, 504 U.S. 428, 433 (1992)). It is "preservative of all other rights" because it serves as a check against tyrannical rule while simultaneously ensuring the competition of ideas amongst our elected officials. *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886).

Congress has repeatedly legislated to protect the franchise, including through Title III of the Civil Rights Act of 1960 ("CRA"), 52 U.S.C. § 20701 *et seq*., as well as the National Voter Registration Act ("NVRA"), 52 U.S.C. § 20501 *et seq*., and the Help America Vote Act ("HAVA"), 52 U.S.C. § 20901 *et seq*. These statutes were enacted for the purpose of ensuring that all eligible Americans—especially racial minorities and voters with disabilities—have the opportunity to participate in free, fair, and secure elections. As the United States Department of Justice itself explains, Title III of the CRA, the election records provision invoked in the Complaint here, was designed to "secure a more effective protection of the right to vote." U.S. Dep't of Just., Civ. Rts. Div., *Federal Law Constraints on Post-Election "Audits"* (Jul. 28, 2021), https://perma.cc/74CP-58EH (citing *State of Ala. ex rel. Gallion v. Rogers*, 187 F. Supp. 848, 853 (M.D. Ala. 1960) and H.R. Rep. No. 86-956 (1959)).

The United States' demand for Maryland's unredacted voter file—which contains sensitive personal information such as full birth dates, driver's license numbers, and Social Security numbers from every voter in the state—undermines these statutes' core purposes and is contrary

to law. To be sure, the public disclosure of state voting records is important to ensure transparency and the accuracy of the voter rolls, especially by ensuring that citizens are not erroneously removed from the voter records. But releasing the State's voter records *without redaction* and for purposes far afield from protecting voter access would only deter voter participation and undermine the right to vote. That is especially so here where the United States has failed to fully and accurately set forth "the basis and the purpose" for their request for this data, as required by the very statute that it purports to invoke. 52 U.S.C. § 20703. Because the United States has failed to establish its entitlement to a complete, unredacted Maryland voter file, the Court should dismiss this action.

## BACKGROUND

Beginning in May 2025, Plaintiff the United States, through its Department of Justice ("DOJ"), began sending letters to election officials in at least forty states, making escalating demands for the production of statewide voter registration databases, with plans to gather data from all fifty states. *See* Kaylie Martinez-Ochoa, Eileen O'Connor & Patrick Berry, *Brennan Ctr. for Just., Tracker of Justice Department Requests for Voter Information* (updated Dec. 5, 2025), https://perma.cc/A73C-8YDZ.

On July 14, 2025, DOJ sent a letter to Defendant DeMarinis, Maryland's State Administrator of Elections, demanding, among other things, "[t]he current electronic copy of Maryland's computerized statewide voter registration list," and directing the State to "include all fields contained within the list." *See* Ex. 1, Letter of Michael E. Gates to the Hon. Jared DeMarinis dated July 14, 2025, Dkt. No. 2-2, ("July 14 Letter"), at 2–3 Defendant DeMarinis responded on July 30, 2025, setting out the process under Maryland law for procuring the statewide voter registration list and referring the DOJ to the state's website for doing so. *See* Ex. 2, Letter of the Hon. Jared DeMarinis to Maureen Riordan and Michael E. Gates dated July 30, 2025, Dkt. No. 2-

2, at 7–9. Defendant DeMarinis directed DOJ to "follow these instructions" at the state website "to obtain a copy of the portions of the statewide voter registration list that are subject to disclosure." *Id.* at 9.

On August 13, 2025, Defendant DeMarinis sent another letter to DOJ, seemingly in response to DOJ's "request for Maryland's voter registration list." *See* Ex. 3, Letter of the Hon. Jared DeMarinis to Maureen Riordan and Michael E. Gates dated Aug. 13, 2025, Dkt. No. 2-2, ("Aug. 13 Letter"), at 13. Defendant DeMarinis raised several issues with DOJ's request. First, he noted that "Maryland law requires that the voter registration list not be used for 'commercial solicitation,' and, more importantly, may not be used for 'any other purpose not related to the electoral process." *Id.* at 13 (quoting Md. Code Ann., Election Law § 3-506(a)(1)). Yet Defendant DeMarinis stated that based on DOJ's request, "it is not clear what you intend to do with Maryland's voter registration list." *Id.* Further, Defendant DeMarinis noted that the Federal Privacy Act requires DOJ to "share the Department's purpose in creating [a system of records of Maryland voters] . . . and how the public voter registration list requested is necessary and relevant to that purpose." *Id.* Finally, Defendant DeMarinis warned that "[t]he voter registration list may not be used in a manner that intimidates a voter from going to the polls, results in or has the intent to result in the denial or abridgement of the right of a Maryland citizen to vote . . . ." *Id.* at 14.

On August 18, 2025, DOJ responded to Defendant DeMarinis, demanding that Maryland provide to the DOJ its complete, non-public voter database. *See* Ex. 4, Letter of Harmeet K. Dhillon to the Hon. Jared DeMarinis dated Aug. 18, 2025, Dkt. No. 2-2 ("Aug. 18 Letter"), at 16–18. DOJ specified that it was seeking an unredacted electronic copy of the statewide voter registration list that "contains *all fields*," including registrants' full name, date of birth, address, driver's license number and the last four digits of the registrant's social security number ("SSN4").

*Id.* at 16. DOJ cited the NVRA, HAVA, and Title III of the CRA as authority for its records request, and stated that "[t]he purpose of the request is to ascertain Maryland's compliance with the list maintenance requirements of the NVRA and HAVA," but did not elaborate further in this regard or refer to any compliance deficiencies by Maryland with respect to those statutes' voter list maintenance requirements. *Id.* at 17. It waved away any privacy issues, claiming that the federal prohibition on sharing voter information obtained under the Civil Rights Act of 1960 with the public was sufficient to assuage concerns. *See id.* (citing 52 U.S.C. § 20704). DOJ's August 18 Letter never addressed Defendant DeMarinis's questions raised in his August 13 Letter.

Defendant DeMarinis responded on August 25, 2025. *See* Ex. 5, Letter of the Hon. Jared DeMarinis to Harmeet K. Dhillon and Maureen Riordan dated Aug. 25, 2025, Dkt. No. 2-2, ("Aug. 25 Letter"), at 20–22. His letter noted that DOJ's August 18 Letter "did not answer the questions posed in [Maryland's] August 13, 2025 letter"—*i.e.* DOJ's purpose for procuring a list of Maryland's voters and why the list was necessary and relevant for that purpose. *Id.* at 20. Defendant DeMarinis reiterated that DOJ's answers to these questions was important for compliance with state and federal law. *Id.* at 20–22.

According to documents in the public record, DOJ never responded to Defendant DeMarinis's August 25 Letter, and never provided additional legal arguments to support its position or address Defendant DeMarinis's objections and concerns. Instead, months later on December 1, 2025, the United States sued Defendant DeMarinis (and brought very similar lawsuits in five other states, in addition to the eight states it had already sued to demand their full and unredacted statewide voter registration lists, and four more states it has sued since).[1]

---

[1] *See* Press Release, U.S. Dep't of Just., *Justice Department Sues Four Additional States and One Locality for Failure to Comply with Federal Elections Laws* (Dec. 12, 2025), https://perma.cc/TQ5T-FB2A; Press Release, U.S. Dep't of Just., *Justice Department Sues Six*

Notably, according to public reporting, DOJ's requests for private, sensitive voter data from Maryland and other states do not appear to relate to list maintenance under the NVRA and HAVA. Rather, they appear to be in connection with unprecedented efforts by the United States to construct a national voter database, and to otherwise use untested forms of database matching in order to scrutinize state voter rolls. According to this reporting, DOJ employees "have been clear that they are interested in a central, federal database of voter information." Devlin Barrett & Nick Corasaniti, *Trump Administration Quietly Seeks to Build National Voter Roll*, N.Y. TIMES, Sept. 9, 2025, https://www.nytimes.com/2025/09/09/us/politics/trump-voter-registration-data.html. DOJ is coordinating these efforts with the federal Department of Homeland Security ("DHS"), according to reported statements from DOJ and DHS. *Id.*; *see also, e.g.*, Jonathan Shorman, *DOJ is Sharing State Voter Roll Lists with Homeland Security*, STATELINE, Sept. 12, 2025, https://stateline.org/2025/09/12/doj-is-sharing-state-voter-roll-lists-with-homeland-security; Sarah Lynch, *US Justice Dept Considers Handing over Voter Roll Data for Criminal Probes, Documents Show*, REUTERS, Sept. 9, 2025, https://www.reuters.com/legal/government/us-justice-dept-considers-handing-over-voter-roll-data-criminal-probes-documents-2025-09-09. One article extensively quoted a recently departed lawyer from DOJ's Civil Rights Division describing DOJ's aims in this case and others like it:

---

*Additional States for Failure to Provide Voter Registration Rolls* (Dec. 2, 2025), https://perma.cc/F5MD-NWHD; Press Release, U.S. Dep't of Just., *Justice Department Sues Six States for Failure to Provide Voter Registration Rolls* (Sept. 25, 2025), https://perma.cc/7J99-WGBA; Press Release, U.S. Dep't of Just., *Justice Department Sues Oregon and Maine for Failure to Provide Voter Registration Rolls* (Sept. 16, 2025), https://perma.cc/M69P-YCVC; *see also* Kaylie Martinez-Ochoa, Eileen O'Connor & Patrick Berry, *Tracker of Justice Department Requests for Voter Information*, Brennan Ctr. for Just. (last updated Dec. 5, 2025), https://perma.cc/A73C-8YDZ.

> We were tasked with obtaining states' voter rolls, by suing them if necessary.
> Leadership said they had a DOGE person who could go through all the data and
> compare it to the Department of Homeland Security data and Social Security
> data. . . . I had never before told an opposing party, Hey, I want this information
> and I'm saying I want it for this reason, but I actually know it's going to be used
> for these other reasons. That was dishonest. It felt like a perversion of the role of
> the Civil Rights Division.

Emily Bazelon & Rachel Poser, *The Unraveling of the Justice Department*, N.Y. TIMES MAGAZINE,
Nov. 16, 2025, https://www.nytimes.com/interactive/2025/11/16/magazine/trump-justice-
department-staff-attorneys.html.

According to additional public reporting, these efforts are being conducted with the
involvement of self-proclaimed "election integrity" advocates within and outside the government
who have previously sought to disenfranchise voters and overturn elections. Those advocates
include Heather Honey, who sought to overturn the result of the 2020 presidential election in
multiple states and now serves as DHS's "deputy assistant secretary for election integrity."[2] Also
involved is Cleta Mitchell, a private attorney and leader of a national group called the "Election
Integrity Network," who has, among other things, promoted the use of artificial intelligence to
challenge registered voters.[3] Such actors, including actors associated with Ms. Honey, have

---

[2] *See* Alexandra Berzon & Nick Corasaniti, *Trump Empowers Election Deniers, Still Fixated on
2020 Grievances*, N.Y. TIMES, Oct. 22, 2025,
https://www.nytimes.com/2025/10/22/us/politics/trump-election-deniers-voting-security.html
(documenting "ascent" of election denier Honey); Jen Fifield, *Pa.'s Heather Honey, Who
Questioned the 2020 Election, Is Appointed to Federal Election Post*, PA. CAPITAL-STAR, Aug. 27,
2025, https://penncapital-star.com/election-2025/pa-s-heather-honey-who-questioned-the-2020-
election-is-appointed-to-brief-federal-election-post; Doug Bock Clark, *She Pushed to Overturn Trump's
Loss in the 2020 Election. Now She'll Help Oversee U.S. Election Security*, PROPUBLICA, Aug. 26,
2025, https://www.propublica.org/article/heather-honey-dhs-election-security.

[3] *See, e.g.*, Matt Cohen, *DHS Said to Brief Cleta Mitchell's Group on Citizenship Checks for Voting*,
DEMOCRACY DOCKET, June 12, 2025, https://www.democracydocket.com/news-alerts/dhs-said-
to-brief-cleta-mitchells-anti-voting-group-on-checking-citizenship-for-voters; *see also* Jude Joffe-
Block & Miles Parks, *The Trump Administration Is Building a National Citizenship Data System*,
NPR, June 29, 2025, https://www.npr.org/2025/06/29/nx-s1-5409608/citizenship-trump-privacy-
voting-database (reporting that Mitchell had received a "full briefing" from federal officials); *see*

previously sought to compel states to engage in aggressive purges of registered voters, and have abused voter data to make mass challenges to disenfranchise voters in other states. *See, e.g.*, *PA Fair Elections v. Pa. Dep't of State*, 337 A.3d 598, 600 n.1 (Pa. Commw. Ct. 2025) (determining that complaint brought by group affiliated with current DHS official Honey, challenging Pennsylvania's voter roll maintenance practices pursuant to the federal Help America Vote Act, was meritless).[4]

Here, DOJ's actions also indicate that it may focus on or target specific groups of voters in its use of the requested data. In its letters to Maryland and other States requesting the same private voter data, DOJ also requested information about how elections officials, among other things, process applications to vote by mail; identify and remove duplicate registrations; and verify that registered voters are not ineligible to vote, such as due to a felony conviction or citizenship status.[5] *See* July 14 Letter.

---

*also* Andy Kroll & Nick Surgey, *Inside Ziklag, the Secret Organization of Wealthy Christians Trying to Sway the Election and Change the Country*, PROPUBLICA, July 13, 2024, https://www.propublica.org/article/inside-ziklag-secret-christian-charity-2024-election ("Mitchell is promoting a tool called EagleAI, which has claimed to use artificial intelligence to automate and speed up the process of challenging ineligible voters.").

[4] *See* Carter Walker, *Efforts to Challenge Pennsylvania Voters' Mail Ballot Applications Fizzle*, SPOTLIGHT PA, Nov. 8, 2024, https://www.spotlightpa.org/news/2024/11/mail-ballot-application-challenges-pennsylvania-fair-elections/ (describing mass-challenges and noting connection to Honey and her organization "PA Fair Elections"); *see also* Jeremy Roebuck and Katie Bernard, *'I Can't Think of Anything Less American': Right-Wing Activists' Effort to Nullify Hundreds of Pa. Votes Met with Skepticism*, PHILA. INQUIRER, Nov. 1, 2024, https://www.inquirer.com/politics/election/heather-honey-pa-fair-elections-vote-challenges-pennsylvania-20241101.html (noting sworn testimony regarding PA Fair Elections' involvement in the challenges); Hansi Lo Wang, *Thousands of Pennsylvania Voters Have Had Their Mail Ballot Applications Challenged*, NPR, Nov. 5, 2024, https://www.npr.org/2024/11/04/nx-s1-5178714/pennsylvania-mail-ballot-voter-challenges-trump (same).

[5] *See, e.g.*, Letter from Maureen Riordan to Sec'y of State Al Schmidt (June 23, 2025), Dkt. No. 37-1, *United States v. Pennsylvania*, No. 2:25-cv-01481 (W.D. Pa. Oct. 9, 2025) (Pennsylvania); Letter from Michael E. Gates to Sec'y of State Jocelyn Benson, Dkt. No. 34-3, *United States v. Benson*, No. 1:25-cv-01148 (W.D. Mich. Nov. 25, 2025) (Michigan); Letter from Michael E. Gates to Sec'y of State Tobias Read (July 16, 2025), Dkt. No. 33-1, *United States v. Oregon*, No. 6:25-

**LEGAL STANDARD**

A court must dismiss a complaint if, accepting all well-pleaded factual allegations as true, it does not "state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). When considering a motion to dismiss, a court need not accept the complaint's legal conclusions. *Iqbal*, 556 U.S. at 678. A complaint must state a "plausible claim for relief" and contain more than "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Id.* at 678–79.

Thus, in practice, while courts "accept[] all well-pled facts as true and construe[] these facts in the light most favorable to the plaintiff," they ignore "legal conclusions, elements of a cause of action, and bare assertions devoid of further factual enhancement." *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 255 (4th Cir. 2009). This "context-specific" inquiry requires courts, using "judicial experience and common sense," to determine whether the factual allegations "nudge claims across the line from conceivable to plausible." *Id.* at 256 (internal quotation marks omitted). To perform this review, courts can also "consider documents incorporated into the complaint by reference, and matters of which a court may take judicial notice," as well as "documents attached to the motion to dismiss, so long as they are integral to the complaint and authentic." *Just Puppies, Inc. v. Brown*, 123 F.4th 652, 660 (4th Cir. 2024) (internal quotation marks omitted).

---

cv-01666 (D. Ore. Nov. 17, 2025) (Oregon); Letter from Michael E. Gates to Sec'y of State Shirley Weber (July 10, 2025), Dkt. No. 37-2, *United States v. Weber*, No. 2:25-cv-09149 (C.D. Cal. Nov. 7, 2025) (California).

**ARGUMENT**

**I.   THE UNITED STATES' DEMANDS EXCEED THE STATUTORY AUTHORITY OF THE CRA AND ARE CONTRARY TO LAW.**

The United States' demand for Maryland's full and unredacted electronic voter file exceeds its statutory authority under the CRA. Against the backdrop of the turmoil of the Jim Crow era, Congress enacted the CRA, including the public records provisions in Title III, to facilitate investigations of civil rights violations preventing eligible citizens from voting due to discrimination. H.R. Rep. No. 86-956 at 7 (1959) (indicating the purpose of Title III "is to provide a more effective protection of the right of all qualified citizens to vote without discrimination on account of race"). But the Attorney General's access to these records is not unbounded. If the Attorney General makes a demand for records, she must provide "a statement of the basis and the purpose therefor." 52 U.S.C. § 20703.

The United States' records request here is contrary to the CRA for at least two distinct reasons. *First*, in making this sweeping demand for Maryland's full and unredacted state voter registration list, the United States fails to offer a statutorily sufficient statement of "the basis and the purpose" in support of its records requests. *Second*, to the extent Plaintiff may be entitled to any records under the CRA, those records should be redacted to vindicate the privacy and constitutional rights of Maryland voters. Nothing in the CRA prevents the appropriate redaction of the sensitive personal information of voters.

**A.   Plaintiff's Demand for Records Fails to Meet the Requisite Statutory Requirements of the CRA.**

Title III of the CRA sets out requirements regarding federal election records, including a requirement in Section 301 for officers of elections to "retain and preserve, for a period of twenty-two months from the date of any" federal election, "all records and papers which come into [their] possession relating to any application, registration, payment of poll tax, or other act requisite to

voting in such election," with certain exceptions regarding delivery and designation of custodians. 52 U.S.C. § 20701. Section 303 requires that "[a]ny record or paper" retained and preserved under Section 301 "shall, upon demand in writing by the Attorney General or [her] representative directed to the person having custody, possession, or control of such record or paper, be made available for inspection, reproduction, and copying at the principal office of such custodian by the Attorney General or [her] representative." *Id*. § 20703. "This demand *shall* contain a statement of *the basis <u>and</u> the purpose* therefor." *Id.* (emphasis added).

Plaintiff's requests to Maryland fail to provide "a statement of the basis and the purpose" sufficient to support disclosure of the unredacted voter file. *Id*. Contemporaneous case law immediately following the enactment of Title III of the CRA shows that the "basis" is the statement for why the Attorney General believes there is a violation of federal civil rights law and the "purpose" explains how the requested records would help determine if there is a violation of the law. *Kennedy v. Lynd*, 306 F.2d 222, 229 n.6 (5th Cir. 1962). Indeed, "basis" and "purpose" under Title III of the CRA have consistently been treated as distinct concepts. *See id.*; *In re Coleman*, 208 F. Supp. 199, 199–200 (S.D. Miss. 1962), *aff'd sub nom.*, *Coleman v. Kennedy*, 313 F.2d 867 (5th Cir. 1963). As set forth below, the United States' failure to articulate both a sufficient "basis" and "purpose" underlying its request for the unredacted voter file warrants dismissal of the CRA claim.

The United States alleges that the "purpose" of its request seeking "an electronic copy of Maryland's complete and current [voter registration list]" was "to ascertain Maryland's compliance with the list maintenance requirements of the NVRA and HAVA." Compl. ¶ 25; Aug. 18 Letter at 17. But neither the Complaint nor the DOJ's August 18 Letter that invoked the CRA supply a "basis" for why the United States believes Maryland's list maintenance procedures might violate

the NVRA or HAVA in the first place. The United States claims it is investigating Maryland's compliance with the NVRA and HAVA based on its review of the Election Administration and Voting Survey 2024 Comprehensive Report from the U.S. Election Assistance Commission ("2024 EAVS Report"), which includes states' "reported data on their efforts to keep voter registration lists current and accurate, known as list maintenance." Compl. ¶¶ 19–20. Yet in its August 18 Letter, DOJ included no reference at all to the 2024 EAVS Report. *See* Aug. 18 Letter. While DOJ mentioned the 2024 EAVS Report in its earlier July 14 Letter, it did so in connection to other requests for data and did not make any connection between the report and its request for the statewide voter file. *See* July 14 Letter at 3–4. Moreover, neither the Complaint nor either of DOJ's two letters addressed to Defendant DeMarinis alleges any evidence of anomalies or anything inconsistent with reasonable list maintenance efforts in the data Maryland reported to EAVS. *See* Compl. ¶¶ 19–20; July 14 Letter; Aug. 18 Letter.

Moreover, even if the United States had provided a proper "basis" for its demand—and it did not—it fails to explain any connection between its purported "purpose" and the vast scope of its records request here, seeking the full and unredacted Maryland statewide voter file. It does not attempt to explain why *unredacted* voter files are necessary to determine whether Maryland has "conduct[ed] a general program that makes a reasonable effort to remove the names of ineligible voters" by virtue of "death" or "a change in the residence of the registrant," 52 U.S.C. § 20507; Compl. ¶ 12. And in fact, such unredacted files are not necessary: A single snapshot of a state's voter list does not and could not provide enough information to determine if the state has made a "reasonable effort" to remove ineligible voters under Section 8 of the NVRA. Compl. ¶ 12; 52 U.S.C. § 20507(a)(4)(A)–(B). The NVRA and HAVA both leave the mechanisms for conducting list maintenance within the discretion of the State. *See* 52 U.S.C. § 20507(a)(4); (c)(1);

11

§ 21083(a)(2)(A); § 21085. The *procedures* carried out by a state or locality establish its compliance; the unredacted voter file does not. Even were the United States to use voter file data to identify voters who had moved or died on Maryland's voter list at a single point in time, that would not amount to Maryland failing to comply with the "reasonable effort" required by the NVRA or HAVA. *See, e.g., Pub. Int. Legal Found. v. Benson*, 136 F.4th 613, 624–27 (6th Cir. 2025) (describing a "reasonable effort" as "a serious attempt that is rational and sensible" and rejecting any "quantifiable, objective standard" in this context).[6] For these reasons, the United States' demand failed on its face to meet the basis and purpose requirements of the CRA.

The basis and purpose requirements under the CRA are critical safeguards. They prevent the statute from being used as a fishing expedition to obtain records for reasons that are speculative, unrelated to the CRA's aims, or otherwise impermissible or contrary to law. The statutory basis and purpose requirements are not perfunctory but require a specific statement as to the reason for requesting the information and how that information will aid in the investigatory analysis. In the context of administrative subpoenas, and specifically in assessing an analogous power by which federal agencies obtain records in service of investigations, courts have found that the test of judicial enforcement of such subpoenas includes an evaluation of whether the investigation is "conducted pursuant to a legitimate purpose," *Equity Inv. Assocs., LLC v. United States*, 40 F.4th 156, 161–62 (4th Cir. 2022) (quoting *United States v. Powell*, 379 U.S. 48, 57 (1964)), and that such subpoenas are not in service of "unnecessary examination or investigations," *United States v.*

---

[6] Indeed, the inclusion at any particular point in time on Maryland's voter registration list of some voters who may have potentially moved out of state is to be expected, since Section 8(d) of the NVRA explicitly sets out a specific set of rules and requirements for removals from the voter rolls based on changes of residence, whereby states "shall not remove" voters on these grounds unless these voters directly confirm their change of residence in writing, or unless states first provide notice and then abide by a statutory waiting period until the second general federal election after providing notice. 52 U.S.C. § 20507(d).

*Rosinsky*, 547 F.2d 249, 253 (4th Cir. 1977) (internal quotation marks omitted. Indeed, courts have explained that such a purpose requirement ensures that the information sought is relevant to the inquiry and not unduly burdensome. *See, e.g.*, *F.D.I.C. v. Wentz*, 55 F.3d 905, 908 (3d Cir. 1995) (reciting requirements for investigation pursuant to an administrative subpoena).

As such, even if some portion of the voter file were necessary to investigate "Maryland's compliance with the list maintenance requirements of the NVRA and HAVA," Compl. ¶ 25; Aug. 18 Letter at 17, the United States has not provided any justification for why the full *unredacted* voter file is necessary to carry out this purported purpose. It is telling that, for decades, DOJ has neither sought nor required a full and unredacted voter file in its investigations regarding compliance with the NVRA. *See, e.g.*, Press Release, U.S. Dep't of Just., *United States Announces Settlement with Kentucky Ensuring Compliance with Voter Registration List Maintenance Requirements* (July 5, 2018) https://perma.cc/G2EZUUA5 (describing letters to all 44 states covered by the NVRA with requests for list maintenance information, but without demanding voter files). The United States' failure to articulate the basis and the purpose for its demand for the full and unredacted voter file in particular is another ground to hold their demand insufficient as a matter of law.

Title III's basis and purpose requirement is moreover especially important here, where massive amounts of public reporting and public, judicially noticeable documents show that DOJ in fact did not disclose the main basis and purpose for its demand for Maryland's full and unredacted voter file: building an unprecedented national voter file for its own use, to be shared with other agencies like DHS for unlawful purposes. *See supra* 4–7 & nn.2–4 (describing this reporting in detail). The creation of such a database has never been authorized by Congress, and indeed likely violates the federal Privacy Act. *See* 5 U.S.C. § 552a(e)(7) (provision of the federal

Privacy Act prohibiting the creation or maintenance of any database "describing how any individual exercises rights guaranteed by the First Amendment," which necessarily includes exercising the right to vote).

DOJ's failure to fully and accurately provide this information is fatal to its Complaint. Section 303 of the CRA requires a statement of "*the* basis and *the* purpose" of a records request, and by twice using the definite article here, the statute requires not just *a* basis or purpose among many, but *the* complete basis and purpose underlying the request. *See Niz-Chavez v. Garland*, 593 U.S. 155, 165–66 (2021); *see also, e.g.*, *Corner Post, Inc. v. Bd. of Governors of the Fed. Rsrv. Sys.*, 603 U.S. 799, 817 (2024) (emphasizing distinction between the definite and the indefinite article). This is yet another ground for dismissal.

Moreover, and even setting aside this fatal deficiency, compliance with the NVRA and HAVA also cannot be the true basis and purpose for the data requests at issue here based on the United States' own more recent statements to States in connection with the requests. In particular, the United States represented in a December 4 hearing in the Central District of California in *United States v. Weber*, No. 25-cv-09149, that it has recently sought for a number of States to sign a memorandum of understanding ("MOU") regarding its requests for statewide voter files. And far from ensuring compliance with the NVRA and HAVA, this MOU insisted upon by the United States runs afoul of those statutes. *See* Ex. 1, U.S. Dep't of Just., Civ. Div., Confidential Mem. of Understanding ("MOU").

As noted, the NVRA and HAVA require a state to conduct a "reasonable effort" to remove ineligible voters from the rolls, 52 U.S.C. § 20507(a)(4); § 21083(a)(4)(A), and indeed the NVRA itself is structured so that potentially ineligible voters *must* necessarily stay on the rolls for two election cycles so as to limit the likelihood of a state removing eligible voters by mistake, *id*.

§ 20507(d)(1)(B). But the MOU indicates multiple contemplated violations of those statutory requirements. First, the United States seeks to place authority to identify supposed ineligible voters in the hands of the federal government, directly contrary to statutory text, *id*. § 21085 (methods of complying with HAVA "left to the discretion of the State"). MOU at 2, 5. Second, its substantive terms seek to compel states to remove supposedly ineligible voters "within forty-five (45) days," MOU at 5, in a manner that would violate multiple protections of the NVRA, 52 U.S.C. § 20507. This now-public memorandum, which was apparently made public by officials from the State of Colorado, demonstrates that Plaintiff's supposed purpose is not in compliance with federal law but aggrandizing authority to a federal agency that is contrary to federal law.[7]

Under the circumstances here, Plaintiff's invocation of Title III of the CRA fails in myriad ways to provide a sufficient "statement of the basis and the purpose" for its demand and accordingly does not comply with the CRA. Dismissal is proper.

### B. Any Records Disclosed Under the CRA Should Be Redacted to Protect the Constitutional Rights of the Voter.

Even had the United States provided a valid basis and purpose sufficient to support its demands—which it did not—any sensitive personal voter information would still be subject to redaction. The text of Title III of the CRA does not prohibit redactions to protect voter privacy and ensure compliance with federal and state law and the Constitution. Indeed, courts have found that redaction may be required to prevent the disclosure of sensitive personal information that would create an intolerable burden on the constitutional right to vote.

As noted, to justify its demand for data under Title III of the CRA, the United States claims it is investigating Maryland's compliance with federal election laws, including the NVRA and

---

[7] Dismissal on the grounds set forth above would also be proper under Rule 12(c) or after discovery regarding the United States' purported basis and purpose for its requests pursuant to Rule 56.

HAVA, purportedly based on its review of data from the 2024 EAVS Report. Compl. ¶¶ 21–22. The United States also discusses additional requirements of the NVRA and HAVA, including the NVRA's requirement in Section 8(i) to maintain "all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters" upon request. 52 U.S.C. § 20507(i); Compl. ¶¶ 10–15. Anyone—including individual voters, groups that protect the right to vote, and government officials—has the same right to records under the NVRA. Voting rights advocates have consistently relied on the NVRA to investigate infringements on the right to vote, including whether election officials have improperly denied or cancelled voter registrations. *See, e.g., Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331, 333 (4th Cir. 2012) (nonprofit investigating improper rejection of voter registrations submitted by students at a historically Black university).

While the United States does not rely on Section 8(i) of the NVRA for its demand for data in this lawsuit, the cases interpreting this provision are instructive, as courts have consistently found that the information required to be disclosed under the NVRA has limits. These courts, including the Fourth Circuit, have consistently permitted—and in some instances required—states to redact sensitive personal data of voters when disclosing information under the NVRA. Failure to do so can violate the fundamental right to vote protected by the Constitution.

Like the CRA, the NVRA is silent as to how sensitive personal information should be treated during disclosure. *See* 52 U.S.C. § 20703; 52 U.S.C. § 20507(i)(1). Courts must interpret the disclosure provisions in these statutes in a manner that does not unconstitutionally burden the right to vote. *See United States v. Simms*, 914 F.3d 229, 251 (4th Cir. 2019) ("We are obligated to construe a statute to avoid constitutional problems" where "such a reading is fairly possible") (internal quotation marks and alterations omitted). Federal courts throughout the country have

consistently struck this balance, interpreting the "all records concerning" language in Section 8(i) to permit—and even in some cases require—redaction and the protection of confidential materials. As the First Circuit has noted, "nothing in the text of the NVRA prohibits the appropriate redaction of uniquely or highly sensitive personal information in the Voter File," and as such, "the proper redaction of certain personal information in the Voter File can further assuage the potential privacy risks implicated by the public release of the Voter File." *Pub. Int. Legal Found., Inc. v. Bellows*, 92 F.4th 36, 56 (1st Cir. 2024); *see also Pub. Int. Legal Found., Inc. v. N.C. State Bd. of Elections*, 996 F.3d 257, 266–68 (4th Cir. 2021) (holding that the potential connection to ongoing criminal investigations and the possibility of erroneously labeling a voter as a noncitizen and subjecting them to public harassment warrants maintaining confidentiality of records). Other courts have consistently recognized that the NVRA disclosure provisions do not compel the release of sensitive information that is otherwise protected by federal or state laws. *See, e.g.*, *N.C. State Bd. of Elections*, 996 F.3d at 264; *Pub. Int. Legal Found., Inc. v. Dahlstrom*, 673 F. Supp. 3d 1004, 1015–16 (D. Alaska 2023); *Pub. Int. Legal Found., Inc. v. Matthews*, 589 F. Supp. 3d 932, 942 (C.D. Ill. 2022), *clarified on denial of reconsideration*, No. 20-CV-3190, 2022 WL 1174099 (C.D. Ill. Apr. 20, 2022); *Pub. Int. Legal Found. v. Boockvar*, 431 F. Supp. 3d 553, 561–63 (M.D. Pa. 2019).

Redaction may also be affirmatively required to the extent the disclosure of such sensitive material would "create[] an intolerable burden on [the constitutional right to vote] as protected by the First and Fourteenth Amendments." *Long*, 682 F.3d at 339 (quotation marks and citation omitted). The Fourth Circuit in *Long*, even while granting access to a state's voter registration applications for inspection and photocopying, ensured the redaction of Social Security numbers,

17

which are "uniquely sensitive and vulnerable to abuse."[8] *Id.* In coming to this conclusion, the court emphasized that the NVRA reflected Congress's view that the right to vote was "fundamental," and that the unredacted release of records risked deterring citizens from registering to vote and thus created an "intolerable burden" on this fundamental right. *Id.* at 334, 339; *cf. In re Coleman*, 208 F. Supp. 199, 200 (S.D. Miss. 1962) (noting, in the context of a records request under Title III of the CRA, multiple considerations not at issue in that case but which could be "[s]ignificant," including that "[i]t is not claimed that these official records are privileged, or exempt from discovery for any sound reason of public policy," or "that an inspection of these records would be oppressive, or any unlawful invasion of any personal constitutional right"). As such, public disclosure provisions such as those in the NVRA and Title III of the CRA must be interpreted to avoid this unconstitutional burden. *See id.*; *Bellows*, 92 F.4th at 56. The danger of imposing those burdens on Maryland voters like Mr. Snowden, Ms. Paul, and Mr. Sims, and non-partisan, non-profit organizations like Common Cause and Out for Justice, is present here. *See* Mot. to Intervene, Ex. D, Decl. of Carl Snowden, ¶¶ 9–10; Mot. to Intervene, Ex. E, Decl. of Myriam Paul, ¶¶ 5–6; Mot. to Intervene, Ex. F, Decl. of Luis Sims, ¶¶ 6–8.

As with any requester of records, the United States would be afforded access to voting records under Section 8(i) of the NVRA. But federal court precedent is clear that this access is not unfettered and instead must always be balanced against privacy protections that are vital to

---

[8] Plaintiff itself has stated—on multiple occasions—that the NVRA does not prohibit the States from redacting "uniquely sensitive information" when disclosing voting records. *See, e.g.*, Br. for the United States as Amicus Curiae, *Pub. Int. Legal Found., Inc. v. Bellows* ("United States Amicus Brief"), No. 23-1361 (1st Cir. July 25, 2024), 2023 WL 4882397 at *27–28; Br. for the United States as Amicus Curiae, *Pub. Int. Legal Found. v. Schmidt*, No. 23-1590 (3d Cir. Nov. 6, 2023), https://perma.cc/3BQ9-36UJ ("States may redact certain information before disclosing Section 8(i) records."); Br. for the United States as Amicus Curiae, *Project Vote/Voting for Am., Inc. v. Long*, No. 11-1809 (4th Cir. Oct. 18, 2011), 2011 WL 4947283, at *11, 25–26.

ensuring citizens retain their fundamental right to vote. The same privacy and constitutional concerns that federal courts have found warrant redactions under NVRA records requests apply equally to requests for the same records under the CRA. *Cf. Sheetz v. Cnty. of El Dorado*, 601 U.S. 267, 281–282 (2024) (Gorsuch, J., concurring) ("[O]ur Constitution deals in substance, not form. However the government chooses to act, . . . it must follow the same constitutional rules."). Indeed, the limited case law considering records requests under the CRA expressly acknowledged that courts retain the "power and duty to issue protective orders," *Lynd*, 306 F.2d at 230, such as the redaction of sensitive fields that courts have consistently determined are entitled to protection from disclosure.

Thus, even were the United States entitled to records under Title III after having provided a valid statement of the basis and the purpose therefor (which it failed to do here), sensitive personal identifying information, including Social Security numbers and driver's license numbers, should similarly be redacted. No matter the statutory mechanism, conditioning the right to vote on the release of voters' sensitive private information "creates an intolerable burden on that right." *Long*, 682 F.3d at 339 (citation omitted).

## II.    THE UNITED STATES IS NOT ENTITLED TO SUMMARY DISPOSITION OF ITS CRA CLAIM.

The United States makes expansive claims that Title III of the CRA universally "displaces the Federal Rules of Civil Procedure by creating a 'special statutory proceeding'" where "'[a]ll that is required is a simple statement by the Attorney General'" that "a written demand for Federal election records and papers covered by the statute" was made, "explaining that the person against whom an order is sought has failed or refused to make the requested records" available. Mem. of Law in Supp. of the Request for Order to Compel Prod. of Records ("Mot. to Compel"), Dkt. No. 2-1 at 5; *see also* Compl. ¶¶ 1–4. This argument rests entirely on a single set of non-binding cases

19

decided more than sixty years ago, in the early 1960's, in a different circuit and a drastically different historical context, including primarily *Kennedy v. Lynd*, 306 F.2d 222 (5th Cir. 1962). *See* Mot. to Compel; *see also* Compl. ¶¶ 1–4.

The United States briefly acknowledges that "[c]aselaw addressing the CRA in any depth is confined to courts within the Fifth Circuit in the early years following the CRA's enactment. Since then, courts have not had occasion to revisit the issue." Mot. to Compel at 4 n.1. But the United States does not provide key historical context that could help explain why this provision of the CRA would have been addressed primarily in the Fifth Circuit—which at the time those cases were decided, during the Jim Crow era, included the southern states of Alabama, Florida, Georgia, Louisiana, Mississippi, and Texas.[9] In these states, it was widely known that many election officials were recalcitrant in their refusal to register Black voters.[10] It was against this particular backdrop that the Fifth Circuit in *Kennedy v. Lynd* fashioned an expedited, summary procedure for enforcing CRA records requests in those early 1960's cases. In the face of Jim Crow regimes that were using every possible means to block Black Americans from registering to vote, including resistance from judges, the Fifth Circuit in *Lynd* noted that "the factual foundation for, or the sufficiency of, the Attorney General's 'statement of the basis and the purpose' contained in the written demand is not open to judicial review or ascertainment." *Lynd*, 306 F.2d at 226. In that context, "the factual foundation for" the basis and purpose of the Attorney General's request was

---

[9] "Federal Judicial Circuits: Fifth Circuit," FEDERAL JUDICIAL CENTER, https://perma.cc/9MSD-EFRB (last visited Dec. 9, 2025).

[10] *See generally, e.g.*, Steven F. Lawson, *Black Ballots: Voting Rights in the South, 1944-1969* (1976).

utterly self-evident, and thus plenary consideration was not required. *See id.* The Fifth Circuit's treatment of Section 303 of the CRA cannot be divorced from that context.[11]

By contrast, here, more than sixty years later, the context of *this* records request could not be more different. The United States has invoked the CRA for unprecedented purposes, to make sweeping demands for extensive voter data with no showing or claim of legal deficiencies or violations of rights, while making unprecedented demands for sensitive, non-public personal identifying information. Even more alarming, there is extensive reporting that the purported basis and purpose of DOJ's request are likely pretextual, and that the data at issue is in fact being sought for unlawful ends.[12]

Nothing in the text of Title III of the CRA insulates the sufficiency of the requirement for a "statement of the basis and the purpose" of a demand from standard judicial review—especially not in the circumstances presented here. *See* 52 U.S.C. § 20703. Indeed, in the more than sixty years since *Lynd*, the Supreme Court has reaffirmed that "the Federal Rules apply to proceedings to compel the giving of testimony or production of documents in accordance with a subpoena issued by an officer or agency of the United States under any statute of the United States except as otherwise provided by statute or by rules of the district court or by order of the court in the proceedings." *Becker v. United States*, 451 U.S. 1306, 1307–08 (1981) (internal citation and quotation marks omitted); *see also, e.g.*, *Powell*, 379 U.S. at 57–58  (holding that IRS

---

[11] *See also In re Coleman*, 208 F. Supp. 199, 201 (S.D. Miss. 1962) (acknowledging in the context of Title III of the CRA that while "[t]he right of free examination of official records is the rule," there could be "exception[s]" where "the purpose is speculative, or from idle curiosity").

[12] *See supra* 4–7 & nn.2–4 (citing, *inter alias*, Devlin Barrett & Nick Corasaniti, *Trump Administration Quietly Seeks to Build National Voter Roll*, N.Y. TIMES (Sept. 9, 2025), https://www.nytimes.com/2025/09/09/us/politics/trump-voter-registration-data.html; Emily Bazelon & Rachel Poser, *The Unraveling of the Justice Department*, N.Y. TIMES MAGAZINE (Nov. 16, 2025), https://www.nytimes.com/interactive/2025/11/16/magazine/trump-justice-department-staff-attorneys.html?unlocked_article_code=1.

Commissioner bears the burden to establish statutory requirements before enforcement of a tax subpoena); *Sugarloaf Funding, LLC v. U.S. Dep't of Treasury*, 584 F.3d 340, 347–50 (1st Cir. 2009) (allowing summons recipient opportunity to rebut government's prima facie case). *Powell* is especially on point. There, just two years after *Lynd*, the Court held that proceedings to enforce a statute providing the United States with the power to request records in terms that are materially identical to the CRA were governed by the Federal Rules. *Powell*, 379 U.S. at 57–58 & n.18 (citing 26 U.S.C. § 7604(a)); *compare* 26 U.S.C. § 7604(a) ("[T]he United States district court for the district in which such person resides or is found *shall have jurisdiction by appropriate process* to compel such attendance, testimony, or production of books, papers, records, or other data[.]" (emphasis added)) *with* 52 U.S.C. § 20705 ("The United States district court for the district in which a demand is made . . .or in which a record or paper so demanded is located, *shall have jurisdiction by appropriate process* to compel the production of such record or paper." (emphasis added)). The United States' demand for a summary resolution to this case, with no discovery into whether it has a proper statutory basis for its demand, flies in the face of a half-century of precedent as well as the Federal Rules.

Furthermore, even in *Lynd*, the court in explaining its findings noted that "we are not discussing confidential, private papers and effects. We are, rather dealing with public records which ought ordinarily to be open to legitimate reasonable inspection and which by nature relate directly to the most vital of all public functions—the franchise of the citizen." 306 F.2d at 231. The court also noted that what is now Section 305 of the CRA authorizes only jurisdiction by "appropriate process" to compel document production, which the court had "no doubt" would "include the power and duty to issue protective orders"—such as orders protecting and redacting sensitive information such as that at issue in this case. 52 U.S.C. § 20705; *Lynd*, 306 F.2d at 230.

Thus, even in the 1960's, before sensitive personal identifying information such as Social Security Numbers or driver's license numbers were widely collected as part of the voter registration record, and before any federal laws had been passed to protect and constrain access to personal information,[13] the court recognized the distinction between the disclosure of "confidential, private" information and "public records" that would already "ordinarily [] be open to legitimate reasonable inspection," *Lynd*, 306 F.2d at 231, and anticipated the possibility that the "duty to issue protective orders" would arise for certain records requests under the CRA, *id.* at 230.

To argue that the United States is entitled to summary relief and the forced provision of an unprecedented trove of "confidential, private" information, without *any* review of its statutorily required statement of the basis and the purpose for its demand, would go even further than *Lynd* did in the context of the 1960's Jim Crow South, where, very much unlike here, the federal basis and purpose for the requested voter data were inarguably clear and not apparently pretextual or unlawful. The United States' attempt to end-run the Federal Rules and the CRA's requirements must be rejected.

## CONCLUSION

The United States' request for Maryland's full and unredacted electronic voter file should be denied and the Complaint dismissed.

Dated: December 12, 2025                    Respectfully submitted,

                                            /s/ Deborah A. Jeon
                                            _____

---

[13] *E.g.*, Privacy Act of 1974, Pub. L. No. 93-579, 88 Stat. 1896 (1974); Driver's Privacy Protection Act of 1994, Pub. L. No. 103-322, 108 Stat. 1796 (1994), codified at 18 U.S.C. § 2721 *et seq.*; E-Government Act of 2002, Pub. L. No. 107-347, 116 Stat. 2899 (2002); Federal Information Security Modernization Act of 2014, Pub. L. No. 113-283, 128 Stat. 3073 (2014), codified at 44 U.S.C. §§ 3351 *et seq.* (2014).

Jonathan Topaz*
Theresa J. Lee*
Sophia Lin Lakin*
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
Tel.: (212) 549-2500
jtopaz@aclu.org
tlee@aclu.org
slakin@aclu.org

*application for admission pro hac vice
forthcoming

Deborah A. Jeon (Bar No. 06905)
Dara Johnson (Bar No. 31478)
AMERICAN CIVIL LIBERTIES UNION OF MARYLAND
3600 Clipper Mill Road
Suite 200
Baltimore, MD 21211
Tel. 410-889-8555
jeon@aclu-md.org
djohnson@aclu-md.org

Exhibit 1

 **U.S. Department of Justice**

Civil Rights Division

---

## CONFIDENTIAL MEMORANDUM OF UNDERSTANDING

### I.     PARTIES & POINTS OF CONTACT.

<u>Requester</u>
Federal Agency Name:  Civil Rights Division, U.S. Department of Justice
VRL/Data User:
Title:
Address:
Phone:

<u>VRL/Data Provider</u>
State Agency Name:
Custodian:
Title:
Address:
Phone:


The parties to this Memorandum of Understanding ("MOU" or "Agreement") are the Department of Justice, Civil Rights Division ("Justice Department" or "Department"), and the State of Colorado ("You" or "your state").

### II.     AUTHORITY.

By this Agreement, the State of Colorado ("You" or "your state") has agreed to, and will, provide an electronic copy of your state's complete statewide Voter Registration List ("VRL" or "VRL/Data") to the Civil Rights Division of the U.S. Department of Justice (at times referred to as the "Department").  The VRL/Data must include, among other fields of data, the voter registrant's full name, date of birth, residential address, his or her state driver's license number or

1

the last four digits of the registrant's social security number as required under the HAVA to register

individuals for federal elections. *See* 52 U.S.C. § 21083(a)(5)(A).

The authorities by which this information is requested by the Department of Justice are:

- National Voter Registration Act of 1993, 52 U.S.C. § 20501, *et seq*.

- Attorney General's authority under Section 11 of the NVRA to bring enforcement

  actions. See 52 U.S.C. § 20501(a).

- Help America Vote Act of 2002, 52 U.S.C. § 20901, *et seq*.

- Attorney General's authority to enforce the Help America Vote Act under 53 U.S.C. §

  21111.

- Attorney General authority to request records pursuant to Title III of the Civil Rights

  Act of 1960 ("CRA"), codified at 52 U.S.C. § 20701, *et seq*.

- The Privacy Act of 1974, 5 U.S.C. § 552a, as amended.

**III.    PURPOSE.**

A VRL is a Voter Registration List pursuant to the NVRA and HAVA, commonly referred

to as "voter roll," compiled by a state – often from information submitted by counties – containing

a list of all the state's *eligible* voters.  Regardless of the basis for ineligibility, ineligible voters do

not appear on a state's VRL when proper list maintenance is performed by states.  The Justice

Department is requesting your state's VRL to test, analyze, and assess states' VRLs for proper list

maintenance and compliance with federal law.  In the event the Justice Department's analysis of a

VRL results in list maintenance issues, insufficiency, inadequacy, anomalies, or concerns, the

Justice Department will notify your state's point of contact   of the issues to assist your state with

curing.

The purpose of this MOU is to establish the parties' understanding as to the security protections for data transfer and data access by the Department of Justice of the electronic copy of the statewide voter registration list, including all fields requested by the Department of Justice.

**IV.    TIMING OF AGREEMENT – TIME IS OF ESSENCE.**

Although the Justice Department is under no such obligation as a matter of law, because this Agreement is proposed, made, and to be entered into at your state's request as part of your state's transmission of its VRL to the Justice Department, this Agreement is to be fully executed within seven (7) days of the Justice Department presenting this Agreement to you.  Both parties agree that no part of this Agreement or execution is intended to, or will, cause delay of the transmission of your state's VRL to the Justice Department for analysis.

**V.    TIMING OF VRL/DATA TRANSFER.**

You agree to transfer an electronic copy of your state's complete statewide VRL/Data to the Civil Rights Division of the U.S. Department of Justice as described in Section III of this Agreement no later than five (5) business days from the execution of this Agreement, which is counted from the last day of the last signatory.

**VI.    METHOD OF VRL/DATA ACCESS OR TRANSFER.**

The VRL will be submitted by your state via the Department of Justice's secure file-sharing system, i.e., Justice Enterprise File Sharing (JEFS").  A separate application to use JEFS must be completed and submitted by your state through the Civil Rights Help Desk.  JEFS implements strict access controls to ensure that each user can only access their own files.  All files and folders are tied to a specific user, and each user has defined permissions that govern how they may interact with those files (e.g., read, write, or read-only).

Whenever a user attempts to access a file or folder, JEFS validates the request against the assigned permissions to confirm that the user is explicitly authorized.  This process guarantees that users can only access files and folders only where they have permission.  Users are also limited to the authorized type of interaction with each file or folder.  Within the Department of Justice, access to JEFS is restricted to specific roles: Litigation Support, IT staff, and Civil Rights Division staff.

## VII.    LOCATION OF DATA AND CUSTODIAL RESPONSIBILITY.

The parties mutually agree that the Civil Rights Division (also "Department") will be designated as "Custodian" of the file(s) and will be responsible for the observance of all conditions for use and for establishment and maintenance of security agreements as specified in this agreement to prevent unauthorized use.  The information that the Department is collecting will be maintained consistent with the Privacy Act of 1974, 5 U.S.C. § 552a.  The full list of routine uses for this collection of information can be found in the Systems of Record Notice ("SORN") titled, JUSTICE/CRT – 001, "Central Civil Rights Division Index File and Associated Records," 68 Fed. Reg. 47610-01, 611 (August 11, 2003); 70 Fed. Reg. 43904-01 (July 29, 2005); and 82 Fed. Reg. 24147-01 (May 25, 2017).  It should be noted that the statutes cited for routine use include NVRA, HAVA, and the Civil Rights Act of 1960, and the Justice Department is making our request pursuant to those statutes.  The records in the system of records are kept under the authority of 44 U.S.C. § 3101 and in the ordinary course of fulfilling the responsibility assigned to the Civil Rights Division under the provisions of 28 C.F.R. §§ 0.50, 0.51.

VRL/Data storage is similar to the restricted access provided on JEFS and complies with the SORN: Information in computer form is safeguarded and protected in accordance with applicable Department security regulations for systems of records.  Only a limited number of staff members who are assigned a specific identification code will be able to use the computer to access

the stored information.  However, a section may decide to allow its employees access to the system in order to perform their official duties.

All systems storing the VRL data will comply with all security requirements applicable to Justice Department systems, including but not limited to all Executive Branch system security requirements (e.g., requirements imposed by the Office of Management and Budget [OMB] and National Institute of Standards and Technology [NIST]), Department of Justice IT Security Standards, and Department of Justice Order 2640.2F.

## VIII.    NVRA/HAVA COMPLIANT VOTER REGISTRATION LIST.

After analysis and assessment of your state's VRL, the Justice Department will securely notify you or your state of any voter list maintenance issues, insufficiencies, inadequacies, deficiencies, anomalies, or concerns, the Justice Department found when testing, assessing, and analyzing your state's VRL for NVRA and HAVA compliance, i.e., that your state's VRL only includes eligible voters.

You agree therefore that within forty-five (45) days of receiving that notice from the Justice Department of any issues, insufficiencies, inadequacies, deficiencies, anomalies, or concerns, your state will clean its VRL/Data by removing ineligible voters and resubmit the updated VRL/Data to the Civil Rights Division of the Justice Department to verify proper list maintenance has occurred by your state pursuant to the NVRA and HAVA.

## IX.    CONFIDENTIALITY & DEPARTMENT SAFEGUARDS.

Any member of the Justice Department in possession of a VRL/Data will employ reasonable administrative, technical, and physical safeguards designed to protect the security and confidentiality of such data.  Compliance with these safeguards will include secure user authentication protocols deploying either: (i) Two-Factor Authentication ("2FA"), which requires users to go through two layers of security before access is granted to the system; or (ii) the

assignment of unique user identifications to each person with computer access plus unique complex passwords, which are not vendor supplied default passwords.

The Department will activate audit logging for the records, files, and data containing the state's VRL/Data in order to identify abnormal use, as well as to track access control, on computers, servers and/or Devices containing the VRL/Data.

For all devices storing records, files, and data containing the VRL/Data: there is (i) up-to-date versions of system security agent software that includes endpoint protection and malware protection and reasonably up-to-date patches and virus definitions, or a version of such software that can still be supported with up-to-date patches and virus definitions, and is set to receive the most current security updates on a regular basis; and (ii) up-to-date operating system security patches designed to maintain the integrity of the personal information.

For all devices storing records, files, and data containing the VRL/Data: there is (i) controlled and locked physical access for the Device; and (ii) the prohibition of the connection of the Device to public or insecure home networks.

There will be no copying of records, files, or data containing the VRL/Data to unencrypted USB drives, CDs, or external storage.  In addition, the use of devices outside of moving the records, files, or data to the final stored device location shall be limited.

Any notes, lists, memoranda, indices, compilations prepared or based on an examination of VRL/Data or any other form of information (including electronic forms), that quote from, paraphrase, copy, or disclose the VRL/Data with such specificity that the VRL/Data can be identified, or by reasonable logical extension can be identified will not be shared by the Department. Any summary results, however, may be shared by the Department.

In addition to the Department's enforcement efforts, the Justice Department may use the information you provide for certain routine, or pre-litigation or litigation purposes including:

present VRL/Data to a court, magistrate, or administrative tribunal; a contractor with the Department of Justice who needs access to the VRL/Data information in order to perform duties related to the Department's list maintenance verification procedures.  Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. § 552a(m).

**X.    LOSS OR BREACH OF DATA.**

If a receiving party discovers any loss of VRL/Data, or a breach of security, including any actual or suspected unauthorized access, relating to VRL/Data, the receiving party shall, at its own expense immediately provide written notice to the producing party of such breach; investigate and make reasonable and timely efforts to remediate the effects of the breach, and provide the producing party with assurances reasonably satisfactory to the producing party that such breach shall not recur; and provide sufficient information about the breach that the producing party can reasonably ascertain the size and scope of the breach. The receiving party agrees to cooperate with the producing party or law enforcement in investigating any such security incident. In any event, the receiving party shall promptly take all necessary and appropriate corrective action to terminate unauthorized access.

**XI.    DESTRUCTION OF DATA.**

The Department will destroy all VRL/Data associated with actual records as soon as the purposes of the list maintenance project have been accomplished and the time required for records retention pursuant to applicable law has passed.  When the project is complete and such retention requirements by law expires, the Justice Department will:

1.  Destroy all hard copies containing confidential data (e.g., shredding);

2.  Archive and store electronic data containing confidential information offline in a secure location; and

3. All other data will be erased or maintained in a secured area.

**XII.    OTHER PROVISIONS.**

A. Conflicts. This MOU constitutes the full MOU on this subject between the Department and your state. Any inconsistency or conflict between or among the provisions of this MOU, will be resolved in the following order of precedence: (1) this MOU and (2) other documents incorporated by reference in this MOU (e.g., transaction charges).

B. Severability. Nothing in this MOU is intended to conflict with current law or regulation or the directives of Department, or the your state. If a term of this MOU is inconsistent with such authority, then that term shall be invalid but, to the extent allowable, the remaining terms and conditions of this MOU shall remain in full force and effect.

C. Assignment. Your state may not assign this MOU, nor may it assign any of its rights or obligations under this MOU.  To the extent allowable by law, this MOU shall inure to the benefit of, and be binding upon, any successors to the Justice Department and your state without restriction.

D. Waiver. No waiver by either party of any breach of any provision of this MOU shall constitute a waiver of any other breach. Failure of either party to enforce at any time, or from time to time, any provision of this MOU shall not be construed to be a waiver thereof.

E. Compliance with Other Laws. Nothing in this MOU is intended or should be construed to limit or affect the duties, responsibilities, and rights of the User Agency under the National Voter Registration Act, 52 U.S.C. § 20501 *et seq*., as amended; the Help America Vote Act, 52 U.S.C. § 20901 *et seq*., as amended; the Voting Rights Act, 52 U.S.C. § *10301 et seq.*, as amended; and the Civil Rights Act, 52 U.S.C. § 10101 et seq., as amended.

F. Confidentiality of MOU.  To the extent allowed by applicable law, this MOU, its contents, and the drafts and communications leading up to the execution of this MOU are deemed

8

by the parties as "confidential."  Any disclosures therefore could be made, if at all,

pursuant to applicable laws or court orders requiring such disclosures.


**SIGNATURES**

<u>VRL/Data Provider</u>
State Agency Name:
Signature: _____ Date of Execution:_____

Authorized Signatory Name Printed:_____

Title: _____


<u>Requester</u>
Federal Agency Name:  Civil Rights Division, U.S. Department of Justice

Signature: _____ Date of Execution:_____

Authorized Signatory Name Printed:_____

Title: _____