**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

THE UNITED STATES OF AMERICA,　　*

　　　　　*Plaintiff*,　　　　　　　*

　　　　v.　　　　　　　　　　*

　　　　　　　　　　　　　　　　　No. 1:25-cv-03934-SAG

JARED DEMARINIS, in his official　　*
capacity as state administrator of
elections for the state of Maryland,　*

　　　　　*Defendant*.

　*　　*　　*　　*　　*　　*　　*　　*　　*　　*　　*　　*

**MEMORANDUM IN SUPPORT OF MARYLAND STATE ADMINISTRATOR'S**
**MOTION TO DISMISS**

ANTHONY G. BROWN
Attorney General of Maryland

/s/ Daniel M. Kobrin

_____
DANIEL M. KOBRIN
Federal Bar No. 30392
Assistant Attorney General
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland  21202
dkobrin@oag.state.md.us
(410) 576-6472
(410) 576-6955 (facsimile)

January 30, 2026　　　　　　　Attorneys for Defendant

## TABLE OF CONTENTS

Page

STATEMENT OF FACTS ........................................................................... 2

    Federal Law Governing Elections ........................................................ 2

    The Federal Government's Efforts to Collect Personal Information ...................... 4

    The Federal Government's Voter Registration Demand in Maryland ................... 9

    Allegations in the Complaint................................................................ 12

ARGUMENT............................................................................................ 14

I.    STANDARD OF REVIEW ...................................................................... 14

II.    TITLE III DOES NOT AUTHORIZE THE ATTORNEY GENERAL TO DEMAND AN ENTIRE, COMPUTERIZED, VOTER REGISTRATION DATABASE. ............................... 14

III.    THE ATTORNEY GENERAL DID NOT PROVIDE A SUFFICIENT PURPOSE OR ANY BASIS FOR ITS DEMAND. .......................................................... 18

    A.    Congress enacted Title III to protect against racially discriminatory voting practices................................................................... 18

    B.    The basis and purpose of a Title III demand must relate to Title III. ......... 21

    C.    The Attorney General did not provide a basis for the voter registration database demand. ...................................................... 22

    D.    The Attorney General provided an inadequate, and possibly pretextual, purpose for the demand. .......................................... 23

CONCLUSION ......................................................................................... 27

**Cases**

*A Society Without A Name v. Virginia,* 655 F.3d 342 (4th Cir. 2011) ............................ 14

*Alvarez Ronquillo v. Bondi*, 151 F.4th 522 (4th Cir. 2025) ................................ 15

*Bell Atlantic v. Twombly*, 550 U.S. 544 (2007)........................................ 14

*Bey v. Shapiro Brown & Alt, LLP*, 997 F.Supp.2d 310 (D. Md. 2014)............................ 10

*Chambers v. King Buick GMC,* LLC, 43 F.Supp.3d 575 (D. Md. 2014)......................... 27

*Department of Commerce v. New York*, 588 U.S. 752 (2019) ............................... 26

*Hillman v. Amazon.com Services*, 785 F.Supp.3d 59 (D. Md. 2025)............................ 14

*In re 2025 Subpoena to Children's National Hospital*, No. 1:25-CV-03780, 2026 WL 160792 (D. Md., Jan. 21, 2026) ............................................... 21, 25

*In re Coleman*, 208 F. Supp. 199 (S.D. Miss. 1962) ......................................... 22

*In re Subpoena Duces Tecum*, 228 F.3d 341 (4th Cir. 2000)............................. 25

*Judicial Watch v. Lamone*, 399 F.Supp.3d 425 (D. Md. 2019)......................... 24

*Just Puppies, Inc. v. Frosh*, 565 F.Supp.3d 665 (D. Md. 2021)....................... 15

*Kennedy v. Bruce*, 298 F.2d 860 (5th Cir. 1962)................................. 25

*Kennedy v. Lynd*, 306 F.2d 322 (5th Cir. 1962) .................................. 21, 24, 25

*Minnesota, et al. v. Kristi Noem, et al.,* No. 1:26-CV-190, (D. Minn. Jan. 25, 2026) ........ 9

*Prewett v. Weems*, 749 F.3d 454 (6th Cir. 2014) .................................. 16

*Redeemed Christian Church of God (Victory Temple) Bowie, MD v. Prince George's County*, 17 F.4th 497 (4th Cir. 2021).......................................... 15

*Tankersley v. Almand*, 837 F.3d 390 (4th Cir. 2016) ...................................... 15

*United States v. Aguilar*, No. 3:25-cv-00728 (D. Nev.) .................................... 7

*United States v. Albence*, No. 1:25-cv-01453 (D. Del.) ................................ 6

*United States v. Amore*, No. 1:25-cv-00639 (D.R.I.) .............................. 7

*United States v. Beals*, No. 3:26-CV-00042 (E.D. Va.) .................................. 7

*United States v. Bellows*, No. 1:25- cv-00468 (D. Me.) ......................................................7

*United States v. Benson*, No. 1:25-cv-01148 (W.D. Mich.) .............................................7

*United States v. Board of Elections of the State of N.Y.*, No. 1:25-cv-01338 (N.D.N.Y.) .. 7

*United States v. DeMarinis*, No. 1:25-cv-03934 (D. Md.) ................................................7

*United States v. Evans*, No. 1:25-cv-04403 (D.D.C) ........................................................7

*United States v. Fontes*, No. 2:26-cv-00066 (D. Az.) ........................................................7

*United States v. Griswold*, No. 1:25-cv-03967 (D. Colo.) .................................................6

*United States v. Hobbs*, No. 3:25-cv-06078 (W.D. Wash.) ...............................................7

*United States v. Matthews*, No. 3:25-cv-03398 (C.D. Ill.) ...............................................7

*United States v. Nago*, No. 1:25-cv-00522 (D. Haw.) .......................................................7

*United States v. Oliver*, No. 1:25-cv-01193 (D.N.M.) ......................................................7

*United States v. Oregon, et al.*, No. 6:25-CV-01666, (D. Or. Jan 26, 2026) .................2, 7

*United States v. Pennsylvania, et al.*, No. 2:25-CV-01481 (W.D. Penn) ..........................7

*United States v. Raffensperger*, No. 1:25-cv-00548 (M.D. Ga.) ......................................7

*United States v. Read*, No. 6:25-CV-01666 (D. Or.) ..........................................................7

*United States v. Scanlan*, No. 1:25-CV-00371 (D.N.H.) ...................................................7

*United States v. Simon*, 0:25-cv-03761 (D. Minn.) ...........................................................7

*United States v. Thomas*, No. 3:26 cv 00021 (D. Conn.) ...................................................6

*United States v. Weber*, ___ F.Supp.3d ___, 2026 WL 118807 (C.D. Cal. Jan. 15, 2026) .........................................................................................................................passim

*United States v. Weber*, No. 2:25-cv-09149 (C.D. Cal.) .........................................6, 12, 23

*United States v. Wisc. Elections Comm'n*, 3:25-cv-01036 (W.D. Wis.) ............................7

*United Steelworkers of America, AFL-CIO-CLC v. Weber*, 443 U.S. 193 (1979) ..........25

**Statutes**

52 U.S.C. § 20507 ....................................................................................3, 8, 17, 26

52 U.S.C. § 20510 ........................................................................................................4

52 U.S.C. § 20701 ..............................................................................................passim

52 U.S.C. § 20702 ........................................................................................................3

52 U.S.C. § 20703 ..............................................................................................passim

52 U.S.C. § 20705 ........................................................................................................3

52 U.S.C. § 21083 ..................................................................................4, 14, 16, 24

52 U.S.C. § 21111 ........................................................................................................4

6 U.S.C. § 1502 .........................................................................................................16

Ariz. Rev. Stat. Ann. § 16-152 ..................................................................................8

Ga. Code Ann. §§ 21-2-220(c) ..................................................................................8

La. Stat. Ann. § 18:104 ...............................................................................................8

Mass. Gen. Laws ch. 51, § 47C ................................................................................8

Md. Code Ann., Cts. & Jud. Proc., § 3-2303 .....................................................9, 24

Md. Code Ann., Elec. Law § 3-101 .........................................................................25

Md. Code Ann., State Gov't. § 7-303 ...................................................................9, 24

Mo. Rev. Stat. § 115.157 ............................................................................................8

Mont. Code Ann. § 13-2-110 ......................................................................................8

N.H. Rev. Stat. Ann. § 659:13-b ................................................................................8

N.J. Stat. Ann. § 19:31-6.4 .........................................................................................9

N.Y. Elec. Law § 8-303 ...............................................................................................9

Tenn. Code Ann. § 2-2-116 ........................................................................................9

Wis. Stat. § 6.34 ...........................................................................................................9

**Regulations**

COMAR 33.01.01.01...................................................................................8, 24

COMAR 33.05.02.02.........................................................................................24

COMAR 33.05.04.05...................................................................................8, 24

**Other Authorities**

Executive Order No. 14243, *Stopping Waste, Fraud, and Abuse by Eliminating Information Silos*, 90 Fed. Reg. 13681 (Mar. 20, 2025)................................................5

Executive Order No. 14248, *Preserving and Protecting the Integrity of American Elections*, 90 Fed. Reg. 14005 (Mar. 25, 2025).............................................................5

U.S. Election Assistance Comm'n, *Election Administration and Voting Survey: 2024 Comprehensive Report* (June 2025)...........................................................................8

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

THE UNITED STATES OF AMERICA,    *

       *Plaintiff*,    *

     v.    *

                No. 1:25-cv-03934-SAG

JARED DEMARINIS, in his official    *
capacity as state administrator of
elections for the state of Maryland,    *

       *Defendant*.

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## MEMORANDUM IN SUPPORT OF STATE ADMINISTRATOR'S MOTION TO DISMISS

The United States has filed a complaint against the Maryland State Administrator of Elections to compel the disclosure of an unredacted, electronic copy of Maryland's voter registration database. The United States alleges that Title III of the Civil Rights Act of 1960, codified at 52 U.S.C. §§ 20701–20706 ("Title III"), grants the Attorney General authority to obtain the unredacted database because it is an "election record" within the meaning of 52 U.S.C. § 20701. (ECF 1 ¶¶ 17, 25.) It must thus be made available to the Attorney General for inspection upon written demand setting forth "the basis and the purpose therefor." 52 U.S.C. § 20703. The United States further alleges that it transmitted two letters to the State Administrator demanding the unredacted database, with the second letter providing the requisite basis and purpose. (ECF 1 ¶¶ 25.) And it has filed this suit in response to the State Administrator's failure to comply with that demand.

The complaint fails to state a claim because it is legally insufficient. Title III is a civil rights statute enacted 40 years ago to combat racial discrimination in voting administration. It's mandate to retain records of an election received during an election cannot reasonably be read to apply to a persistent and computerized voter registration database created and maintained by the State. *See* 52 U.S.C. § 20701. And even if it did, the Department of Justice failed to meet the law's conditions for the exercise of the Attorney General's record inspection authority. *See* 52 U.S.C. § 20703. The Department provided no "basis" for its demand, neglecting to articulate why it believed a federal election law had been violated. And it provided an inadequate "purpose," failing to connect its demand to concerns about disenfranchisement through racial discrimination. This Court should dismiss the complaint for its failure to state a claim upon which the government could obtain relief. *See United States v. Weber*, ___ F.Supp.3d ___, 2026 WL 118807 (C.D. Cal. Jan. 15, 2026); *see also United States v. Oregon*, *et al.*, No. 6:25-CV-01666, Dkt. No. 68 (D. Or. Jan 26, 2026).

## STATEMENT OF FACTS

### Federal Law Governing Elections

Pertinent to this case, Congress enacted three laws that govern the administration of elections and voter registration: Title III of the Civil Rights Act of 1960, 52 U.S.C. §§ 20701—20706 ("Title III"); the National Voter Registration Act of 1993, 52 U.S.C. §§ 20501—20511 ("NVRA"); and the Help America Vote Act of 2002, 52 U.S.C. §§

20901—21145 ("HAVA").    Title III governs the retention of records related to an election.    It requires an "officer of election" to "retain and preserve" all "records and papers which come into his possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election."    52 U.S.C. § 20701.    The records must be retained "for a period of twenty-two months from the date" of the federal election to which the records relate.    *Id.*    And the premature destruction, mutilation, or alteration of such records is a crime punishable by up to a $1,000 fine, one year in prison, or both.    *Id.* at § 20702.

The Attorney General of the United States may make a "demand in writing" for records retained under Title III.    52 U.S.C. § 20703.    The demand "shall" provide both a "basis" and a "purpose" for the demand.    *Id.*    Upon a sufficient demand, the records must be available at the "principal office" of the records' custodian for "inspection, reproduction, and copying."    *Id.*    If a dispute over the demand arises, a United States district court for the district in which the records are held possesses jurisdiction "to compel production" of the records "by appropriate process."    *Id.* at § 20705.

The NVRA provides minimum standards for the administration of voter registration.    One such standard, pertinent to this case, is the requirement that a state "conduct a general program that makes a reasonable effort" to remove registered voters from a voter registration list when the voter dies or moves out of the registrar's jurisdiction.    52 U.S.C. § 20507(a)(4).    A state "may" meet this requirement by using change-of-address information provided by the United States' Postal Service to identify voters who may have moved from the jurisdiction; but, it may only remove such voters

3

by sending them written notice and having them reply to the notice with written confirmation of their move. *Id*. at § 20507(c)(1). If the voter does not respond to the state's notice, they can only be removed from the voter roll if they subsequently fail to vote, or appear to vote, in the jurisdiction for two consecutive general elections for federal office. *Id*. at § 20507(c)(1), (d)(1).

HAVA, among other measures, governs the operational requirements for the administration of voter registration. The law requires a state to maintain its voter registration data in "a single, uniform, official, centralized, interactive computerized statewide voter registration" database that is administered at the state level. 52 U.S.C. § 21083(a)(1)(A). The state must conduct "list maintenance" on its computerized database, removing ineligible voters on a consistent and timely basis. *Id*. at § 21083(a)(2)(A). But HAVA does not impose any substantive requirements to remove ineligible voters or conduct systemized removal programs; it only requires that states remove voters from a computerized system in accordance with the standards set by the NVRA. *Id*.

For a violation of the NVRA, both the Attorney General of the United States and an aggrieved member of the public may sue for declaratory and injunctive relief. 52 U.S.C. § 20510(a), (b). For a violation of the voter registration requirements in HAVA, only the Attorney General is authorized to file an enforcement suit. 52 U.S.C. § 21111.

**The Federal Government's Efforts to Collect Personal Information**

In March 2025, the President issued two executive orders directing federal officials to undertake novel efforts to aggregate federal and state records containing

millions of individuals' personal information.  The first executive order, issued on March 20, 2025, commanded federal officials across agencies to synthesize "agency records, data, software systems, and information technology systems" to pursue "Administration priorities" related to "waste, fraud, and abuse."  Executive Order No. 14243, *Stopping Waste, Fraud, and Abuse by Eliminating Information Silos*, § 3(a), 90 Fed. Reg. 13681 (Mar. 20, 2025).  The order further directed federal officials to establish "unfettered access to comprehensive data *from all State programs* that receive federal funding."  *Id*. § 3(b) (emphasis added).

A second executive order, issued on March 25, 2025, sought to impose new requirements on the conduct of federal elections.  Executive Order No. 14248, *Preserving and Protecting the Integrity of American Elections*, 90 Fed. Reg. 14005 (Mar. 25, 2025). The President directed the Secretary of the Department of Homeland Security and the Administrator of the Department of Government Efficiency to "review each State's *publicly available* voter registration list and available records concerning voter list maintenance activities," and to compare the publicly available data to "Federal immigration databases and State records requested" to ensure "consistency with Federal requirements."  *Id.* § 2(b)(iii) (emphasis added).

Subsequent to these orders, the federal government began taking unprecedented steps to collect and pool Americans' personal data and to pressure States into assisting with this effort.  The federal government enlisted technology company Palantir to build a massive repository of data pulled from federal agencies, including the Internal Revenue Service, the Social Security Administration, and the Department of Health and Human

Services ("HHS"), to facilitate immigration enforcement and deportations.[1]  At the same time, federal agencies have pressed States to turn over sensitive, personal data collected in administering vital programs like Medicaid[2] and the Supplemental Nutrition Assistance Program.[3]

Apparently undeterred by federal court orders enjoining the improper collection and sharing of sensitive data,[4] the federal government has now demanded unredacted voter registration databases from 44 states and the District of Columbia.  Brennan Center for Justice, *Tracker of Justice Department Requests for Voter Information*, https://tinyurl.com/532npb34 (last accessed Jan. 30, 2026).  Eleven states have obliged the demand.  *Id*.  Of the remaining 33 states who have sought clarification or declined, the Department of Justice has initiated litigation against 24 states and the District of Columbia. *See United States v. Weber*, No. 2:25-cv-09149 (C.D. Cal.); *United States v. Griswold*, No. 1:25-cv-03967 (D. Colo.); *United States v. Thomas*, No. 3:26 cv 00021 (D. Conn.); *United States v. Albence*, No. 1:25-cv-01453 (D. Del.); *United States v. Evans*,

---

[1] Priscilla Alvarez et al., *DOGE Is Building a Master Database for Immigration Enforcement, Sources Say*, CNN (Apr. 25, 2025), https://tinyurl.com/4bcurxw4.

[2] *See* Kimberly Kindy & Amanda Seitz, *Trump Administration Hands Over Medicaid Recipients' Personal Data, Including Addresses, to ICE*, Associated Press (July 17, 2025), https://tinyurl.com/32xwt9ws.

[3] Press Release, *Secretary Rollins Requires States to Provide Records on SNAP Benefits, Ensure Lawful Use of Federal Funds* (May 6, 2025), https://tinyurl.com/5yvbdwxt.

[4] *California, et al. v. U.S. Dep't of Health & Hum. Servs. et al.*, No. 3:25-cv-05536-VC, Dkt. No. 148 (N.D. Cal. Dec. 29, 2025) (enjoining sharing plaintiff states' Medicaid data regarding citizens and lawful residents); *California, et al. v. v. U.S. Dep't of Agric., et al.*, No. 3:25-cv-06310, Dkt. 106 (N.D. Cal., Oct. 15, 2025) (granting a preliminary injunction against the demand for SNAP data).

No. 1:25-cv-04403 (D.D.C); *United States v. Raffensperger*, No. 1:25-cv-00548 (M.D. Ga.); *United States v. Matthews*, No. 3:25-cv-03398 (C.D. Ill.); *United States v. Nago*, No. 1:25-cv-00522 (D. Haw.); *United States v. Bellows*, No. 1:25- cv-00468 (D. Me.); *United States v. DeMarinis*, No. 1:25-cv-03934 (D. Md.); *United States v. Galvin*, No. 1:25-cv13816 (D. Mass.); *United States v. Simon*, 0:25-cv-03761 (D. Minn.); *United States v. Aguilar*, No. 3:25-cv-00728 (D. Nev.); *United States v. Oliver*, No. 1:25-cv-01193 (D.N.M.); *United States v. Board of Elections of the State of N.Y.*, No. 1:25-cv-01338 (N.D.N.Y.); *United States v. Amore*, No. 1:25-cv-00639 (D.R.I.); *United States v. Hanzas*, No. 2:25-cv-00903 (D. Vt.); *United States v. Hobbs*, No. 3:25-cv-06078 (W.D. Wash.); *United States v. Wisc. Elections Comm'n*, 3:25-cv-01036 (W.D. Wis.); *United States v. Benson*, No. 1:25-cv-01148 (W.D. Mich.); *United States v. Fontes*, No. 2:26-cv-00066 (D. Az.); *United States v. Read*, No. 6:25-CV-01666 (D. Or.); *United States v. Beals*, No. 3:26-CV-00042 (E.D. Va.); *United States v. Pennsylvania, et al.*, No. 2:25-CV-01481 (W.D. Penn); *United States v. Scanlan*, No. 1:25-CV-00371 (D.N.H.).

As of today's date, only two courts have issued a ruling on the viability of the Department's demands.  Both granted the state's motion to dismiss for failure to state a claim.  *See Weber*, ___ F.Supp.3d ___, 2026 WL 118807 (C.D. Cal. Jan. 15, 2026); *see also Oregon*, No. 6:25-CV-01666 at Dkt. No. 68 (D. Or. Jan 26, 2026) (docketing court's oral grant of defendants' motion to dismiss with a formal, written opinion to follow).

By its very nature, a voter registration database is a unique repository of information.  As of the 2024 general election, 86.6% of the estimated national citizen voting-age population was registered to vote.  U.S. Election Assistance Comm'n,

*Election Administration and Voting Survey: 2024 Comprehensive Report* 132, 156-60 (June 2025).  Most States reported rates greater than 80%, with sixteen reporting more than 90%.  *See id.* at 156-60.  Moreover, 32 States and the District of Columbia permit pre-registration, i.e., registration by an underage applicant, which becomes active when the applicant turns 18.  *Id.* at 173-74.  Those jurisdictions reported recording 1.18 million pre-registrations between 2022 and 2024.  *Id.* at 174.

In addition to the personal information that election officials must collect to verify voter identity and eligibility, voter registration databases may contain information about a voter's electoral participation necessary to administering the State's elections.  In all States, this includes information on whether a voter actually participated in an election, because federal law requires States to remove non-participatory voters who moved out of a jurisdiction.  *See* 52 U.S.C. § 20507(d)(1)(ii).  And in 30 States and the District of Columbia, the voter registration database includes information about party affiliation. Ballotpedia, *Partisan Affiliations of Registered Voters* (Aug. 31, 2025), https://tinyurl.com/yx2aec8b.  Additionally, voter registration databases may contain information on a variety of sensitive topics (used to assist with voting or verify residency), such as disability, religious beliefs, occupation, parents' names, and criminal history, along with documents that include sensitive information, such as paychecks and bank statements.[5] Finally, the Department's request in this case would unmask specific

---

[5] *See, e.g.*, COMAR 33.05.04.05 & 33.01.01.01B(26)(a)(ii); Ariz. Rev. Stat. Ann. § 16-152(A)(9), (11); Ga. Code Ann. §§ 21-2-220(c), -417(c); La. Stat. Ann. § 18:104(B)(5), (8); Mass. Gen. Laws ch. 51, § 47C; Mo. Rev. Stat. § 115.157(1); Mont. Code Ann. § 13-2-110(5)(b)(ii); N.H. Rev. Stat. Ann. § 659:13-b; N.J. Stat. Ann. §

voters enrolled in programs that protect the home addresses of victims of domestic and sexual violence, law enforcement officers, and judicial officials. *See* Md. Code Ann., State Gov't. § 7-303 (LexisNexis 2021) (establishing an address confidentiality program for survivors of "domestic violence, sexual assault, stalking, harassment, or human trafficking"); *see also* Md. Code Ann., Cts. & Jud. Proc., §§ 3-2303, 3-2406 (LexisNexis 2020) (establishing an address confidentiality program and the means for removing for state and federal judicial officers).

The government has not publicly provided a consistent reason for its demands. Public statements and news reports indicate that the effort to collect voter registration databases from every state is actually an effort to create "a centralized federal database" for broader immigration enforcement purposes. *See Weber*, ___ F.Supp.3d at ___, 2026 WL 118807 at *11 (aggregating reports and statements in analyzing the government's purpose for collecting voter registration data). And the Attorney General implied in a recent letter to the Governor of Minnesota that the efforts to aggregate voter registration data is part-and-parcel of a larger effort to "bring back law and order" and "improve the lives of Americans." *See Minnesota, et al. v. Kristi Noem, et al.,* No. 1:26-CV-190, Dkt. No. 114-1 (D. Minn. Jan. 25, 2026).

**The Federal Government's Voter Registration Demand in Maryland**

On July 14, 2025, the Deputy Assistant Attorney General for the Civil Rights Division of the Department of Justice transmitted a letter to State Administrator

---

19:31-6.4; N.Y. Elec. Law § 8-303(3)(a)(2); Tenn. Code Ann. § 2-2-116; Wis. Stat. § 6.34(3)(a)(8)-(9).

DeMarinis (attached to this motion and hereafter referred to as "Exhibit A.")[6]  The letter sought to "request information" about Maryland's compliance with the "list maintenance" provisions of the NVRA.  (Exhibit A at 1.)  In response to the request, the State Administrator was directed to provide "a list of the election officials who are responsible for implementing Maryland's general program of voter registration list maintenance from November 2022 through receipt of this letter."  (*Id.*)  The State Administrator was further directed to provide "information in electronic form," or an explanation in the absence of information, to clarify certain statistics and findings in the Election Assistance Commission's recent Election Administration and Voting Survey Report and in the State's recent Office of Legislative Audit's review of the statewide voter registration database.  (*Id.* at 2-3.)

Most pertinent to this case, though, the letter demanded a "current electronic copy" of the computerized, statewide voter registration database. (*Id.* at 1.)  The database was to contain "all fields," without redactions.  (*Id.*)  And alongside the list, the State Administrator was to provide materials that explained "how a voter record is coded into the statewide voter registration list and reported in the electronic copy," such as a "database user manual" or "coding list."  (*Id.* at 1-2.)

In a responsive letter dated July 30, 2025 (attached to this motion and hereafter referred to as "Exhibit B"), the State Administrator provided portions of the requested

---

[6] This Court may consider the letters sent to the State Administrator in the motion to dismiss because the government expressly references them in its complaint (ECF 1 ¶¶ 21-27) and rely on them in bringing their action.  *Bey v. Shapiro Brown & Alt, LLP*, 997 F.Supp.2d 310, 314 (D. Md. 2014).

information.  The letter clarified Maryland's "list maintenance" processes (Exhibit B at 1-3) and directed the recipient to pertinent sources of information explaining the statistics and findings that had been questioned (*id*. at 3-4).  In response to the voter registration database request, the State Administrator directed the Department to Maryland's public-facing portal for requesting copies of the state's voter registration list.  (*Id* at 3.)  The Department could obtain "publicly-available data in the statewide voter registration list" by submitting a standard request through that portal.  (*Id.*)

The Assistant Attorney General for the Civil Rights Division responded by letter dated August 18, 2025 (attached to this motion and hereafter referred to as "Exhibit C"). It declined the offer of publicly available data and twice specified that the government sought production of Maryland's voter registration database containing "*all fields*, which includes the registrant's full name, date of birth, residential address, and his or her state driver's license number or the last four digits of the registrant's social security number." (Exhibit C at 1, 3 n. 2.)  The letter continued by offering that its demand for a full, unredacted voter registration database was made pursuant to three grants of statutory authority:  the NVRA's grant to the Attorney General "to bring enforcement actions," HAVA's grant to the Attorney general "for actions to enforce," and the Title III authority to request records of elections.  (*Id*. at 2.)  For the Title III authority, the letter further offered that the "purpose of the request is to ascertain Maryland's compliance with the list maintenance requirements of the NVRA and HAVA." (*Id.*)

By responsive letter one week later, the State Administrator declined to provide the unredacted voter registration database (attached to this motion and hereafter referred to as "Exhibit D.")

Maryland's experience in this context was not unique. The Department of Justice transmitted substantively identical letters to a majority of states during the summer of 2025. *See United States v. Weber*, No. 2:25-CV-09149, Dkt. No. 37-2 at 148 (Filed Nov. 7, 2025) (collecting demand letters sent by the Department to 30 States).

**Allegations in the Complaint**

The complaint makes nine factual allegations. (ECF 1 ¶¶ 19-27.) Those allegations summarize the correspondence between the government and the State Administrator from July and August 2025. (*Id.*) They also provide a brief background into the Election Assistance Commission and its publication of a biennial Election Administration and Voting Survey Report. (ECF 1 ¶ 19-20.). None of the allegations provide the Department's basis or purpose for making its demand; instead, the allegations only provide that prior statements about the basis and purpose were made in the correspondence.

According to the complaint, the letters sent to Administrator DeMarinis followed "a review of the 2024 EAVS Report." (ECF 1 at ¶ 21.) The July 14 letter allegedly sought "information regarding Maryland's compliance with federal election law." (*Id.*) The complaint does not allege what in the EAVS Report caused DOJ's interest in Maryland's compliance with federal law, nor how the requested information—including an unredacted voter registration database—would shed light on the State's compliance.

The August 18th letter was allegedly sent after Administrator DeMarinis "refus[ed] to provide Maryland's" unredacted database. (ECF 1 ¶ 24.) The complaint alleges that the August 18th letter "advis[ed] the federal basis for [the Attorney General's] request, including the NVRA and HAVA." (ECF 1 ¶ 25.) It also "demanded" the unredacted voter registration database "pursuant to [Title III]" and stated that "[t]he purpose of the request is to ascertain Maryland's compliance with the list maintenance requirements of the NVRA and HAVA." (*Id.*) Administrator DeMarinis "again refus[ed]" to provide "an unredacted computerized [voter registration database." (ECF 1 ¶ 27.)

The complaint therefore claims that the Attorney General sent a sufficient written demand to the State Administrator, containing a "statement of basis and purpose therefor," for the production of "specific election records pursuant to 52 U.S.C. § 20703 [Title III]." (ECF 1 ¶¶ 28-29.) It asks this Court to declare that the State Administrator's refusal to provide "election records" is a violation of Title III; and, to order the State Administrator to provide the Attorney General "the current electronic copy of Maryland's computerized statewide voter registration list, with all fields, including each registrant's full name, date of birth, residential address, and either their state driver's license number, the last four digits of their Social Security number" within five days of the Court's order. (ECF 1 at 30-31.)

## ARGUMENT

### I.     STANDARD OF REVIEW

Under Rule 12(b)(6), a motion to dismiss tests the legal sufficiency of the complaint placed before the court.  *Hillman v. Amazon.com Services*, 785 F.Supp.3d 59, 64 (D. Md. 2025).  "A court decides whether [the 12(b)(6) standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer" that the plaintiff is entitled to the remedy requested.  *A Society Without A Name v. Virginia,* 655 F.3d 342, 346 (4th Cir. 2011).  When the complaint provides no more than "labels and conclusions" for its entitlement to relief, it is insufficient.  *Bell Atlantic v. Twombly*, 550 U.S. 544, 555 (2007).

### II.     TITLE III DOES NOT AUTHORIZE THE ATTORNEY GENERAL TO DEMAND AN ENTIRE, COMPUTERIZED, VOTER REGISTRATION DATABASE.

The live, computerized voter registration database that a state must maintain under HAVA is not an "election record[]" (ECF 1 ¶ 28), i.e., a record of a specific election.  The voter registration database required by HAVA is dynamic and continual, *see* 52 U.S.C. § 21083(a)(1)(A)(vi), (viii), it is not tied to a singular election, *see id.* at § 20701 (requiring retention of records of any act "requisite to voting in such election").  When the government thus claims entitlement to an unredacted version of Maryland's electronic voter registration database under the Title III authorization to demand election records, it misreads the law.  The plain language of Title III cannot reasonably be read to require the

maintenance of a persistent voter registration database, so the government cannot use Title III to compel its production.

The task of statutory interpretation begins with "the language of the statute itself." *Redeemed Christian Church of God (Victory Temple) Bowie, MD v. Prince George's County*, 17 F.4th 497, 508 (4th Cir. 2021) (quotation omitted). The language in a statute cannot be interpreted in a vacuum and must instead be read in the context of the overall statutory scheme. *Just Puppies, Inc. v. Frosh*, 565 F.Supp.3d 665, 706 (D. Md. 2021) *aff'd* 123 F.4th 652 (4th Cir. 2024) (quotation omitted). Undefined language in a statute is given its "ordinary meaning unless the context suggests otherwise." *Tankersley v. Almand*, 837 F.3d 390, 395 (4th Cir. 2016) (quotation omitted). And when the plain language produces an unambiguous result, this Court "need look no further." *Alvarez Ronquillo v. Bondi*, 151 F.4th 522, 526 (4th Cir. 2025) (quotation omitted).

Title III at § 20701 provides in pertinent part:

> Every officer of election shall retain and preserve, for a period of twenty-two months from the date of any general, special, or primary election of which candidates for the office of President, Vice President, presidential elector, Member of the Senate, Member of the House of Representatives, or Resident Commissioner from the Commonwealth of Puerto Rico are voted for, all records and papers which come into his possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election.

52 U.S.C. § 20701. The statute's description of what must be retained, and how, does not describe the computerized system required by HAVA.

First, the records that must be retained and preserved are those that "come into" the possession of the officer of an election—the materials an officer receives (primarily

from registrants and voters) that are predicate to the act of voting. *Id*. A HAVA voter registration database does not "come into" the possession of an election official. *See* Black's Law Dictionary, *Entry for "Receive"* (12th ed. 2024) ("to come into possession or get from some outside source"). Just the opposite, HAVA requires that the database originate with state's chief election official; it is built by the state. *See* 52 U.S.C. § 21083(a)(1)(A) (providing that "each State, acting through the chief State election official, shall implement" a computerized voter registration database). Congress could have used broader language to include any record "in the possession" of the officer of election. *See e.g.* 6 U.S.C. § 1502(a). It did not, indicating that it did not intend to require the retention of systems *created* by election officials. *See Prewett v. Weems*, 749 F.3d 454, 461 (6th Cir. 2014) ("Omitting a phrase from one statute that Congress has used in another statute with a similar purpose 'virtually commands the ... inference' that the two have different meanings.")

Moreover, the records at issue are those that relate to the act of voting in a particular election. The twenty-two month retention period begins on the "date of any general, special or primary election," and the records to be retained are those that relate to voting "in such election." *Id*. But under HAVA a voter registration database is persistent, serving as "the official voter registration list for the conduct of all elections for Federal office in the State." 52 U.S.C. § 21083(a)(1)(A)(viii). It is not a record of any particular election. And disposing of a voter database 22 months after an election would conflict directly with HAVA, which does not permit the expiration of a voter registration database. *See* 52 U.S.C. § 21083(a). Congress could not have intended the 22-month

16

retention of specific "election records" (ECF 1 ¶¶ 25, 28) to include continuous computer systems that operate in every election.

Finally, Title III criminalizes conduct that HAVA requires for voter registration databases. Section 20702 prohibits "[a]ny person" from willfully "destroy[ing]" or "alter[ing]" any record required by § 20701 for retention and preservation. Under the government's reading, then, § 20702 criminalizes destroying or altering any part of a voter registration database. But HAVA requires constant alteration to a voter registration database in the form of list maintenance. Election officials must systematically remove ineligible voters, 52 U.S.C. § 21083(a)(1)(A)(2), and duplicate entries, *id.* at § 21083(a)(1)(B)(iii), from a voter registration database. And under the NVRA, officials must promptly update registration records with new address information. 52 U.S.C. § 20507(c)(1)(B)(i). Congress could not have intended to compel and criminalize the same conduct with two different statutes. It's choice *not* to amend Title III's criminal prohibition when it enacted HAVA and the NVRA evidence its understanding, and intent, that Title III does not apply to computerized voter registration databases.

Ultimately, the government alleges that it sufficiently provided a "written demand" for the production of "specific election records pursuant to 52 U.S.C. § 20703." (ECF 1 ¶ 28.) But it missed the predicate to § 20703—that the object it seeks to compel production of is "a record or paper required by section 20701 . . . to be retained and preserved." A plain reading of § 20701 within its statutory framework reveals that its description of what is to be retained and how it is to be preserved does not apply to a computerized system that is constantly updated and meant for use in multiple elections.

17

The government cannot compel the disclosure of an unredacted voter registration database under Title III.

### III. THE ATTORNEY GENERAL DID NOT PROVIDE A SUFFICIENT PURPOSE OR ANY BASIS FOR HER DEMAND.

If this Court determines that Title III applies to require the retention of a computerized voter registration database, that does not end the inquiry.  To compel the production of a record, the Attorney General must issue a written demand setting forth "the basis and the purpose therefor."  52 U.S.C. § 20703.  The Attorney General did not do so in this instance.  The Department's letters to the State Administrator did not provide any basis for its voter registration database demand and set forth a purpose unrelated to Title III and its subject matter.  The stated purpose was also called into question by contemporaneous statements from Department officials and news reports.  The government therefore fails to state a claim for a violation of Title III, given the insufficiency of its written demand.  *See Weber*, ___ F.Supp.3d at ___, 2026 WL 118807 at *8-*10 (ruling that the Department, using substantively identical letters, failed to provide an adequate basis and purpose in its written demand to California).

#### A. Congress enacted Title III to protect against racially discriminatory voting practices.

"Title III of the Civil Rights Act of 1960 was passed during the Jim Crow era, when persistent voter suppression was preventing Black Americans from voting. States were utilizing literacy tests, arbitrary registration tactics, voter ID laws, and poll taxes to keep minorities away from the ballot." *Weber*, ___ F.Supp.3d at ___, 2026 WL 118807 at *1.  The impetus behind Title III, however, arrived earlier.  In 1957, Congress created

the bipartisan Commission on Civil Rights. Civil Rights Act of 1957, § 101(a), Pub. L. No. 85-315, 71 Stat. 634 (Sept 9, 1957). It charged the Commission with investigating and studying how voters were disenfranchised and denied equal protection on the basis of their "color, race, religion, or national original." *Id.* at § 104(a)(1). But recalcitrant election officials stymied the Commission in its mission. "To hide their complicity in voter suppression, state officials destroyed the records of Black Americans who had registered to vote, as well as those denied the opportunity to register." *Weber*, ___ F.Supp.3d at ___, 2026 WL 11807 at *1; *see also* United States' Comm'n on Civ. Rights, *Report of the United States Commission on Civil Rights* at 93 (Sept. 9, 1959), accessible at https://tinyurl.com/y253324x ("Rejected applications were destroyed approximately 30 days after being rejected, which fact made accurate statistical review of the records impossible."); *id* at 137 (explaining that midway through the Commission's review of Alabama counties' records, the state legislature authorized counties to destroy denied registrants' application forms even though the forms were "essential to any investigation of denials of the right to vote").

The Commission thus recommended that Congress enact retention and preservation requirements for "all State registration and voting records" and make such records subject to "public inspection." *Id*. at 138. President Eisenhower echoed the recommendation, urging Congress to adopt provisions granting the Attorney General authority to "inspect Federal election records, and to require that such records be preserved for a reasonable period of time so as to permit such inspection." *Selected*

*Speeches of Dwight D. Eisenhower: Special Message to the Congress on Civil Rights,* 91 Cong. Rec 2d, Vol. 2-3 at 145 (Feb. 5, 1959) accessible at https://perma.cc/5KCX-3JT4.

"Title III was enacted directly in response to these concerns, requiring states to retain and preserve all records pertaining to voter registration, voting applications, and payments of poll taxes." *Weber*, ___ F.Supp.3d at ___, 2026 WL 118807 at *1; *see also* Dwight D. Eisenhower, *Statement by the President Upon Signing the Civil Rights Act of 1960* (May 6, 1960) (explaining how Title III, including the requirement to retain voting records, "deals significantly with that key constitutional right of every American, the right to vote without discrimination on account of race or color"); Sen. R. No. 86-1205 at 2 (1960) (stating that the congressional assumption regarding the effectiveness of the Civil Rights Act of 1957 has proven "wrong," requiring the Civil Rights Act of 1960); H.R. Rep. No. 86-956 at 26 (1959) (providing how Title III was a "necessary supplement" to the enforcement of the Civil Rights Act of 1957 prohibition against threats or intimidation designed to disenfranchise).

And after its enactment the Commission and Department of Justice used Title III for its intended purpose: gathering evidence to investigate complaints of racially discriminatory practices in election administration and evaluating whether there were patterns or practices disenfranchising Black voters. *See generally* United States Comm'n on Civ. Rights, *Civil Rights: Report of United States Commission on Civil Rights in 1963* at 13-26 (Sept. 30, 1963) accessible at https://tinyurl.com/58v3a84u (detailing investigations, negotiations, and lawsuits initiated by the Department of Justice based on the 1957 and 1960 Civil Rights Acts.)

**B.     The basis and purpose of a Title III demand must relate to Title III.**

The sufficiency of the Attorney General's demand for election records depends on the provided "statement of the basis and purpose." 52 U.S.C. § 20703. That statement must be sufficiently related to Title III and its subject matter—disenfranchisement through discriminatory practices—otherwise the statutory requirement would become meaningless. *See American Petroleum Institute v. Cooper*, 718 F.3d 347, 356 (4th Cir. 2013) (counseling avoidance of interpreting a statute that "may render statutory terms meaningless or superfluous"). Congress sets such requirements to ensure that the government exercise its authority pursuant to statutorily set purposes rather than engaging in harmful fishing expeditions. *See In re 2025 Subpoena to Children's National Hospital*, No. 1:25-CV-03780, 2026 WL 160792. *6-*7 (D. Md., Jan. 21, 2026) (quashing an administrative subpoena issued by the Department of Justice because it was "not issued for a legitimate governmental purpose, is not limited in scope to any legitimate purpose, and is oppressive in its breadth").

Under their ordinary meanings, a basis is "something on which something else is established or based"; a purpose is "the reason something is done or used." *Weber*, ___ F.Supp.3d ___, 2026 WL 118807 at *9, n. 17 & n. 18 (citing the Merriam-Webster Dictionary). In the context of Title III, a basis is the articulation of the particular, factual violation that the Attorney General suspects; a purpose is the rationale for the demand, or what the demand seeks to determine. *Weber*, ___ F.Supp.3d ___, 2026 WL 118807 at *9; *see also Kennedy v. Lynd*, 306 F.2d 322, 229 n.6 (5th Cir. 1962). This interpretation

of the statutory terms is reflected in the Department's investigative demands immediately after the enactment of Title III. *See Lynd*, 306 F.2d at 229 n. 6; *see also In re Coleman*, 208 F. Supp. 199, 199-200 (S.D. Miss. 1962), *aff'd sub nom.*, *Coleman v. Kennedy*, 313 F.2d 867 (5th Cir. 1963).

Accordingly, the statutory requirement in § 20703 for a statement of the basis and purpose of a demand is not "merely perfunctory—it is a critical safeguard that ensures the request is legitimately related to the purpose of the statute." *Weber*, ___ F.Supp.3d ___, 2026 WL 118807 at *9. Interpreting the statute otherwise grants the Attorney General a warrantless search through a compilation of sensitive data without suspicion or justification.

### C. The Attorney General did not provide a basis for the voter registration database demand.

The Department did not provide a basis for its database demand in either letter it sent to the State Administrator of Elections. (*See* Exhibits A, C.) The word "basis" does not even appear in either letter. In its second letter, the Department quotes the statutory language of 52 U.S.C. § 20703 but leaves out the mandate that a demand "contain a statement of the basis and purpose therefor." (Exhibit C at 2.)[7] The second letter then cites to Title III and purports to provide a "purpose of the request," but no basis. (*Id.*)

Nonetheless, the government alleges now that its database demand in the first letter was sent "[b]ased on a review of the 2024 EAVS Report" and the desire to seek information about "Maryland's compliance with federal election law." (ECF 1 ¶¶ 21-22.)

---

[7] The government likewise leaves this out of its quotation of the statutory text in its complaint. (ECF 1 ¶ 18.)

It further alleges that the second letter "advise[ed] the federal basis for [the Attorney General's] request, including the NVRA and HAVA." (ECF 1 ¶ 25.) But the letters themselves refute those allegations. The first letter only mentions the EAVS Report in the context of its statistics inquiry, not its database demand. (Exhibit A at 2.) And the second letter only mentions the NVRA and HAVA in citing the Attorney General's authority under those statutes to bring enforcement actions.

In any event, it would not have been enough to cite a federal statute as a basis for the database demand. Especially when the Department used boilerplate language to cite the same statutes to more than twenty states. *See Weber*, No. 2:25-CV-09149, Dkt. No. 37-2 at 148. Title III required DOJ to particularize "why it believed the NVRA [or HAVA] was violated." *Weber*, ___ F.Supp.3d ___, 2026 WL 118807 at *9. And neither letter articulated any factual basis to believe that Maryland had violated either law. The failure to provide any basis in the demand is fatal to the government's claim.

> **D.    The Attorney General provided an inadequate, and possibly pretextual, purpose for the demand.**

The Department's purpose for its database demand was, allegedly, "to ascertain Maryland's compliance with the list maintenance requirements of the NVRA and HAVA." (ECF 1 ¶ 25; *see also* Exhibit C at 2.) But Title III is not a list maintenance tool and could not have been intended as a means for vetting a state's computerized voting database. Congress enacted the NVRA, imposing list maintenance standards on states, three decades after Title III. Congress likewise enacted HAVA, establishing standards for uniform and computerized registration databases, almost four decades after

Title III.  When Title III became law, it was set to apply to "public records which ought ordinarily to be open to legitimate reasonable inspection." *Weber*, ___ F.Supp.3d ___, 2026 WL 118807 at *10-*11 (quoting *Lynd*, 306 F.2d at 231).  Today, pursuant to federal law, voter registration databases contain driver's license numbers and, at least, partial social security numbers.  *See* 52 U.S.C. § 21083(a)(5).

This is no small concern.  Maryland's voter database contains more than demographic information.  Each voter record in Maryland's database consists of three parts: "voter data, images of transaction source documents, and an activity log." *Judicial Watch v. Lamone*, 399 F.Supp.3d 425, 432 (D. Md. 2019).  The images are scans of any documents that cause a change in a voter's record.  *Id*.  And the activity log "tracks changes to a voter's data."  *Id*.  An electronic copy of Maryland's voter registration database would therefore not only contain driver's license numbers, COMAR 33.05.02.02A(6)(a), and social security numbers, COMAR 33.05.02.02A(6)(b), but also documents used to prove residency (such as bank statements), COMAR 33.05.04.05B(4) & 33.01.01.01B(26), and identifying information for voters shielded by address confidentiality programs, State Gov't. § 7-303; *see also* Cts. & Jud. Proc., §§ 3-2303, 3-2406.  And it would reveal how a voter changed their party affiliation or moved to a series of new addresses within the State.

A modern system for tracking and organizing a multi-million-voter roster necessarily contains a trove of sensitive data.  *See* 52 U.S.C. § 21083(a)(3) (requiring that the computerized voter registration database be protected by "adequate technological security measures to prevent unauthorized access").  And Maryland's database contains

24

that information going back further than 22 months.  *See* Elec. Law § 3-101(b)(6) (requiring the voter database to contain "voting history information" for a period covering "at least" the five preceding years); *cf. Lynd*, 306 F.2d at 228 ("one of the clearest purposes of the Title III proceeding is to enable the Attorney General to assemble all of the voter record information *within the time-reach* of the statute ") (emphasis added).    Reviewing Maryland's "list maintenance" through its computerized voter registration database could not have been, and is not now, a purpose contemplated by a 40-year-old civil rights statute designed to mechanically provide the Attorney General with access to otherwise "public" election records.  *Weber*, ___ F.Supp.3d ___, 2026 WL 118807 at *10-*11.

Nor does the Department's "list maintenance" purpose fit within the subject matter of the statute, which it must.  *See United Steelworkers of America, AFL-CIO-CLC v. Weber*, 443 U.S. 193, 201-02 (1979) (literal construction of a statute is insufficient because "a thing may be within the letter of the statute and yet not within the statute, because not within its spirit nor within the intention of its makers").  The Department's curiosity with Maryland's general list maintenance is unrelated to racial discrimination in voting administration.   And more to the point, the removal of ineligible voters from a voter registration list is "a matter which does not bear any particular importance" to a Title III inquiry.  *Kennedy v. Bruce*, 298 F.2d 860, 863 n. 3 (5th Cir. 1962).

The Department's alleged purpose is also not "limited in scope to reasonably relate to and further its purpose."  *2025 Subpoena*, 2026 WL 160792 at *7 (quoting *In re Subpoena Duces Tecum*, 228 F.3d 341, 349 (4th Cir. 2000)).  The requested "electronic

copy" (ECF 1 ¶¶ 22, 25 (quoting Exhibits A, C)) of a voter registration database cannot meaningfully provide insight into a state's compliance with its list maintenance obligations. Nor do materials that explain "how a voter record is coded into the statewide voter registration list and reported in the electronic copy," such as a "database user manual" or "coding list." (Exhibit A at 1-2.) The former would give the Department a snapshot in time of who was in Maryland's database, but not whether the State was routinely and timely removing ineligible voters in accordance with the NVRA mandate against removing certain voters until they failed to participate in two consecutive general elections. *See* 52 U.S.C. § 20507(c)(1). And the latter would provide the Department nothing relating to list maintenance. It would provide the Department unprecedented access to manipulate the computerized database files, which could assist in transferring data from the State's voter database into other federal databases.

The Department's alleged purpose is therefore insufficient for its Title III demand. But it is also possibly not the Department's actual purpose for making the demand. *See Department of Commerce v. New York*, 588 U.S. 752, 784 (2019) (noting that courts are not bound to defer to a "contrived" rationale and are instead free to "ignore the disconnect between the decision made and the explanation given"). Outside of its letters, the Department has given every indication that it seeks states' voter registration databases "for use in a centralized federal database," likely for immigration enforcement purposes. *See Weber*, ___ F.Supp.3d ___, 2026 WL 118807 at *10-*11 (compiling press reports and statements by Department officials). This Court may therefore accept the "truth" of the allegation in paragraph 25 of the Department's complaint—that the August 18, 2025

letter contained the language, "[t]he purpose of the request is to ascertain Maryland's compliance with the list maintenance requirements of the NVRA and HAVA." But it should not assume the truth of the underlying assertion—that list maintenance was, in fact, the Department's purpose. *Chambers v. King Buick GMC*, LLC, 43 F.Supp.3d 575, 586 (D. Md. 2014) (reasoning that this Court does not need to credit "conclusory factual allegations devoid of any reference to actual events").

## CONCLUSION

The motion to dismiss should be granted with prejudice.

Respectfully submitted,

ANTHONY G. BROWN
Attorney General of Maryland

/s/ Daniel M. Kobrin

_____
DANIEL M. KOBRIN
Federal Bar No.
Assistant Attorney General
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland  21202
dkobrin@oag.state.md.us
(410) 576-6472
(410) 576-6955 (facsimile)

January 30, 2026                                    Attorneys for Defendant

27