# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>   Plaintiff,<br><br>v.<br><br>JARED DEMARINIS, in his Official Capacity as State Administrator of Elections for the State Maryland,<br><br>   Defendant. | Case No. 1:25-cv-03934<br>(Hon. Stephanie A. Gallagher) |

**MOTION TO DISMISS, AND BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION TO COMPEL, OF INTERVENOR-DEFENDANTS COMMON CAUSE, OUT FOR JUSTICE, INC., CARL SNOWDEN, MYRIAM PAUL, AND LUIS SIMS**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................. 3

LEGAL STANDARD......................................................................................................... 11

ARGUMENT...................................................................................................................... 11

   I.    THE UNITED STATES' CASE SHOULD BE DISMISSED BECAUSE ITS DEMANDS
EXCEED THE STATUTORY AUTHORITY OF THE CRA AND ARE CONTRARY TO
LAW. ................................................................................................................................... 11

     A.   Plaintiff's Demand for Records Fails to Meet the Requisite Statutory Requirements of
the CRA. .............................................................................................................................. 12

     B.   The United States' Demand is Invalid Because it Does Not Allow for Redactions and
Modifications to Protect the Privacy and Constitutional Rights of Voters............................ 19

   II.    THE UNITED STATES' MOTION TO COMPEL SHOULD BE DENIED BECAUSE
IT IS NOT ENTITLED TO SUMMARY DISPOSITION OF ITS CRA CLAIM. ................... 23

CONCLUSION................................................................................................................... 27

# TABLE OF AUTHORITIES

**Cases**

*American Federation of State, County & Municipal Employees, AFL-CIO v. Social Security Administration*,
No. 1:25-cv-596-ELH (D. Md. Jan. 16, 2026) .......................................................... 9

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ...................................................................................... 11

*Becker v. United States*,
451 U.S. 1306 (1981) .................................................................................... 25

*Burdick v. Takushi*,
504 U.S. 428 (1992) ........................................................................................ 1

*Coleman v. Kennedy*,
313 F.2d 867 (5th Cir. 1963) .......................................................................... 13

*Corner Post, Inc. v. Board of Governors of the Federal Reserve System*,
603 U.S. 799 (2024) ...................................................................................... 17

*Equity Investment Associates, LLC v. United States*,
40 F.4th 156 (4th Cir. 2022) .......................................................................... 13

*Federal Deposit Insurance Co. v. Wentz*,
55 F.3d 905 (3d Cir. 1995) ............................................................................ 14

*In re Coleman*,
208 F. Supp. 199 (S.D. Miss. 1962) ................................................ 13, 21, 22, 24

*Just Puppies, Inc. v. Brown*,
123 F.4th 652 (4th Cir. 2024) ........................................................................ 11

*Kennedy v. Lynd*,
306 F.2d 222 (5th Cir. 1962) .................................................................... passim

*Navigators Insurance Co. v. Under Armour, Inc.*,
No. 25-1068, --- F.4th ----, 2026 WL 137123 (4th Cir. Jan. 20, 2026) ................... 18

*Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*,
591 F.3d 250 (4th Cir. 2009) .......................................................................... 11

*Niz-Chavez v. Garland*,
593 U.S. 155 (2021) ...................................................................................... 17

*Pennsylvania Fair Elections v. Pennsylvania Department of State*,
337 A.3d 598 (Pa. Commw. Ct. 2025) ............................................................... 7

*Project Vote/Voting for America, Inc. v. Long*,
682 F.3d 331 (4th Cir. 2012) .............................................................. 20, 21, 22

*Pubic Interest Legal Foundation v. Boockvar*,
   431 F. Supp. 3d 553 (M.D. Pa. 2019) .................................................................... 21

*Public Interest Legal Foundation v. Benson*,
   136 F.4th 613 (6th Cir. 2025) ............................................................................... 16

*Public Interest Legal Foundation, Inc. v. Bellows*,
   92 F.4th 36 (1st Cir. 2024) ............................................................................. 20, 22

*Public Interest Legal Foundation, Inc. v. Dahlstrom*,
   673 F. Supp. 3d 1004 (D. Alaska 2023) ............................................................... 21

*Public Interest Legal Foundation, Inc. v. Matthews*,
   589 F. Supp. 3d 932 (C.D. Ill. 2022) ................................................................... 21

*Public Interest Legal Foundation, Inc. v. Matthews*,
   No. 20-CV-3190, 2022 WL 1174099 (C.D. Ill. Apr. 20, 2022) ........................... 21

*Public Interest Legal Foundation, Inc. v. North Carolina State Board of Elections*,
   996 F.3d 257 (4th Cir. 2021) ............................................................................... 20

*Republican National Commission v. North Carolina State Board of Elections*,
   120 F.4th 390 (4th Cir. 2024) ................................................................................ 1

*Sheetz v. County of El Dorado*,
   601 U.S. 267 (2024) ............................................................................................. 22

*Shore v. Charlotte-Mecklenburg Hospital Authorities*,
   412 F. Supp. 3d 568 (M.D.N.C. 2019) ................................................................ 18

*State of Ala. ex rel. Gallion v. Rogers*,
   187 F. Supp. 848 (M.D. Ala. 1960) ....................................................................... 2

*Tincher v. Noem*,
   No. 0:25-cv-04669-KMM-DTS (D. Minn. Jan. 16, 2026) .................................. 10

*United States v. Oregon*,
   No. 6:25-cv-01666-MTK (D. Or. Jan. 26, 2026) .................................................. 1

*United States v. Powell*,
   379 U.S. 48 (1964) ......................................................................................... 14, 25

*United States v. Rosinsky*,
   547 F.2d 249 (4th Cir. 1977) ............................................................................... 14

*United States v. Simms*,
   914 F.3d 229 (4th Cir. 2019) ............................................................................... 20

*United States v. Weber*,
   No. 2:25-CV-09149-DOC-ADS, 2026 WL 118807 (C.D. Cal. Jan. 15, 2026) ............... passim

*Yick Wo v. Hopkins*,
   118 U.S. 356 (1886) .............................................................................................. 1

## Statutes

5 U.S.C. § 552a ................................................................................................ 17

18 U.S.C. § 2721 .............................................................................................. 26

26 U.S.C. § 7604 .............................................................................................. 25

44 U.S.C. § 3351 .............................................................................................. 26

52 U.S.C. § 20501 .............................................................................................. 1

52 U.S.C. § 20507 ..................................................................................... passim

52 U.S.C. § 20701 ......................................................................................... 1, 12

52 U.S.C. § 20703 ..................................................................................... passim

52 U.S.C. § 20704 .............................................................................................. 5

52 U.S.C. § 20705 ...................................................................................... 25, 26

52 U.S.C. § 20901 .............................................................................................. 1

52 U.S.C. § 21083 ............................................................................................ 15

52 U.S.C. § 21085 ............................................................................................ 15

E-Government Act of 2002,
   Pub. L. No. 107-347, 116 Stat. 2899 (2002) ......................................... 26

Md. Code Ann.,
   Election Law § 3-506(a)(1) ........................................................................ 4

Privacy Act of 1974,
   Pub. L. No. 93-579, 88 Stat. 1896 (1974) ............................................. 26

## Other Authorities

"Federal Judicial Circuits: Fifth Circuit," FEDERAL JUDICIAL CENTER (last visited Dec. 9, 2025) ................................................................................................................ 23

Alexandra Berzon & Nick Corasaniti, *Trump Empowers Election Deniers, Still Fixated on 2020 Grievances*, N.Y. TIMES, Oct. 22, 2025 ............................................... 7

Andy Kroll & Nick Surgey, *Inside Ziklag, the Secret Organization of Wealthy Christians Trying to Sway the Election and Change the Country*, PROPUBLICA, July 13, 2024 ............................ 7

*Bondi's Letter to Minnesota's Governor*, N.Y. TIMES, Jan. 24, 2026 ........................................... 10

Br. for the United States as Amicus Curiae, *Project Vote/Voting for Am., Inc. v. Long*, No. 11-1809 (4th Cir. Oct. 18, 2011) ................................................ 21

Br. for the United States as Amicus Curiae, *Pub. Int. Legal Found. v. Schmidt*, No. 23-1590 (3d Cir. Nov. 6, 2023) ........................................................... 21

Br. for the United States as Amicus Curiae, *Pub. Int. Legal Found., Inc. v. Bellows*, No. 23-1361 (1st Cir. July 25, 2024) ................................................................................................ 21

Devlin Barrett & Nick Corasaniti, *Trump Administration Quietly Seeks to Build National Voter Roll*, N.Y. TIMES, Sept. 9, 2025 ............................................................................... 6

Doug Bock Clark, *She Pushed to Overturn Trump's Loss in the 2020 Election. Now She'll Help Oversee U.S. Election Security*, PROPUBLICA, Aug. 26, 2025 .................................... 7

Emily Bazelon & Rachel Poser, *The Unraveling of the Justice Department*, N.Y. TIMES MAGAZINE, Nov. 16, 2025 .................................................................... 6

H.R. Rep. No. 86-956 (1959) ................................................................................. 2

Hansi Lo Wang, *Thousands of Pennsylvania Voters Have Had Their Mail Ballot Applications Challenged*, NATIONAL PUBLIC RADIO, Nov. 5, 2024 ........................................... 8

Jen Fifield, *Pa.'s Heather Honey, Who Questioned the 2020 Election, Is Appointed to Federal Election Post*, PA. CAPITAL-STAR, Aug. 27, 2025 ................................................. 7

Jeremy Roebuck and Katie Bernard, *'I Can't Think of Anything Less American': Right-Wing Activists' Effort to Nullify Hundreds of Pa. Votes Met with Skepticism*, PHILA. INQUIRER, Nov. 1, 2024 ...................................................................................................... 8

Jonathan Shorman, *DOJ is Sharing State Voter Roll Lists with Homeland Security*, STATELINE, Sept. 12, 2025 ................................................................................................. 6

Jude Joffe-Block & Miles Parks, *The Trump Administration Is Building a National Citizenship Data System*, NATIONAL PUBLIC RADIO, June 29, 2025 ........................................... 7

Jude Joffe-Block, *Trump's SAVE Tool Is Looking for Noncitizen Voters. But It's Flagging U.S. Citizens Too*, NATIONAL PUBLIC RADIO, Dec. 10, 2025 ............................................ 9

Kaylie Martinez-Ochoa, Eileen O'Connor, & Patrick Berry, *Tracker of Justice Department Requests for Voter Information*, Brennan Center for Justice (updated Jan. 23, 2026) ............... 3

Kyle Cheney, *Trump Administration Concedes DOGE Team May Have Misused Social Security Data*, POLITICO, Jan. 20, 2026 ................................................................................ 9

Matt Cohen, *DHS Said to Brief Cleta Mitchell's Group on Citizenship Checks for Voting*, DEMOCRACY DOCKET, June 12, 2025 .................................................................. 7

Miles Parks & Jude Joffe-Block, *Trump's DOJ focuses in on voter fraud, with a murky assist from DOGE*, NATIONAL PUBLIC RADIO, May 22, 2025 ............................................... 9

Press Release, United States Department of Justice, *Justice Department Sues Arizona and Connecticut for Failure to Produce Voter Rolls* (Jan. 6, 2026) .................................... 5

Press Release, United States Department of Justice, *Justice Department Sues Four Additional States and One Locality for Failure to Comply with Federal Elections Laws* (Dec. 12, 2025) .. 5

Press Release, United States Department of Justice, *Justice Department Sues Four States for Failure to Produce Voter Rolls* (Dec. 18, 2025) .................................................. 5

Press Release, United States Department of Justice, *Justice Department Sues Oregon and Maine for Failure to Provide Voter Registration Rolls* (Sept. 16, 2025)................................................ 5

Press Release, United States Department of Justice, *Justice Department Sues Six Additional States for Failure to Provide Voter Registration Rolls* (Dec. 2, 2025)........................................ 5

Press Release, United States Department of Justice, *Justice Department Sues Six States for Failure to Provide Voter Registration Rolls* (Sept. 25, 2025) ...................................................... 5

Press Release, United States Department of Justice, *United States Announces Settlement with Kentucky Ensuring Compliance with Voter Registration List Maintenance Requirements* (July 5, 2018)......................................................................................................................... 16

Press Release, United States. Department of Justice, *Justice Department Sues Virginia for Failure to Produce Voter Rolls* (Jan. 16, 2026).......................................................................... 5

Sarah Lynch, *US Justice Dept Considers Handing over Voter Roll Data for Criminal Probes, Documents Show*, REUTERS, Sept. 9, 2025 ................................................................................ 6

Steven F. Lawson, *Black Ballots: Voting Rights in the South, 1944-1969* (1976)........................ 23

United States Department of Justice, Civil Rights Division, *Federal Law Constraints on Post-Election "Audits"* (Jul. 28, 2021)......................................... 2

**Rules**

Fed. R. Civ. P. 12(b)(6) ............................................................................................................. 11

# INTRODUCTION

In this action, the United States seeks to compel the disclosure of sensitive personal voter data to which it is not entitled, using the civil rights laws as a pretext. But the information requests propounded on the State by the U.S. Department of Justice ("DOJ"), as set forth in the Complaint, do not satisfy the core statutory requirement that any federal demand for information under the Civil Rights Act of 1960 ("CRA") include a disclosure of "the basis and the purpose" for the federal data request. 52 U.S.C. § 20703. Because the United States fails to properly disclose any sufficient basis and purpose for its request for the data, and because its request is unlawful, it has failed to state a claim. Indeed, a district court in California reached those same conclusions just three weeks ago with respect to a materially identical complaint, dismissing the United States' claims without leave to replead and denying its materially identical Motion to Compel. *See United States v. Weber*, No. 2:25-CV-09149-DOC-ADS, 2026 WL 118807 (C.D. Cal. Jan. 15, 2026); *see also* Minutes of Proceedings, *United States v. Oregon*, No. 6:25-cv-01666-MTK (D. Or. Jan. 26, 2026), Dkt. No. 68 (also granting dismissal of the United States's claims with written opinion to follow). This Court should do the same.

The right to vote "'is of the most fundamental significance under our constitutional structure.'" *Republican Nat'l Comm. v. N.C. State Bd. of Elections*, 120 F.4th 390, 404 (4th Cir. 2024) (quoting *Burdick v. Takushi*, 504 U.S. 428, 433 (1992)). It is "preservative of all other rights" because it serves as a check against tyrannical rule while simultaneously ensuring the competition of ideas among our elected officials. *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886).

Congress has repeatedly legislated to protect the franchise, including through Title III of the CRA, 52 U.S.C. § 20701 *et seq*., as well as the National Voter Registration Act ("NVRA"), 52 U.S.C. § 20501 *et seq*., and the Help America Vote Act ("HAVA"), 52 U.S.C. § 20901 *et seq*. These statutes were enacted for the purpose of ensuring that all eligible Americans—especially

racial minorities and voters with disabilities—have the opportunity to participate in free, fair, and secure elections. As the United States Department of Justice itself explains, Title III of the CRA, the election records provision invoked in the Complaint here, was designed to "secure a more effective protection of the right to vote." U.S. Dep't of Just., Civ. Rts. Div., *Federal Law Constraints on Post-Election "Audits"* (Jul. 28, 2021), https://perma.cc/74CP-58EH (citing *State of Ala. ex rel. Gallion v. Rogers*, 187 F. Supp. 848, 853 (M.D. Ala. 1960) and H.R. Rep. No. 86-956 (1959)).

The United States' demand for Maryland's unredacted voter file—which contains sensitive personal information such as full birth dates, driver's license numbers, and Social Security numbers from every voter in the state—undermines these statutes' core purposes and is contrary to law. To be sure, the public disclosure of state voting records is important to ensure transparency and the accuracy of the voter rolls, especially by ensuring that citizens are not erroneously removed from the voter rolls. But releasing the State's voter records *without redaction* and for purposes far afield from protecting voter access would only deter voter participation and undermine the right to vote. That is especially so here, where the United States' *actual* reason for the data demand—which it never disclosed in its request but has been widely reported—is to create an unauthorized and unlawful national voter database, and to use this illicit tool to illegally target voters.

For good reason, there is no statutory right to demand the type of sensitive voter information at issue here without fully and accurately setting forth "the basis and the purpose" for the data request. 52 U.S.C. § 20703. Because the United States has failed to establish its entitlement to a complete, unredacted Maryland voter file— much less its entitlement to obtain this sensitive data at the very beginning of the case, without any discovery process or any of the other protections

and procedures required by the Federal Rules—this Court should deny Plaintiff's Motion to Compel and dismiss this action.

## BACKGROUND

Beginning in May 2025, Plaintiff the United States, through its Department of Justice ("DOJ"), began sending letters to election officials in at least forty states, making escalating demands for the production of statewide voter registration databases, with plans to gather data from all 50 states. *See* Kaylie Martinez-Ochoa, Eileen O'Connor, & Patrick Berry, *Tracker of Justice Department Requests for Voter Information*, Brennan Ctr. for Just. (updated Jan. 23, 2026), https://perma.cc/R824-QG68.

On July 14, 2025, DOJ sent a letter to Defendant DeMarinis, Maryland's State Administrator of Elections, demanding, among other things, "[t]he current electronic copy of Maryland's computerized statewide voter registration list," and directing the State to "include all fields contained within the list." *See* Ex. 1, Letter of Michael E. Gates to the Hon. Jared DeMarinis dated July 14, 2025, Dkt. No. 2-2, ("July 14 Letter"), at 2–3. Defendant DeMarinis responded on July 30, 2025, setting out the process under Maryland law for procuring the statewide voter registration list and referring the DOJ to the state's website for doing so. *See* Ex. 2, Letter of the Hon. Jared DeMarinis to Maureen Riordan and Michael E. Gates dated July 30, 2025, Dkt. No. 2-2, at 7–9. Defendant DeMarinis directed DOJ to "follow these instructions" at the state website "to obtain a copy of the portions of the statewide voter registration list that are subject to disclosure." *Id.* at 9.

On August 13, 2025, Defendant DeMarinis sent another letter to DOJ, seemingly in response to DOJ's "request for Maryland's voter registration list." *See* Ex. 3, Letter of the Hon. Jared DeMarinis to Maureen Riordan and Michael E. Gates dated Aug. 13, 2025, Dkt. No. 2-2,

("Aug. 13 Letter"), at 13. Defendant DeMarinis raised several issues with DOJ's request. First, he noted that "Maryland law requires that the voter registration list not be used for 'commercial solicitation,' and, more importantly, may not be used for 'any other purpose not related to the electoral process." *Id.* at 13 (quoting Md. Code Ann., Election Law § 3-506(a)(1)). Yet Defendant DeMarinis stated that based on DOJ's request, "it is not clear what you intend to do with Maryland's voter registration list." *Id.* Further, Defendant DeMarinis noted that the Federal Privacy Act requires DOJ to "share the Department's purpose in creating [a system of records of Maryland voters] . . . and how the public voter registration list requested is necessary and relevant to that purpose." *Id.* Finally, Defendant DeMarinis warned that "[t]he voter registration list may not be used in a manner that intimidates a voter from going to the polls, results in or has the intent to result in the denial or abridgement of the right of a Maryland citizen to vote . . . ." *Id.* at 14.

On August 18, 2025, DOJ responded to Defendant DeMarinis, demanding that Maryland provide to the DOJ its complete, non-public voter database. *See* Ex. 4, Letter of Harmeet K. Dhillon to the Hon. Jared DeMarinis dated Aug. 18, 2025, Dkt. No. 2-2 ("Aug. 18 Letter"), at 16–18. DOJ specified that it was seeking an unredacted electronic copy of the statewide voter registration list that "contains *all fields*," including registrants' full name, date of birth, address, driver's license number and the last four digits of the registrant's social security number ("SSN4"). *Id.* at 16. DOJ cited the NVRA, HAVA, and Title III of the CRA as authority for its records request, and stated that "[t]he purpose of the request is to ascertain Maryland's compliance with the list maintenance requirements of the NVRA and HAVA," but did not elaborate further in this regard or refer to any compliance deficiencies by Maryland with respect to those statutes' voter list maintenance requirements. *Id.* at 17. It waved away any privacy issues, claiming that the federal prohibition on sharing voter information obtained under the Civil Rights Act of 1960 with the

public was sufficient to assuage concerns. *See id.* (citing 52 U.S.C. § 20704). DOJ's August 18 Letter never addressed Defendant DeMarinis's questions raised in his August 13 Letter.

Defendant DeMarinis responded on August 25, 2025. *See* Ex. 5, Letter of the Hon. Jared DeMarinis to Harmeet K. Dhillon and Maureen Riordan dated Aug. 25, 2025, Dkt. No. 2-2, ("Aug. 25 Letter"), at 20–22. His letter noted that DOJ's August 18 Letter "did not answer the questions posed in [Maryland's] August 13, 2025 letter"—*i.e.* DOJ's purpose for procuring a list of Maryland's voters and why the list was necessary and relevant for that purpose. *Id.* at 20. Defendant DeMarinis reiterated that DOJ's answers to these questions were important for compliance with state and federal law. *Id.* at 20–22.

According to documents in the public record, DOJ never responded to Defendant DeMarinis's August 25 Letter, and never provided additional legal arguments to support its position or address Defendant DeMarinis's objections and concerns. Instead, months later on December 1, 2025, the United States filed this lawsuit—one of at least 25 nearly identical lawsuits that DOJ has initiated against states and election officials across the country—seeking to compel the production of this sensitive Maryland voter data.[1]

---

[1] *See* Press Release, U.S. Dep't of Just., *Justice Department Sues Virginia for Failure to Produce Voter Rolls* (Jan. 16, 2026), https://perma.cc/3L8Q-SJM5; Press Release, U.S. Dep't of Just., *Justice Department Sues Arizona and Connecticut for Failure to Produce Voter Rolls* (Jan. 6, 2026), https://perma.cc/YCM2-QQKM; Press Release, U.S. Dep't of Just., *Justice Department Sues Four States for Failure to Produce Voter Rolls* (Dec. 18, 2025), https://perma.cc/RZL3-4E4B; Press Release, U.S. Dep't of Just., *Justice Department Sues Four Additional States and One Locality for Failure to Comply with Federal Elections Laws* (Dec. 12, 2025), https://perma.cc/8V9V-SRPJ; Press Release, U.S. Dep't of Just., *Justice Department Sues Six Additional States for Failure to Provide Voter Registration Rolls* (Dec. 2, 2025), https://perma.cc/F5MD-NWHD; Press Release, U.S. Dep't of Just., *Justice Department Sues Six States for Failure to Provide Voter Registration Rolls* (Sept. 25, 2025), https://perma.cc/7J99-WGBA; Press Release, U.S. Dep't of Just., *Justice Department Sues Oregon and Maine for Failure to Provide Voter Registration Rolls* (Sept. 16, 2025), https://perma.cc/M69P-YCVC.

Notably, according to extensive public reporting, DOJ's requests for private, sensitive voter data from Maryland and other states do not appear to relate to list maintenance under the NVRA and HAVA. Rather, they appear to be in connection with unprecedented efforts by the United States to construct a national voter database, and to otherwise use untested forms of database matching in order to scrutinize state voter rolls. According to this reporting, DOJ employees "have been clear that they are interested in a central, federal database of voter information." Devlin Barrett & Nick Corasaniti, *Trump Administration Quietly Seeks to Build National Voter Roll*, N.Y. Times, Sept. 9, 2025, https://www.nytimes.com/2025/09/09/us/politics/trump-voter-registration-data.html. DOJ is coordinating these efforts with the federal Department of Homeland Security ("DHS"), according to reported statements from DOJ and DHS. *Id.*[2] One article extensively quoted a recently departed lawyer from DOJ's Civil Rights Division describing DOJ's aims in this case and others like it:

> We were tasked with obtaining states' voter rolls, by suing them if necessary. Leadership said they had a DOGE person who could go through all the data and compare it to the Department of Homeland Security data and Social Security data. . . . I had never before told an opposing party, Hey, I want this information and I'm saying I want it for this reason, but I actually know it's going to be used for these other reasons. That was dishonest. It felt like a perversion of the role of the Civil Rights Division.

Emily Bazelon & Rachel Poser, *The Unraveling of the Justice Department*, N.Y. Times Magazine, Nov. 16, 2025, https://www.nytimes.com/interactive/2025/11/16/magazine/trump-justice-department-staff-attorneys.html.

---

[2] *See also, e.g.*, Jonathan Shorman, *DOJ is Sharing State Voter Roll Lists with Homeland Security*, Stateline, Sept. 12, 2025, https://stateline.org/2025/09/12/doj-is-sharing-state-voter-roll-lists-with-homeland-security; Sarah Lynch, *US Justice Dept Considers Handing Over Voter Roll Data for Criminal Probes, Documents Show*, Reuters, Sept. 9, 2025, https://www.reuters.com/legal/government/us-justice-dept-considers-handing-over-voter-roll-data-criminal-probes-documents-2025-09-09.

According to additional public reporting, these efforts are being conducted with the involvement of election deniers within and outside the government who have previously sought to disenfranchise voters and overturn elections. Those advocates include Heather Honey, who sought to overturn the result of the 2020 presidential election in multiple states and now serves as DHS's "deputy assistant secretary for election integrity."[3] Also involved is Cleta Mitchell, a private attorney and leader of a national group called the "Election Integrity Network," who has, among other things, promoted the use of artificial intelligence to challenge registered voters.[4] These actors and their associates have previously sought to compel states to engage in aggressive purges of registered voters, and have abused voter data to make mass challenges to disenfranchise voters in other states. *See, e.g.*, *PA Fair Elections v. Pa. Dep't of State*, 337 A.3d 598, 600 n.1 (Pa. Commw. Ct. 2025) (dismissing as meritless complaint brought by "PA Fair Elections," a group affiliated

---

[3] *See* Alexandra Berzon & Nick Corasaniti, *Trump Empowers Election Deniers, Still Fixated on 2020 Grievances*, N.Y. TIMES, Oct. 22, 2025, https://www.nytimes.com/2025/10/22/us/politics/trump-election-deniers-voting-security.html (documenting "ascent" of election denier Honey); Jen Fifield, *Pa.'s Heather Honey, Who Questioned the 2020 Election, Is Appointed to Federal Election Post*, PA. CAPITAL-STAR, Aug. 27, 2025, https://penncapital-star.com/election-2025/pa-s-heather-honey-who-questioned-the-2020-election-is-appointed-to-federal-election-post; Doug Bock Clark, *She Pushed to Overturn Trump's Loss in the 2020 Election. Now She'll Help Oversee U.S. Election Security*, PROPUBLICA, Aug. 26, 2025, https://www.propublica.org/article/heather-honey-dhs-election-security.

[4] *See, e.g.*, Matt Cohen, *DHS Said to Brief Cleta Mitchell's Group on Citizenship Checks for Voting*, DEMOCRACY DOCKET, June 12, 2025, https://www.democracydocket.com/news-alerts/dhs-said-to-brief-cleta-mitchells-anti-voting-group-on-checking-citizenship-for-voters; *see also* Jude Joffe-Block & Miles Parks, *The Trump Administration Is Building a National Citizenship Data System*, NPR, June 29, 2025, https://www.npr.org/2025/06/29/nx-s1-5409608/citizenship-trump-privacy-voting-database (reporting that Mitchell had received a "full briefing" from federal officials); *see also* Andy Kroll & Nick Surgey, *Inside Ziklag, the Secret Organization of Wealthy Christians Trying to Sway the Election and Change the Country*, PROPUBLICA, July 13, 2024, https://www.propublica.org/article/inside-ziklag-secret-christian-charity-2024-election ("Mitchell is promoting a tool called EagleAI, which has claimed to use artificial intelligence to automate and speed up the process of challenging ineligible voters.").

with current DHS official Honey, challenging Pennsylvania's voter roll maintenance practices pursuant to HAVA).[5]

Here, DOJ's actions indicate that it may focus on or target specific groups of voters in its use of the requested data. In its letters to Maryland and other States requesting the same private voter data, DOJ also requested information about how elections officials, among other things, process applications to vote by mail; identify and remove duplicate registrations; and verify that registered voters are not ineligible to vote, such as due to a felony conviction or citizenship status.[6] *See* July 14 Letter.

According to public reporting, as another part of its efforts to use novel and unspecified forms of data analysis to scrutinize state voter data and target voters for potential disenfranchisement, DOJ last year asked staffers from the new "Department of Governmental Efficiency" ("DOGE") to identify noncitizens in state voter rolls by matching voter data with data

---

[5] *See* Carter Walker, *Efforts to Challenge Pennsylvania Voters' Mail Ballot Applications Fizzle*, SPOTLIGHT PA, Nov. 8, 2024, https://www.spotlightpa.org/news/2024/11/mail-ballot-application-challenges-pennsylvania-fair-elections/ (describing mass-challenges and noting connection to Honey and her organization "PA Fair Elections"); *see also* Jeremy Roebuck and Katie Bernard, *'I Can't Think of Anything Less American': Right-Wing Activists' Effort to Nullify Hundreds of Pa. Votes Met with Skepticism*, PHILA. INQUIRER, Nov. 1, 2024, https://www.inquirer.com/politics/election/heather-honey-pa-fair-elections-vote-challenges-pennsylvania-20241101.html (noting sworn testimony regarding PA Fair Elections' involvement in the challenges); Hansi Lo Wang, *Thousands of Pennsylvania Voters Have Had Their Mail Ballot Applications Challenged*, NPR, Nov. 5, 2024, https://www.npr.org/2024/11/04/nx-s1-5178714/pennsylvania-mail-ballot-voter-challenges-trump (same).

[6] *See, e.g.*, Letter from Maureen Riordan to Sec'y of State Al Schmidt (June 23, 2025), Dkt. No. 37-1, *United States v. Pennsylvania*, No. 2:25-cv-01481 (W.D. Pa. Oct. 9, 2025) (Pennsylvania); Letter from Michael E. Gates to Sec'y of State Jocelyn Benson, Dkt. No. 34-3, *United States v. Benson*, No. 1:25-cv-01148 (W.D. Mich. Nov. 25, 2025) (Michigan); Letter from Michael E. Gates to Sec'y of State Tobias Read (July 16, 2025), Dkt. No. 33-1, *United States v. Oregon*, No. 6:25-cv-01666 (D. Ore. Nov. 17, 2025) (Oregon); Letter from Michael E. Gates to Sec'y of State Shirley Weber (July 10, 2025), Dkt. No. 37-2, *United States v. Weber*, No. 2:25-cv-09149 (C.D. Cal. Nov. 7, 2025) (California).

from the Social Security Administration.[7] DOJ officials have since claimed that "we've checked 47.5 million voter records" and found "several thousand non-citizens who are enrolled to vote in Federal elections," although public reporting indicates that these efforts are producing false positives—*i.e.*, that they are flagging U.S. citizens as being non-citizens who are ineligible to vote.[8]

A recent federal court filing by DOJ correcting misrepresentations in a case in this district before Judge Hollander further corroborates how United States officials have been seeking to use voter data in conjunction with DOGE-inspired data-matching and aggregation techniques, and have been working with outside groups seeking to deny election results in those efforts. As detailed in the corrected filing, which was made on behalf of the U.S. Social Security Administration ("SSA"):

> [I]n March 2025, a political advocacy group contacted two members of SSA's DOGE Team with a request to analyze state voter rolls that the advocacy group had acquired. The advocacy group's stated aim was to find evidence of voter fraud and to overturn election results in certain States. In connection with these communications, one of the DOGE team members signed a "Voter Data Agreement," in his capacity as an SSA employee, with the advocacy group. He sent the executed agreement to the advocacy group on March 24, 2025.

Notice of Corrections to the Record at 5, *Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO v. Soc. Sec. Admin.*, No. 1:25-cv-596-ELH, Dkt. No. 197 (D. Md. Jan. 16, 2026); *see also* Kyle Cheney, *Trump Administration Concedes DOGE Team May Have Misused Social Security Data*, POLITICO, Jan. 20, 2026, https://www.politico.com/news/2026/01/20/trump-musk-doge-social-

---

[7] *E.g.*, Miles Parks & Jude Joffe-Block, *Trump's DOJ focuses in on voter fraud, with a murky assist from DOGE*, NPR, May 22, 2025, https://www.npr.org/2025/05/17/nx-s1-5383277/trump-doj-doge-noncitizenvoting.

[8] December 5, 2025 Post by @AAGDhillon https://x.com/AAGDhillon/status/1997003629442519114; *see* Jude Joffe-Block, *Trump's SAVE Tool Is Looking for Noncitizen Voters. But It's Flagging U.S. Citizens Too*, NPR, Dec. 10, 2025, https://www.npr.org/2025/12/10/nx-s1-5588384/savevoting-data-us-citizens.

security-00737245. The filings, which do not specify the terms of the "Voter Data Agreement" or the activities these DOGE actors or others undertook pursuant to it, also indicated that, around the same period, DOGE actors also improperly shared unknown amounts of social security data on an unapproved third-party server, in a "manner [that] is outside SSA's security protocols." Notice of Corrections to the Record, *supra*, at 6.

Extensive public reporting, including government documents created by the DOJ and DOJ officials' own statements and admissions, thus indicate that the United States's aim in seeking sensitive voter data on millions of Americans is to turn states' own voter rolls into a tool for unlawfully and improperly mass-challenging voters and interfering with the democratic process in the states. Recent events have further highlighted the pretextual, and extremely abnormal, nature of the United States' request. On January 24, 2026, Attorney General Pamela Bondi wrote a letter to Minnesota Governor Tim Walz, purporting to discuss DHS's "Operation Metro Surge" activities in the Twin Cities amidst ongoing violence against the civilian population there.[9] The letter purports to set out three actions that Minnesota—which is one of the states DOJ has sued to try to obtain sensitive voter data—should take to "restore the rule of law, support ICE officers, and bring an end to the chaos in Minnesota," one of which is to "allow the Civil Rights Division of the Department of Justice to access voter rolls to confirm that Minnesota's voter registration practices comply with federal law as authorized by the Civil Rights Act of 1960."[10]

---

[9] *Read Bondi's Letter to Minnesota's Governor*, N.Y. TIMES, Jan. 24, 2026, https://perma.cc/H5GY-ZKBS ("Bondi Letter"); *see also* Order, *Tincher v. Noem*, No. 0:25-cv-04669-KMM-DTS (D. Minn. Jan. 16, 2026), Dkt. No. 85 (granting injunction against certain DHS practices towards the civilian population of Minneapolis-St. Paul in connection with purported immigration enforcement operations there).

[10] Bondi Letter at 2, 3.

## LEGAL STANDARD

A court must dismiss a complaint if, accepting all well-pleaded factual allegations as true, it does not "state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). When considering a motion to dismiss, a court need not accept the complaint's legal conclusions. *Iqbal*, 556 U.S. at 678. A complaint must state a "plausible claim for relief" and contain more than "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Id.* at 678–79.

Thus, in practice, while courts "accept[] all well-pled facts as true and construe[] these facts in the light most favorable to the plaintiff," they ignore "legal conclusions, elements of a cause of action, and bare assertions devoid of further factual enhancement." *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 255 (4th Cir. 2009). This "context-specific" inquiry requires courts, using "judicial experience and common sense," to determine whether the factual allegations "nudge claims across the line from conceivable to plausible." *Id.* at 256 (internal quotation marks omitted). To perform this review, courts can also "consider documents incorporated into the complaint by reference, and matters of which a court may take judicial notice," as well as "documents attached to the motion to dismiss, so long as they are integral to the complaint and authentic." *Just Puppies, Inc. v. Brown*, 123 F.4th 652, 660 (4th Cir. 2024) (internal quotation marks omitted).

## ARGUMENT

## I. THE UNITED STATES' CASE SHOULD BE DISMISSED BECAUSE ITS DEMANDS EXCEED THE STATUTORY AUTHORITY OF THE CRA AND ARE CONTRARY TO LAW.

The United States' demand for Maryland's full and unredacted electronic voter file exceeds its statutory authority under the CRA. Against the backdrop of the turmoil of the Jim Crow era, Congress enacted the CRA, including the public records provisions in Title III, to facilitate

investigations of civil rights violations preventing eligible citizens from voting due to discrimination. H.R. Rep. No. 86-956 at 7 (1959) (indicating the purpose of Title III "is to provide a more effective protection of the right of all qualified citizens to vote without discrimination on account of race"). But the Attorney General's access to these records is not unbounded. If the Attorney General makes a demand for records, she must provide "a statement of the basis and the purpose therefor." 52 U.S.C. § 20703.

The United States' records request here is contrary to the CRA for at least two distinct reasons. *First*, in making this sweeping demand for Maryland's full and unredacted state voter registration list, the United States fails to offer a statutorily sufficient statement of "the basis and the purpose" in support of its records requests. *Second*, to the extent the United States might be entitled to any records under the CRA, those records would need to be redacted to protect the privacy and constitutional rights of Maryland voters. State and federal law would require such redaction, and nothing in the CRA prevents the appropriate redaction of the sensitive personal information of voters. Plaintiff's case should thus be dismissed.

**A.    Plaintiff's Demand for Records Fails to Meet the Requisite Statutory Requirements of the CRA.**

Title III of the CRA sets out requirements regarding federal election records, including a requirement in Section 301 for officers of elections to "retain and preserve, for a period of twenty-two months from the date of any" federal election, "all records and papers which come into [their] possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election," with certain exceptions regarding delivery and designation of custodians. 52 U.S.C. § 20701. Section 303 requires that "[a]ny record or paper" retained and preserved under Section 301 "shall, upon demand in writing by the Attorney General or [her] representative directed to the person having custody, possession, or control of such record or paper, be made

available for inspection, reproduction, and copying at the principal office of such custodian by the Attorney General or [her] representative." *Id*. § 20703. "This demand *shall* contain a statement of *the basis __and__ the purpose* therefor." *Id.* (emphasis added).

Contemporaneous case law immediately following the enactment of Title III of the CRA shows that the "basis" is the statement for why the Attorney General believes there is a violation of federal civil rights law and the "purpose" explains how the requested records would help determine if there is a violation of the law. *Kennedy v. Lynd*, 306 F.2d 222, 229 n.6 (5th Cir. 1962); *accord Weber*, 2026 WL 118807, at *9 ("The basis is the reasoning provided by the DOJ regarding the evidence behind its investigation of a particular state and specific, articulable facts pointing to the violation of federal law."). Indeed, "basis" and "purpose" under Title III of the CRA have consistently been treated as distinct concepts. *See id.*; *In re Coleman*, 208 F. Supp. 199, 199–200 (S.D. Miss. 1962), *aff'd sub nom.*, *Coleman v. Kennedy*, 313 F.2d 867 (5th Cir. 1963).

The basis-and-purpose requirement under the CRA is a "critical safeguard that ensures the request is legitimately related to the purpose of the statute." *Weber*, 2026 WL 118807, at *9. It prevents the statute from being used as a fishing expedition to obtain records for reasons that are speculative, unrelated to the CRA's aims, or otherwise impermissible or contrary to law. *See id.* The statutory basis and purpose requirements are therefore not perfunctory but require a specific statement as to the reason for requesting the information and how that information will aid in the investigatory analysis. This is consistent with other federal statutes allowing federal agencies to obtain records in service of investigations, where courts have found that the test of judicial enforcement of such subpoenas includes an evaluation of whether the investigation is "conducted pursuant to a legitimate purpose," *Equity Inv. Assocs., LLC v. United States*, 40 F.4th 156, 161–62 (4th Cir. 2022) (quoting *United States v. Powell*, 379 U.S. 48,

57 (1964)), and that such subpoenas are not in service of "unnecessary examination or investigations," *United States v. Rosinsky*, 547 F.2d 249, 253 (4th Cir. 1977) (internal quotation marks omitted). Indeed, courts have explained that such a purpose requirement ensures that the information sought is relevant to the inquiry and not unduly burdensome. *See, e.g.*, *F.D.I.C. v. Wentz*, 55 F.3d 905, 908 (3d Cir. 1995) (reciting requirements for investigation pursuant to an administrative subpoena).

As set forth below, the United States failed to articulate in its demand and in the Complaint "the basis and the purpose" for its request for Maryland voters' sensitive voter information. The United States' demand fails to meet this requirement of the CRA for at least three distinct reasons. These failures warrant dismissal of the case.

*First*, the United States has not stated a proper "basis" for its demand. The United States alleges that the "purpose" of its request seeking "an electronic copy of Maryland's complete and current [voter registration list]" was "to ascertain Maryland's compliance with the list maintenance requirements of the NVRA and HAVA." Compl. ¶ 25; Aug. 18 Letter at 17. But neither the Complaint nor the DOJ's August 18 Letter that invoked the CRA supply a "basis" for why the United States believes Maryland's list maintenance procedures might violate the NVRA or HAVA in the first place. The United States claims it is investigating Maryland's compliance with the NVRA and HAVA based on its review of the Election Administration and Voting Survey 2024 Comprehensive Report from the U.S. Election Assistance Commission ("2024 EAVS Report"), which includes states' "reported data on their efforts to keep voter registration lists current and accurate, known as list maintenance." Compl. ¶¶ 19–20. Yet in its August 18 Letter, DOJ included no reference at all to the 2024 EAVS Report. *See* Aug. 18 Letter. While DOJ mentioned the 2024 EAVS Report in its earlier July 14 Letter, it did so in connection to other requests for data and did

not make any connection between the report and its request for the statewide voter file. *See* July 14 Letter at 3–4. Moreover, neither the Complaint nor either of DOJ's two letters addressed to Defendant DeMarinis alleges any evidence of anomalies or anything inconsistent with reasonable list maintenance efforts in the data Maryland reported to EAVS. *See* Compl. ¶¶ 19–20; July 14 Letter; Aug. 18 Letter.

*Second*, even if the United States had provided a proper "basis" for its demand—and it did not—it fails to explain any connection between its purported "purpose" and the vast scope of its records request here, seeking the full and unredacted Maryland statewide voter file. It does not attempt to explain why unredacted voter files are necessary to determine whether Maryland has "conduct[ed] a general program that makes a reasonable effort to remove the names of ineligible voters" by virtue of "death" or "a change in the residence of the registrant," 52 U.S.C. § 20507; Compl. ¶ 12. And in fact, such unredacted files are not necessary: A single snapshot of a state's voter list does not and could not provide enough information to determine if the state has made a "reasonable effort" to remove ineligible voters under Section 8 of the NVRA. Compl. ¶ 12; 52 U.S.C. § 20507(a)(4)(A)–(B). The NVRA and HAVA both leave the mechanisms for conducting list maintenance within the discretion of the State. *See* 52 U.S.C. § 20507(a) (4); (c)(1); § 21083(a)(2)(A); § 21085. The *procedures* carried out by a state or locality establish its compliance; the unredacted voter file does not. Even were the United States to use voter file data to identify voters who had moved or died on Maryland's voter list at a single point in time, that would not amount to Maryland failing to comply with the "reasonable effort" required by the NVRA or HAVA. *See, e.g.*, *Pub. Int. Legal Found. v. Benson*, 136 F.4th 613, 624–27 (6th Cir.

2025) (describing a "reasonable effort" as "a serious attempt that is rational and sensible" and rejecting any "quantifiable, objective standard" in this context).[11]

Even if some portion of the voter file were necessary to investigate "Maryland's compliance with the list maintenance requirements of the NVRA and HAVA," Compl. ¶ 25; Aug. 18 Letter at 17, the United States has not provided any justification for why the full unredacted voter file is necessary to carry out this purported purpose. It is telling that, for decades, DOJ has neither sought nor required a full and unredacted voter file in its investigations regarding NVRA compliance. *See, e.g.*, Press Release, U.S. Dep't of Just., *United States Announces Settlement with Kentucky Ensuring Compliance with Voter Registration List Maintenance Requirements* (July 5, 2018) https://perma.cc/G2EZUUA5 (describing letters to all 44 states covered by the NVRA with requests for list maintenance information, but without demanding voter files).

*Third*, even if the United States had plausibly set forth some facially sufficient statement of the basis and the purpose for its request related to compliance with the NVRA and HAVA, the CRA claim would also be subject to dismissal because DOJ's stated reason for requesting the sensitive personal data of millions of Maryland voters is pretextual.

DOJ's failure to fully and accurately provide this information is fatal to its Complaint. Section 303 of the CRA requires a statement of "*the* basis and *the* purpose" of a records request, and by twice using the definite article here, the statute requires not just *a* basis or purpose among many, but *the* complete basis and purpose underlying the request. *See Niz-Chavez v. Garland*, 593

---

[11] Indeed, the inclusion at any particular point in time on Maryland's voter registration list of some voters who may have potentially moved out of state is to be expected, since Section 8(d) of the NVRA explicitly sets out a specific set of rules and requirements for removals from the voter rolls based on changes of residence, whereby states "shall not remove" voters on these grounds unless these voters directly confirm their change of residence in writing, or unless states first provide notice and then abide by a statutory waiting period until the second general federal election after providing notice. 52 U.S.C. § 20507(d).

U.S. 155, 165–66 (2021); *see also, e.g., Corner Post, Inc. v. Bd. of Governors of the Fed. Rsrv. Sys.*, 603 U.S. 799, 817 (2024) (emphasizing distinction between the definite and the indefinite article). But the United States has not disclosed the actual purpose for its requests, and this Court "is not obliged to accept a contrived statement and purpose" in place of an accurate one. *Weber*, 2026 WL 118807, at \*10.

Title III's basis and purpose requirement is especially important here, where massive amounts of public reporting and public, judicially noticeable documents confirm that the United States' *actual* purpose is not to ensure compliance with the NVRA and HAVA, but to build an unprecedented national voter file through novel, error-prone, DOGE-inspired forms of data-matching and then to use this tool to identify ostensibly ineligible voters and challenge their right to vote. *See supra* 6–10 & nn.2–10 (describing this evidence). As the *Weber* court characterized it, considering the same robust set of public reporting and documents, "[i]t appears that the DOJ is on a nationwide quest to gather the sensitive, private information of millions of Americans for use in a centralized federal database." 2026 WL 118807, at \*10. The creation of such a database has never been authorized by Congress and violates the federal Privacy Act. *See* 5 U.S.C. § 552a(e)(7) (provision of the federal Privacy Act prohibiting the creation or maintenance of any database "describing how any individual exercises rights guaranteed by the First Amendment," which necessarily includes exercising the right to vote).

Now, consider that the United States has recently sought states to sign a memorandum of understanding ("MOU") in connection with its requests for statewide voter files. *See* Ex. 1, U.S. Dep't of Just., Civ. Div., Confidential Mem. of Understanding ("MOU").[12] Far from indicating a

---

[12] This Court can take judicial notice of the MOU as a government document produced by DOJ. *See, e.g., Shore v. Charlotte-Mecklenburg Hosp. Auth.*, 412 F. Supp. 3d 568, 573 (M.D.N.C.

purpose of ensuring compliance with the NVRA and HAVA, this MOU runs afoul of those statutes. For one, the United States seeks to place authority to identify supposed ineligible voters in the hands of the federal government, directly contrary to statute's requirement that procedures for complying with HAVA be "left to the discretion of the State." 52 U.S.C. § 21085; MOU at 2, 5. In addition, the MOU's substantive terms would allow DOJ to compel states to remove supposedly ineligible voters "within forty-five (45) days," MOU at 5, in a manner that would violate multiple protections of the NVRA, including the requirement to provide voters with notice prior to their removal from the rolls, and the firm bar against systematic voter removals within 90 days of an election. 52 U.S.C. § 20507. This MOU confirms that Plaintiff's stated purpose of ensuring compliance with the NVRA and HAVA is not accurate or plausible, and that its actual purpose is to ingest the sensitive personal information of millions of Maryland voters in defiance of those statutes and the procedural protections they provide to voters.[13]

And now consider the Attorney General's recent letter to Minnesota Governor Tim Walz, demanding that Minnesota turn over voters' private data in order to help "support ICE officers" and "bring an end to the chaos" being inflicted on the civilian population there by DHS agents ostensibly tasked with enforcing the immigration laws. The Bondi Letter, purporting to connect DOJ's request for state voter data with the Administration's draconian immigration-enforcement efforts, further highlights DOJ's failure to disclose the true purpose of the request here.

Plaintiff's failure to honestly disclose what it is doing and will do with voters' sensitive personal information—to state the true purpose for the demand for Marylanders' protected

---

2019); *see also, e.g.*, *Navigators Ins. Co. v. Under Armour, Inc.*, No. 25-1068, --- F.4th ----, 2026 WL 137123, at *6 n.9 (4th Cir. Jan. 20, 2026).

[13] Dismissal on the grounds set forth above would also be proper under Rule 12(c) or after discovery regarding the United States' purported basis and purpose for its requests pursuant to Rule 56.

personal data—is independently fatal to the CRA claim. "Congress passed the NVRA, Civil Rights Act, and HAVA to protect voting rights. If the DOJ wants to instead use these statutes for more than their stated purpose, circumventing the authority granted to them by Congress, it cannot do so under the guise of a pretextual investigative purpose." *Weber*, 2026 WL 118807, at *12.

### B. The United States' Demand is Invalid Because it Does Not Allow for Redactions and Modifications to Protect the Privacy and Constitutional Rights of Voters.

Even had the United States provided a valid basis and purpose sufficient to support its demands—which it did not—any sensitive personal voter information would still be subject to redaction. The text of Title III of the CRA does not prohibit redactions to protect voter privacy and ensure compliance with federal and state law and the Constitution. Indeed, courts have found that redaction may be required to prevent the disclosure of sensitive personal information that would create an intolerable burden on the constitutional right to vote. The United States' CRA is thus defective and should be dismissed on this ground, as well.

As noted *supra*, to justify its demand for data under Title III of the CRA, the United States claims it is investigating Maryland's compliance with federal election laws, including the NVRA and HAVA, purportedly based on its review of data from the 2024 EAVS Report. Compl. ¶¶ 21–22. The United States also discusses additional requirements of the NVRA and HAVA, including the NVRA's requirement in Section 8(i) to maintain "all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters" upon request. 52 U.S.C. § 20507(i); Compl. ¶¶ 10–15. Anyone—including individual voters, groups that protect the right to vote, and government officials—has the same right to records under the NVRA. Voting rights advocates have consistently relied on the NVRA to investigate infringements on the right to vote, including whether election officials have improperly denied or cancelled voter registrations. *See, e.g., Project Vote/Voting for Am., Inc. v.*

*Long*, 682 F.3d 331, 333 (4th Cir. 2012) (nonprofit investigating improper rejection of voter registrations submitted by students at a historically Black university).

While the United States does not rely on Section 8(i) of the NVRA for its demand for data in this lawsuit, the cases interpreting this provision are instructive, as courts have consistently found that the information required to be disclosed under the NVRA has limits. These courts, including the Fourth Circuit, have consistently permitted—and in some instances required—states to redact sensitive personal data of voters when disclosing information under the NVRA. Failure to do so can violate the fundamental right to vote protected by the Constitution.

Like the CRA, the NVRA is silent as to how sensitive personal information should be treated during disclosure. *See* 52 U.S.C. § 20703; 52 U.S.C. § 20507(i)(1). Courts must interpret the disclosure provisions in these statutes in a manner that does not unconstitutionally burden the right to vote. *See United States v. Simms*, 914 F.3d 229, 251 (4th Cir. 2019) ("We are obligated to construe a statute to avoid constitutional problems" where "such a reading is fairly possible") (internal quotation marks and alterations omitted). Federal courts throughout the country have consistently struck this balance, interpreting the "all records concerning" language in Section 8(i) to permit—and even in some cases require—redaction and the protection of confidential materials. As the First Circuit has noted, "nothing in the text of the NVRA prohibits the appropriate redaction of uniquely or highly sensitive personal information in the Voter File," and as such, "the proper redaction of certain personal information in the Voter File can further assuage the potential privacy risks implicated by the public release of the Voter File." *Pub. Int. Legal Found., Inc. v. Bellows*, 92 F.4th 36, 56 (1st Cir. 2024); *see also Pub. Int. Legal Found., Inc. v. N.C. State Bd. of Elections*, 996 F.3d 257, 266–68 (4th Cir. 2021) (holding that the potential connection to ongoing criminal investigations and the possibility of erroneously labeling a voter as a noncitizen and subjecting

them to public harassment warrants maintaining confidentiality of records). Other courts have consistently recognized that the NVRA disclosure provisions do not compel the release of sensitive information that is otherwise protected by federal or state laws. *See, e.g.*, *N.C. State Bd. of Elections*, 996 F.3d at 264; *Pub. Int. Legal Found., Inc. v. Dahlstrom*, 673 F. Supp. 3d 1004, 1015–16 (D. Alaska 2023); *Pub. Int. Legal Found., Inc. v. Matthews*, 589 F. Supp. 3d 932, 942 (C.D. Ill. 2022), *clarified on denial of reconsideration*, No. 20-CV-3190, 2022 WL 1174099 (C.D. Ill. Apr. 20, 2022); *Pub. Int. Legal Found. v. Boockvar*, 431 F. Supp. 3d 553, 561–63 (M.D. Pa. 2019).

Redaction may also be affirmatively required to the extent the disclosure of such sensitive material would "create[] an intolerable burden on [the constitutional right to vote] as protected by the First and Fourteenth Amendments." *Long*, 682 F.3d at 339 (quotation marks and citation omitted). The Fourth Circuit in *Long*, even while granting access to a state's voter registration applications for inspection and photocopying, ensured the redaction of Social Security numbers, which are "uniquely sensitive and vulnerable to abuse."[14] *Id.* In coming to this conclusion, the court emphasized that the NVRA reflected Congress's view that the right to vote was "fundamental," and that the unredacted release of records risked deterring citizens from registering to vote and thus created an "intolerable burden" on this fundamental right. *Id.* at 334, 339; *cf. In re Coleman*, 208 F. Supp. 199, 200 (S.D. Miss. 1962) (noting, in the context of a records request under Title III of the CRA, multiple considerations not at issue in that case but which could be

---

[14] Plaintiff itself has stated—on multiple occasions—that the NVRA does not prohibit the States from redacting "uniquely sensitive information" when disclosing voting records. *See, e.g.*, Br. for the United States as Amicus Curiae, *Pub. Int. Legal Found., Inc. v. Bellows* ("United States Amicus Brief"), No. 23-1361 (1st Cir. July 25, 2024), 2023 WL 4882397 at *27–28; Br. for the United States as Amicus Curiae, *Pub. Int. Legal Found. v. Schmidt*, No. 23-1590 (3d Cir. Nov. 6, 2023), https://perma.cc/3BQ9-36UJ ("States may redact certain information before disclosing Section 8(i) records."); Br. for the United States as Amicus Curiae, *Project Vote/Voting for Am., Inc. v. Long*, No. 11-1809 (4th Cir. Oct. 18, 2011), 2011 WL 4947283, at *11, 25–26.

"[s]ignificant," including that "[i]t is not claimed that these official records are privileged, or exempt from discovery for any sound reason of public policy," or "that an inspection of these records would be oppressive, or any unlawful invasion of any personal constitutional right"). As such, public disclosure provisions such as those in the NVRA and Title III of the CRA must be interpreted to avoid this unconstitutional burden. *See id.*; *Bellows*, 92 F.4th at 56. The danger of imposing those burdens on Maryland voters like Mr. Snowden, Ms. Paul, and Mr. Sims, and non-partisan, non-profit organizations like Common Cause and Out for Justice, is present here. *See* Dkt. No. 8-4, Decl. of Carl Snowden, ¶¶ 9–10; Dkt. No. 8-5, Decl. of Myriam Paul, ¶¶ 5–6; Dkt. No. 8-6, Decl. of Luis Sims, ¶¶ 6–8.

The same privacy and constitutional concerns that federal courts have found warrant redactions under NVRA records requests apply equally to requests for the same records under the CRA. *Cf. Sheetz v. Cnty. of El Dorado*, 601 U.S. 267, 281–282 (2024) (Gorsuch, J., concurring) ("[O]ur Constitution deals in substance, not form. However the government chooses to act, . . . it must follow the same constitutional rules."). Indeed, the limited case law considering records requests under the CRA expressly acknowledged that courts retain the "power and duty to issue protective orders," *Lynd*, 306 F.2d at 230, such as the redaction of sensitive fields that courts have consistently determined are entitled to protection from disclosure.

Thus, even were the United States entitled to records under Title III after having provided a valid statement of the basis and the purpose therefor (which it failed to do here), sensitive personal identifying information, including Social Security numbers and driver's license numbers, should similarly be redacted. No matter the statutory mechanism, conditioning the right to vote on the release of voters' sensitive private information "creates an intolerable burden on that right." *Long*, 682 F.3d at 339 (citation omitted).

## II. THE UNITED STATES' MOTION TO COMPEL SHOULD BE DENIED BECAUSE IT IS NOT ENTITLED TO SUMMARY DISPOSITION OF ITS CRA CLAIM.

In its Motion to Compel, the United States makes expansive claims that Title III of the CRA universally "displaces the Federal Rules of Civil Procedure by creating a 'special statutory proceeding'" where "'[a]ll that is required is a simple statement by the Attorney General'" that "a written demand for Federal election records and papers covered by the statute" was made, "explaining that the person against whom an order is sought has failed or refused to make the requested records" available. Mem. of Law in Supp. of the Request for Order to Compel Prod. of Records ("Mot. to Compel"), Dkt. No. 2-1 at 5; *see also* Compl. ¶¶ 1–4. This argument rests entirely on a single set of non-binding cases decided more than 60 years ago, in the early 1960's, in a different circuit and a drastically different historical context, including primarily *Kennedy v. Lynd*, 306 F.2d 222 (5th Cir. 1962). *See* Mot. to Compel; *see also* Compl. ¶¶ 1–4.

The United States briefly acknowledges that "[c]aselaw addressing the CRA in any depth is confined to courts within the Fifth Circuit in the early years following the CRA's enactment. Since then, courts have not had occasion to revisit the issue." Mot. to Compel at 4 n.1. But the United States does not provide key historical context that could help explain why this provision of the CRA would have been addressed primarily in the Fifth Circuit—which at the time those cases were decided, during the Jim Crow era, included the southern states of Alabama, Florida, Georgia, Louisiana, Mississippi, and Texas.[15] In these states, it was widely known that many election officials were recalcitrant in their refusal to register Black voters.[16] It was against this particular

---

[15] "Federal Judicial Circuits: Fifth Circuit," FEDERAL JUDICIAL CENTER, https://perma.cc/9MSD-EFRB (last visited Dec. 9, 2025).

[16] *See generally, e.g.*, Steven F. Lawson, *Black Ballots: Voting Rights in the South, 1944-1969* (1976).

backdrop that the Fifth Circuit in *Kennedy v. Lynd* fashioned an expedited, summary procedure for enforcing CRA records requests in those early 1960's cases. In the face of Jim Crow regimes that were using every possible means to block Black Americans from registering to vote, including resistance from judges, the Fifth Circuit in *Lynd* noted that "the factual foundation for, or the sufficiency of, the Attorney General's 'statement of the basis and the purpose' contained in the written demand is not open to judicial review or ascertainment." *Lynd*, 306 F.2d at 226. In that context, "the factual foundation for" the basis and purpose of the Attorney General's request was utterly self-evident, and thus plenary consideration was not required. *See id.* The Fifth Circuit's treatment of Section 303 of the CRA cannot be divorced from that context.[17]

By contrast, here, more than 60 years later, the context of *this* records request could not be more different. The United States has invoked the CRA for unprecedented purposes, to make sweeping demands for extensive voter data with no showing or claim of legal deficiencies or violations of rights, while making unprecedented demands for sensitive, non-public personal identifying information. Even more alarming, as noted *supra*, there is extensive reporting and publicly available, judicially noticeable documents showing that the purported basis and purpose of DOJ's request are pretextual, and that the data at issue is in fact being sought for unlawful ends. *See supra* 6–10 & nn.2–10; *Weber*, 2026 WL 118807, at *10 (federal court holding DOJ's invocation of the CRA in a near-identical case seeking California's unredacted voter file is "contrived" and "pretextual").

Nothing in the text of Title III of the CRA insulates the sufficiency of the requirement for a "statement of the basis and the purpose" of a demand from standard judicial review—especially

---

[17] *See also In re Coleman*, 208 F. Supp. 199, 201 (S.D. Miss. 1962) (acknowledging in the context of Title III of the CRA that while "[t]he right of free examination of official records is the rule," there could be "exception[s]" where "the purpose is speculative, or from idle curiosity").

not in the circumstances presented here. *See* 52 U.S.C. § 20703. Indeed, in the more than 60 years since *Lynd*, the Supreme Court has reaffirmed that "the Federal Rules apply to proceedings to compel the giving of testimony or production of documents in accordance with a subpoena issued by an officer or agency of the United States under any statute of the United States except as otherwise provided by statute or by rules of the district court or by order of the court in the proceedings." *Becker v. United States*, 451 U.S. 1306, 1307–08 (1981) (internal citation and quotation marks omitted); *see also, e.g.*, *Powell*, 379 U.S. at 57–58 (holding that IRS Commissioner bears the burden to establish statutory requirements before enforcement of a tax subpoena); *Sugarloaf Funding, LLC v. U.S. Dep't of Treasury*, 584 F.3d 340, 347–50 (1st Cir. 2009) (allowing summons recipient opportunity to rebut government's prima facie case). *Powell* is especially on point. There, just two years after *Lynd*, the Court held that proceedings to enforce a statute providing the United States with the power to request records in terms that are materially identical to the CRA were governed by the Federal Rules. *Powell*, 379 U.S. at 57–58 & n.18 (citing 26 U.S.C. § 7604(a)); *compare* 26 U.S.C. § 7604(a) ("[T]he United States district court for the district in which such person resides or is found *shall have jurisdiction by appropriate process* to compel such attendance, testimony, or production of books, papers, records, or other data[.]" (emphasis added)) *with* 52 U.S.C. § 20705 ("The United States district court for the district in which a demand is made . . .or in which a record or paper so demanded is located, *shall have jurisdiction by appropriate process* to compel the production of such record or paper." (emphasis added)). The United States' demand for a summary resolution to this case, with no discovery into whether it has a proper statutory basis for its demand, flies in the face of a half-century of precedent as well as the Federal Rules.

Furthermore, even in *Lynd*, the court in explaining its findings noted that "we are not discussing confidential, private papers and effects. We are, rather, dealing with public records which ought ordinarily to be open to legitimate reasonable inspection and which by nature relate directly to the most vital of all public functions—the franchise of the citizen." 306 F.2d at 231. The court also noted that what is now Section 305 of the CRA authorizes only jurisdiction by "appropriate process" to compel document production, which the court had "no doubt" would "include the power and duty to issue protective orders"—such as orders protecting and redacting sensitive information such as that at issue in this case. 52 U.S.C. § 20705; *Lynd*, 306 F.2d at 230. Thus, even in the 1960's, before sensitive personal identifying information such as Social Security Numbers or driver's license numbers were widely collected as part of the voter registration record, and before any federal laws had been passed to protect and constrain access to personal information,[18] the court recognized the distinction between the disclosure of "confidential, private" information and "public records" that would already "ordinarily [] be open to legitimate reasonable inspection," *Lynd*, 306 F.2d at 231, and anticipated the possibility that the "duty to issue protective orders" would arise for certain records requests under the CRA, *id.* at 230.

To argue that the United States is entitled to summary relief and the forced provision of an unprecedented trove of "confidential, private" information, without *any* review of its statutorily required statement of the basis and the purpose for its demand, would go even further than *Lynd* did in the context of the 1960's Jim Crow South, where, very much unlike here, the federal basis and purpose for the requested voter data were inarguably clear and not apparently pretextual or

---

[18] *E.g.*, Privacy Act of 1974, Pub. L. No. 93-579, 88 Stat. 1896 (1974); Driver's Privacy Protection Act of 1994, Pub. L. No. 103-322, 108 Stat. 1796 (1994), codified at 18 U.S.C. § 2721 *et seq.*; E-Government Act of 2002, Pub. L. No. 107-347, 116 Stat. 2899 (2002); Federal Information Security Modernization Act of 2014, Pub. L. No. 113-283, 128 Stat. 3073 (2014), codified at 44 U.S.C. §§ 3351 *et seq.* (2014).

unlawful. The United States' attempt to end-run the Federal Rules and the CRA's requirements must be rejected, and its Motion to Compel should accordingly be denied.

## CONCLUSION

The United States' Motion to Compel should be denied and the Complaint dismissed.

Dated: February 5, 2026            Respectfully submitted,

/s/ Jonathan Topaz      .

| | |
|---|---|
| Jonathan Topaz* | Deborah A. Jeon (Bar No. 06905) |
| Theresa J. Lee* | Dara Johnson (Bar No. 31478) |
| Sophia Lin Lakin* | AMERICAN CIVIL LIBERTIES UNION OF MARYLAND |
| AMERICAN CIVIL LIBERTIES UNION FOUNDATION | 3600 Clipper Mill Road |
| 125 Broad Street, 18th Floor | Suite 200 |
| New York, NY 10004 | Baltimore, MD 21211 |
| Tel.: (212) 549-2500 | Tel. 410-889-8555 |
| jtopaz@aclu.org | jeon@aclu-md.org |
| tlee@aclu.org | djohnson@aclu-md.org |
| slakin@aclu.org | |

*admitted pro hac vice*

**CERTIFICATE OF SERVICE**

I hereby certify that on February 5, 2026, a true and correct copy of the foregoing document was served via the Court's ECF system on all counsel of record and by email on counsel for the United States and Defendant DeMarinis.

/s/ Jonathan Topaz
Jonathan Topaz
