# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA,

               Plaintiff,

   v.

JARED DEMARINIS, in his official
capacity as the State Administrator of
Elections for the State of Maryland,

               Defendant.

Civil Case No.: 1:25-cv-03934-SAG

**BRIEF OF AMICI CURIAE FORMER
EMPLOYEES OF THE U.S.
DEPARTMENT OF JUSTICE**

Anne T. Marchitello (Bar #19918)
O'MELVENY & MYERS LLP
1625 Eye St. NW
Washington, DC 20006
(202) 383-5329
amarchitello@omm.com

*Attorney for* Amici Curiae *Former
Employees of the U.S. Department of Justice*

# TABLE OF CONTENTS

Page

INTEREST OF AMICI ............................................................................................. 1

SUMMARY OF ARGUMENT ................................................................................ 1

ARGUMENT ........................................................................................................... 2

    THE 1960 CIVIL RIGHTS ACT DOES NOT JUSTIFY THE DEPARTMENT
    OF JUSTICE'S REQUESTS IN THIS CASE ................................................... 2

        A.    DOJ's Justification For Seeking Full Voter Files From Maryland Is
             Inadequate Under the Civil Rights Act ................................................... 3

             1.    DOJ has provided no adequate "basis" for needing records
                    from Maryland, as the Civil Rights Act requires ........................... 4

             2.    DOJ cannot seek voter records for the purposes of creating
                    a national voter roll and identifying noncitizens ........................... 7

        B.    The Civil Rights Division Has Previously Used The Civil Rights
             Act To Seek Targeted Information Based On Reasonable Law-
             Enforcement Concerns .......................................................................... 11

CONCLUSION ...................................................................................................... 16

APPENDIX A ........................................................................................................1a

Page(s)

**Cases**

*Dep't of Com. v. New York*,
588 U.S. 752 (2019)..................................................................7, 10

*E.E.O.C. v. Lockheed Martin Corp., Aero & Naval Sys.*,
116 F.3d 110 (4th Cir. 1997) ...........................................................4

*Kennedy v. Bruce*,
298 F.2d 860 (5th Cir. 1962) .........................................................12

*Kennedy v. Lynd*,
306 F.2d 222 (5th Cir. 1962) ................................................. *passim*

*McLaughlin Chiropractic Assocs., Inc. v. McKesson Corp.*,
606 U.S. 146 (2025).........................................................................5

*Mi Familia Vota v. Fontes*,
719 F. Supp. 3d 929 (D. Ariz. 2024), *aff'd in part, vacated in part, remanded*,
129 F.4th 691 (9th Cir. 2025) ........................................................15

*Niz-Chavez v. Garland*,
593 U.S. 155 (2021).......................................................................10

*Pub. Int. Legal Found. v. Benson*,
136 F.4th 613 (6th Cir. 2025), *petition for cert. filed*, No. 25-437 (U.S. Oct. 7,
2025) ............................................................................................6, 7

*Solis v. Food Emps. Lab. Rels. Ass'n*,
644 F.3d 221 (4th Cir. 2011) ...........................................................4

*South Carolina v. U.S. Army Corps of Eng'rs*,
66 F.4th 189 (4th Cir. 2023) ............................................................3

*United States v. Powell*,
379 U.S. 48 (1964)...................................................................4, 5, 10

*United States v. Weber*,
2026 WL 118807 (C.D. Cal. Jan. 15, 2026) ....................................4

*Veasey v. Perry*,
71 F. Supp. 3d 627 (S.D. Tex. 2014), *aff'd in part, vacated in part sub nom.*
*Veasey v. Abbott*, 796 F.3d 487 (5th Cir. 2015), *aff'd in part, vacated in part,*
*rev'd in part*, 830 F.3d 216 (5th Cir. 2016) (en banc) ..........................15

**Statutes**

52 U.S.C. § 10101(a)(2)(B) .................................................................15

52 U.S.C. § 20507(a)(4)...................................................................6, 10

52 U.S.C. § 20507(c)(2)........................................................................14

52 U.S.C. § 20510(a) .............................................................................11

52 U.S.C. § 20701 ...................................................................................2

52 U.S.C. § 20703 ............................................................................................ *passim*

52 U.S.C. § 20704 ................................................................................................3, 15

52 U.S.C. § 20705 ..................................................................................................3, 5

52 U.S.C. § 21083(a)(1)(A) ......................................................................................11

52 U.S.C. § 21083(a)(4) ............................................................................................11

52 U.S.C. § 21083(a)(4)(A) ........................................................................................6

52 U.S.C. § 21085 ................................................................................................7, 11

52 U.S.C. § 21111 ....................................................................................................11

**Regulations**

Exec. Order 14,248, § 2(b)(3), 90 Fed. Reg. 14005 (Mar. 28, 2025) ........................8

**Rules**

Fed. R. Civ. P. 34 ....................................................................................................14

Fed. R. Civ. P. 45 ....................................................................................................14

Fed. R. Civ. P. 81(a)(5) .............................................................................................5

**Other Authorities**

Confidential Memorandum of Understanding, U.S. Dep't of Just. (Dec. 1, 2025),
    https://perma.cc/N25Z-NN2E ......................................................................11

Devlin Barrett & Nick Corasaniti, *Trump Administration Quietly Seeks to Build
    National Voter Roll*, N.Y. Times (Sept. 9, 2025), https://perma.cc/9PM4-
    2A6R ..........................................................................................................7-8

Emily Bazelon & Rachel Poser, *The Unraveling of the Justice Department*, N.Y.
    Times (Nov. 16, 2025), https://perma.cc/JGH7-NQ7P ....................................9

H.R. Rep. No. 86-956 (1959) ....................................................................................12

Jonathan Shorman, *DOJ Is Sharing State Voter Roll Lists With Homeland
    Security*, Stateline (Sept. 12, 2025), https://perma.cc/C6RQ-6ATP .............8, 9

Jude Joffe-Block, *Trump's SAVE Tool Is Looking for Noncitizen Voters. But It's
    Flagging U.S. Citizens Too*, NPR (Dec. 10, 2025), https://perma.cc/6NE7-
    ECGT ...........................................................................................................9

Kris Maher & Eliza Collins, *The Fight Over the Justice Department's Push for
    State Voter Data*, Wall St. J. (Dec. 24, 2025),
    https://www.wsj.com/politics/elections/the-fight-over-the-justice-departments-
    push-for-state-voter-data-111103f8 ................................................................8

Letter from Pamela Bondi, U.S. Att'y Gen., to Tim Walz, Gov. of Minn. (Jan. 24,
    2026), https://perma.cc/34U4-3SK3 ..............................................................10

*Memorandum of Understanding*, U.S. Dep't of Just. (May 13, 2008),
    https://perma.cc/JB7Z-JQDU ......................................................................14

Tierney Sneed & Fredreka Schouten, *Bondi's Injection of Voter Roll Demands into Minneapolis ICE Tensions Draws Claims of 'Ransom,'* CNN (Jan 27, 2026), https://perma.cc/7VF6-U4CU...................................................................................9, 10

*Tracker of Justice Department Requests for Voter Information*, Brennan Ctr. for Just. (last updated Feb. 4, 2026), https://perma.cc/N25Z-NN2E...............................................8

# INTEREST OF AMICI

*Amici curiae*, listed in Appendix A, are all former attorneys who worked on voting enforcement in the Civil Rights Division of the U.S. Department of Justice (DOJ). *Amici*'s experience is widespread and varied. Some worked at DOJ decades ago; others worked there until last year. Some were line attorneys; others were managers who reviewed their work. Most worked in the Division's Voting Section, directly enforcing federal voting rights law; others worked alongside them as Appellate Section attorneys or political appointees. Many *amici* have made, reviewed, and approved information requests to States and localities under the National Voter Registration Act (NVRA) and Title III of the Civil Rights Act of 1960, or have litigated under those statutes and the Help America Vote Act (HAVA) on behalf of the United States. *Amici* file this brief to explain that, even though DOJ retains significant authority to investigate potential violations of federal election law, DOJ's request to Maryland for its full unredacted voter file is inconsistent with prior DOJ practice and cannot be justified by the authority it has invoked.

# SUMMARY OF ARGUMENT

Title III of the Civil Rights Act of 1960 is a vital tool that helps the Attorney General make "preliminary investigations of registration practices," determine whether to file voting lawsuits, and obtain evidence for those suits. *Kennedy v. Lynd*, 306 F.2d 222, 225 (5th Cir. 1962). Although "[w]ide scope must be accorded the Attorney General in the facilities for adequate investigation," *id.* at 228, that scope is not unlimited. Title III requires DOJ to provide "a statement of the basis and the purpose" for its information requests. 52 U.S.C. § 20703. Here, DOJ has overstepped its bounds by requesting "all fields" of the registration list for every voter in Maryland—including registration method, participation history, partisan affiliation, partial Social Security Numbers (SSNs), and driver's license numbers—without a sufficient basis and in furtherance of an improper purpose. DOJ has not provided any basis at all for thinking that Maryland might be violating

federal statutes, much less a basis that would justify requesting sensitive voter data about all Maryland voters. And while DOJ has provided a purpose for its requests—enforcing the NVRA— that purpose appears to be a stalking horse for its true purpose: to enable the federal government to conduct its own list maintenance to discover whether noncitizens or undocumented immigrants are registered to vote. That purpose cannot justify the requests for sensitive data here. The NVRA and HAVA place *States*—not the federal government—in charge of developing and maintaining voter registration lists. DOJ's sweeping request, made without adequate investigative rationale, is a radical departure from the sorts of targeted, justified requests that *amici* and others in the Voting Section have previously made under Title III.

## ARGUMENT

### THE 1960 CIVIL RIGHTS ACT DOES NOT JUSTIFY THE DEPARTMENT OF JUSTICE'S REQUESTS IN THIS CASE

Title III of the Civil Rights Act of 1960 gave election officials a new duty to preserve, and granted DOJ a new power to request, certain election-related documents—subject to important guardrails. Under Title III, "[e]very officer of election shall retain and preserve, for a period of twenty-two months from the date of any general, special, or primary election of which candidates for" federal office "are voted for, all records and papers which come into his possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election." 52 U.S.C. § 20701. DOJ may then seek "inspection, reproduction, and copying" of the records they are required to "retain and preserve." 52 U.S.C. § 20703. But the government must have, and provide its targets with, both a "purpose" for conducting an inquiry and a "basis" for thinking there may be a legal violation to which the requested records would be relevant. *Id.*

DOJ has failed to meet that basic standard here: it (i) fails to provide a "basis" for suspecting that Maryland is not fulfilling its NVRA and HAVA obligations, and (ii) appears to be

obscuring its true "purpose" in seeking not only Maryland's voter rolls, but the rolls of every State in the country. When DOJ has used the 1960 Civil Rights Act, it has rarely sought a State's entire voter database, and it certainly has not done so to enable a fishing expedition.

## A. DOJ's Justification For Seeking Full Voter Files From Maryland Is Inadequate Under the Civil Rights Act

DOJ may use the 1960 Civil Rights Act to seek some information that cannot be disclosed under other statutes, like the NVRA. But Title III's statutory framework establishes restrictions on DOJ's ability to obtain and disseminate this material. *First*, DOJ must make a "demand in writing" for the requested records. 52 U.S.C. § 20703. That demand "shall contain a statement of the basis and the purpose" for seeking the information. *Id. Second*, DOJ must not "disclose any record or paper produced" pursuant to Title III, except to Congress or other agencies, or in court proceedings. 52 U.S.C. § 20704. *Third*, courts have "jurisdiction *by appropriate process* to compel the production" of records. 52 U.S.C. § 20705 (emphasis added). DOJ is bound by these restrictions and processes whenever it seeks voting records under the 1960 Civil Rights Act.

This case directly implicates the written demand requirement. Under Title III, any demand for records "shall contain a statement of *the basis and the purpose* therefor." 52 U.S.C. § 20703 (emphasis added). Like any statute, this provision must be "interpreted to give each word some operative effect." *South Carolina v. U.S. Army Corps of Eng'rs*, 66 F.4th 189, 195 (4th Cir. 2023). Thus, the purpose and basis must be read as independent requirements. The *purpose* of a records request is the rationale for the investigation—*e.g.*, determining whether a State is complying with the NVRA or the Voting Rights Act (VRA). The *basis* is the statement indicating why DOJ believes, or what evidence suggests, that it should investigate this particular State or locality, or what other suspected violation the records are needed to investigate. Combined, the basis and purpose requirements make explicit what is implicitly true for many other coercive, investigative

3

information requests: the agency seeking information must have both a legitimate *purpose* within its enforcement ambit for pursuing an investigation and a sufficient *basis* for suspecting a potential violation to which the requested records would be relevant.  *See United States v. Powell*, 379 U.S. 48, 58 (1964) (noting an administrative summons must have a proper purpose "reflecting on the good faith of the particular investigation"); *see also Solis v. Food Emps. Lab. Rels. Ass'n*, 644 F.3d 221, 226 (4th Cir. 2011) (requiring that administrative subpoenas be based in statutory authority and that "the materials requested are relevant").

DOJ's investigative actions in the early years of Title III confirm the difference between these two necessary procedural elements, both of which were provided in its requests under Section 20703.  In *Lynd*, 306 F.2d at 229 n.6, for instance, DOJ said that its purpose in requesting records was "to ascertain whether or not violations of Federal law in regard to registration and voting"— *i.e.*, the Civil Rights Act of 1957—"have occurred."  And it stated that the basis for the request was "information in the possession of the Attorney General tending to show that distinctions on the basis of race or color have been made with respect to registration and voting within your jurisdiction."  *Id.*  DOJ made similar statements of basis and purpose in *In re Coleman*, 208 F. Supp. 199, 199-200 (S.D. Miss. 1962), *aff'd sub nom.*, *Coleman v. Kennedy*, 313 F.2d 867 (5th Cir. 1963).  DOJ cannot seek Maryland's full, unredacted voter file here, when it has satisfied neither Title III's "basis" nor its "purpose" requirement.  *See United States v. Weber*, 2026 WL 118807, at *8-12 (C.D. Cal. Jan. 15, 2026) (holding same in case brought against California).

### 1. DOJ has provided no adequate "basis" for needing records from Maryland, as the Civil Rights Act requires.

DOJ has not provided an adequate basis for the broad requests it has made in this case. Although Title III does not impose a high standard for the basis of a demand for records, the provision is not so deferential as to allow DOJ to engage in fishing expeditions.  *See E.E.O.C. v.*

*Lockheed Martin Corp., Aero & Naval Sys.*, 116 F.3d 110, 113 (4th Cir. 1997) ("[A]n agency's 'broad access to information relevant to inquiries' is not without limits."). Rather, the statutory requirement that the Attorney General articulate in writing the "basis" for a Title III demand means that DOJ must know of specific, articulable facts suggesting that a violation of federal law may have occurred. *See, e.g.*, *Lynd*, 306 F.2d at 229 n.6.

To be sure, early cases—decided in the midst of a concerted effort to frustrate federal investigations of racial discrimination in voter registration in the Jim Crow South—opined that "the factual foundation for, or the sufficiency of, the Attorney General's 'statement of the basis and the purpose' contained in the written demand, § [20703], is not open to judicial review or ascertainment." *Lynd*, 306 F.2d at 226.[1] That assertion in *Lynd* must be considered in the context of what was a particularized investigation into racial discrimination in 1961 Forrest County, Mississippi, and in four rural parishes in northwest Louisiana, and not a dragnet of unprecedented national scope. But even so, the Supreme Court has since held that notice requirements similar to those in Title III create judicially reviewable standards. *See Powell*, 379 U.S. at 53, 58 (holding that statute requiring Treasury Secretary to "notif[y] the taxpayer in writing that an additional inspection is necessary" allows courts to "inquire into the underlying reasons for the examination" because "a court may not permit its process to be abused"). The Court also has long applied a strong presumption in favor of judicial review of the government's actions, and the Administrative Procedure Act "itself articulates the default principle that parties in enforcement proceedings can challenge an agency's interpretation of a statute." *McLaughlin Chiropractic Assocs., Inc. v.*

---

[1] This determination was based in part on the idea that the "process to compel the production of record[s]," 52 U.S.C. § 20705, should be treated as merely "a summary proceeding" not subject to regular rules of procedure, *Lynd*, 306 F.2d at 226. Title III's text, however, requires "*appropriate* process," 52 U.S.C. § 20705 (emphasis added), and courts must ensure that their process is not being abused, *Powell*, 379 U.S. at 58. The Federal Rules of Civil Procedure also expressly apply to proceedings seeking "production of documents" in the analogous context of a subpoena issued under any federal statute, unless the statute clearly states otherwise. Fed. R. Civ. P. 81(a)(5). The statutory text and case law confirm that Title III proceedings are likewise subject to traditional procedural rules.

*McKesson Corp.*, 606 U.S. 146, 156 (2025).

Here, DOJ has provided no basis at all for demanding sensitive data about every Maryland voter, much less a basis that would indicate that Maryland possibly violated federal law. DOJ's supposed *purpose* is "to ascertain Maryland's compliance with the list maintenance requirements of the NVRA and HAVA." Dkt. 34-4, at 2; *but see infra* Part II.A.2. But DOJ has provided no *basis* for thinking that Maryland might be violating the NVRA or HAVA in a manner that would justify its request for the State's full, unredacted voter rolls. DOJ's initial letter simply requested "a description of the steps that you have taken, and when those steps were taken, to ensure that the state's list maintenance program has been properly carried out in full compliance with the NVRA" and asked for "all fields" in Maryland's statewide voter registration list. Dkt. 34-2, at 1. (It also initially requested the information pursuant to Section 8(i) of the NVRA, not the Civil Rights Act. *Id.*) DOJ's follow-up letter explained that its purpose was "to ascertain Maryland's compliance with the list maintenance requirements of the NVRA and HAVA," but it apparently treated this statement as satisfying the entirety of Title III's basis-and-purpose requirement, despite the lack of any stated *basis* for the investigation. Dkt. 34-4, at 2.

And requiring that basis is especially important given the questionable fit between DOJ's demand and its ostensible purpose. The statutes DOJ invokes only require States to conduct a "general program" of list maintenance that makes a "reasonable effort" to remove ineligible voters from the rolls. 52 U.S.C. § 20507(a)(4); 52 U.S.C. § 21083(a)(4)(A) (requiring a "system of file maintenance"). They also require only a "reasonable effort" to remove deceased or relocated voters. *Id.* "[T]he attempt need not be perfect, or even optimal, so long as it remains within the bounds of rationality." *Pub. Int. Legal Found. v. Benson*, 136 F.4th 613, 625 (6th Cir. 2025), *petition for cert. filed*, No. 25-437 (U.S. Oct. 7, 2025). A snapshot of a State's voter file at one

point in time is unlikely to convey whether a State is engaging in that reasonable effort through a continuing program. *See, e.g.*, *id.* (rejecting identification of "27,000 'potentially deceased' voters on Maryland's registration rolls" as evidence of an NVRA violation). Indeed, HAVA provides that "[t]he specific choices on the methods of complying with [the list maintenance mandate] shall be left to the discretion of the State." 52 U.S.C. § 21085. And the potential for government misuse of the information sought outweighs any reason yet provided for needing that information to investigate an ostensible HAVA or NVRA violation. DOJ cannot derive from the NVRA and HAVA a "basis" for seeking Maryland's full, unredacted voter files. 52 U.S.C. § 20703.

> **2.** **DOJ cannot seek voter records for the purposes of creating a national voter roll and identifying noncitizens.**

DOJ fails the purpose prong of Title III's basis-and-purpose requirement because DOJ's true purpose is not articulated in the request for records and would exceed DOJ's Title III enforcement authority. Although courts' "review" of an information request's purpose is deferential, courts "are 'not required to exhibit a naiveté from which ordinary citizens are free.'" *Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019). News reports and the Administration's public statements have revealed that DOJ's true purpose in seeking these voter files is not what DOJ stated in its information requests—*i.e.*, to monitor Maryland's compliance with the NVRA's and HAVA's list-maintenance requirements. Rather, that proffered purpose has been shown to be a pretext for other, undeclared aims that appear to include collecting all States' voter data and then sharing that information with the Department of Homeland Security (DHS) as part of a broader effort to discover what DOJ thinks are undocumented immigrants who are unlawfully voting.

DOJ is currently "compiling the largest set of national voter roll data it has ever collected" in an attempt "to prove long-running, unsubstantiated claims that droves of undocumented immigrants have voted illegally." Devlin Barrett & Nick Corasaniti, *Trump Administration*

*Quietly Seeks to Build National Voter Roll*, N.Y. Times (Sept. 9, 2025), https://perma.cc/9PM4-2A6R.  As part of that scheme, DOJ plans to compare States' "voter data to a different database, maintained by the Department of Homeland Security, to see how many registered voters on the state lists match up with noncitizens listed by immigration agents."  *Id.*; *see* Kris Maher & Eliza Collins, *The Fight Over the Justice Department's Push for State Voter Data*, Wall St. J. (Dec. 24, 2025) ("The Trump administration has signaled it plans to conduct an unprecedented fact-check of these state voter lists.").[2]  An executive order, blocked by a court in October 2025, "would have required [DHS] and the Department of Government Efficiency," or DOGE, "to cross-check state voter-registration lists with federal immigration databases."  Maher & Collins, *supra*; *see* Exec. Order 14,248, § 2(b)(3), 90 Fed. Reg. 14005, 14006-07 (Mar. 28, 2025).  To accomplish these goals, DOJ has sent requests for voter-roll data to at least 44 States and so far has sued 24 of them along with the District of Columbia.  *See Tracker of Justice Department Requests for Voter Information*, Brennan Ctr. for Just. (last updated Feb. 4, 2026), https://perma.cc/N25Z-NN2E.

DHS has largely confirmed these reports, issuing a statement to media outlets explaining that the Administration's plan to have DOJ and DHS share voter roll information is essential to "scrub aliens from voter rolls," and that DHS's "collaboration" with DOJ will "prevent illegal aliens" from voting.  Jonathan Shorman, *DOJ Is Sharing State Voter Roll Lists With Homeland Security*, Stateline (Sept. 12, 2025), https://perma.cc/C6RQ-6ATP.  As DHS put it, "[e]lections exist for the American people to choose their leaders, not illegal aliens," *id.*, and that "[b]y allowing states to efficiently verify voter eligibility, we are reinforcing the principle that America's elections are reserved exclusively for American citizens," Maher & Collins, *supra*.  For its part, DOJ admitted in a separate statement that state voter rolls were in fact "being screened for ineligible

---

[2] https://www.wsj.com/politics/elections/the-fight-over-the-justice-departments-push-for-state-voter-data-111103f8.

voter entries." *Id.*; *accord* Shorman*, supra*.  Assistant Attorney General for Civil Rights Harmeet

Dhillon has also stated that the federal government has "checked 47.5 million voter records"—

apparently through SAVE, a system with known accuracy issues—and that there are "several

thousand noncitizens who are enrolled to vote in federal elections."  Jude Joffe-Block, *Trump's*

*SAVE Tool Is Looking for Noncitizen Voters.  But It's Flagging U.S. Citizens Too*, NPR (Dec. 10,

2025), https://perma.cc/6NE7-ECGT.  DHS has expanded the SAVE database to include Social

Security and passport data, "and the Trump administration has encouraged states to upload their

voter files to the beefed-up SAVE system to hunt for potential noncitizens on their voter rolls."

Tierney Sneed & Fredreka Schouten, *Bondi's Injection of Voter Roll Demands into Minneapolis*

*ICE Tensions Draws Claims of 'Ransom*,*'* CNN (Jan 27, 2026), https://perma.cc/7VF6-U4CU.

An attorney in the Housing Section of the Civil Rights Division, who was "detailed to work

in the Voting Section enforcing the [NVRA]" and participated in making the requests for States'

voter rolls, has also explained DOJ's true purpose to the *New York Times*:

> Leadership said they had a DOGE person who could go through all the data and
> compare it to the Department of Homeland Security data and Social Security data.
> The idea was, We want to identify undocumented immigrants that have registered
> to vote.  There was no pre-existing evidence this is a problem.  I had a concern that
> the data would be used not for purging voter rolls of people who aren't eligible to
> vote but for broader immigration enforcement.

Emily Bazelon & Rachel Poser, *The Unraveling of the Justice Department*, N.Y. Times (Nov. 16,

2025), https://perma.cc/JGH7-NQ7P.

DOJ recently underscored the potential connection between its efforts to seek States' voter

rolls and its immigration enforcement efforts.  In response to intense outrage over a sustained

Immigration and Customs Enforcement (ICE) operation in Minneapolis—including two fatal

attacks by ICE officers on citizens—Attorney General Pam Bondi sent a letter to Minnesota

Governor Tim Walz outlining three "common sense solutions" to "restore the rule of law, support

ICE officers, and bring an end to the chaos in Minnesota." Letter from Pamela Bondi, U.S. Att'y Gen., to Tim Walz, Gov. of Minn. 2 (Jan. 24, 2026), https://perma.cc/34U4-3SK3. One of the solutions was to "allow the Civil Rights Division of the Department of Justice to access voter rolls to confirm that Minnesota's voter registration practices comply with federal law." *Id.* at 3; *see* Sneed & Schouten, *supra* (discussing concerns about extortive implications of letter's demand).

DOJ's use of the Civil Rights Act to maintain its own voter lists and then use those lists to substantiate its claims of widespread voter fraud by noncitizens is improper twice over. First, it is not the "purpose" that DOJ set forth in its "statement" to Maryland. 52 U.S.C. § 20703. "If men must turn square corners when they deal with the government, it cannot be too much to expect the government to turn square corners when it deals with them." *Niz-Chavez v. Garland*, 593 U.S. 155, 172 (2021). An agency's action thus cannot be sustained when there is "a significant mismatch between the decision [an agency] made and the rationale [it] provided." *Dep't of Com.*, 588 U.S. at 783. This principle is especially important in the context of a proceeding to enforce administrative process, since it would be an abuse of the court's *own* process to invoke it when there are doubts about "the good faith of the particular investigation." *Powell*, 379 U.S. at 58.

Second, even if DOJ had been truthful about its purpose for seeking voter data, that purpose would have been improper, as the very statutes that DOJ invokes establish that the *States*, not the federal government, are in charge of maintaining voter rolls. The NVRA provides that "each *State* shall . . . conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters." 52 U.S.C. § 20507(a)(4) (emphasis added). HAVA is likewise clear that *States* are required to define, maintain, and administer voter rolls. For example, HAVA requires "each State" to "implement" "a single, uniform, official, centralized, interactive computerized statewide voter registration list *defined, maintained, and*

*administered at the State level.*"  52 U.S.C. § 21083(a)(1)(A) (emphasis added).  It is this "list" that serves "as the official voter registration list for the conduct of all elections for Federal office in the State."  *Id.*  HAVA similarly requires each State to provide for a "[m]inimum standard for accuracy of State voter registration records," 52 U.S.C. § 21083(a)(4), but leaves the means of implementation to the States, 52 U.S.C. § 21085.  While DOJ has authority to enforce these provisions, 52 U.S.C. §§ 20510(a), 21111, it does *not* have authority to conduct list maintenance itself and then force States to remove certain voters from their rolls.  Yet that is precisely what a Memorandum of Understanding that DOJ recently offered to Colorado proposed to do.  *See* Confidential Mem. of Understanding 5, U.S. Dep't of Just. (Dec. 1, 2025), https://perma.cc/N25Z-NN2E (click Colorado).  Simply put, there is nothing in the Civil Rights Act, the NVRA, or HAVA that authorizes the federal government to use highly sensitive, personal data in state voter rolls to conduct a nationwide search for individual registrants that it suspects may not be eligible to vote.

B.     **The Civil Rights Division Has Previously Used The Civil Rights Act To Seek Targeted Information Based On Reasonable Law-Enforcement Concerns**

DOJ's demand for Maryland's full voter roll is also out of step with the way the Civil Rights Division historically has used Title III's records-inspection authority: as a focused investigative tool tethered to concrete, articulable concerns about unlawful registration or voting laws or practices.  The earliest Title III cases from the 1960s arose against a backdrop of blatant, widely documented racial exclusion from voter registration.  *See Lynd*, 306 F.2d at 818-19 (describing the government's clear showing of voting rights discrimination against Black voters).  Those decisions reflect two relevant features of Title III practice.  First, DOJ's demands were directed at "records and papers" connected to the mechanics of registration and voting—materials that would allow federal investigators to evaluate whether discriminatory administration was occurring.  They were not generalized requests for personal identifiers untethered to a defined

investigative need. For example, in *Kennedy v. Bruce*, 298 F.2d 860, 861 (5th Cir. 1962), DOJ sought inspection of "all records and papers . . . relating to any application, registration, payment of poll tax, or other act requisite to voting" for federal elections, and provided both a basis ("distinctions on the basis of race or color have been made with respect to registration and voting within your jurisdiction") and a purpose ("to examine the aforesaid records in order to ascertain whether or not violations of Federal law in regard to registration and voting have occurred").

Second, those cases underscore that Title III's inspection mechanism was conceived as an investigative instrument keyed to identifiable concerns about discriminatory voting practices in discrete locations, not a free-standing entitlement to assemble broad voter data sets to try to find a "problem" in the first place. In *Bruce*, the Fifth Circuit noted that the record reflected extraordinary racial disparities in access to registration in Wilcox County, Alabama, that made an inspection plainly appropriate. 298 F.2d at 863-64. And in *Lynd*, the Fifth Circuit emphasized with respect to five southern counties that a Title III application is intended to "enable the Attorney General to determine whether . . . suit[s] . . . should be instituted" and "to enable him to obtain evidence for use in such [suits] if and when filed." 306 F.2d at 228. These requests fulfilled Title III's principal purpose: serving as a "necessary supplement" to, and helping to "implement federal enforcement" of, the 1957 Civil Rights Act's prohibitions against racial discrimination in voting. H.R. Rep. No. 86-956, at 26 (1959). It is unthinkable that the Department of Justice in 1960 could instead have invoked the authority of the new Civil Rights Act to demand millions of voter registration cards held by the thousands of voter registration authorities across the country.

Modern practice reinforces the same point. When the Civil Rights Division has invoked Title III more recently, it has typically done so to obtain discrete categories of records narrowly keyed to a specific, articulated enforcement concern. Several examples illustrate how the Civil

Rights Division has traditionally wielded its investigative authority, including under Title III:

- When necessary to investigate potential violations of Section 2 of the VRA, the Voting Section may send Title III requests to jurisdictions under investigation based on definite, articulable discriminatory practices, seeking, *e.g.*, a voter registration list to conduct racial bloc voting analysis of elections held within the jurisdiction. DOJ has not generally needed, and has rarely made, Title III requests for SSNs or driver's license numbers to conduct any such analyses.

- In 2021, the United States challenged several provisions of Georgia's new omnibus voting law, SB202, as having a discriminatory purpose. *See* Compl. ¶ 161, *United States v. Georgia*, No. 1:21-cv-2575 (N.D. Ga. June 25, 2021), Dkt. No. 1. Counties with records relevant to the case were not parties to the suit, and the district court froze discovery while deciding the motions to dismiss. *See* Min. Order of Aug. 6, 2021, *Georgia*, *supra*. DOJ therefore used its authority under the 1960 Civil Rights Act to request county records that were relevant to the allegations that DOJ had already made in its lawsuit: (1) the Numbered Lists of Provisional Voters from each polling place in a county—paper lists of provisional voters, with voters' names and their reasons for casting a provisional ballot—which were relevant to DOJ's challenge to SB202's "prohibition on counting most out-of-precinct provisional ballots," Compl. ¶ 161(g); and (2) Drop Box Ballot Transfer Forms—paper records of how many ballots a county picked up from each mail-in ballot drop box on each day—which were relevant to DOJ's challenge to SB202's "cutback in the number of drop boxes permitted" and limitations on their dates and times of use, *see id.* ¶ 161(e). *See, e.g.*, Decl. of Dr. Barry C. Burden, 35, 51, *In re Georgia Senate Bill 202*, No. 1:21-mi-55555 (N.D. Ga. May 30, 2023), Dkt. No. 566-42.

- In 2024, DOJ sued Alabama for systematically removing several thousand people from its voter rolls within 90 days of a federal election, which would violate the NVRA's Quiet-Period

Provision, 52 U.S.C. § 20507(c)(2). *See* Compl. ¶¶ 2-4, *United States v. Alabama*, No. 2:24-cv-1329 (N.D. Ala. Sept. 27, 2024), Dkt. No. 1. DOJ sent a letter to state election officials explaining that DOJ had "reviewed reports" (which it cited) suggesting that the State was implementing within 90 days of the November 5, 2024 federal election a "program" to identify and remove registrants identified as noncitizens, in violation of the Quiet-Period Provision. Letter, *Alabama*, *supra*, Dkt. No. 11-7, at 2. DOJ then requested a defined set of materials keyed to that asserted concern, including (1) a list of the voters removed under the State's new processes; (2) a list of any additional voters sent notices of intent to cancel on similar grounds; and (3) a "complete description" of the methodology used, including contacts with or requests to federal agencies. Letter, *Alabama*, *supra*, at 2-3. The letter did not explicitly invoke Title III. *Id.* But in later conversations, DOJ did "assert[]" that authority, and the State "produced" the requested records "in compliance with Title III of the Civil Rights Act of 1960." Letter, *Alabama*, *supra*, Dkt. No. 11-9, at 1. DOJ did not request SSN or driver's license data, but the State did provide it for those registrants who were ensnared in its program.

Thus, in the rare instances when DOJ has requested sensitive information like SSNs and driver's license numbers, it was because this information was vital to investigating or proving a potential legal violation in a particular jurisdiction, and there was an articulable reason to believe that a violation might have occurred. DOJ does not usually request such data under Title III.[3]

To the extent DOJ has need of sensitive voter data, it has instead tended to obtain it through traditional civil litigation tools. *See, e.g.*, Fed. R. Civ. P. 34, 45. For instance, DOJ may need a

---

[3] In 2006 and 2008, DOJ sent Title III requests to Georgia and Texas, seeking the States' voter files with SSNs and/or driver's license numbers to ensure NVRA compliance. *See* Compl. ¶¶ 9-10, *United States v. Georgia*, No. 1:06-cv-02442 (N.D. Ga. Oct. 12, 2006), Dkt. No. 1; *Memorandum of Understanding*, U.S. Dep't of Just. (May 13, 2008), https://perma.cc/JB7Z-JQDU. DOJ and Georgia agreed to a consent order approved shortly after DOJ filed a complaint. *See* Consent Judgment and Decree, *Georgia*, *supra*, Dkt. No. 4. DOJ and Texas signed a memorandum of understanding, obviating any litigation. *Memorandum of Understanding*, *supra*.

State's voter file (including SSNs and driver's license numbers) to analyze whether a voter ID law violates the VRA, because this information allows DOJ to compare the voter file to other state and federal databases to determine (1) how many people registered in a State do not have the forms of ID allowed under the voter ID law and (2) whether there are significant racial disparities in possession of those IDs. Likewise, it may need such information to determine whether a required field on a voter-registration form is "not material in determining whether" an applicant "is qualified under State law to vote" and so violates the Civil Rights Act of 1964. 52 U.S.C. § 10101(a)(2)(B).

The United States has typically gotten such information in discovery. *See, e.g.*, *Mi Familia Vota v. Fontes*, 719 F. Supp. 3d 929, 962 (D. Ariz. 2024) (noting that United States' expert witness—to help show that state requirement for place of birth on voter registration forms is not material to determining registrants' qualifications—"determined that of the nearly 4.7 million active and inactive voter records in Arizona, only 2,734 records cannot be uniquely identified based on the voter's name and date of birth"), *aff'd in part, vacated in part, remanded*, 129 F.4th 691 (9th Cir. 2025); *Veasey v. Perry*, 71 F. Supp. 3d 627, 659 (S.D. Tex. 2014) (noting that United States' expert witness determined which voters and of what race lacked IDs covered by Texas's photo ID law "by comparing individual [state] voter records with databases" of U.S. passports, citizenship certificates, and military IDs), *aff'd in part, vacated in part sub nom. Veasey v. Abbott*, 796 F.3d 487 (5th Cir. 2015), *aff'd in part, vacated in part, rev'd in part*, 830 F.3d 216 (5th Cir. 2016) (en banc). And crucially, it has done so under strict court supervision and pursuant to the terms of detailed protective orders that prescribe procedures for exchanging, handling, storing, protecting, and deleting this sensitive data. *See, e.g.*, Protective Order, *Mi Familia Vota*, *supra*, Dkt. No. 353. Title III does not offer these kinds of safeguards. *See* 52 U.S.C. § 20704. Against this backdrop, DOJ's approach here stands out for both overbreadth and lack of justification.

## CONCLUSION

For the reasons discussed above, the Court should grant Defendants' motions to dismiss.

Dated: February 6, 2026

Respectfully submitted,

**O'MELVENY & MYERS LLP**

/s/ Anne T. Marchitello

Anne T. Marchitello (Bar #19918)
O'MELVENY & MYERS LLP
1625 Eye St. NW
Washington, DC 20006
(202) 383-5329
amarchitello@omm.com

*Attorney for* Amici Curiae *Former Employees of the U.S. Department of Justice*

# APPENDIX A

## *Alphabetical List of Amici Curiae*[*]

**Anna Baldwin**
U.S. Department of Justice (2010-2025): *Trial Attorney*, Voting Section (2010-2015); *Trial Attorney/Senior Trial Attorney*, Appellate Section (2015-2025)

**David Becker**
U.S. Department of Justice (1998-2005): *Trial Attorney*, Voting Section (1998-2005)

**Gregory Friel**
U.S. Department of Justice (1989-2022): *Attorney*, Appellate Section (1992-2006); *Special Litigation Counsel*, Appellate Section (2006-2011); *Senior Counsel*, Office of the Assistant Attorney General (2011); *Deputy Assistant Attorney General* (2012-2022)

**Bradley Heard**
U.S. Department of Justice (2010-2022): *Trial Attorney*, Voting Section (2010-2022)

**Brian Heffernan**
U.S. Department of Justice (1978-2011): *Trial Attorney*, Voting Section (2000-2009); *Special Litigation Counsel*, Voting Section (2009-2011)

**Robert Kengle**
U.S. Department of Justice (1984-2005): *Trial Attorney*, Voting Section (1984-1996); *Special Counsel*, Voting Section (1996-1999); *Deputy Chief*, Voting Section (1999-2005)

**Timothy Lambert**
U.S. Department of Justice (2001-2004): *Trial Attorney*, Voting Section (2001-2004)

**Justin Levitt**
U.S. Department of Justice (2015-2017): *Deputy Assistant Attorney General*, Civil Rights Division (2015-2017)

**Steven Mulroy**
U.S. Department of Justice (1991-2000): *Trial Attorney*, Voting Section (1991-1995)

**Dana Paikowsky**
U.S. Department of Justice (2021-2025): *Trial Attorney*, Voting Section (2021-2023)

**Stephen B. Pershing**
U.S. Department of Justice (1996-2005): *Trial Attorney*, Voting Section (1996-2005)

---

[*] *Amici* submit this brief in their personal capacities. *Amici*'s institutional affiliations are for identification purposes only.

**John Powers**
U.S. Department of Justice (2007-2015, 2021-2024): *Civil Rights Analyst & Senior Civil Rights Analyst*, Voting Section (2007-2015); *Counsel*, Office of the Assistant Attorney General (2021-2024)

**Joseph Rich**
U.S. Department of Justice (1968-2005): *Trial Attorney*, Southern Section (1968); *Chief*, Voting Section (1999-2005)

**Elizabeth Ryan**
U.S. Department of Justice (2012-2025): *Trial Attorney*, Voting Section (2012-2025)

**Bryan Sells**
U.S. Department of Justice (2010-2015): *Special Litigation Counsel*, Voting Section (2010-2015)

**Avner Shapiro**
U.S. Department of Justice (2000-2007, 2013-2016): *Trial Attorney*, Voting Section (2000-2007, 2013-2016)

**Thomas Sheran**
U.S. Department of Justice (1971-1977): *Trial Attorney*, Voting & Public Accommodations Section (1971-1977)