## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

| | |
|---|---|
| THE UNITED STATES OF AMERICA, | Case No. 1:25-cv-03934-SAG |
| Plaintiff, | |
| v. | |
| JARED DEMARINIS in his official capacity as STATE ADMINISTRATOR of Elections for the State of Maryland, | **MEMORANDUM OF THE UNITED STATES IN OPPOSITION TO MOTIONS TO DISMISS (ECF Nos. 34-35, 43, and 50)** |
| Defendant. | |

## <u>MEMORANDUM OF LAW</u>

## <u>TABLE OF CONTENTS</u>

I.     INTRODUCTION…………………………………………………………………...1

II.    BACKGROUND ................................................................................................ 3

III.   THE UNITED STATES IS ENTITLED TO PRODUCTION OF THE FEDERAL
ELECTION RECORDS IT HAS DEMANDED UNDER TITLE III OF THE CRA. .................. 5

   A.    The Federal Rules of Civil Procedure, including the motion to dismiss standard, are
inapplicable to orders to compel under Section 305 of the CRA. ............................................ 6

   B.    Title III of the CRA does not require allegations that the federal election records
demanded are needed to investigate race-based denial of voting rights. .................................. 10

   C.    Movants cannot challenge the Attorney General's basis and purpose to investigate
Maryland's NVRA and HAVA compliance. ............................................................................. 16

   D.    Maryland's SVRL falls within Section 301's broad definition of "all records and papers"
relating to registration to vote in federal elections. .................................................................. 19

   E.    The United States is entitled to unredacted "reproduction" and "copying" of Maryland's
federal election records, including its SVRL. ........................................................................... 23

IV.   THE UNITED STATES IS COMPLYING WITH APPLICABLE FEDERAL PRIVACY
LAWS. ......................................................................................................................................... 27

V.    CONCLUSION ................................................................................. 30

# TABLE OF AUTHORITIES

## Cases

*Ala. ex rel. Gallion v. Rogers*, 187 F. Supp. 848 (M.D. Ala. 1960) ...................................... passim

*Arbaugh v. Y&H Corp.*, 546 U.S. 500 (2006) ............................................................................... 15

*Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1 (2013) ................................................... 3

*Bostock v. Clayton Cnty., Ga.*, 590 U.S. 644 (2020) .................................................................... 13

*Carolina Tobacco Co. v. Bureau of Customs & Border Prot.*, 402 F.3d 1345 (Fed. Cir. 2005) ... 27

*Coal. for Open Democracy v. Scanlan*, No. 24-CV-312-SE, 2025 WL 1503937 (D.N.H. May 27, 2025) ................................................................................................................................. 26

*Coleman v. Campbell*, 208 F. Supp. 199 (S.D. Miss. 1962) ........................................... 10, 18, 19

*Coleman v. Kennedy*, 313 F.2d 867 (5th Cir. 1963) ............................................................... passim

*Cook v. Peter Kiewit Sons Co.*, 775 F.2d 1030 (9th Cir.1985) .................................................... 15

*Ebert v. Poston*, 266 U.S. 548 (1925) ......................................................................................... 12

*Ex Parte Siebold*, 100 U.S. 371 (1879) ......................................................................................... 3

*Exp. Grp. v. Reef Indus., Inc.*, 54 F.3d 1466 (9th Cir. 1995) ...................................................... 15

*Foster v. Love*, 522 U.S. 67 (1997) ............................................................................................... 3

*Franklin v. Or. Welfare Div.*, 662 F.2d 1337 (9th Cir. 1981) ...................................................... 15

*In re Duncan*, 713 F.2d 538 (9th Cir. 1983) ............................................................................... 14

*In re Gordon*, 218 F. Supp. 826 (S.D. Miss. 1963) ...................................................................... 9

*Kennedy v. Lynd*, 306 F.2d 222 (5th Cir. 1962) .................................................................... passim

*Koster v. Harris*, 847, F.3d 646 (9th Cir. 2017) ......................................................................... 15

*Panama R. Co. v. Johnson*, 264 U.S. 375, 384 (1924) ................................................................. 14

*Pure Oil Co. v. Suarez*, 384 U.S. 202 (1966) .............................................................................. 14

*U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779 (1995) ............................................................. 3

*United States v. Armstrong*, 517 U.S. 456 (1996) ....................................................................... 27

*United States v. Ass'n of Citizens Councils of La.*, 187 F. Supp. 846 (W.D. La. 1960) .............. 6, 7

*United States v. Benson*, Case No. 1:25-cv-01148-HYJ-PJG (W.D. Mich. Feb. 10, 2026) ... passim

*United States v. Bisceglia*, 420 U.S. 141 (1975) .......................................................................... 6

United States v. Cotton, 535 U.S. 625 (2002) .............................................................................. 15

*United States v. Great N. Ry. Co.*, 343 U.S. 562 (1952) .............................................................. 13

*United States v. Mo. Pac. R.R. Co.*, 278 U.S. 269 (1929) ........................................................... 12

*United States v. Morton Salt Co.*, 338 U.S. 632 (1950) ....................................................... 6, 9, 18

*United States v. Oregon*, Case No. 6:25-cv-01666-MTK (D. Or. Feb. 5, 2026) ........................ 8,9

*United States v. Powell*, 379 U.S. 48 (1964) ......................................................................... passim

*United States v. Raffensperger*, Case No. 5:25-cv-548-CAR (M.D. Ga. January 23, 2026) ........ 15

*United States v. Weber*, Case No. 2:25-cv-09149-DOC-ADS (C.D. Cal. Jan. 15, 2026) ...... passim

*Wachovia Bank v. Schmidt*, 546 U.S. 303 (2006) ........................................................................ 14

## Statutes

26 U.S.C. § 7605 ........................................................................................................ 8

44 U.S.C. § 3101 ...................................................................................................... 28

5 U.S.C. § 552a ........................................................................................................ 29

52 U.S.C. § 20507 ................................................................................................ 4, 25

52 U.S.C. § 20701 ............................................................................................. passim

52 U.S.C. § 20702 ..................................................................................................... 8

52 U.S.C. § 20703 ............................................................................................. passim

52 U.S.C. § 20704 .................................................................................................... 24

52 U.S.C. § 20705 ............................................................................................. passim

52 U.S.C. § 21083 ......................................................................................... 4, 25, 29

52 U.S.C. § 21111 ..................................................................................................... 4

The Privacy Act of 1974, Pub. L. No. 93–579, 88 Stat. 1896 (1974) ........................... 30

## Other Authorities

14D Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 3801 (4th ed. 2014). ................................................................................................................ 14

64 Fed. Reg. 73585-02 (Dec. 30, 1999) ..................................................................... 29

66 Fed. Reg. 8425-02 (Jan. 31, 2001) ........................................................................ 29

74 Fed. Reg. 57194 (Nov. 4, 2009) ............................................................................ 29

82 Fed. Reg. 24151 (May 25, 2017) ........................................................................... 29

U.S. Dep't of Just., Privacy Act of 1974; System of Records, 82 Fed. Reg. 24147-01 (May 25, 2017) .............................................................................................................. 28

## Constitutional Provisions

U.S. Const. art. I, § 4, cl. 1 ........................................................................................ 3

## Legislative Materials

106 Cong. Rec. 7767 ................................................................................................ 10

H.R. Rep. 107-329, pt. 1 (2001) ............................................................................... 12

Plaintiff United States of America respectfully submits this Memorandum of Law in Opposition to: (1) the Motion to Dismiss by Defendant Jared DeMarinis, State Administrator of Elections for the State of Maryland ("Administrator DeMarinis") (ECF Nos. 34-35); (2) the combined Motion to Dismiss by Defendant-Intervenors Common Cause and Out for Justice ("Common Cause Intervenors") (ECF No. 43); and (3) the Motion to Dismiss by Defendant-Intervenor Maryland/DC Alliance for Retired Americans Educational Fund ("Alliance Intervenors") (ECF No. 50). Collectively, the moving Defendant and Defendant-Intervenors are referred to as "Movants."[1] The United States submits this consolidated memorandum in opposition to all motions to dismiss to facilitate the Court's review of the duplicative and overlapping arguments made by the Movants.

## I.    INTRODUCTION

The Attorney General of the United States brought this case as part of her investigation of Maryland's list maintenance practices under the Help America Vote Act ("HAVA"), and the National Voter Registration Act ("NVRA"). The United States engaged in correspondence with Administrator DeMarinis, requesting Maryland's cooperation in providing federal election records necessary to its assessment in a manner consistent with federal privacy law. Administrator DeMarinis refused to produce Maryland's records as mandated by federal law and necessary to evaluate the State's compliance with federal election laws. This action followed. *See* Compl., ECF No. 1.

Title III of the Civil Rights Act ("CRA") provides the principal statutory authority for the United States to immediately obtain federal election records including Maryland's statewide Voter

---

[1] Alliance Intervenors includes all Alliance members, including Roger Blacklow, throughout this document. Further, Common Cause Intervenors includes all members, and Joanne Antoine, Trina Selden, Carl O. Snowden, Myriam Paul, and Luis Sims throughout this document.

Registration List ("SVRL"). Those provisions broadly authorize the Attorney General to compel production of "all records and papers" that "come into … possession" of Administrator DeMarinis's office relating to registration or other acts requisite to voting in federal elections. 52 U.S.C. § 20701; *see also* 52 U.S.C. § 20705 (authorizing the Attorney General to bring an action to compel the production of federal election records demanded under Section 303 of the CRA). In that manner, Title III is unique because it is purely an investigative tool. As such, it enables the Attorney General to determine whether a federal lawsuit "should be instituted" and "to obtain evidence for use in such cases if and when filed." *Kennedy v. Lynd*, 306 F.2d 222, 228 (5th Cir. 1962).[2]

As explained below, a motion to dismiss is not appropriate for the CRA claim. The CRA restricts the Court to a "severely limited" inquiry: (1) did the Attorney General make a written demand for federal election records stating the basis and purpose; (2) was that demand made to one or more "officer[s] of election" responsible for performing any act requisite to voting in federal elections including voter registration; (3) did the officer(s) of election fail or refuse to make the demanded federal election records "available for inspection, reproduction, and copying"; and (4) did the Attorney General make "a simple statement" to the Court that she satisfied the first three elements. *Lynd*, 306 F.2d at 225-26; *see also* 52 U.S.C. § 20703.

The record before the Court demonstrates that the United States has established each of these requirements. In contrast, Movants have wholly failed to establish that there remains any

---

[2] Circuit caselaw addressing the CRA in any depth has been confined to courts within the Fifth Circuit in the early years following the CRA's enactment. The United States is unaware of any circuit courts disagreeing with the Fifth Circuit's approach to the CRA. Recently two district courts in the Ninth Circuit and one district court in the Sixth Circuit reached a contrary conclusion. However, those decisions are burdened by erroneous applications of the statute. *See infra* at 7, 8, 12-15, 20-21.

"matter[] open for determination" which would provide a basis for their respective motions to dismiss. *Lynd*, 306 F.2d at 226. Therefore, the motions to dismiss should be denied.

## II.    BACKGROUND

While the United States Constitution invests states with broad powers over the conduct of federal elections, it also explicitly authorizes Congress to override those state choices.[3] The Elections Clause provides, "The Times, Places, and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations...." U.S. Const. art. I, § 4, cl. 1. The Supreme Court has explained that the Elections Clause

> is a default provision; it invests the States with responsibility for the mechanics of congressional elections … but only so far as Congress declines to preempt state legislative choices …. Thus it is well settled that the Elections Clause grants Congress "the power to override state regulations" by establishing uniform rules for federal elections, binding on the States.

*Foster v. Love*, 522 U.S. 67, 69 (1997) (quoting *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 832-33 (1995)) (citations omitted). "[T]he regulations made by Congress are paramount to those made by the State legislature; and if they conflict therewith, the latter, so far as the conflict extends, ceases to be operative." *Foster*, 522 U.S. at 69 (quoting *Ex Parte Siebold*, 100 U.S. 371, 384 (1879)); *see also Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 7-9 & n.1 (2013) (discussing the breadth of the Elections Clause).

---

[3] Alliance Intervenors argue otherwise, ignoring the Elections Clause and incorrectly suggesting that the United States has no authority to ensure States are performing their voter list maintenance duties required by federal law. *See* Alliance Intervenor's Mot., ECF No. 50 at 14-17. As discussed below, HAVA and the NVRA adopt a "trust but verify" approach to list maintenance: States are entrusted with the responsibility to engage in reasonable list maintenance practices, but the Attorney General is authorized by statute to verify they have done so.

Congress enacted broad regulations over the conduct of federal elections in the three statutes at issue in this litigation. Title III of the CRA imposes a "sweeping" obligation on election officials to preserve and, on request, to produce registration records pertaining to federal elections. *Lynd*, 306 F.2d at 226. HAVA requires states to implement a computerized SVRL and establish "[m]inimum standard[s] for accuracy of State voter registration records." 52 U.S.C. § 21083(a)(4). Section 303 of HAVA mandates that every state "ensure that voter registration records in the State are accurate and are updated regularly," including by use of a "system of file maintenance that makes a reasonable effort to remove registrants who are ineligible to vote from the official list of eligible voters" and "[s]afeguards to ensure that eligible voters are not removed in error from the official list of eligible voters." *Id*. Section 8(i) of the NVRA requires states to make available "all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters…." 52 U.S.C. § 20507(i)(1). Only the United States, through the Attorney General, is authorized to compel records under Title III of the CRA and to enforce Section 303 of HAVA. *See* 52 U.S.C. §§ 20703, 20705 (CRA); 52 U.S.C. § 21111 (HAVA). The Attorney General likewise enforces the NVRA's requirement that all states maintain "accurate and current voter rolls" and remove ineligible voters in the conduct of federal elections. *See* 52 U.S.C. §§ 20510(a), 20507(b), 20507(a)(4).

As explained in greater detail in the Memorandum in Support of Motion to Compel Production of Documents, the United States sent letters on July 14, 2025, and August 18, 2025 to Administrator DeMarinis requesting an electronic copy of Maryland's current SVRL used for federal elections, including both active and inactive voters. *See* Mot. to Compel, ECF No. 2 at Ex. 1 and Ex. 4. The August 18 Letter explained that the CRA provided the basis of the request and that the purpose of the request was to enforce the list maintenance provisions of HAVA.

4

Administrator DeMarinis responded in an August 25, 2025 letter and refused to provide an unredacted copy of the SVRL. *Id.* at Ex. 5.

On December 1, 2025, the United States filed the instant action seeking to compel production of the federal election records that it demanded, including Maryland's SVRL with the HAVA identifying numbers. *See* Compl., ECF No. 1. The Complaint included one count requiring production under the CRA. *Id.* at 9. The United States' CRA claim is dispositive of all the relief that it seeks through Title III's "severely limited" inquiry in a "summary proceeding." *Lynd*, 306 F.2d at 228.

### III. THE UNITED STATES IS ENTITLED TO PRODUCTION OF THE FEDERAL ELECTION RECORDS IT HAS DEMANDED UNDER TITLE III OF THE CRA.

Movants misapprehend the nature of a CRA claim by erroneously suggesting the Court should apply the motion to dismiss standard to it. They incorrectly maintain that Title III of the CRA applies to investigation of only a narrow category of federal election laws. They ask the Court to ignore caselaw under the CRA and allow an impermissible challenge to the basis and purpose of the Attorney General's written demand. Likewise, they assert that the Court should undermine the Attorney General's enforcement authority by rewriting the congressional mandate in the CRA. In place of producing all election records requisite to voting in federal elections, Movants invite the Court to narrow the mandate to encompass only publicly available records. For the reasons discussed below, Movants' respective motions should be denied and the United States' demand for production of Maryland's unredacted federal election records, including its SVRL, should be granted.

**A.** **The Federal Rules of Civil Procedure, including the motion to dismiss standard, are inapplicable to orders to compel under Section 305 of the CRA.**

Each Movant contends that the Court should apply the motion to dismiss standard to the United States' CRA claim seeking an order to compel production of federal election records. *See* Def.'s Mot., ECF No. 34-1 at 14; Alliance Intervenors' Mot., ECF No. 50 at 7; Common Cause Intervenors' Mot., ECF No. 43 at 11. Movants repeat what the Fifth Circuit has described as "a basic misconception … concerning a Title III proceeding." *Lynd*, 306 F.2d at 225.

The "chief purpose" of Title III "is to facilitate the investigation of the records before suit is filed." *United States v. Ass'n of Citizens Councils of La.*, 187 F. Supp. 846, 847 (W.D. La. 1960) (per curiam) (emphasis added). "[T]he function sought to be exercised by the Attorney General is … purely investigative," *Ala. ex rel. Gallion v. Rogers*, 187 F. Supp. 848, 854 (M.D. Ala. 1960), to evaluate "possible violations of a Federal statute," *Coleman v. Kennedy*, 313 F.2d 867, 868 (5th Cir. 1963) (per curiam) ("*Coleman II*"). It does not require known violations of federal law. In that manner, Title III enables the Attorney General to determine whether a federal lawsuit "should be instituted" and "to obtain evidence for use in such cases if and when filed." *Lynd*, 306 F.2d at 228. Contrary to what the Movants argue, no factual allegations of a substantive violation of federal law are required. Instead, "Congress has specifically committed the investigative responsibility to the Attorney General and has equipped [her] with machinery thought suitable for the effective fulfillment of that obligation" through Title III of the CRA.[4] *Id*. at 230. That approach makes sense.

---

[4] Title III invests the Attorney General with a power akin to a grand jury which "can investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not." *United States v. Bisceglia*, 420 U.S. 141, 148 (1975). The Supreme Court has recognized that statutes that vested investigative powers in Executive Branch agencies provide such agencies with grand jury-like powers and latitude. *See, e.g.*, *United States v. Powell*, 379 U.S. 48, 57 (1964) (recognizing the IRS Commissioner has grand jury-like powers); *United States v. Morton Salt Co.*, 338 U.S. 632, 642-43 (1950) (same with respect to the Federal Trade Commission). The investigative powers that the Attorney General derives from Title III fall comfortably within this

The United States cannot be expected to effectively enforce federal election laws such as HAVA and the NVRA if the Attorney General is required to allege facts from federal election records that state officers of election have denied to her. *See id.* at 227 (the Attorney General's "right to records does not require that [she] show [she] could win without them").

The Attorney General's filing of an application for an order under Title III "is not the commencement of an ordinary, traditional civil action with all of its trappings." *Id.* at 225. It is "a special statutory proceeding in which the courts play a limited, albeit vital, role." *Id.* In structuring the statute in this way, Congress has indicated that the Federal Rules of Civil Procedure are inapplicable. "Since it is a special statutory proceeding, it does not require pleadings which satisfy usual notions under the Federal Rules of Civil Procedure." *Id.* at 225-26; *see also Gallion*, 187 F. Supp. at 852 (comparing CRA applications to compel to actions by the Securities and Exchange Commission in which procedural rules "are made specifically inapplicable to investigations"). The CRA differs from ordinary civil actions because its "chief purpose" is to facilitate pre-suit investigation. *See Citizens Councils*, 187 F. Supp. at 847. In stark contrast, "[t]he chief purpose of Rule 34 … is to give a party litigant the right to have records produced after suit has been filed." *Id.* (emphasis added). To summarize, "[t]here is no place for any other procedural device or maneuver," including the motions to dismiss presently before the Court, in response to a CRA claim. *Lynd*, 306 F.2d at 226; *see also* Fed. R. Civ. P. 81 (summarizing other federal claims to which the Federal Rules of Civil Procedure do not apply).

At least one of the Movants argues that *Lynd* is irreconcilable with *United States v. Powell*, 379 U.S. 48, 58 n.18 (1964), which applied the Federal Rules of Civil Procedure regarding an IRS administrative summons. *See* Common Cause Intervenors' Mot., ECF No. 43 at 13-14, 25. A

paradigm.

recent decision in *United States v. Oregon*, Case No. 6:25-cv-01666-MTK, slip op. (D. Or. Feb. 5, 2026) (attached to Neff Decl. as Ex. 12), adopted that reasoning and incorrectly concluded that *Powell* squarely rejects the Fifth Circuit's holding in *Lynd* that Title III of the CRA is a special statutory proceeding where the Federal Rules of Civil Procedure do not apply. *Oregon*, slip op. at 15. In *Powell*, the Supreme Court made the unremarkable observation that because section 7604(b) of the Internal Revenue Code ("IRC") "contains no provision specifying the procedure to be followed in invoking the court's jurisdiction, the Federal Rules of Civil Procedure apply…." 379 U.S. at 58 n.18. However, the *Oregon* court applied a much broader construction of *Powell* than the Supreme Court intended.

The *Oregon* court found that *Powell* involved interpretation of "a similar statute" to Title III of the CRA, and the decision's admonition that "the court may 'inquire into the underlying reasons for the examination [of records]'" therefore applied to the CRA. *Oregon*, slip. op. at 15 (quoting *Powell*, 379 U.S. at 58). Although the quoted language from *Powell* is correct, *see id..*, the *Oregon* court omitted any explanation that the quoted language referred to a process expressly provided in the IRC that is missing from the CRA. The Supreme Court explained that judicial inquiry was appropriate where asked to enforce an administrative summons under the IRC to determine "if the summons had been issued for an improper purpose, such as to harass the taxpayer or to put pressure on him to settle a collateral dispute, or for any other purpose reflecting on the good faith of the particular investigation." *Id.* That inquiry was permitted because it was specifically authorized by section 7605(b) of the IRC, which prohibited the Government from subjecting a taxpayer "to unnecessary examination or investigations." *Id.* at 52-53 (quoting 26 U.S.C. § 7605(b)). However, no similar language limits the Attorney General's authority to compel

8

records under the CRA. *See* 52 U.S.C. §§ 20701-20706. Nor does the CRA provide any process for officers of election to object to Title III proceedings being initiated against them. *See id.*

Moreover, even with language in the IRC limiting records to "necessary" investigations, the Supreme Court made clear "[t]here is no intimation in the legislative history that Congress intended the courts to oversee the Commissioner's determinations to investigate." *Powell*, 379 U.S. at 56. Strong deference is given to the Government, and "'[] does not depend on a case or controversy for power to get evidence but can investigate merely on suspicion that the law is being violated, *or even because it wants assurance that it is not.*'" *Id.* at 57 (quoting *Morton Salt*, 338 U.S. at 642-43) (emphasis added). *Powell* is completely consistent with *Lynd* and in no way restricts records demands under the CRA to the statutory limitations that Congress included in the IRC. [5]

Notably, a recent decision issued by a District Court in the Sixth Circuit rejected the arguments raised by Common Cause Intervenors. *See United States v. Benson*, Case No. 1:25-cv-01148-HYJ-PJG, slip op at 14 (W.D. Mich. Feb. 10, 2026) (attached to Neff Decl. as Ex. 13). Instead, the *Benson* court construed "a request for records under the CRA as a form of administrative subpoena." *See* slip. op. at 14 (citing *Lynd*, 306 F.2d at 225 and *In re Gordon*, 218 F. Supp. 826, 826-27 (S.D. Miss. 1963)). Therefore, "[m]ost of the Federal Rules of Civil Procedure are simply inapplicable…." *Benson*, slip op. at 15. The court acknowledged that "'a

---

[5] The *Oregon* decision similarly misreads *Lynd* by reasoning "the Court doubts its applicability here where Plaintiff made an affirmative choice to file a complaint and proceed through ordinary litigation" instead of applying "directly to the court for the records." *Oregon*, slip op. at 15 n.1. *Lynd* does not say filing a pleading waives the expedited process under the CRA. Instead, as discussed above, the Fifth Circuit explained only that any pleadings that are filed do not need to "satisfy usual notions under the Federal Rules of Civil Procedure." 306 F.2d at 225-26.

district court's role in the enforcement of an administrative subpoena is a limited one.'" *Id.* (citation omitted).

### B.    Title III of the CRA does not require allegations that the federal election records demanded are needed to investigate race-based denial of voting rights.

Title III of the Civil Rights Act of 1960 is entitled "Federal Election Records." CRA § 301, Pub. L. No. 86-449, 74 Stat. 86 (1960). This "sweeping" obligation requires officers of election to preserve and, on request, to produce registration records pertaining to federal elections. *Lynd*, 306 F.2d at 226. Section 301 provides, in pertinent part, "[e]very officer of election shall retain and preserve, for a period of twenty-two months from the date of [a federal election] all records and papers which come into his possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election …." 52 U.S.C. § 20701. Section 303 authorizes the Attorney General of the United States to compel any person "having custody, possession, or control of such record or paper" to make "available for inspection, reproduction, and copying … by the Attorney General or [her] representative." 52 U.S.C. § 20703.

Notwithstanding the CRA's plain language, Defendant argues that the Court must go outside the text of the statute to the sparse legislative history and find that Title III is limited to only those records which address racially discriminatory voting practices. *See* Def.'s Mot., ECF No. 34-1 at 18-21. That is not correct.

Title III functions as "a special statutory proceeding in which the courts play a limited, albeit vital, role." *Lynd*, 306 F.2d at 225. The only language that is required in the Attorney General's demand is that it "was made for the purpose of investigating possible violations of a Federal statute." *Coleman II*, 313 F.2d at 868 (quoting "Senator Keating, one of the principal spokesmen for the bill in the Senate," at 106 Cong. Rec. 7767); *see also Coleman v. Campbell*, 208 F. Supp. 199, 200 (S.D. Miss. 1962) ("*Coleman I*") (a sufficient purpose to examine federal

election records is "to see if any Federal laws were violated"). The United States clearly has satisfied that requirement by informing the officers of election in the August 18 Letter that "the purpose of the request is to ascertain Maryland's compliance with the list maintenance requirement of federal laws...." *See* ECF No. 2, Ex. 4.

Moreover, enforcing list maintenance by examining compliance with HAVA's identification requirements is essential to fully securing an individual's right to vote. In 2001, the bipartisan National Commission on Federal Election Reform, with former Presidents Gerald R. Ford (Rep.) and Jimmy Carter (Dem.) serving as Honorary Co-Chairs, explained why adding driver's license information and the last four of the Social Security numbers for federal elections protected individual voters:

> Any state adopting a statewide voter registration system will confront the problem of uniquely identifying voters, figuring which Joseph Smith is the same as that Joe Smith. That is why, following the Michigan example, we recommend obtaining residential addresses, with the DMV and voter registration address required in identical form. An added identifier is desirable, given the various spellings and the clerical errors that frustrate reliance only on a given name and address. For this purpose some numeric identifier can be useful. Given the danger from overuse of entire Social Security Numbers as an individual identifier we suggest that states obtain the last 4 digits of this number as an added identifier. The Federal Election Commission has made the same recommendation.

Nat'l Comm'n on Fed. Election Reform, To Assure Pride and Confidence in the Electoral Process 32-33 (Aug. 2021) (excerpts provided as Neff Decl., Ex. 14). Furthermore, the Commission noted that it was "estimated that 92% of all registered voters also have a driver's license," *id.* at 30, which strongly supported use of a driver's license number as a unique identifier for each voter who possessed one. The Commission recognized that "accuracy" of a statewide voter registration database "can mean access." *Id.* It explained, "[u]sed cumulatively, this information could improve the accurate exchange of information affecting voter eligibility and help avoid mistaken voter removals like those that occurred in Florida." *Id.* at 33. Congress heeded the Commission's finding that inaccurate voter databases can disenfranchise individual voters when it enacted HAVA in 2002.

It explained how list maintenance and compliance with HAVA's identifying numbers helps protect an individual's right to vote: to "reduce the incidence of voters appearing at a polling place only to discover that no record of their registration can be found."[6] H.R. Rep. 107-329, pt. 1, at 36 (2001).

Engrafting a requirement of racial discrimination that does not exist in Title III of the CRA would violate the statute's express congressional mandate, while also undermining the Attorney General's enforcement of requirements in HAVA and the NVRA that help protect voting rights. Where, like here, the language of an enactment is unambiguous, "…the words employed are to be taken as the final expression of the meaning intended." *United States v. Mo. Pac. R.R. Co*., 278 U.S. 269, 278 (1929). Well-established principles of statutory construction foreclose federal courts from rewriting a statute in a manner that better suits a litigant. As the Supreme Court explained, "[t]he judicial function to be exercised in construing a statute is limited to ascertaining the intention of the Legislature therein expressed. A *casus omissus* does not justify judicial legislation." *Ebert v. Poston*, 266 U.S. 548, 554-55 (1925). "[W]here the language of an enactment is clear, and construction according to its terms does not lead to absurd or impracticable consequences, the words employed are to be taken as the final expression of the meaning intended. And in such cases legislative history may not be used to support a construction that adds to or takes from the significance of the words employed." *Mo. Pac.,* 278 U.S. at 278 (citations omitted). In that manner, the "judicial function [is] to apply statutes on the basis of what Congress has written, not what

---

[6] Recent enforcement efforts by the Attorney General demonstrate the need for federal scrutiny. Neff Decl. ¶¶ 12-14. In 2025, North Carolina election officials admitted that the state "maintained and used a HAVA List that includes records that do not comply with the requirements for Federal elections under Section 303(a)(5)." *United States v. N. Carolina Bd. of Elections*, Consent J. & Order at 4 (E.D.N.C. Sept. 8, 2025) (attached as Neff Decl., Ex. 10). As a result of the Attorney General's enforcement action, North Carolina has reduced the number of voter records missing an identification number under HAVA from 103,329 to 70,709. *See N. Carolina Bd. of Elections*, Defs.' 2d Status R. at 2 (E.D.N.C. Jan. 30, 2026) (attached as Neff Decl., Ex.11).

Congress might have written." *United States v. Great N. Ry. Co.*, 343 U.S. 562, 575 (1952). "After all, only the words on the page constitute the law adopted by Congress and approved by the President. If judges could add to, remodel, update, or detract from old statutory terms inspired only by extratextual sources and our own imaginations, we would risk amending statutes outside the legislative process…." *Bostock v. Clayton Cnty., Ga.*, 590 U.S. 644, 654-55 (2020).

The *Benson* court rejected arguments that parallel those of the Movants in this case, concluding that the CRA cannot be judicially rewritten to restrict the statute's scope. The court first rejected the argument of a temporal limitation on the CRA to only those statutes in effect when the Act became law. The court explained, "[t]here is no rule of statutory interpretation that prevents a statute from interacting with, or being used in conjunction with, subsequently enacted statutes." *Benson*, slip op. at 17. Turning to the argument that Title III of the CRA only could be used to investigate racial discrimination, *Benson* observed that "the CRA's text includes no such limitation…" *Id.* Investigating list maintenance efforts under the NVRA fit neatly within the scope of Title III: "The CRA aides the Attorney General in assessing states' compliance with federal election law and protecting voting rights; the NVRA is a federal election law that protects voting rights." *Id.*

Movants also cite as support for their racial discrimination argument the District Court ruling in *United States v. Weber*, Case No. 2:25-cv-09149-DOC-ADS, slip op. (C.D. Cal. Jan. 15, 2026) (attached to Neff Decl. as Ex. 15). *See* Def.'s Mot., ECF No. 34-1 at 18-20. In *Weber*, the Court began its analysis of the pending motions to dismiss by acknowledging it lacked jurisdiction to do so: "California argue[d] that [the] Court lack[ed] jurisdiction to adjudicate the claim for violation of Title III of the … CRA … because DOJ's demand was made to the California Secretary of State's Sacramento address and the records sought [were] located there." *Weber*, slip

13

op. at 12. The Court agreed, finding "this argument persuasive," because the case was brought in the Central District instead of the Eastern District, where the Secretary's office and records were kept. *Id.* at 12 & n.13. Section 305 is explicit on this point. It provides, "The United States district court for the district in which a demand is made pursuant to [section 303] of this title, or in which a record or paper so demanded is located, shall have jurisdiction…" 52 U.S.C. § 20705. Nevertheless, the Court rendered its decision on the merits, resting on an alleged waiver of subject matter jurisdiction and a "critical" need for the merits to be examined. *Weber*, slip op. at 12.

The United States considers the language in Section 305 to apply to venue as opposed to jurisdiction, and thus the District Court's analysis was incorrect *ab initio*. The provision in 52 U.S.C. § 20705 is focused on "where" a case may be brought, not "whether" it may be brought, *Wachovia Bank v. Schmidt*, 546 U.S. 303, 316 (2006)—the tell-tale sign of a special venue provision. 14D Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 3801 (4th ed. 2014) ("[S]ubject matter jurisdiction addresses whether a dispute may be heard by a federal court at all.  If so, venue then determines *which* federal court—usually meaning which federal district—should hear the case." (footnote omitted)). In similar situations, the Supreme Court has interpreted a provision of the Jones Act prescribing where suit may occur and using the word "jurisdiction" as "refer[ring] only to venue." *Pure Oil Co. v. Suarez*, 384 U.S. 202, 203 (1966) (citing *Panama R. Co. v. Johnson*, 264 U.S. 375, 384 (1924)); *see Pure Oil*, 384 U.S. at 203 ("Jurisdiction in such actions shall be under the court of the district in which the defendant employer resides or in which his principal office is located."). In *In re Duncan,* the Ninth Circuit[7] addressed a statute providing that "[t]he jurisdiction of the courts herein specified to naturalize persons shall extend only to such persons resident within the respective jurisdiction of such

---

[7] Ninth Circuit caselaw is discussed because it is controlling authority showing the error in *Weber*.

courts." 713 F.2d 538, 542 (9th Cir. 1983). The court held that this sentence was a "special venue provision" that did not affect "subject matter jurisdiction" and was thus waivable. *Id.*

Nevertheless, the District Court treated this as a jurisdictional requirement, and thus every element of the decision that followed was in error. It is axiomatic that "subject-matter jurisdiction, because it involves a court's power to hear a case, can never be forfeited or waived." *United States v. Cotton*, 535 U.S. 625, 630 (2002). "[C]ourts … have an independent obligation to determine whether subject-matter jurisdiction exists, even in the absence of a challenge from any party." *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006). When a court concludes it lacks subject-matter jurisdiction, only a single action is available: "the court must dismiss the complaint in its entirety."[8] *Id*. The *Weber* court therefore lacked any discretion to reach the merits of the claims and defenses thereto, regardless of whether the court deemed the case "concern[ed] matters of national importance." *Weber*, slip op. at 12. As the Ninth Circuit has explained, once the court finds it lacks jurisdiction, the judge "retain[s] no power to make judgments relating to the merits of the case." *Cook v. Peter Kiewit Sons Co.*, 775 F.2d 1030, 1035 (9th Cir. 1985); *see also Franklin v. Or. Welfare Div.*, 662 F.2d 1337, 1343 (9th Cir. 1981) ("[D]ismissal for failure to state a claim requires a judgment on the merits and cannot be decided before the court has assumed jurisdiction."). *Weber*, by its own terms, even though incorrectly applied, lacked subject matter jurisdiction to analyze the merits. Consequently, its entire discussion of the CRA outside of Section 305 is dictum entitled to no weight in this, or any other, case. *See Exp. Grp. v. Reef Indus., Inc.*, 54 F.3d 1466, 1472 (9th

---

[8] "In general, dismissal for lack of subject matter jurisdiction is without prejudice." *Missouri ex rel. Koster v. Harris*, 847, F.3d 646,656 (9th Cir. 2017); *see also United States v. Raffensperger*, Case No. 5:25-cv-548-CAR, slip op. (M.D. Ga. January 23, 2026) (court lacked jurisdiction to compel CRA records in Middle District of Georgia, dismissing the case without prejudice) (attached to Neff Decl. as Ex. 16).

Cir. 1995) (holding that dicta, including statements "not necessary to the decision," "have no binding or precedential impact…").

The Fourth Circuit recognizes that dictum, such as all of *Weber*'s analysis following its conclusion it lacked subject matter jurisdiction, "is not binding." *Payne v. Taslimi*, 998 F.3d 648, 654 (4th Cir. 2021). As *Payne* explained, dictum is a "statement in a judicial opinion that could have been deleted without seriously impairing the analytical foundations of the holding—that, being peripheral, may not have received the full and careful consideration of the court that uttered it." *Id.* at 654-55 (citations omitted). Because *Weber*'s discussion of the merits after finding it lacked jurisdiction was not "necessary to the outcome," it lacks precedential value. *Id.* at 655.

As a result, the United States respectfully submits that the Court must decline Movants' invitation to rewrite the CRA to add a requirement of racial discrimination that simply does not exist in Title III. *See id*.

C.     **Movants cannot challenge the Attorney General's basis and purpose to investigate Maryland's NVRA and HAVA compliance.**

The CRA establishes a straightforward requirement for the Attorney General to make a written demand to officers of election for federal election records. As explained in the preceding discussion, it covers "all records and papers" which come into possession of an officer of election that relate to any prerequisite to voting in a federal election, including voter registration applications and records. 52 U.S.C. § 20701. Pursuant to Section 303 of the Act, to obtain those federal election records, the Attorney General need only make to an officer of election with custody, possession, or control of those records a "demand in writing" for "inspection, reproduction, and copying," accompanied by "a statement of the basis and the purpose therefor." 52 U.S.C. § 20703. After that written demand has been made, and the officer of election has

rejected it, the Attorney General may seek an order from the federal court "to compel the production of such record or paper." 52 U.S.C. § 20705.

In the August 18 Letter, the Attorney General made a written demand under Section 303 of the CRA for Maryland's federal election records, including its SVRL. The letter specifically cited Section 303 of the CRA, stating that the Attorney General "…is demanding [pursuant to 52 U.S.C. § 20703] an electronic copy of Maryland's complete and current VRL.  The purpose of the request is to ascertain Maryland's compliance with the list maintenance requirements of the NVRA and HAVA [under 52 U.S.C. §§ 21083(b)(4)(A) and (B)]." ECF No. 2, Ex. 4 at 2.

Nevertheless, the Movants argue that the United States failed to provide a sufficient statement of the basis and purpose of its request for federal election records. Movants criticize the Attorney General's stated basis and purpose of the need for the records to assess the state's compliance with the NVRA and HAVA. *See* Def.'s Mot., ECF No. 34-1 at 18-23; Alliance Intervenors' Mot., ECF No. 50 at 8-13; Common Cause Intervenors' Mot., ECF No. 43 at 12-18. Administrator DeMarinis argues that the Attorney General's August 18 Letter "…did not provide a basis for its voter registration database demand and set forth a purpose unrelated to Title III and its subject matter." *See* Def.'s Mot. ECF No. 34-1 at 18. The other Movants make related arguments. *See* Alliance Intervenors' Mot., ECF No. 50 at 8-13; Common Cause Intervenors' Mot., ECF 43 at 12-18 (arguing that a detailed factual basis for the demand must be included). To the extent that Movants assert the demand needs to include facts showing an *extant* violation of federal law, that argument fails as a matter of law. *See supra* Part III(A) (describing why the investigative nature of a demand under Title III forecloses any requirement that a specific allegation of a violation of federal law be included in that demand).

Federal courts have rejected contentions that parallel those made by Movants. Section 303's requirement that the written demand "contain a statement of the basis and the purpose therefor," 52 U.S.C. § 20703, "means only that the Attorney General [must] identify in a general way the reasons for [her] demand." *Coleman II*, 313 F.2d at 868 (citation omitted). "Clearly a sufficient statement would be the assertion that the demand was made for the purpose of investigating possible violations of a Federal statute." *Id.* (emphasis added); *see also Coleman I*, 208 F. Supp. at 200 (the written demand need only indicate the records were needed "to see if any federal laws were violated"); *cf. Morton Salt*, 338 U.S. at 642-43 (same construction of administrative subpoena by the FTC). A reference to the statutory basis for making the demand, namely the CRA, suffices.[9]

Contrary to what Movants argue, they are prohibited from using "any other procedural device or maneuver," including their motions to dismiss, to challenge or "ascertain the factual support for, or the sufficiency of, the Attorney General's 'statement of the basis and the purpose therefor' as set forth in the written demand." *Lynd*, 306 F.2d at 226. No discovery or other tools ordinarily available under the Federal Rules of Civil Procedure may be used to question or examine "the reasons why the Attorney General considers the records essential…." *Id.* "Questions of relevancy or good cause or other like considerations" that may be assessed under other statutes to

---

[9] Even if more of an explanation was required, to wit, why the records are needed, the Attorney General did so in her August 18 Letter, in which she wrote:

> When providing the electronic copy of the [SVRL], Maryland must ensure that it contains *all fields*, which includes the registrant's full name, date of birth, residential address, his or her state driver's license number or the last four digits of the registrant's social security number [SSN4] as required under … HAVA … to register individuals for federal elections.

Mot. to Compel, ECF No. 2 at Ex. 4 (emphasis in original). An accompanying footnote explained that when Congress charged the Attorney General with HAVA enforcement, it "plainly intended that [the] Justice Department be able to conduct an independent review of each state's list." *Id.* at n.1.

which the Federal Rules of Civil Procedure are applicable "are completely foreign to the summary proceeding" under Section 304 of the CRA. *Id.* at 228; *see also Benson*, slip op. at 16-17 ("[T]he CRA does not allow courts to evaluate the substance of the DOJ's purported basis and purpose."). Congress vested the Attorney General with broad authority to obtain federal election records under Title III of the CRA. *Coleman I*, 208 F. Supp. at 200-01. In sum, "the factual foundation for, or the sufficiency of, the Attorney General's" written demand under Section 303 "is not open to judicial review or ascertainment." *Lynd*, 306 F.2d at 226. Movants' motions to dismiss the CRA claim for not meeting an elevated showing of statement of "the basis and the purpose" fail under the plain language of the statute, as applied by federal courts.

### D. Maryland's SVRL falls within Section 301's broad definition of "all records and papers" relating to registration to vote in federal elections.

The scope of federal election records covered by Title III of the CRA is broadly established by Congress. Section 301 of the Act provides that the retention and production requirements apply to "*all records and papers*" which "come into … possession" of an officer of election "relating to any application, registration, payment of poll tax, or other act requisite to voting" in a federal election "for a period of twenty-two months" from the date of any federal election. 52 U.S.C. § 20701 (emphasis added). This language is unequivocal in its breadth.

Nevertheless, Administrator DeMarinis contends that § 20701 "…does not apply to a computerized system that is constantly updated and meant for use in multiple elections." *See* Def.'s Mot., ECF No. 34-1 at 17. The same arguments made by Administrator DeMarinis were rejected by the District Court in the context of the NVRA in *Judicial Watch v. Lamone*, 399 F. Supp. 3d 425 (D. Md. 2019). The court explained that Maryland misunderstood the requirements of the NVRA and the plaintiff was entitled to the registered voter list because "a voter list is simply a partial compilation of voter registrations." *Id*. at 442. The court also was persuaded that the "focus

on the information sought" was significant "rather than the particular language used to characterize that information." *Id*. at 440 (citing *Project Vote v. Kemp*, 208 F.Supp.3d 1320, 1329 (N.D. Ga. 2016) (court rejected defendant's argument that plaintiff could not obtain voter list); *see also Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331, 337 (4th Cir. 2012) (finding all records under Section 8(i)(1) included voter registration records).

The *Gallion* court applied Section 301 of the CRA in a similar manner. That section does not exclude electronic records or records created by the officer of election. *See* 52 U.S.C. § 20701. Nor does it allow redaction of those electronic records. *Gallion* explained in detail why a similar effort to impede the Attorney General's enforcement of federal election laws failed:

> There is nothing uncertain about that part of the Act requiring preservation and production of all records and papers which are in the possession of an election official … if those records and papers relate to the acts requisite to voting…. Regardless of when these records came into the possession of the election official, under Section 301 they must be retained and preserved for a period of twenty-two months 'from the date of any general, special, or primary election…' if they relate to acts requisite to voting in such election.

187 F. Supp. at 855 (quoting 52 U.S.C. § 20701). In *Lynd*, the Fifth Circuit likewise recognized that "the papers and records" covered by Section 301 "have been specifically identified by Congress." 306 F.2d at 226. This requirement "is sweeping." *Id.* It applies to "all records and papers," as the statute provides. *Id.* Despite the argument by Common Cause Intervenors that the CRA does not *prohibit* redactions – for the Court to require redactions would fly in the face of not only the CRA's clear and unambiguous language, but also federal court precedent. *See* Common Cause Intervenors' Mot., ECF No. 8-1 at 15.

In a similar vein, "there is no question for judicial determination as to how far back the records go. This, too, is fixed by the statute." *Gallion*, 187 F. Supp. at 226. "[T]he Attorney General's right of inspection and copying extend as far back as the earliest date of any such record

or paper which bears on the eligibility of any currently listed voter to vote" in a federal election. *Id.* at 227. To put it even more succinctly: Section 301 means what it says in requiring production of "all records and papers" relating to registration to vote in a federal election, including Maryland's SVRL. 52 U.S.C. § 20701. As *Lynd* made clear, "All means all." 306 F.2d at 230. Therefore, the argument by Movants that the Attorney General is limited to public or redacted SVRLs fails as a matter of law.

The *Benson* court did not follow the reasoning in *Lamone*, *Long*, or the Fifth Circuit decisions, reading Section 301 narrowly to deny production of a SVRL. *Benson* tacitly acknowledged that it may have applied a hyper-technical construction of the CRA that even the state defendants had not raised. *See* slip op. at 16. Nevertheless, the court found that "if the distinction between voter registration applications and voter registration lists is overly pedantic, it is a pedantic distinction *made by Congress*, and it is Congress's prerogative to make distinctions that may seem unnecessary to a person reading the statute over six decades after its passage." *Id.* at 22 (emphasis in original). The United States believes that *Lamone*'s focus on the requested information makes the most sense under the plain language of the CRA because as the Fifth Circuit decisions explained, Section 301 encompasses the ready collection of such information. Moreover, today many – and likely even most – voter registration applications are only in electronic form in a SVRL. Such a reading would effectively carve out vast numbers of federal election records, which was plainly not the intention of Congress in passing such "sweeping" legislation. *Lynd*, 306 F.2d at 226.

Administrator DeMarinis also argues that Title III of the CRA would criminalize routine HAVA maintenance of a SVRL if it is found to apply to an SVRL. *See* Def.'s Mot., ECF No. 34-1, at 17. That is incorrect. Removing ineligible voters from a registration list is not destroying a

record. The application still exists. Taking someone off a voter roll who was not eligible to be on it in the first place does not violate any of the criminal statutes applicable to the CRA, NVRA or the CRA. Similarly, taking off a name that is incorrectly on the SVRL twice because a duplicate record has erroneously been created, does not implicate the criminal provisions.

Finally, the United States previously has pursued successful matters, including in litigation, to obtain statewide voter registration lists under Title III of the CRA. For example, in two of those matters against Georgia and Texas, the United States obtained the SVRLs, including drivers' license numbers and SSN4s, to evaluate compliance with the NVRA, including that Act's list maintenance requirements.[10] To ascertain whether a jurisdiction engages in practices that violate federal law (whether the Voting Rights Act or HAVA or any other one), the Attorney General needs to examine both applications to register to vote and the final voting rolls, including the SVRL, so as to assure herself that the applications are being properly processed and that reasonable list maintenance efforts have been practiced. Thus, the Attorney General needs to examine both the records created by third parties that then "come into possession" of election officials and the records created by election officials themselves. Limiting the Attorney General's ability solely to the first type of records or to redact those records would make it nearly impossible for her to carry out the duties assigned to her by Congress. Because Movants' suggested statutory construction would lead to absurd results that no rational legislator could have possibly intended, the Court should reject it.

---

[10] *See* Compl., *United States v. Georgia*, No. 1:06-cv-02442 (N.D. Ga. Oct. 12, 2006), ECF No. 1. The Court entered a consent decree in the Georgia case requiring production of the SVRL. *See Georgia*, *supra*, at ECF No. 4 (filed Oct. 27, 2006). The Texas matter was resolved by a Memorandum of Understanding. *See* U.S. Dep't of Just., Mem. of Understanding between the United States and Texas (May 13, 2008), *available at* https://www.justice.gov/media/1173461/dl?inline (last visited Jan. 6, 2026). For the Court's convenience, the three documents are provided as attachments to Neff Decl., Exs. 7-9.

**E.      The United States is entitled to unredacted "reproduction" and "copying" of Maryland's federal election records, including its SVRL.**

Section 303's language provides that "[a]ny record or paper required by [Section 301] to be retained and preserved shall" upon written demand by the Attorney General or her representative stating the basis and purpose, "be made available for inspection, reproduction, and copying…." 52 U.S.C. § 20703. "The incorporated standard of [Section 301] is sweeping." *Lynd*, 306 F.2d at 226. The question is only "open for determination" by the Court if "a genuine dispute … arises as to whether or not any specified particular paper or record comes within this broad statutory classification of 'all records and papers … relating to any … act requisite to voting'…." *Id.*

Nevertheless, the Movants ask the Court to legislate limitations conspicuously absent from Title III. Federal courts have concluded that Section 303 requires reproduction and copying. For example, in *Lynd*, the court rejected a "mechanical objection[]" in which copying federal election records "would, at one time, have been a formidable thing." *Lynd*, 306 F.2d at 231. There, the court observed that "[m]odern photostating equipment will make short order of most of these demands…." *Id.* Maryland's SVRL is required by HAVA to be in electronic form. It is obvious that providing the United States with an electronic copy of its SVRL will be much less burdensome than physical copying of every individual registration record—which the state describes as records of "*millions*" Maryland citizens—if, indeed, complete physical records even exist outside of their electronic form.[11] Def.'s Mot., ECF No. 34-1 at 5 (emphasis added).

---

[11] According to the data that Maryland reported to the U.S. Election Assistance Commission, it is doubtful that millions of federal voter registration records exist in any medium other than electronic form. A large percentage of voter registration transactions were reported as being through e-mail, online, and in-person, and through computer entries at designated voter registration locations. *See* U.S. Election Assistance Comm'n, Election Administration and Voting Survey 2024 Comprehensive Report at 157, 162 (June 2025), *available at* https://www.eac.gov/research-and-

The other Movants make similar arguments and contend that unredacted information does not have to be provided under the CRA, that federal and state privacy laws prevent the Attorney General from collecting unredacted data, and that redacting may be needed to protect the constitutional right to vote. *See* Common Cause Intervenors' Mot., ECF No. 43 at 19-22; The Alliance Intervenors' Mot., ECF No. 50 at 16.  Movants ignore that Congress has overridden any state laws that conflict with the CRA. *See supra* Part II. The statutory text of Title III itself makes clear that the records that must be produced under the CRA are not limited to only those that are public. Section 304 of the CRA explicitly requires the nondisclosure of records produced to the Attorney General under the Act:

> Unless otherwise ordered by a court of the United States, neither the Attorney General nor any employee of the Department of Justice, nor any other representative of the Attorney General, shall disclose any record or paper produced pursuant to this chapter, or any reproduction or copy, except to Congress and any committee thereof, governmental agencies, and in the presentation of any case or proceeding before any court or grand jury.

52 U.S.C. § 20704. Section 304's privacy protection only has meaning if the records covered by the CRA include non-public information. Yet, Movants ignore the plain language of Section 304 and ask the Court to do the same by rewriting the CRA to exclude all non-public records and information. Congress rejected the position that they advance by its broad reference to "all records and papers…" 52 U.S.C. § 20701. To put it succinctly: Section 301 means what it says in requiring production of "all records and papers" relating to registration to vote in a federal election, including Maryland's SVRL. 52 U.S.C. § 20701. As *Lynd* made clear, "All means all." 306 F.2d at 230. Therefore, the argument by Movants that all electronic and non-public records are excluded fails as a matter of law.

---

data/studies-and-reports (last visited Feb. 13, 2026).

The United States will strictly abide by these statutory limitations. The unredacted SVRL and other responsive federal election records can certainly be produced to the United States consistent with these federal privacy protections through a protective order stating those protections.[12] *Lynd*, 306 F.2d at 230.

Finally, if the Movants' position were to be adopted, it would eviscerate Title III. The Attorney General can only meaningfully investigate and enforce list maintenance requirements under HAVA and the NVRA by having access to the voter identification numbers required by federal law. For each voter, that includes their driver's license number, the last four of their social security number ("SSN4"), or other HAVA identifying number. *See* 52 U.S.C. § 21083(a)(5)(A). That information is necessary to identify duplicate registration records, registrants who have moved, and registrants who have died, or who are otherwise no longer eligible to vote in federal elections.[13] There is no question that enforcement of the list maintenance requirements of HAVA and the NVRA are for "the purpose of investigating possible violations of a Federal statute." *Coleman II*, 313 F.2d at 868.

---

[12] Consistent with this approach to address any reasonable privacy concerns without impeding the Attorney General's authority to enforce federal law, the United States has offered all states a memorandum of understanding, or MOU, memorializing these requirements. *See* Neff Decl. ¶¶ 15-16. As of February 11, 2026, twelve states have provided their SVRLs without any MOU. Neff Decl. ¶ 16. Two states have agreed to provide their SVRL under the terms of the MOU. *Id*. Six other states have indicated their intention to provide the SVRLs in the near future. *Id*.

[13] *See generally* 52 U.S.C. § 20507(a)(4) ("In the administration of voter registration for elections for Federal office, each State shall – (4) conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters by reason of – (A) the death of the registrant; or (B) a change in the residence of the registrant…"); 52 U.S.C. § 21083(a)(4) ("The State election system shall include provisions to ensure that voter registration records in the State are accurate and are updated regularly, including… (A) A system of file maintenance that makes a reasonable effort to remove registrants who are ineligible to vote from the official list of eligible voters….").

The data the United States has requested under the CRA is the same that twenty-five states (including Maryland) and the District of Columbia routinely share through the Electronic Registration Information Center, ("ERIC"), to facilitate their compliance with federal list-maintenance requirements.[14] More importantly, Administrator DeMarinis clearly admits to giving out private and protected information to ERIC – citing to the Administrator's website summary – (the Voter Registration List Maintenance website) which states "Each ERIC member shares their voter registration data along with data provided by each Department of Motor Vehicles. This allows the data to be matched with member states and against the Social Security Administration's death records and the National Change of Address program through the U.S. Postal Service." Mot. to Compel, ECF No. 2-2, Ex. 2 at 2. Administrator DeMarinis, in making those admissions, proves that Maryland already shares private citizen data with a non-governmental private entity. In doing so, Administrator DeMarinis tacitly acknowledges that for the Attorney General to properly evaluate list maintenance compliance, data in Maryland's SVRL that includes the identifying information required by HAVA including the HAVA identifiers (driver's license numbers, SSN4s, or other unique identifiers) is needed.

Similarly, private parties have been granted access to even more detailed voter data than what the United States has requested where necessary to bring actions to enforce federal rights. *See Coal. for Open Democracy v. Scanlan*, No. 24-CV-312-SE, 2025 WL 1503937, at *2 (D.N.H. May 27, 2025) (ACLU compelled production of "[a] copy of the New Hampshire statewide voter database and all documents concerning the use of the statewide voter database, including instruction manuals or other guides concerning the data fields contained in the database and their correct interpretation."), *appeal dismissed*, No. 25-1585 (1st Cir. July 2, 2025).

---

[14] *See* ERIC, ERIC Overview, *available at* https://ericstates.org/ (last visited Feb. 13, 2026).

Consequently, the United States is entitled to reproduction and copying of Maryland's unredacted SVRL under the unambiguous language of Section 303 of the CRA. *See* 52 U.S.C. § 20703; *see also Gallion*, 187 F. Supp. at 855-56 (granting the Attorney General "an order to require the production of records for inspection, reproduction and copying"); *Lynd*, 306 F.2d at 231 (same).

## IV.    THE UNITED STATES IS COMPLYING WITH APPLICABLE FEDERAL PRIVACY LAWS

Movants make a variety of arguments and references throughout their Memoranda that privacy laws require dismissal of the United States' action to compel production of Maryland's federal election records. They are mistaken. The United States does not dispute that the requirements of the Privacy Act and Section 304 of the CRA apply here, and it is complying with those requirements. The Constitution does not prohibit the collection of voter information by the United States to assess compliance with HAVA and the NVRA.

Movants argue that the United States must comply with the Privacy Act, and the United States is doing that. *See* Alliance Intervenors' Mot., ECF No. 50 at 18-21; Common Cause Intervenors' Mot., ECF No. 43 at 17. Not surprisingly, however, there is no requirement in federal law requiring that the United States plead its compliance with the Privacy Act in every complaint it brings in which it may obtain records that contain personally identifiable information.[15] Rather, the Privacy Act and Section 304 of the CRA simply require that when protected information is obtained, it must be securely stored and not be subject to unauthorized dissemination or use.

---

[15] Indeed, governmental compliance with relevant laws is, absent a showing to the contrary, presumed. *See, e.g.*, *Carolina Tobacco Co. v. Bureau of Customs & Border Prot.*, 402 F.3d 1345, 1350 (Fed. Cir. 2005) ("Government officials are presumed to do their duty, and one who contends they have not done so must establish that defect by 'clear evidence.'") (quoting *United States v. Armstrong*, 517 U.S. 456, 464 (1996)).

The voter information that the United States is collecting is maintained according to the Privacy Act protections explained in the Department of Justice, Civil Rights Division's Privacy Policy, which it has published online. The full list of routine uses for this collection of information, which include investigations and enforcement actions, can be found in the Department of Justice's systems of records notices ("SORN"), most of which are identified with their citations in U.S. Dep't of Just., Privacy Act of 1974; System of Records, 82 Fed. Reg. 24147-01 (May 25, 2017), listed in a table at pages 24,148 to 24,151.

The statutes cited for routine use include the NVRA, HAVA, and the Civil Rights Act of 1960, as described in note 16 of the Department of Justice's Privacy Policy. The United States made its requests pursuant to those statutes. *See* Mot. to Compel (ECF No. 2) at Exs. (ECF No. 2-2) and Riordan Decl. (ECF No. 2-3). The records in the system of records are kept under authority of 44 U.S.C. § 3101 and in the ordinary course of fulfilling the responsibility assigned to the Civil Rights Division under the provisions of 28 C.F.R. §§ 0.50, 0.51.

Also, contrary to what Movants contend through third-party hearsay, the records the United States is seeking to compel under the CRA are not intended "to create a nationwide voter list, an unprecedented scheme not authorized by any source of law." Alliance Intervenors' Mot., ECF No. 50 at 1, 4-5; Common Cause Intervenors' Mot., ECF No. 43 at 17. Rather, the records sought from Maryland are necessary to perform an individualized assessment of the State's efforts to comply with HAVA and the NVRA.[16] Neff Decl. ¶ 5. The extent of the litigation necessary to obtain those

---

[16] When the Civil Rights Division performs this individualized assessment, the State's SVRL is compartmentalized and maintained by the Civil Rights Division separately from the SVRL of any other State. The maintenance, use, and destruction of those records is in full compliance with the requirements in the CRA, Privacy Act, and all other federal laws governing the records. Neff Decl. ¶ 6.

records, in this case and in others, reflects a coordinated effort to impede federal enforcement of those statutes in every state.[17]

Similarly, to the extent that Movants are concerned about the transport of such data to the United States, the Department of Justice uses a secure file-sharing system, Justice Enterprise File Sharing ("JEFS"). That system implements strict access controls to ensure that each user can only access their own files and is also covered by SORNs.[18]

Moreover, the Privacy Act does not bar the disclosure of Maryland's SVRL to the United States, as the Alliance Intervenors contends. Alliance Intervenor's Mot., ECF No. 50 at 18-21. The Privacy Act regulates federal agencies' collection, maintenance, and disclosure of information within their own systems of records—it does not restrict the ability of state actors to share information with federal agencies. The statute's plain language confirms that it applies only to federal "agencies" as defined in 5 U.S.C. § 552a(a)(1), meaning "any executive department, military department, Government corporation, Government controlled corporation, or other establishment in the executive branch of the Government." State and local entities fall outside that

---

[17] Movants claim that JUSTICE/CRT – 001 SORN does not give fair notice of the collection. Alliance Intervenors' Mot., ECF No. 50, at 19-20. That is not accurate. States have frequently been the subject of voting investigations and enforcement as JUSTICE/CRT – 001 SORN advises. The United States has been involved in statewide redistricting cases where it has used statewide voter registration lists (https://www.justice.gov/crt/cases-raising-claims-under-section-2-voting-rights-act-0#tx2021). The Brief of Former DOJ Employees, ECF No. 48 at 13-14, explains the uses of Title III in Georgia in the vote denial context and in Alabama in the NVRA context. This is the first Administration to request the SVRL from states nationwide (except North Dakota) to enforce HAVA's driver's license and SSN4 requirement pursuant to 52 U.S.C. § 21083(a)(5)(A). Neff Decl. ¶ 7. Nationwide HAVA enforcement, however, does not equate to a violation of the Privacy Act.

[18] *See* JUSTICE/DOJ-014, Department of Justice Employee Directory Systems, last published in full at 74 Fed. Reg. 57194 (Nov. 4, 2009), and modified at 82 Fed. Reg. 24151, 24153 (May 25, 2017); JUSTICE/DOJ-002, Department of Justice Computer Systems Activity and Access Records, last published in full at 64 Fed. Reg. 73585-02 (Dec. 30, 1999), and modified at 66 Fed. Reg. 8425-02 (Jan. 31, 2001) and 82 Fed. Reg. 24147-01 (May 25, 2017).

definition.

The Privacy Act "erects certain safeguards for an individual against an invasion of personal privacy," Pub. L. No. 93–579, § 2(b), 88 Stat. 1896 (1974), only within the scope of federal agency record systems. There is no basis for Maryland to fail to disclose information to a federal agency for law enforcement purposes, particularly here, where the United States is complying with the provisions of the Privacy Act, which includes proper notice for all citizens.

## V.  CONCLUSION

For the foregoing reasons, the United States respectfully requests that the Court grant its motion to compel production of federal election records under Section 305 of the CRA, and to deny the Motions to Dismiss by Administrator DeMarinis (ECF No. 34), Common Cause Intervenors (ECF No. 43) and Alliance Intervenors (ECF No. 50).

Dated: February 13, 2026          Respectfully submitted,


HARMEET DHILLON
Assistant Attorney General
Civil Rights Division

ROBERT J. KEENAN
Acting Deputy Assistant Attorney General
Civil Rights Division

ERIC V. NEFF
Acting Chief, Voting Section
Civil Rights Division


*/s/ Megan Frederick*
_____

MEGAN FREDERICK
BRITTANY BENNETT
Trial Attorneys, Voting Section
U.S. Department of Justice
4 Constitution Square
150 M Street NE, Room 8.141
Washington, D.C. 20002
Telephone: (202) 704-5430
Email:  Brittany.Bennett@usdoj.gov
Email:  Megan.Frederick@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on February 13, 2026 a true and correct copy of the foregoing document was served via the Court's ECF system to all counsel of record.


/s/ *Megan Frederick*

MEGAN FREDERICK
BRITTANY BENNETT
Trial Attorneys, Voting Section
Civil Rights Division
U.S. Department of Justice