## IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| *Plaintiff,* | |
| *v.* | |
| | Case No. 1:25-cv-03934-SAG |
| JARED DEMARINIS, *in his official capacity as the State Administrator of Elections for the State of Maryland,* | |
| *Defendant.* | |

## REPLY IN SUPPORT OF THE MARYLAND/DC ALLIANCE FOR RETIRED AMERICANS' MOTION TO DISMISS

## INTRODUCTION

The U.S. Department of Justice's ("DOJ") opposition to all Defendants' motions to dismiss[1] merely confirms that the complaint fails to state a claim under Title III of the Civil Rights Act of 1960. *See* Mem. of the U.S. in Opp. to Mots. to Dismiss ("Opp."), ECF No. 56.

Title III requires an explicit "statement of the basis and the purpose" of all records request, 52 U.S.C. § 20703, yet DOJ has failed to provide *any* basis for its demand, and its alleged purpose—to "ascertain Maryland's compliance with the list maintenance requirements of the NVRA and HAVA," Compl. ¶ 25, ECF No. 1—is beyond the scope of Title III. Accepting DOJ's claims here would grant the federal government unprecedented power to invade a traditional domain of the states on nothing more than a whim, and to employ the federal judiciary to do so. This is not what Congress authorized.

The plain text of Title III settles this matter, but there are several other reasons why this suit must be dismissed. For one, Maryland's own privacy laws prevent disclosure, and none of the federal laws that DOJ invokes preempt them. For another, the federal Privacy Act prohibits unfettered governmental acquisition of sensitive personal information and requires agencies to implement procedural safeguards before doing so. Because DOJ has not complied with these requirements, it is barred from collecting the sensitive voter data that it seeks.

In an attempt to sidestep the fatal defects in its complaint, DOJ insists that Rule 12(b) does not even apply. But the Federal Rules of Civil Procedure are clear that they "govern the procedure in *all* civil actions," Fed. R. Civ. P. 1 (emphasis added), including this one, absent an express

---

[1] Motions to dismiss have been filed by both sets of Intervenor-Defendants—the Maryland/DC Alliance for Retired Americans, ECF No. 50 ("Alliance Mot."), and Common Cause, Out for Justice, Inc, and three individuals, ECF No. 43—and by Defendant State Administrator Jared DeMarinis, ECF No. 34.

1

exemption. And nothing in the text of Title III allows DOJ to ignore the Federal Rules. Rule 12(b) motions serve an important gatekeeping function "for weeding out meritless claims," *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 425 (2014), and because DOJ's complaint does not state a claim for relief, the Court should grant those motions, just as two federal district courts in California and Oregon did this past month when dismissing DOJ's parallel lawsuits in those states. *See United States v. Weber*, No. 2:25-cv-09149, 2026 WL 118807 (C.D. Cal. Jan. 15, 2026); *United States v. Oregon*, No. 6:25-cv-01666, 2026 WL 318402 (D. Or. Feb. 5, 2026).

## ARGUMENT

## I.    Rule 12(b) motions are appropriate vehicles to test the sufficiency of the complaint.

DOJ leads by arguing that a motion to dismiss is procedurally improper in a Title III proceeding. *See* Opp. at 6–10. In support, DOJ relies on *Kennedy v. Lynd*, 306 F.2d 222 (5th Cir. 1962), and a handful of other out-of-circuit cases from the 1960s.[2] But as the Alliance has explained, and two federal courts have now found in rejecting this exact argument from DOJ, those cases are irreconcilable with the Supreme Court's subsequent decision in *United States v. Powell*, 379 U.S. 48 (1964). *See* Alliance Mot. to Compel Opp. at 6–7 ("Alliance MTC Opp."), ECF No. 51; *see also Oregon*, 2026 WL 318402, at *8; *Weber*, 2026 WL 118807, at *8 & n.15.[3]

---

[2] DOJ also includes a stray citation to Rule 81, which identifies certain types of proceedings for which the Federal Rules do not apply. But as the Alliance explained, Rule 81 does not apply to Title III, *see* Alliance MTC Opp. at 4–5, and DOJ does not contend otherwise, *see* Opp. at 7 (noting Rule 81 discusses "*other* federal claims" to which the Federal Rules do not apply (emphasis added)).

[3] DOJ spends four pages arguing that *Weber*'s analysis is nonbinding because DOJ filed its complaint in the wrong California district. *See* Opp. at 13–16. Of course, district court decisions are never binding on other courts. The Alliance cites *Weber*, *Oregon*, and other opinions because their analysis is persuasive. *Cf. United States v. Johnson*, 680 F. App'x 194, 199 n.3 (4th Cir. 2017) ("Though unpublished and non-precedential, we find the reasoning of the cases cited from our sister circuits persuasive.").

The relevant text of the Internal Revenue Code ("IRC") construed in *Powell* was *identical* to the language in Title III—both provide that district courts "shall have jurisdiction by appropriate process to compel" the production of the records the government seeks. 26 U.S.C. § 7604(a); 52 U.S.C. § 20705. *Powell* held that because 26 U.S.C. § 7604(a) "contain[ed] no provision specifying the procedure to be followed in invoking the court's jurisdiction, *the Federal Rules of Civil Procedure apply*." 379 U.S. at 58 n.18 (emphasis added). The same must be true of Title III's identical text, which also does not contain any mention of a specific process that necessitates disturbing the default application of the regular rules for civil litigation. As the federal courts in California and Oregon confirmed, *Powell*'s application of the Federal Rules is instructive and a Rule 12(b)(6) motion is procedurally proper. *See Weber*, 2026 WL 118807, at *8 (holding DOJ's parallel lawsuit was governed by the Federal Rules before proceeding to evaluate and grant motions to dismiss); *Oregon*, 2026 WL 318402, at *7–8 (same).[4]

In response, DOJ seeks to distinguish *Powell* by positing that the IRC included language that permitted judicial inquiry into the purpose of the government's request for records—namely, the IRC's statement that "[n]o taxpayer shall be subjected to unnecessary examination or investigations," 26 U.S.C. § 7605(b). But the Supreme Court did not rely on section 7605(b) to justify its application of the Federal Rules. Instead, in addition to observing that the IRC did not specify the procedure to be followed in invoking the court's jurisdiction, 379 U.S. at 58 n.18, *Powell* explained that a court may inquire into the underlying reasons for a records examination

---

[4] DOJ cites to the recent decision in its parallel Michigan case, but that decision is in accord on this point. After briefly surveying Sixth Circuit law on administrative subpoenas, the court emphasized that DOJ's complaint "takes the form of a traditional civil complaint, not a petition for summary enforcement." *United States v. Benson*, No. 1:25-CV-1148, 2026 WL 362789, at *7 (W.D. Mich. Feb. 10, 2026). Accordingly, the court "appl[ied] the Rule 12(b)(6) standard to evaluate"—and dismiss—"the United States' CRA claim." *Id.*

when the government seeks judicial enforcement. *Id.* at 58. Because the government has invoked the court's process to compel compliance, a court may examine the request to ensure its own process is not being abused by enforcing a request issued for an improper purpose. *Id.* Thus, DOJ's representation that *Powell* relied on section 7605(b) to apply the Federal Rules is simply wrong.

## II.    DOJ did not state any "basis" or a proper "purpose" for its Title III demand.

Before a government agency may validly demand information pursuant to an authorizing statute, it first "must comply with statutory requirements." *CFPB v. Source for Pub. Data, L.P.*, 903 F.3d 456, 460 (5th Cir. 2018). For Title III, that means DOJ must issue a written demand for covered records that "contain[s] a statement of the basis and the purpose therefor." 52 U.S.C. § 20703. Under basic principles of statutory interpretation, and as recently confirmed by two federal courts, that provision means "DOJ is required to offer a written statement of *both* the purpose and basis for its demands." *Weber*, 2026 WL 118807, at *8; *Oregon*, 2026 WL 318402, at *9. This requirement is "not merely perfunctory—it is a critical safeguard." *Weber*, 2026 WL 118807, at *9. As the Alliance explained in its motion, DOJ fails to provide *any* basis for its demand, and its stated purpose is not proper. *See* Alliance Mot. at 8–14. DOJ fails to rebut these showings, either one of which is sufficient to dismiss the complaint.

### A.    DOJ failed to provide *any* "basis" for its demand.

There is no way to read DOJ's August 18 letter to contain any statement of the "basis" for its demand for Maryland's unredacted voter registration list. The letter states: "The purpose of the request is to ascertain Maryland's compliance with the list maintenance requirements of the NVRA and HAVA." ECF No. 2-2 at 17 (emphasis added). But a "*purpose*" for DOJ's request is not the same as the "*basis*" for the request. Those are different words, with different meanings. *Compare Basis*, *Black's Law Dictionary* (4th rev. ed. 1968) (including definitions such as the "groundwork,"

"support," or "foundation" of something), *with Purpose*, *Black's Law Dictionary* (4th rev. ed. 1968) (defining "purpose" to include "an end, intention, or aim, object, plan, project").

In stating that it would use Maryland's voter list to evaluate the State's compliance with list maintenance obligations, DOJ has indicated what it purportedly intends to *do* with the voter list, *i.e.*, its "purpose" in requesting it. But in no way can DOJ be said to have explained its *basis* for requesting the list, *i.e.*, why DOJ is *justified* in demanding that Maryland produce sensitive information. *See Oregon*, 2026 WL 318402, at *9 ("Reading 'basis in the way [DOJ] suggests collapses its meaning with that of 'purpose.' Title III explicitly requires a statement of 'the basis *and* the purpose.'" (citation omitted)). DOJ has previously understood how to comply with this requirement: in *Lynd*, for example, DOJ explained that its basis for demanding records under Title III was that it had "information . . . tending to show" that racial discrimination in voter registration had occurred in the target jurisdiction. 306 F.2d at 229 n.6. DOJ's letters to Administrator DeMarinis say nothing remotely analogous. While the July 14 letter reports figures related to Maryland's alleged voter list maintenance efforts and asks questions about those efforts, it does not supply any reason to believe that Maryland is abridging any of its citizens' voting rights or violating any federal laws. In short, DOJ's demand letter does not contain a "basis" for its request—it simply is not there. *See Weber*, 2026 WL 118807, at *9 ("DOJ may have stated a purpose for its request, . . . however, in no circumstances has the DOJ established the basis for its request." (citation modified)); *Oregon*, 2026 WL 318402, at *8–9.

In response, DOJ essentially asks the Court to read the "basis" requirement out of the statute. To that end, DOJ quotes a decades-old opinion from the Fifth Circuit for the proposition that "a sufficient statement would be the assertion that the demand was made for the purpose of investigating *possible violations* of a Federal statute." Opp. at 18 (emphasis added) (quoting

*Coleman v. Kennedy*, 313 F.2d 867, 868 (5th Cir. 1963)). But that statement, by its terms, speaks only about how DOJ may satisfy the *purpose* requirement—it says nothing about how DOJ would satisfy Title III's separate *basis* requirement. Besides, the Fifth Circuit was merely quoting a single legislator's discussion of Title III, and the actual text of Title III is plain: it requires a statement of "basis *and . . .* purpose." 52 U.S.C. § 20703 (emphasis added). To hold that stating a "purpose" was sufficient to satisfy Title III's requirement to state a "basis *and . . .* purpose," *id.* (emphasis added), would be an impermissible reading of the statute, since the term "basis" would be rendered "meaningless, redundant, [and] superfluous." *United States v. Bunner*, 134 F.3d 1000, 1006 n.5 (10th Cir. 1998).

DOJ next argues that it can satisfy the "basis" requirement merely by *referencing* a statute, rather than stating a reason to believe that Maryland might be *violating* a statute. Opp. at 18 ("A reference to the statutory basis for making the demand, namely the CRA, suffices."). But such a rule would drain Title III's "basis" requirement of any practical meaning, making it an unacceptable construction of the statute. *See Pac. Coast Fed'n of Fishermen's Ass'ns v. Nickels*, 150 F.4th 1260, 1273 (9th Cir. 2025) (courts "cannot adopt a statutory reading [that] will sap the interpreted provision of all practical significance"), *cert. pending sub nom. Cal. Sportfishing Prot. All. v. Nickels*, No. 25-989 (U.S. Feb. 17, 2026).

DOJ's proposed interpretation of the statute should also be rejected because it requires a tortured reading of the term "basis," contrary to its standard usage. *See, e.g.*, *Leocal v. Ashcroft*, 543 U.S. 1, 9 (2004) ("When interpreting a statute, we must give words their 'ordinary or natural' meaning." (citation omitted)). Consider the following analogy. A police officer watches two cars drive by. The first drives within the lines, under the speed limit, and appears to be acting entirely safely. The second car is speeding, periodically drifts into other lanes before sharply returning, and

it nearly hits several other cars. State law makes it illegal to drive under the influence. Although the obligation to avoid drunk driving applies equally to both drivers, plainly the police officer would have a "basis" under that law to pull over *only* the second driver. That is because the police officer can articulate facts that gave reason to suspect that the second driver might be intoxicated. In contrast, no reasonable observer would say that the officer had any "basis" to demand that the first (entirely safe) driver pull over and take a breathalyzer test. Yet that is how DOJ proposes to interpret the word "basis" in Title III: it contends that the mere *existence* of a legal obligation (federal list maintenance requirements) gives DOJ a "basis" to demand Maryland's voter list, even though DOJ has not articulated any reason to believe that the State might not be complying with those requirements. The Court should reject that implausible understanding of Title III's use of the term "basis." *See Oregon*, 2026 WL 318402 at *8–9; *Weber*, 2026 WL 118807, at *9.

Finally, DOJ retreats to its maximalist position that any statement of its basis is wholly immune from judicial scrutiny. Opp. at 18–19. As the Alliance has explained, that startling contention is plainly wrong. *See* Alliance MTC Opp. at 4–8. But it is worth repeating that two federal courts have rejected this precise argument within the last month, *Weber*, 2026 WL 118807, at *8; *Oregon*, 2026 WL 318402, at *7–8, and the Supreme Court held just the opposite when construing identical language as that contained in Title III, *see Powell*, 379 U.S. at 58 & n.18.

### B.    DOJ failed to state a proper "purpose" for its demand.

In its motion to dismiss, the Alliance explained that Congress's purpose in enacting Title III was to protect federal voting rights, and that Title III has nothing to do with investigating administrative voter registration list requirements, which were enacted decades later in the NVRA and HAVA. *See* Alliance Mot. at 6, 10–11 (discussing context in which Title III was enacted, its early enforcement history, and contemporaneous precedent discussing the statute's purpose). The Alliance further explained that courts will not enforce a document demand when made for a

purpose that is far removed from that of the authorizing statute. *See, e.g.*, *In re Subpoena No. 25-1431-014*, No. MC 25-39, 2025 WL 3252648, at *12, 17 (E.D. Pa. Nov. 21, 2025); *In re Admin. Subpoena No. 25-1431-019*, 800 F. Supp. 3d 229, 236–39 (D. Mass. 2025). DOJ does not rebut these points. Accordingly, the fact that DOJ's stated reason for demanding Maryland's voter list is disconnected from Title III's purpose is an independent ground upon which the Court can dismiss DOJ's complaint, as two federal courts have already done. *See Oregon*, 2026 WL 318402, at *10 (concluding DOJ failed to state a Title III claim because its stated purpose "lacked any reference or relation to the purposes for which Title III was enacted"); *Weber*, 2026 WL 118807, at *9 (holding that NVRA and HAVA compliance could not be a sufficient purpose for Title III demand).

### III.    DOJ failed to demonstrate that it is entitled to unredacted records.

Even if DOJ's request did not fall outside of Title III (and for the reasons discussed, it plainly does), DOJ still would not be entitled to the records it seeks because Title III reaches only public documents, not "confidential, private" information. *Lynd*, 306 F.2d at 231. Maryland's state law protects sensitive voter data, and nothing in Title III can be read to preempt those laws. Nor would it make any sense to conclude that Title III preempts state privacy laws to allow DOJ to evaluate a State's compliance with the NVRA and HAVA, when the NVRA and HAVA express congressional intent *not* to preempt those same laws. *See* Alliance Mot. at 16–18. DOJ does not grapple directly with these points, and nothing in its response provides any reason to conclude that Title III preempts state laws prohibiting the disclosure of highly sensitive personal information.[5]

---

[5] The Alliance also explained in its motion that the presumption against preemption applies to Maryland privacy laws, notwithstanding the fact that Title III concerns the production of voter registration records. Alliance Mot. at 15. In the background section of its brief, DOJ suggests that Title III was passed pursuant to the Elections Clause, *see* Opp. at 3–4, in an attempt to show that the presumption against preemption does not apply here. But contemporary caselaw recognizes

For instance, DOJ contends that because Title III allows for "inspection, reproduction, and copying" of covered records, 52 U.S.C. § 20703, the statute must be read to reach *unredacted* covered records, including highly sensitive information contained with them. *See* Opp. at 23. But in like manner, the NVRA requires states to "make available" covered records "for public inspection" and "photocopying," 52 U.S.C. § 20507(i)(1), and yet courts have uniformly held that the NVRA does not prohibit states from withholding sensitive voter information before the records may be inspected or photocopied. *See* Alliance Mot. at 16.

DOJ next argues that Title III must be read to reach sensitive information contained within voter files because otherwise Section 304 of the Civil Rights Act—which limits the instances in which DOJ may "disclose" records it receives pursuant to a Title III demand—would have no purpose. Opp. at 24; *see* 52 U.S.C. § 20704. But DOJ forgets its history. Some of the most sensitive information protected by Maryland laws (*e.g.*, social security numbers) were not required to be included in state registration records until HAVA was enacted decades after Title III. Clearly, then, Congress did not contemplate in 1960 that state voter records would contain such sensitive information. Moreover, *Lynd* observed in 1962 that Title III was intended to reach only "public records which ought ordinarily to be open to legitimate reasonable inspection," and that it did *not* reach "confidential, private papers and effects." 306 F.2d at 231. The fact that Congress nonetheless chose to limit further dissemination of records obtained through Title III says nothing

---

that Title III was enacted pursuant to the Fifteenth Amendment. *See Alabama ex rel. Gallion v. Rogers*, 187 F. Supp. 848, 853-54 (M.D. Ala. 1960), *aff'd sub nom. Dinkens v. Att'y Gen. of U.S.*, 285 F.2d 430 (5th Cir. 1961) (per curiam); *see also In re Wallace*, 170 F. Supp. 63, 66 (M.D. Ala. 1959). That understanding is more appropriate because Title III is a document preservation and production law; it does not make or alter state election regulations, nor does it implicate voting requirements. Accordingly, the presumption against preemption applies here. But even if it did not, Title III still would not conflict with Maryland privacy protections for the reasons stated herein.

about whether the law preempts state laws protecting highly sensitive information. Indeed, it is not unusual for Congress to place restrictions on the *government's* ability to disclose information even when the same data could be held and shared freely by private parties. The Privacy Act, for example, does just that. *See* 5 U.S.C. § 552a *et seq.*

DOJ then turns to policy arguments, complaining it would "eviscerate" Title III to hold that it did not reach sensitive voter information, and that DOJ would not be able to "meaningfully investigate" a state's list maintenance efforts under HAVA and the NVRA without "access to the voter identification numbers." Opp. at 25. But there is nothing to "eviscerate"—there is no indication whatsoever that Congress ever meant for DOJ to be able to "investigate" a state's compliance with HAVA or the NVRA using Title III—indeed, both HAVA and the NVRA were passed long after the Civil Rights Act. Again, HAVA and the NVRA indicate that Congress did *not* intend for DOJ to access (or to even need) this type of private information. Alliance Mot. at 16–18. Nor would the unredacted voter file meaningfully assist DOJ in evaluating whether Maryland has complied with the NVRA and HAVA, since the list by itself cannot tell anything about Maryland's list maintenance *procedures* and the data within it would become outdated almost immediately.

Nor is there any merit to DOJ's contention that it should be handed the sensitive information it seeks because "private parties have been granted access to even more detailed voter data than what the United States has requested." Opp. at 26. To the contrary, in the case that DOJ cites, the court *excluded* social security numbers and other confidential information, and entered a protective order strictly limiting who can view the limited information that was produced, how they can view it, and for what purposes. *See* Protective Order & Schedule A, *Coal. for Open Democracy v. Formella*, No. 1:24-CV-00312-SE-TSM (D.N.H. June 18, 2025), ECF Nos. 87 &

87-1.[6] Similarly, that the government has previously obtained statewide voter registration lists does nothing for DOJ's legal arguments here. As DOJ concedes, the two examples it points to— in Georgia and Texas—were resolved via a consent decree and a memorandum of understanding, and thus the questions raised here were not contested in those litigations. Opp. at 22 & n.10; *see Oregon*, 2026 WL 318402 at *10 n.3.

## IV.    DOJ's collection of Maryland's voter list would violate the Privacy Act.

DOJ's memorandum demonstrates a fundamental misunderstanding of how the Privacy Act operates. For example, DOJ contends that the Privacy Act applies only to federal agencies' internal management of "their own systems of records," and thus has no applicability to DOJ collecting data from sources outside the government. Opp. at 29. That is wrong. Many of the Privacy Act's protections are triggered whenever an agency "collects" or "maintains" any "system of records"—and the statute makes no distinctions based on the *source* of the records. Alliance Mot. at 18–21; *see* 5 U.S.C. § 552a(a)(3)–(4), (e). DOJ does not dispute that Maryland's voter registration list is a "system of records," and therefore by attempting to "collect" the list from Maryland and to "maintain" it on government servers, the Privacy Act is implicated.

DOJ also is wrong to say that the Privacy Act "simply require[s]" that protected information "be securely stored and not be subject to unauthorized dissemination or use." Opp. at 27. In fact, the statute requires much more, including that the government give the public notice and publish detailed disclosures whenever an agency "establish[es] or revise[es]" a system of records. 5 U.S.C. § 552a(e)(4), (11). Namely, the agency must publish a Systems of Record Notice

---

[6] DOJ has been informed about these restrictions in several other cases, including in briefs filed nearly three months before DOJ filed its brief here, *see, e.g.*, Reply Br. Supp. Mot. Intervene, *United States v. Weber*, No. 2:25-cv-09149 (C.D. Cal. Nov. 3, 2025), ECF No. 31; Reply Br. Supp. Mot. Intervene, *United States v. Scanlan*, No. 1:25-cv-371 (D.N.H. Dec. 16, 2025), ECF No. 22, but DOJ persists in repeating this false claim.

("SORN") that discloses the name and location of the system, the categories of records maintained in it, and all "routine uses" to which the system can be put, among other things. *Id.* § 552a(e)(4). The agency must also "provide an opportunity for interested persons to submit written data, views, or arguments to the agency." *Id.* § 552a(e)(11).

In any event, DOJ "does not dispute that the requirements of the Privacy Act . . . apply here." Opp. at 27. That means DOJ cannot collect or maintain Maryland's voter list unless there is a SORN that covers that system of records. 5 U.S.C. § 552a(e)(4). Although DOJ cites Federal Register notices containing SORNs in an attempt to show compliance with that requirement, *see* Opp. at 28, the Alliance explained that none of the cited SORNs could be read to cover DOJ's unprecedented attempt to maintain a statewide voter list, *see* Alliance Mot. at 20. DOJ does not identify any other SORN that could conceivably cover this system of records. *See Weber*, 2026 WL 118807, at *18 ("[N]one of the SORN[s] identified give sufficient notice to the American public as required under the Privacy Act."). Consequently, until DOJ complies with the Privacy Act's procedural requirements by publishing an appropriate SORN and allowing for public comment, the Privacy Act bars it from collecting and maintaining Maryland's voter list. *Id.* ("Because the DOJ has not fulfilled its requirements under the Privacy Act, it cannot collect the sensitive, unredacted voting records of millions of Californians.").

## CONCLUSION

For all of the foregoing reasons, and for the reasons stated in the Alliance's motion, the Court should dismiss the complaint with prejudice under Rule 12(b)(6).

Respectfully submitted,                    Dated: February 27, 2026

                                          /s/ Uzoma N. Nkwonta
                                          Uzoma N. Nkwonta*
                                          Jacob D. Shelly (D. Md. Bar No. 30972)
                                          Tina Meng Morrison (D. Md. Bar No. 21832)
                                          Marcos Mocine-McQueen*
                                          **ELIAS LAW GROUP LLP**
                                          250 Massachusetts Ave NW Suite 400
                                          Washington, D.C. 20001
                                          Telephone: (202) 968-4490
                                          unkwonta@elias.law
                                          jshelly@elias.law
                                          tmengmorrison@elias.law
                                          mmcqueen@elias.law

                                          * Admitted *pro hac vice*

                                          *Counsel for Intervenor-Defendant the*
                                          *Maryland/DC Alliance for Retired Americans*