IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| THE UNITED STATES OF AMERICA, | * |
| *Plaintiff*, | * |
| v. | * |
| | No. 1:25-cv-03934-SAG |
| JARED DEMARINIS, in his official capacity as State Administrator of elections for the State of Maryland, | * |
| *Defendant*. | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

**REPLY TO THE UNITED STATES' OPPOSITION TO THE MOTIONS TO DIMISS**

The United States opposes the motions to dismiss on two grounds. In its view, procedurally, this Court cannot dismiss the complaint because dismissal is not available in the "severely limited" judicial proceeding initiated by its complaint. (*See* ECF 56 at 2, 18-19). This proceeding is, instead, a pro forma exercise to have a district court endorse the Attorney General's "simple statement" that a written demand for election records was refused by an officer of election. (*See* ECF 56 at 2.) The United States also argues, substantively, that its written demand for election records was sufficient. According to its interpretation of 52 U.S.C. § 20703, the Attorney General provided a sufficient "statement of the basis and purpose" for her demand by providing that it was "made for the purpose of investigating possible violations of a Federal statute." (ECF 56 at 10.)

In mounting this opposition, the United States misinterprets the Attorney General's statutory authority. The nationwide conduct of the Department of Justice is not insulated

from judicial review by the term "appropriate process." 52 U.S.C. § 20705.  Its authority to demand the production of records and papers from a past election does not grant it unfettered access to every state's computerized voter registration database.  And it does not possess unrestricted power to rummage through state records in search of a federal statutory violation.  This Court should reject the United States' interpretation of Title III and dismiss the complaint for its failure to state a claim upon which relief may be granted.

## ARGUMENT

Since the motions to dismiss were filed in this case on January 30, 2026, two more district courts have issued written opinions dismissing lawsuits like this one, where the United States filed a civil action against a state for refusing to provide an unredacted voter registration database under Title III of the Civil Rights Act of 1960 ("Title III").  *See United States v. Benson*, ___ F. Supp. 3d ___, ___, No. 1:25-CV-01148, Dkt. No. 67, 2026 WL 362789, *11 (W.D. Mich. Feb. 10, 2026); *see also United States v. Oregon*, No. 6:25-CV-01666, Dkt. No. 73, 2026 WL 318402, *7-*12 (D. Or. Feb. 5, 2026).[1]  The Court in *Benson* ruled that Title III did not apply to a computerized voter registration database maintained by a state and thus could not require its retention and disclosure.  ___ F. Supp. 3d at ___, 2026 WL 362789 at *10.  The Court in *Oregon* ruled that the Attorney General provided

---

[1] Since that time, the United States has also initiated identical litigation against five more states (West Virginia, Oklahoma, Utah, Kentucky, and New Jersey).  U.S. Dep't of Justice, Office of Pub. Affairs, *Press Release: Justice Department Sues Five Additional States for Failure to Produce Voter Rolls* accessible at https://tinyurl.com/ykhhpwn7 (Feb. 26, 2026).  "This brings the Justice Department's nationwide total to 29 states and the District of Columbia."  *Id.*

no basis, and an insufficient purpose, in her demand for election records. 2026 WL 318402 at *9-*10. As of the date of this filing no court has denied a motion to dismiss, and no court has granted the United States' novel motion to compel.[2]

Both recent rulings relied on records and arguments indistinguishable from those presented in this case. Administrator DeMarinis therefore brings both rulings to the Court's attention in support of his motion to dismiss. And in response to the opposition filed by the United States in this case, Administrator DeMarinis replies as follows.

I.   **THE UNITED STATES' COMPLAINT CAN (AND SHOULD) BE DISMISSED.**

According to the United States, this Court cannot entertain the motions to dismiss because Title III "restricts" this Court to a "severely limited" proceeding. (ECF 56 at 2.) With the Federal Rules of Civil Procedure inapplicable, this Court can do nothing more than determine, on the face of a "simple statement" provided by the Attorney General, whether a written demand was made to an appropriate officer of election. (ECF 56 at 2, 7.) Title III establishes this unique proceeding by omission, i.e., by not expressly providing "any process for officers of election to object to Title III proceedings." (ECF 56 at 9.) The United States incorrectly arrives at this interpretation by making two mistakes.

First, Congress does not create summary proceedings by omission. To the contrary, "there must be a 'clear expression of congressional intent to exempt actions . . . from the operation of the Federal Rules of Civil Procedure.'" *Federal Energy Reg. Comm'n v.*

---

[2] Should this Court deny the defendants' pending motions to dismiss, it should concurrently deny the United States' motion to compel and permit brief discovery on the Attorney General's stated basis and purpose.

*Powhatan Energy Fund, LLC*, 286 F. Supp. 3d 751, 761 (E.D. Va. 2017) (quoting *California v. Yamasaki*, 442 U.S. 682, 700 (1979) (alteration in original)).  In the absence of a statute providing otherwise, the Rules "apply to proceedings to compel . . . the production of documents through a subpoena issued by a United States officer or agency under a federal statute."  Fed. R. Civ. Proc. 81(a)(5).  And while proceedings to enforce a subpoena may be streamlined by a court order, *id*., streamlined proceedings must "protect the rights of the defendant and provide an adversary hearing."  *United States v. McCoy*, 954 F.2d 1000, 1004 (5th Cir. 1992).

Second, Title III empowers this Court to compel the production of election records "by appropriate process." 52 U.S.C. § 20705.  The United States in its opposition does not address this language or how it provides for a "severely limited" proceeding.[3]  Nor, for that matter, does the Fifth Circuit in *Kennedy v. Lynd* reason how or why "appropriate process" collapses down to a review of "whether the written demand has been made." 306 F. 2d 222, 226 (5th Cir. 1962).  The Court in *Lynd* anchors its interpretation of the statutory phrase in the declaration that the Attorney General's "function" under Title III is "purely investigative." *Id*. at 225 (quotation omitted).  But in the intervening 64 years since the decision in *Lynd*, Administrator DeMarinis has not found (nor has the United States provided) a single other instance of a Court similarly reducing its judicial review to the point specified in *Lynd*.

---

[3] This statutory phrase does not appear in the United States' opposition.

4

Just the opposite, the executive branch is empowered to issue a multitude of investigative demands for information. *See* U.S. Dep't of Justice, *Report to Congress on the Use of Administrative Subpoena Authorities by Executive Branch Agencies & Entities*, Appendices A–C, accessible at https://tinyurl.com/sps67z7d (last accessed Feb. 27, 2026). And there is a well-reasoned volume of case law providing how such an administrative demand may be resisted, including by challenge to its underlying purpose or scope. *See e.g. In re Children's National Hospital*, No. 1:25-CV-03780, 2026 WL 160792, *6-*8 (D. Md. Jan. 21, 2026) (granting a motion to quash the Department of Justice's investigative subpoena because it lacked a proper investigative purpose). More importantly, there is direct precedent on how "appropriate process" affords the recipient of an administrative demand a "hearing" at which the recipient may "challenge" it on "any appropriate grounds," including "the underlying reasons" for the demand. *United States v. Powell*, 379 U.S. 48, 57 (1964); *see also Equity Invest. Associates v. United States*, 40 F.4th 156, 162 (4th Cir. 2022).

According to the United States and *Lynd*, this is the only instance in American jurisprudence in which the executive branch may compel the production of materials without substantive judicial oversight or review. And it may do so because the Attorney General is working in a "purely investigative" role. (ECF 56 at 6; *Lynd*, 306 F.2d at 225.) According to the weight of jurisprudence developed over the last six decades, the Attorney General's role is not a dispositive consideration in determining her authority to administratively compel the production of records. *Children's National Hospital*, 2026 WL at *6 ("In 1950, the Supreme Court made clear that the judicial review hurdle of an

5

administrative agency is not onerous; but *neither is an agency's investigatory power boundless*") (emphasis added) (citing *United States v. Morton Salt Co.*, 338 U.S. 632, 652-53 (1950)).  An administrative demand to compel production must be constrained by the "judicial supervision of subpoenas." *In re Duces Tecum*, 228 F.3d 341, 349 (4th Cir. 2000).

Title III grants Administrator DeMarinis "appropriate process." 52 U.S.C. § 20705. It provides no alternative, summary procedure for the conduct of that process.  Therefore, within that process, and according to the Federal Rules of Civil Procedure, Administrator DeMarinis may move for the complaint to be dismissed for its failure to state a claim upon which relief may be granted.  Fed. R. Civ. Proc. 12(b)(6).  And this Court may grant that motion.

## II. THE CIVIL RIGHTS OF ACT OF 1960 DOES NOT REQUIRE STATES TO MAINTAIN COMPUTERIZED VOTER REGISTRATION DATABASES.

According to the United States, Title III applies "broadly" to cover both the voter registration materials that "come into" the possession of an officer of election *and* the centralized computer system the State maintains to administer elections.  (ECF 56 at 19-20.)  In support of this interpretation, it relies on reading *Judicial Watch v. Lamone*, 399 F. Supp. 3d 425 (D. Md. 2019), a ruling on the public disclosure provision in the National Voter Registration Act of 1993 ("NVRA"), to stand for the proposition that registration applications and a registration list are fungible equivalents.  (ECF 56 at 19-20.)  But the United States' reliance is misplaced.  "[T]he records requested by the United States do not fall under [Title III]'s disclosure provision." *United States v. Benson*, ___ F. Supp. 3d ___, ___, 2026 WL 362789, *11 (W.D. Mich. Feb. 10, 2026).

*Judicial Watch* is inapposite because it is an NVRA case interpreting the NVRA's statutory language. *See* 399 F. Supp. 3d at 436-39. It does not stand for the general proposition that voter registration applications and MDVOTERS are legal equivalents, as the United States uses it. The ruling in *Judicial Watch* conducted a four-pronged analysis to determine whether a voter registration list was a record "concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." *Id.* at 437 (quoting 52 U.S.C. § 20507(i)(1)). In that context, a compilation of voter registration applications did not differ from the individual applications making up the compilation.

Moreover, the compilation of records in *Judicial Watch* was the publicly available voter registration list compelled for disclosure by Election Law § 3-506(a). 399 F. Supp. 3d at 441-42. The United States expressly rejected Maryland's offer of that publicly available list. (ECF 34-4 at 1.) Instead, the United States sought an electronic copy of MDVOTERS, the entire voter database from which the publicly available list is generated. *Compare* Elec. Law § 3-101 (providing that the State Administrator shall maintain a statewide voter registration list for the conduct of elections in Maryland); *and* Elec. Law § 3-506 (providing that a copy of "a list of registered voters" shall be made available to the public and authorizing the State Board of Elections to determine the "information to be included on a list"). And, critically, MDVOTERS contains data from sources other than voter registration applications.[4] *See* Elec. Law § 3-504 (specifying State and federal

---

[4] The United States argues that, in asking for an electronic copy of Maryland's voter database, it is asking for no more than what Maryland voluntarily shares with the Electronic

agencies from which Maryland must gather information in order to maintain the accuracy and currency of MDVOTERS); *see also* Elec. Law § 3-101(b)(6) (requiring MDVOTERS to include "voting history information" for each voter covering the preceding five years); *Benson*, ___ F. Supp. 3d at ___, 2026 WL 362789 at *10 (differentiating a voter database from voter registration applications by the range of sources from which a database draws). *Judicial Watch* did not equate the entirety of MDVOTERS with individual voter registration applications.

Finally, *Judicial Watch* did not consider the Title III requirement that the requisite records "come into" the possession of an election official. 52 U.S.C. § 20701. *Judicial Watch* was not concerned with the Title III characterization of the records as relating to a specific election. *Id.* And *Judicial Watch* did not grapple with the conflict between HAVA's requirement to update and amend dynamic voter registration databases, 52 U.S.C. § 21083(a)(4), and Title III's criminal prohibition against altering or destroying records of elections, 52 U.S.C. § 20702. The United States' reliance on *Judicial Watch* does not

---

Registration Information Center ("ERIC") "to facilitate . . . compliance with federal list-maintenance requirements." (ECF 56 at 26.) But Maryland does not share an unredacted, electronic copy of its voter database with ERIC. When Maryland transmits voter registration data to ERIC for list maintenance purposes, it applies a "cryptographic one-way hash" to the driver's license numbers, social security numbers, and dates of birth contained in the database. Electronic Registration Information Center, *Security: Data Security in Practice* accessible at https://tinyurl.com/973e9as6 (last accessed February 27, 2026). And ERIC does not decrypt the hash; in fact, it applies a second hash to further secure those data fields. *Id.* Maryland, thus, does not send to ERIC what the United States seeks in this case: an electronic copy of MDVOTERS including "all fields." (ECF 34-4 at 1.)

address any of the plain language difficulties inherent in applying Title III to a HAVA-compelled database.

To that end, the United States itself does not address any of the plain language obstacles inherent in Title III. It purports to address the criminal prohibition by asserting that removing a voter from a database is not "destroying a record." (ECF 56 at 21-22.) But it does not explain that assertion, nor does it provide any authority in support of it. And the United States ignores the conflict between the criminal prohibition against "alter[ing]" a record, 52 U.S.C. § 20702, and the requirements to expeditiously update voter registration databases when new information is received, 52 U.S.C. § 21083(a)(4); *see also* 52 U.S.C. § 20507(f) (requiring, under the NVRA, an update to a voter registration record based on change-of-address information). The United States provides no interpretive basis for applying Title III to the computerized system HAVA requires.

Illustratively, if Congress were to repeal HAVA tomorrow states would be under no direct obligation to maintain centralized, dynamic voter databases. Nonetheless, the interpretation of Title III offered by the United States in this case would require states to maintain those centralized voter databases over 22-month cycles. Because States *built* the databases nearly five decades after Title III's passage, in the United States' view, they obligated themselves to maintain those databases under Title III. Congress intended, through the words "all records and papers which come into his possession," to obligate the ongoing retention and preservation of any future election administration system that comes into contact with a voter registration application.

The plain language of Title III does not support such a far-reaching interpretation. "[T]he existence of a statewide computerized voter list was not foreseeable to the Congress of 1960," and "a court is not a telepathic time-traveler, . . . and thus it cannot rewrite Congressional legislation to cover a situation that Congress may not have foreseen." *Benson*, ___ F. Supp. 3d ___, 2026 WL at *10 (citations omitted). Instead, this Court must "presume that Congress says in a statute what it means and means in a statute what it says." *Hall v. United States*, 44 F.4th 218, 235 (4th Cir. 2022) (citation omitted). An officer of election must retain and preserve materials relating to "any application, registration, payment of poll tax," or other article "that the voter submits or does as part of the registration process." *Benson*, ___ F. Supp. 3d ___, 2026 WL at *10 (quoting 52 U.S.C. § 20701). That does not include the computerized database required by HAVA. *Id.*

### III. CONGRESS DID NOT DEPUTIZE THE DEPARTMENT OF JUSTICE TO PERPETUALLY CONDUCT VOTER REGISTRATION LIST MAINTENANCE.

The United States disputes what was required of the written demand it sent to Administrator DeMarinis pursuant to 52 U.S.C. § 20703. According to its opposition, the "statement of the basis and purpose" for the demand did not need to relate to racial discrimination in election administration. (ECF 56 at 10.) Instead, the written statement needed only a citation to Title III as a basis (ECF 56 at 18); and to declare that it was made "for the purpose of investigating possible violations of a federal statute" (ECF 56 at 10). Importantly, according to the United States, the statement required no factual allegation that any suspected violation of law had taken place. (ECF 56 at 6.)

The United States' position does not require the Attorney General to act in response to any articulable basis. Rather, the United States conceives of the Attorney General's role under Title III as a routine election monitor. As a matter of course, the Attorney General is entitled to collect records of elections to assess them periodically for any potential violation of a federal statute. And to be clear, that is what the Attorney General has done in asking 47 states and the District of Columbia for their respective voter databases. Brennan Center for Justice, *Tracker of Justice Department Requests for Voter Information*, https://tinyurl.com/532npb34 (last accessed Feb. 27, 2026). The Attorney General is thus not confined to asking for records when she can articulate a particular basis for doing so. She is free to aggregate records in an ongoing supervisory role.

Under that view of Title III and the Attorney General's role, the only limitation on the authority to demand records are the records' relation to a federal statute. In this instance, the United States argues that the "list maintenance" required by the NVRA and HAVA is "essential to fully securing an individual's right to vote." (ECF 56 at 11). It is not—the argument that ineligible voters in a voter registration database injure the voting rights of eligible voters through invalid votes and resultant vote dilution has been soundly rejected in this Circuit. *See Maryland Election Integrity v. Maryland State Board of Elections*, 127 F.4th 534, 539 (4th Cir. 2025). But in the future, the Attorney General need only refer to a federal statute that could be violated by a state's administration of an election in order to demand production of that State's election materials.

The United States' expansive view of the Attorney General's Title III role is wrong. It is not even supported by *Lynd*, which reasoned that the Attorney General's role under

11

Title III was to "assemble all of the voter record information within the time-reach of the statute relating to all persons *as to whom there is a question* concerning *infringement or denial of their constitutional voting rights*." 306 F. 2d at 228 (emphasis added). The case upon which the United States primarily relies concedes that the Attorney General must possess an articulable basis and purpose related to the Fourteenth Amendment (and its enabling statutes) to make a valid demand. *See also South Carolina v. Katzenbach*, 383 U.S. 301, 313 (1966) (recounting that Congress enacted Title III to support the Attorney General in seeking injunctive relief against "interference with the right to vote on racial grounds").

    Moreover, the expansive view of the Attorney General's role is not supported by the plain text of the statute. If Congress had intended to authorize the Attorney General to demand records without an articulable basis, and for the violation of any federal statute, it could have accomplished that without writing the final sentence of the statute: "This demand shall contain a statement of the basis and the purpose therefor." 52 U.S.C. § 20703. A "statement of basis" must be more than a citation to the statute itself. *See* Black's Law Dictionary, *Entry (4) for "Statement"* (12th ed. 2024) ("A formal and exact presentation of facts.") And a statement of purpose cannot ignore the history and context in which Title III was enacted. *Radowich v. United States Atty., Dist. Of Md.*, 658 F. 2d 957, 961 (4th Cir. 1981) ("[T]he Court, in construing statutory language, should look to the clearly expressed intention as expressed without dissent in the legislative history.") When Congress intends to create a supervisory election monitor able to aggregate records as a matter of course, it does so by comprehensive legislation. *See* 52 U.S.C. §§ 30106–30115

(establishing the Federal Election Commission and providing for its supervisory oversight of federal campaign finance).[5]  It could not have intended to do so by conditioning the sufficiency of the Attorney General's written demand for records on the inclusion of a statement of basis and purpose.

The Attorney General's written demand was therefore insufficient as a matter of law, as the United States concedes that it contained no articulated basis.  The motions to dismiss should be granted with prejudice.

Respectfully submitted,

ANTHONY G. BROWN
Attorney General of Maryland

/s/ Daniel M. Kobrin

_____
DANIEL M. KOBRIN
Federal Bar No. 30392
Assistant Attorney General
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland  21202
dkobrin@oag.maryland.gov4794
(410) 576-6472
(410) 576-6955 (facsimile)

Attorneys for Defendant

February 27, 2026

---

[5] In this sole instance where Congress empowered a federal organization to oversee election matters generally, it is notable that it sought to instill that organization with independence from the executive branch and political parties.  *See* 52 U.S.C. § 30106(a).