# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br> v.<br><br>JARED DEMARINIS, in his Official Capacity as State Administrator of Elections for the State Maryland,<br><br>    Defendant. | Case No. 1:25-cv-03934<br>(Hon. Stephanie A. Gallagher) |

**REPLY MEMORANDUM IN SUPPORT OF MOTION TO DISMISS OF INTERVENOR-DEFENDANTS COMMON CAUSE, OUT FOR JUSTICE, INC., CARL SNOWDEN, MYRIAM PAUL, AND LUIS SIMS**

**TABLE OF CONTENTS**

INTRODUCTION.............................................................................................................1

ARGUMENT..................................................................................................................2

      I.       The United States' Request is Subject to Key Procedural Safeguards,
              Including Scrutiny Under Rule 12.....................................................................2

      II.     The United States' Request is Legally Deficient Because It Offers an
              Inadequate and Pretextual Statement of its Basis and Purpose. ...........................6

           A.     The DOJ's Statement of Its Basis and Purpose Is Inadequate...................6

           B.     The DOJ's Stated Basis and Purpose Are Pretextual. ...............................8

      III.    The United States Failed to Plead Compliance with Applicable Privacy
              Laws.................................................................................................11

CONCLUSION ............................................................................................................15

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Sara Lee Corp.*,
   508 F.3d 181 (4th Cir. 2007) ................................................................................14

*Arizona v. Inter Tribal Council of Arizona, Inc.*,
   570 U.S. 1 (2013) ................................................................................................14

*Badlands Trust Co. v. First Financial Fund, Inc.*,
   65 Fed. App'x 876 (4th Cir. 2003) ........................................................................14

*Bassiouni v. Federal Bureau of Investigation*,
   436 F.3d 712 (7th Cir. 2006) ................................................................................13

*Becker v. Internal Revenue Service*,
   34 F.3d 398 (7th Cir. 1994) ..................................................................................13

*Becker v. United States*,
   451 U.S. 1306 (1981) ..........................................................................................3, 4

*Coalition for Open Democracy v. Scanlan*,
   No. 24-CV-312-SE, 2025 WL 1503937 (D.N.H. May 27, 2025) ..........................12

*College Loan Corp. v. SLM Corp., a Delaware Corp.*,
   396 F.3d 588 (4th Cir. 2005) ................................................................................14

*Department of Commerce v. New York*,
   588 U.S. 752 (2019) ..........................................................................................9-10

*Donaldson v. United States*,
   400 U.S. 517 (1971) ..............................................................................................4

*Equal Employment Opportunity Commission v. Maryland Cup Corp.*,
   785 F.2d 471 (4th Cir. 1986) ..................................................................................4

*Fusaro v. Cogan*,
   930 F.3d 241 (4th Cir. 2019) ................................................................................13

*Garris v. Federal Bureau of Investigation*,
   937 F.3d 1284 (9th Cir. 2019) ..............................................................................13

*J. Roderick MacArthur Foundation v. Federal Bureau of Investigation*,
   102 F.3d 600 (D.C. Cir. 1996) ..............................................................................13

*Kennedy v. Lynd*,
   306 F.2d 222 (5th Cir. 1962) ..............................................................................3, 7

*National Labor Relations Board v. SW General, Inc.*,
    137 S. Ct. 929 (2017) ............................................................................................ 3

*Navy Federal Credit Union v. LTD Financial Services, LP*,
    972 F.3d 344 (4th Cir. 2020) ............................................................................... 3

*Polselli v. Interal Revenue Service*,
    598 U.S. 432 (2023) ............................................................................................... 4

*Project Vote/Voting for America, Inc. v. Long*,
    682 F.3d 331 (4th Cir. 2012) ............................................................................. 15

*United States v. Benson*,
    No. 1:25-CV-1148, 2026 WL 362789 (W.D. Mich. Feb. 10, 2026) ............. 1

*United States v. Fowler*,
    58 F.4th 142 (4th Cir. 2023) ............................................................................... 9

*United States v. Georgia*,
    No. 1:06-CV-2442 (N.D. Ga. Oct. 12, 2006) ................................................. 11

*United States v. Newport News Shipbuilding & Dry Dock Co.*,
    837 F.2d 162 (4th Cir. 1988) ............................................................................. 4

*United States v. Oregon*,
    No. 6:25-CV-01666, 2026 WL 318402 (D. Or. Feb. 5, 2026) ............... passim

*United States v. Powell*,
    379 U.S. 48 (1964) ............................................................................................ 3, 4

*United States v. Raffensperger*,
    No. 1:26-CV-485 (N.D. Ga. Feb. 5, 2026) ..................................................... 11

*United States v. Weber*,
    No. 2:25-CV-09149, 2026 WL 118807 (C.D. Cal. Jan. 15, 2026) ......... passim

**Statutes**

5 U.S.C. § 552a ........................................................................................................ 13

26 U.S.C. § 7605 ....................................................................................................... 4

52 U.S.C. § 20507 ............................................................................................. 7, 8, 14

52 U.S.C. § 20701 .................................................................................................... 14

52 U.S.C. § 20703 ............................................................................................. 1, 6, 8

52 U.S.C. § 20705 ..................................................................................................... 3

52 U.S.C. § 21083 ...................................................................................................8

52 U.S.C. § 21085 ...................................................................................................8

Pub. L. No. 93-579, 88 Stat. 1896, § 2 (1974) .............................................................12

**Other Authorities**

Kaylie Martinez-Ochoa, Eileen O'Connor, & Patrick Berry, *Tracker of Justice Department Requests for Voter Information*, Brennan Center for Justice (updated Feb. 6, 2026) .................9

Memorandum of Law in Opposition to Defendants' Motion to Dismiss, *United States v. Oregon*, No. 6:25-CV-01666, Dkt. 57 (D. Or. Dec. 8, 2025) ....................................................5

Opposition to Motions to Dismiss, *United States v. Weber*, No. 2:25-CV-09149, 2025 WL 4098510 (C.D. Cal. Nov. 26, 2025) ..............................................................................5

Press Release, United States Department of Justice, *Justice Department Sues Five Additional States for Failure to Produce Voter Rolls* (Feb. 26, 2026) .........................................9

Reid J. Epstein & Nick Corasaniti, *Trump, in an Escalation, Calls for Republicans to 'Nationalize' Elections*, N.Y. TIMES, Feb. 2, 2026 .....................................................9

**Rules**

Fed. R. Civ. P. 1 .....................................................................................................3

Fed. R. Civ. P. 81 ...............................................................................................3, 4, 5

Fed. R. Evid. 801 ...................................................................................................8

## INTRODUCTION

The United States' Complaint fails to plausibly plead that the Attorney General set forth in writing "the basis and the purpose" of her unprecedented demand for sensitive personal information of all Maryland voters. This is an elemental requirement of the statute that provides the government's sole cause of action. 52 U.S.C. § 20703. Since Intervenors filed their Motion to Dismiss, yet another federal district court recently reached this exact conclusion with respect to a materially identical complaint seeking a state's' complete voter files, dismissing the United States' materially identical lawsuit with prejudice. *See United States v. Oregon*, No. 6:25-CV-01666, 2026 WL 318402 (D. Or. Feb. 5, 2026); *see also United States v. Benson*, No. 1:25-CV-1148, 2026 WL 362789 (W.D. Mich. Feb. 10, 2026) (dismissing the United States' materially identical claims on other grounds). This Court should do the same.

In opposing Common Cause Intervenors' motion to dismiss, the United States does not identify any proper "basis" or "purpose" for its request—let alone "the basis" and "the purpose," which is what the statute requires it to disclose. In its opposition brief, *see* Dkt. 56 ("Opp."), the United States continues to superficially assert that it made its extraordinary demand for Maryland's statewide voter registration list ("SVRL") in order to enforce the Help America Vote Act ("HAVA") and the National Voter Registration Act of 1993 ("NVRA"). But the United States barely contests Common Cause Intervenors' assertion—based on extensive public reporting, documents, and admissions from the Department of Justice ("DOJ") and its top officials—that its actual purpose, which it never disclosed to the State of Maryland, is the creation of an unauthorized national voter database to be used for improper voter purges and spurious challenges to election results. *See* Dkt. 43 ("MTD") at 16–19.

The United States' opposition brief rehashes arguments already properly rejected in *Oregon* and before that in *United States v. Weber*, No. 2:25-CV-09149, 2026 WL 118807 (C.D.

1

Cal. Jan. 15, 2026). None are persuasive. In the end, its only argument is that the Civil Rights Act of 1960 ("CRA"), a statute designed to protect the rights of voters, requires states to turn over voters' sensitive personal data summarily, without any procedural protections, assessment of the United States' basis and purpose, or judicial review. *See* Opp. 6–10, 16–19. That position contravenes the CRA's statutory text, congressional purpose, binding Supreme Court precedent, the Federal Rules of Civil Procedure, and common sense.

The United States casts this Court's role as a rubber stamp, claiming Title III of the CRA entitles it to whatever it wants, whenever it wants, no matter how thin of a justification it gins up. This is not the law, particularly here, where the DOJ seeks to pervert the CRA to weaponize voters' data against them on the basis of a facially deficient pleading and a pretextual rationale. This Court should dismiss.[1]

## ARGUMENT

### I.     The United States' Request is Subject to Key Procedural Safeguards, Including Scrutiny Under Rule 12.

The United States' main argument for why its Complaint survives dismissal is its contention that core procedural protections under the Federal Rules of Civil Procedure, including motions under Rule 12, are categorically unavailable in Title III proceedings. Opp. 6–10, 16–19. The CRA says nothing of the sort, and binding precedent and the Federal Rules are to the contrary. "Title III cannot transform an election records request by the federal government from an ordinary

---

[1] Plaintiff's brief, *see* Dkt. 56, is a memorandum in opposition to Intervenors' and Defendant's motions to dismiss, and does not address Plaintiff's motion to compel, *see* Dkt. 2. This reply memorandum is thus responsive to the pending motions to dismiss only. To the extent this Court is inclined to deny the motions to dismiss, it should defer decision on Plaintiff's motion to compel to permit Defendants and Intervenors the opportunity to take limited discovery as to Plaintiff's basis and purpose for its demand for Maryland's unredacted voter file, particularly given the substantial evidence of pretext already in the record and found by multiple federal courts. *See infra*.

civil action into an action comparable to an order to show cause." *Weber*, 2026 WL 118807, at *8; *see also Oregon*, 2026 WL 318402, at *8 ("There is no current or binding authority for the proposition that Title III precludes the Court from evaluating the sufficiency of Plaintiff's allegations regarding Defendants' alleged failure to comply with Title III, including whether— applying Rule 12(b)(6) standards—a valid Title III demand was made in the first place.").

Start with the text of the Rules: Title III provides that when the Attorney General makes a demand for voting-related records or papers, the federal district court where such demand is made "shall have jurisdiction *by appropriate process* to compel the production of such record or paper." 52 U.S.C. § 20705 (emphasis added). This "appropriate process" is set forth in the Federal Rules of Civil Procedure, which "govern the procedure in *all* civil actions and proceedings in the United States district courts," Fed. R. Civ. P. 1 (emphasis added), subject to a narrow set of express exceptions which does not include Title III requests, Fed. R. Civ. P. 81. *See Navy Fed. Credit Union v. LTD Fin. Servs., LP*, 972 F.3d 344, 360–61 (4th Cir. 2020) ("[E]xpression of one item of an associated group or series excludes another left unmentioned.") (quoting *N.L.R.B. v. SW General, Inc.*, 137 S. Ct. 929, 933 (2017)) (alterations omitted). The Rules—including their processes for taking discovery and testing the sufficiency of pleadings—apply.

As Common Cause Intervenors noted in their opening brief, binding precedent is in accord. *See* MTD 24–25 (citing *United States v. Powell*, 379 U.S. 48 (1964), and *Becker v. United States*, 451 U.S. 1306 (1981)). Plaintiff relies principally on the Fifth Circuit's decision in *Kennedy v. Lynd*, 306 F.2d 222 (5th Cir. 1962), which is not binding on this court, arose out of the very specific historical context of the Jim Crow era, and was decided *before* the Supreme Court's binding decision in *Powell*. *See* MTD 23–27 (Common Cause Intervenors' opening brief setting out this analysis of the *Powell* and *Lynd* decisions in detail). As the *Oregon* court put it succinctly, "[t]he

3

Supreme Court's holding in *Powell* squarely rejects Plaintiff's contention and reliance on *Lynd*." 2026 WL 318402, at *8.

In response, Plaintiff attempts to cabin *Powell*'s holding to its specific circumstances, claiming that the analysis in *Powell* does not apply here because the Internal Revenue Code[2] "prohibited the Government from subjecting a taxpayer 'to unnecessary examination or investigations.'" Opp. 8 (quoting 26 U.S.C. § 7605(b)). Yet in *Powell*, the Supreme Court held that "the Federal Rules of Civil Procedure apply" *not* because of this "unnecessary examination or investigations" language in § 7605(b), but "[b]ecause [§] *7604(a)* contains no provision specifying the procedure to be followed in invoking the court's jurisdiction." *Powell*, 379 U.S. at 52, 58 n.18 (emphasis added). As noted in Common Cause Intervenors' opening brief, this exact same dispositive language in Section 7604(a) is included also in the CRA: "the United States district court . . . shall have jurisdiction by appropriate process." *See* MTD 25. In other words, the Supreme Court held in *Powell* that the Federal Rules of Civil Procedure apply due to statutory language identical to that in the CRA itself.

To the extent *Powell* leaves any ambiguity—which it does not—the Supreme Court further confirmed this interpretation in subsequent cases. *See Donaldson v. United States*, 400 U.S. 517, 528 (1971) ("The Civil Rules, of course, do have an application to a summons proceeding." (citing Fed. R. Civ. P. 81)), *superseded by statute on unrelated grounds as recognized by Polselli v. IRS*, 598 U.S. 432 (2023); *see also Becker v. United States*, 451 U.S. 1306, 1307-08 (1981) (Rehnquist,

---

[2] It is unclear whether Plaintiff argues that *Powell* is distinguishable as applying only to IRS subpoenas, as opposed to other administrative subpoenas. Regardless, any such argument is foreclosed by Fourth Circuit precedent, which has applied the *Powell* framework to cases involving administrative subpoenas issued by agencies other than the IRS. *See, e.g.*, *United States v. Newport News Shipbuilding & Dry Dock Co.*, 837 F.2d 162, 165–66 (4th Cir. 1988); *E.E.O.C. v. Md. Cup Corp.*, 785 F.2d 471, 475–76 (4th Cir. 1986).

J., in chambers) (same). Plaintiff ignores *Becker* entirely, even though Common Cause Intervenors included this quotation in their opening brief. MTD 25. The language quoted in both *Donaldson* and *Becker*—from what was then Federal Rule of Civil Procedure 81(a)(3)—is materially identical to the language in current Federal Rule of Civil Procedure 81(a)(5), which governs this case today. Fed. R. Civ. P. 81(a)(5) ("These rules apply to proceedings to compel . . . the production of documents through a subpoena issued by a United States officer or agency under a federal statute, except as otherwise provided by statute, by local rule, or by court order in the proceedings."). Plaintiff provides no explanation for how it squares its interpretation with these decisions and in the Federal Rules themselves.

Finally, Common Cause Intervenors note that the United States affirmatively invoked the Rules to initiate this litigation and to defend its pleadings elsewhere, and therefore it cannot now disclaim them because the results proved unfavorable. *See Oregon*, 2026 WL 318402, at *8 n.1 ("Even if *Lynd* applied here, the Court doubts its applicability here where Plaintiff made an affirmative choice to file a complaint and proceed through ordinary litigation. By contrast, *Lynd* appears to contemplate an application directly to the court for the records."). In both California and Oregon, the United States filed materially identical briefs in opposition to the States' motions to dismiss, expressly invoking Rule 12(b)(6) and articulating the familiar federal pleading standard. *See* Opposition to Motions to Dismiss, *United States v. Weber*, No. 2:25-CV-09149, 2025 WL 4098510 (C.D. Cal. Nov. 26, 2025); Mem. of Law in Opp. to Defs.' Mot. to Dismiss, *United States v. Oregon*, No. 6:25-CV-01666, Dkt. 57 (D. Or. Dec. 8, 2025). At no point did the DOJ suggest that Title III displaced the Federal Rules or exempted its complaint from ordinary dismissal standards. Only after the California court dismissed the action did the United States pivot

to the position that the Federal Rules do not apply at all. This contention finds no support in either the statutory text or in Supreme Court precedent.

Ultimately, the text of the Rules and cases interpreting the CRA and materially similar statutes point in the same direction: "Nothing in the text of Title III requires a special statutory proceeding or any abbreviated procedures." *Weber*, 2026 WL 118807, at *8.

## II.    The United States' Request is Legally Deficient Because It Offers an Inadequate and Pretextual Statement of its Basis and Purpose.

Because the Federal Rules apply in full force, *see supra*, the Complaint must plead facts sufficient to survive a motion to dismiss. It fails to do so, because it does not plausibly allege that the Attorney General set forth in writing "the basis and the purpose" supporting her unprecedented demand for sensitive voter information. 52 U.S.C. § 20703. The basis and purpose requirement is a "critical safeguard that ensures the request is legitimately related to the purpose of the statute," and prevents the statute from being used for a "fishing expedition" to obtain records. *Weber*, 2026 WL 118807, at *9; *see also Oregon*, 2026 WL 318402, at *9 ("The Court cannot read 'purpose' so broadly that it would sap the interpreted provision of all practical significance.") (internal quotation marks omitted). The DOJ's failure to abide by this core requirement is fatal to its claim.

### A.    The DOJ's Statement of Its Basis and Purpose Is Inadequate.

As Common Cause Intervenors noted in their opening brief, the United States did not assert a proper "basis" for its demand and failed to provide any connection between its purported "purpose" and the scope of its records request here. More problematic, its stated reason for demanding the data is pretextual. MTD 14–19. Notably, the United States barely contests *any* of this, devoting one short paragraph to identifying the basis and purpose that it purportedly included in its correspondence with Defendant DeMarinis, Opp. 17, and instead insisting that this Court cannot "question or examine" the United States' compliance with these statutory requirements, *id.*

at 18. Yet as noted *supra*, the Federal Rules themselves and binding Supreme Court precedent foreclose this latter argument, because the United States' request is subject to normal judicial scrutiny under Rule 12.

As to the former, the United States asserts in a conclusory manner that the basis for its request is "Section 303 of the CRA" and "[t]he purpose of the request is to ascertain Maryland's compliance with the list maintenance requirements of the NVRA and HAVA." Opp. 17 (internal quotation marks omitted). Both are patently insufficient. The basis for a Title III request is a statement as to why the United States believes there is some relevant violation of law. *See Lynd*, 306 F.2d at 229 n.6; *accord Weber*, 2026 WL 118807, at *9 ("The basis is the reasoning provided by the DOJ regarding the evidence behind its investigation of a particular state and specific, articulable facts pointing to the violation of federal law."). Title III cannot itself provide the basis: if the DOJ could cite Title III as a basis for its request under Title III, it would *by definition* satisfy the statute's requirements. This tautology would functionally erase the textual statutory requirement.

As to the purpose, the DOJ must show how the requested records would help it in "investigating violations of individuals' voting rights." *Oregon*, 2026 WL 318402, at *10; *accord Lynd*, 306 F.2d at 229 n.6. As explained in Common Cause Intervenors' opening brief, the DOJ provides no explanation why the full and unredacted Maryland voter file is necessary to investigate the state's compliance with the NVRA and HAVA. MTD 14–16. For one, the state voter file shows a single snapshot in time, so it cannot shed light on whether a state has procedures in place that constitute "reasonable effort" to remove ineligible voters under the NVRA. *See id.* at 15; 52 U.S.C. § 20507(a)(4)(A)–(B). For another, the United States has *never*—in the DOJ's two letters to Defendant DeMarinis preceding this lawsuit, in its Complaint, or even in its filed opposition

brief—alleged any evidence of anomalies or anything inconsistent with reasonable list maintenance efforts that Maryland has conducted. *See* MTD 14–15. In other words, the United States casts no doubt whatsoever on Maryland's compliance with the NVRA and HAVA—two statutes that explicitly leave mechanisms for conducting list maintenance within the discretion of the States. *See* 52 U.S.C. § 20507(a)(4); (c)(1); § 21083(a)(2)(A); § 21085; MTD 15. Further, the United States provides no explanation as to why it needs an *unredacted* version of the state registration list, replete with voters' private information, to investigate Maryland's list maintenance programs, particularly when it has not done so for decades. *See* MTD 16.

The United States' demand for Maryland's unredacted voter file falls well short of satisfying the CRA's basis-and-purpose requirements, meaning dismissal is warranted.

**B.      The DOJ's Stated Basis and Purpose Are Pretextual.**

The DOJ's allegations regarding the basis and purpose of its request are legally insufficient for an additional reason: they do not actually provide "*the* basis and *the* purpose" for the request. 52 U.S.C. § 20703 (emphasis added). *See* MTD 16–19. This Court "is not obliged to accept a contrived statement and purpose," *Weber*, 2026 WL 118807, at *10, particularly when the DOJ's statements are contradicted by a massive body of judicially-noticeable evidence regarding its actual intentions. *See* MTD 6–10, 16–19.

Remarkably, the United States does not specifically contest *any* of the evidence that Common Cause Intervenors included in their opening brief. *See id.* Instead, it claims that only "third-party hearsay" supports the idea that there is anything untoward about its request. Opp. 28. In fact, it is not hearsay, but the DOJ's own actions and statements, that undercut its representations. *Cf.* Fed. R. Evid. 801(d)(2). It is a matter of public record that the DOJ has sued 29 states and the District of Columbia to force the production of complete and unredacted voter

registration lists. *See* Kaylie Martinez-Ochoa, Eileen O'Connor, & Patrick Berry, *Tracker of Justice Department Requests for Voter Information*, Brennan Ctr. for Just. (updated Feb. 6, 2026), https://perma.cc/Q3R9-CQ77 (collecting court filings); Press Release, U.S. Dep't of Just., *Justice Department Sues Five Additional States for Failure to Produce Voter Rolls* (Feb. 26, 2026), https://perma.cc/67UZ-KJFY (reflecting DOJ filing lawsuits in five additional states with materially identical complaints on February 26, 2026); *United States v. Fowler*, 58 F.4th 142, 152 (4th Cir. 2023) ("[T]he most frequent use of judicial notice of ascertainable facts is in noticing the content of court records.") (internal quotation marks omitted). It is the DOJ who admitted in a recent court filing to sharing state voter roll information with election denier advocacy groups for purposes of identifying (non-existent) voter fraud. *See* MTD at 9–10. It was *the Attorney General herself* who wrote the Minnesota Governor tying "Operation Metro Surge," which involves well-documented abuses by United States Immigration and Customs Enforcement against the civilian population in the state with, among other things, Minnesota's refusal to turn over its unredacted voter file. *See id.* at 10. And most recently, it was the President of the United States who announced his desire to "nationalize" elections in certain states: "The Republicans should say, 'We want to take over,'" he said. "We should take over the voting, the voting in at least many—15 places. The Republicans ought to nationalize the voting."[3] None of this is hearsay, and the United States does not have an answer for any of it. The Attorney General's letter and the President's comments are exactly the kind of "significant mismatch" between stated and actual reasons that the Supreme Court has held that courts may not accept. *Dep't of Com. v. New York*, 588 U.S. 752, 755, 785

---

[3] Reid J. Epstein & Nick Corasaniti, *Trump, in an Escalation, Calls for Republicans to 'Nationalize' Elections*, N.Y. TIMES, Feb. 2, 2026,
https://www.nytimes.com/2026/02/02/us/politics/trump-nationalize-elections.html.

(2019) (rejecting agency's "contrived" justification and refusing to "exhibit a naivete from which ordinary citizens are free").

Consequently, federal courts in *Weber* and *Oregon*, considering the same contrived arguments that Plaintiff puts forward in this case, reached the inevitable conclusion: "It appears that the DOJ is on a nationwide quest to gather the sensitive, private information of millions of Americans for use in a centralized federal database." *Weber*, 2026 WL 118807, at *10. The court in *Oregon* found that "[t]he presumption of regularity that has been previously extended to Plaintiff that it could be taken at its word—with little doubt about its intentions and stated purposes—no longer holds." *Oregon*, 2026 WL 318402, at *11. The court noted that despite the United States' "Oregon-specific concerns about voter list maintenance, Plaintiff has in fact requested the same statewide voter registration lists in states across the country." *Id.* The same, of course, is true in Maryland. And specifically in regard to Attorney General Bondi's letter to the Minnesota Governor, the court found that "[t]he context of this demand within a letter about immigration enforcement casts serious doubt as to the true purposes for which Plaintiff is seeking voter registration lists in this and other cases, and what it intends to do with that data." *Id.*[4]

Contra the DOJ's suggestion, this Court plays a vital role under Title III, and it must determine whether the Complaint provides a sufficient—*and truthful*—statement of the basis and the purpose of the United States' request. It does not.

---

[4] While the court in *Oregon* did not explicitly cite President Trump's recent calls to "nationalize" elections, *see supra*, it did also note that Plaintiff's attempt to usurp states' role in election regulations "disturb[s] the framework of federalism envisioned and enshrined in our Constitution." *Oregon*, 2026 WL 318402, at *13.

**III.    The United States Failed to Plead Compliance with Applicable Privacy Laws.**

The United States further asserts that voters' important privacy interests, and federal and state protections of them, pose no barrier to its request for Maryland's unredacted voter file. *See* Opp. 27–30. Plaintiff's claim that it will "strictly abide by . . . statutory limitations" on the use of Marylanders' voter data, *id.* at 25, rings hollow given that the DOJ has already admitted to mishandling sensitive voter data on the part of DOGE actors and election denier third-party groups. *See* MTD 9–10. It is precisely because of these risks that federal and state law impose stringent privacy protections on voter information. The DOJ offers only misleading and inapposite legal authority to evade them.

For example, the DOJ points to two examples of states producing voter registration data, including drivers' license numbers and partial social security numbers. *See* Opp. 22 & n.10 (discussing *United States v. Georgia*, No. 1:06-CV-2442 (N.D. Ga. Oct. 12, 2006), and a memorandum of understanding between the United States and Texas, filed at Dkt. 56-2). However, the DOJ acknowledges that both of these disputes were resolved through mutual agreement very early on in litigation. *See id.* Other states' choices with respect to their voters' information shed no light on the requirements of Maryland law or the DOJ's entitlement to private information under Title III.[5]

The DOJ also asserts that private parties have been given "even more detailed voter data"

---

[5] Indeed, it is worth noting that—regardless of what happened nearly two decades ago—Georgia has similarly refused to turn over the State's unredacted voter file in response to a materially identical demand from DOJ last year. *See* Dkt. 16-1, *United States v. Raffensperger*, No. 1:26-CV-485 (N.D. Ga. Feb. 5, 2026). The United States responded by filing a materially identical suit to its lawsuit against Maryland, and Georgia Secretary of State Brad Raffensperger has recently filed a motion to dismiss that lawsuit, arguing—among other things—that "the CRA does not entitle the DOJ to the [personal identifying information] of Georgia voters because it does not preempt the Georgia statutes that protect that information." *Id.* at 13.

than it requests here, specifically in *Coalition for Open Democracy v. Scanlan*, No. 24-CV-312-SE, 2025 WL 1503937 (D.N.H. May 27, 2025). *See* Opp. 26. *Scanlan* is a challenge to a New Hampshire law requiring proof of citizenship to register to vote, and review of the state voter file was extremely relevant in determining the impact of the challenged law. But *Scanlan* proves Common Cause Intervenors' point. There, the produced voter file did not include sensitive information like social security numbers or driver's license numbers, and it was produced in discovery subject to numerous, severe restrictions—including a scrupulous protective order that designates the file as "highly confidential," restricts its use to the present litigation, restricts viewing to only a tight circle of designated personnel using "air- gapped" computers, and mandates destruction of the data after the case is closed. *See* Protective Order at 4, 13–17, Sched. A at 2–3, *Coal. for Open Democracy v. Scanlan*, No. 24-CV-312 (D.N.H. June 18, 2025), Dkt. Nos. 87 & 87-1. Far from supporting the DOJ, *Scanlan* shows how production of sensitive information, when truly necessary to advance voting rights, should be handled. The United States, in contrast, seeks the complete and unredacted Maryland voter file, with voters' protected personal information included, subject to zero restrictions except its own dubious assurances that it will comply with federal privacy rules—at least insofar as it sees fit.

In its opposition, the United States does nothing to rebut the conclusion that its demand for Marylanders' sensitive voter data is a clear-cut violation of the Privacy Act. Congress passed the Privacy Act because "the right to privacy is a personal and fundamental right protected by the Constitution of the United States" and "the privacy of an individual is directly affected by the collection, maintenance, use, and dissemination of personal information by Federal agencies." Pub. L. No. 93-579, 88 Stat. 1896, § 2 (1974). The statute demonstrated "Congress['s] . . . particular concern with the Government's action in collecting information about citizens' exercise

of their First Amendment rights." *Bassiouni v. F.B.I.*, 436 F.3d 712, 716 (7th Cir. 2006).

Plaintiff's demand for sensitive, private data of every voter in the state is precisely what Congress passed the Privacy Act to prevent. As the court in *Weber* held, the Privacy Act barred DOJ's materially identical request for California's unredacted voter file because "voter registration, participation in elections, as well as party affiliation are all types of political expression protected by the First Amendment." *Weber*, 2026 WL 118807, at *17; *see also generally Fusaro v. Cogan*, 930 F.3d 241, 257 (4th Cir. 2019) (setting out the Supreme Court's "*Anderson-Burdick*" framework for evaluating whether state election laws violate the constitutional right to vote under the First and Fourteenth Amendments).

Just as in *Weber*, "none of the exceptions that would allow for agencies to collect information falling under the First Amendment apply in the present case." 2026 WL 118807, at *17. The Privacy Act's exception for "authorized law enforcement activity" is a high bar to clear. 5 U.S.C. § 552a(e)(7). In particular, it does not apply if the government seeks to "maintain these [materials] for possible future uses," *Becker v. I.R.S.*, 34 F.3d 398, 409 (7th Cir. 1994), or if the materials are in service of a mere "law enforcement *investigation*" as opposed to an "authorized law enforcement *activity*," *J. Roderick MacArthur Found. v. F.B.I.*, 102 F.3d 600, 602 (D.C. Cir. 1996) (emphasis added); *see also generally Garris v. Fed. Bureau of Investigation*, 937 F.3d 1284, 1294 (9th Cir. 2019) (holding law enforcement exception does not apply "if the record is not pertinent to ongoing authorized law enforcement activity"). There is no indication of any such ongoing, authorized law enforcement activity anywhere in the record.

Finally, the United States contends that it is entitled to Maryland's unredacted voter file—despite existing state law protections against the disclosure of that data, *see, e.g.*, Dkt. 50 at 14–18—because "Congress has overridden any state laws that conflict with the CRA" and the CRA

itself "explicitly requires the nondisclosure of records produced to the Attorney General under the Act," Opp. 24. This argument relies on a fundamental misunderstanding of the laws of federal conflict preemption. While Congress has authority to legislate in the elections context, these enactments and their pre-emptive effect extend only "so far as it is exercised, and no farther." *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 9 (2013). "Pre-emption is ordinarily not to be implied absent an actual conflict." *College Loan Corp. v. SLM Corp., a Del. Corp.*, 396 F.3d 588, 598 (4th Cir. 2005) (internal quotation marks omitted). "In assessing whether an actual conflict exists between state and federal law, we resolve the more specific inquiries of whether it is *impossible* to comply with both state and federal law or whether the state law stands as an obstacle to the accomplishment of the full purposes and objectives of federal law." *Anderson v. Sara Lee Corp.*, 508 F.3d 181, 191-92 (4th Cir. 2007) (internal quotation marks omitted) (emphasis added).

The United States' only attempt to clear this high bar is to note that the CRA includes the phrase "all records" in its disclosure provision. Opp. 24 (citing 52 U.S.C. § 20701). But as Common Cause Intervenors noted in their opening brief, *see* MTD 20, the CRA is *silent* as to whether the records at issue may be redacted. Where a state law "authorize[s]" a specific practice, and a federal law "is silent on this point," the state law "does not directly conflict with federal law" and there is no actual conflict. *Badlands Tr. Co. v. First Fin. Fund, Inc.*, 65 Fed. App'x 876, 881 (4th Cir. 2003). Plaintiff's argument is particularly meritless because, as Common Cause Intervenors also discussed in their opening brief, *see* MTD 20–22 (collecting cases), courts have routinely found that redactions are permissible—and indeed sometimes constitutionally required—under the NVRA's public disclosure provision which uses *the same* "all records" language, *see* 52 U.S.C. § 20507(i)(1). Plaintiff does not contest or even acknowledge either the

14

similarities between the NVRA and CRA disclosure provisions, or the cases consistently interpreting the NVRA's provision to permit redaction. It would be incongruous and irrational to permit redaction under the NVRA's public disclosure requirement but prohibit it under the CRA's when both use the same language.

If anything, it is in fact Plaintiff's mistaken interpretation of the CRA—that it somehow compels Maryland to turn over unredacted sensitive personal information of every voter in the state—that conflicts with multiple federal laws. Plaintiff's interpretation of the CRA engineers a conflict with the NVRA. As noted above, Plaintiff's interpretation of the CRA conflicts with the Privacy Act, which protects voters' personal information related to core First Amendment activities like political participation. And as Common Cause Intervenors argued in their opening brief, *see* MTD 20–21, Plaintiff's interpretation of the CRA likely conflicts with the constitutional right to vote, as the Fourth Circuit has held that redaction under the NVRA is affirmatively required to the extent disclosure of sensitive material would "create[] an intolerable burden on [the constitutional right to vote] as protected by the First and Fourteenth Amendments." *Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331, 339 (4th Cir. 2012) (quotation marks and citation omitted).

**CONCLUSION**

For the reasons stated above, this Court should grant this motion and dismiss the Complaint.

Dated: February 27, 2026                          Respectfully submitted,

/s/ Theresa J. Lee            .

15

Jonathan Topaz*
Theresa J. Lee*
Sophia Lin Lakin*
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
Tel.: (212) 549-2500
jtopaz@aclu.org
tlee@aclu.org
slakin@aclu.org

Deborah A. Jeon (Bar No. 06905)
Dara Johnson (Bar No. 31478)
AMERICAN CIVIL LIBERTIES UNION OF MARYLAND
3600 Clipper Mill Road
Suite 200
Baltimore, MD 21211
Tel. 410-889-8555
jeon@aclu-md.org
djohnson@aclu-md.org

*admitted pro hac vice*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 27, 2026, a true and correct copy of the foregoing document was served via the Court's ECF system on all counsel of record and by email on counsel for the United States and Defendant DeMarinis.

<u>/s/ Theresa J. Lee</u>
Theresa J. Lee
